## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MARIA ALEJANDRA CELIMEN SAVINO, JULIO CESAR MEDEIROS NEVES, and all those similarly situated,

           Petitioners-Plaintiffs,

    v.

THOMAS HODGSON, Bristol County Sheriff in his Official Capacity; STEVEN J. SOUZA, Superintendent Bristol County House of Corrections in his Official Capacity; TODD LYONS, Boston Field Office, Acting Director, Immigrations and Customs Enforcement in his Official Capacity;
CHAD F. WOLF, Acting Secretary, Department of Homeland Security, in his Official Capacity; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director for U.S. Immigration and Customs Enforcement, in his Official Capacity; and U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

           Respondents-Defendants.

Civil Action No.

**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. 2241 AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.    This case presents a request for immediate relief on behalf of a putative class of highly vulnerable Petitioner-Plaintiffs ("Plaintiffs") – civil immigration detainees held by Respondents-Defendants ("Defendants") at the Bristol County House of Corrections and C. Carlos Carreiro Immigration Detention Center ("Carreiro") in North Dartmouth, Massachusetts (hereinafter collectively "Bristol County Immigration Detention Facilities") – who are at imminent risk of contracting COVID-19, the lethal virus that is sweeping the globe and that feeds on precisely the unsafe, congregate conditions in which Plaintiffs are being held.

2.      The coronavirus that causes COVID-19 infection – and death – has produced an unprecedented global pandemic. In only a few months, 529,093 people worldwide have been diagnosed with COVID-19 and more than 23,956 have died.[1]  The virus is highly contagious and lethal. By the time this Court reads this complaint, there will be more diagnoses, and more death, with no end in sight.

3.      Despite repeated pleas from Plaintiffs and community advocates, and despite clear evidence that the dangerous conditions in the Bristol County Immigration Detention Facilities where Plaintiffs are confined will imminently result in the uncontrolled spread of COVID-19 and the likely death of many detainees including Plaintiffs, Defendants have continued to confine detainees in close proximity, without adequate soap, toilet paper, and other daily necessities; admit new detainees without COVID-19 testing or screening; deny access to testing and medical care for Plaintiffs and other detainees; and refuse to release even the most vulnerable detainees with medical conditions that heighten their risk for infection, sickness, and death.

4.      These actions by Defendants are the result of two egregious errors: Defendants' flawed policies and decision-making surrounding COVID-19; and the conditions and structure of immigration detention and confinement at Bristol County Immigration Detention Facilities.

5.      Plaintiffs are subject to imminent infection, illness, and death because of their civil immigration detention – literally trapped, with no safe alternative available to them. Facility staff have rebuffed their inquiries about COVID-19 risks and precautions. Their confinement conditions and detention treatment have created a dangerous and hazardous situation that imminently threatens their lives, as well as the well-being of guards and others in the surrounding community, and the

---

[1] John Hopkins University, Coronavirus Resource Center (March 26, 2020), https://coronavirus.jhu.edu/map.html; World Health Organization, *Coronavirus Disease 2019 (COVID-19) Situation Report* (Mar. 26, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200326-sitrep-66-covid-19.pdf?sfvrsn=81b94c61_2.

general public. Immediate relief is necessary before the coronavirus ignites the tinderbox that is BCHOC and irreversible damage is done.

6.      As putative class members have repeatedly expressed in pleas for help to Defendants, they are afraid for their lives. The only known effective measures to reduce the risk of COVID-19 are social distancing and hygiene.  Yet "social distancing" is a meaningless term in BCHOC, where detainees are in constant close contact with each other and with Bristol County Immigration Detention Facilities staff. Hygiene is similarly unavailable and unavailing under the conditions at Bristol County Immigration Detention Facilities.

7.      Plaintiffs are not being detained pursuant to a conviction. Rather, they are in civil detention awaiting the completion of immigration proceedings.  Immigration and Customs Enforcement ("ICE") has significant discretion to release immigration detainees, *see* 8 U.S.C. 1226(a), and has a long-standing practice of releasing for humanitarian reasons even those whose detention has been mandated under particular immigration detention statutes, *see* 8 U.S.C. 1182(d)(5); 1225(b); 1226(c).  ICE regularly uses alternatives to detention to maintain custody and control over non-citizens in immigration proceedings, such as supervised release, electronic ankle monitors, home confinement, and telephonic monitoring.

8.      The risks and consequences of COVID-19 cannot be understated. In the United States alone, 83,507 cases of infection have been reported and 1,201 people have died.[2]

9.      The disease itself does not discriminate between the old and young. People of all ages, with and without preexisting conditions, have died.

---

[2] John Hopkins University, Coronavirus Resource Center (March 26, 2020), https://coronavirus.jhu.edu/map.html; World Heath Organization, *Coronavirus Disease 2019 (COVID-19) Situation Report* tbl. 1 (Mar. 26, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200326-sitrep-66-covid-19.pdf?sfvrsn=81b94c61_2.

10.     At the time of this filing there were 2,417 reported cases in Massachusetts[3] including persons confined or working in correctional institutions.

11.     At the time of this filing there were 1,012 reported cases in Connecticut.[4] Many immigration detainees are brought to BCHOC from Connecticut.

12.     There is no vaccine against COVID-19.

13.     There is no known cure for COVID-19.

14.     No one and no place is immune from COVID-19 infection, illness, and death.

15.     The Centers for Disease Control and Prevention ("CDC") reports that "[t]he best way to prevent illness is to avoid being exposed to this virus." The CDC advises that COVID-19 is thought to spread mainly from person-to-person, between people who are in close contact with one another (within about 6 feet), and through respiratory droplets produced when someone speaks, coughs, or sneezes, including the touch of shared surfaces.[5]

16.     States have taken extraordinary and unprecedented measures to ensure that residents practice "social distancing" in order to halt the spread of COVID-19. On March 23, 2020, Massachusetts Governor Charlie Baker ordered the closure of all non-essential businesses and advised residents to shelter in place.

17.     The projections for those who contract the virus and those who succumb to the illness are startling and grave. The CDC has suggested that between 160 million and 210 million Americans could contract the disease. Based on mortality data and current hospital capacity, the number of deaths under the CDC's estimates range from 200,000 to as many as 1.7 million. The

---

[3] State of Massachusetts, *COVID-19 Cases, Quarantine, and Monitoring* (Mar. 26, 2020), https://www.mass.gov/info-details/covid-19-cases-quarantine-and-monitoring.
[4] State of Connecticut, *COVID-19 Update March 26, 2020* (Mar. 26, 2020), https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary3262020.pdf?la=en.
[5] World Health Organization, Rolling updates on coronavirus disease (COVID-19) (Updated Mar. 20, 2020) https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen. 4 As of March 21, 2020 at 7:06 p.m. EST. See COVID-19 CORONAVIRUS PANDEMIC, WORLDOMETER (Mar. 21, 2020), https://www.worldometers.info/coronavirus/. 5 Id. 6 As of March 21, 2020 at 3:10p.m. EST.

CDC projects that as many as 21 million people might need hospitalization, a daunting figure in a nation with just about 925,000 hospital beds.

18.     Recognizing the urgency of present circumstances, judges, prosecutors and correctional authorities across the country have been ordering releases to protect individuals and the public health. Such releases not only protect the people with the greatest vulnerability to serious illness and death from COVID-19 from transmission of the virus, they also contribute to greater risk mitigation for all people in custody or working in a prison, jail, or detention center, and reduce the burden on the surrounding region's limited hospitals and health care infrastructure, as they lessen the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.[6]

19.     Law enforcement and jail officials in Los Angeles, Oakland, New Jersey, New York City, Cleveland, Nashville, Houston, San Antonio, Charlotte, and numerous other jurisdictions are releasing thousands of individuals - both civil detainees and, in many cases, people serving sentences for criminal convictions or pre-trial detainees, because of the threat COVID-19 poses inside jails.

20.     Several recent court rulings have explained the health risks—to inmates, guards, and the outside community at large—created by large prison populations. See, e.g., *Jimenez v. Wolf*, No. 18-10225-MLW (D. Mass. Mar. 26, 2020) (ordering release of immigrant detainee in the midst of the COVID-19 pandemic and noting that "being in a jail enhances risk" and that in jail "social distancing is difficult or impossible"); *United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (ordering the release of inmate in Federal Bureau of Prisons custody due, in part, to risk posed by COVID-19 in the facility); *In the Matter of the Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055, 2020 WL 1307109, at *1 (N. D. Cal. March 19, 2020) (ordering change to conditions of bail for an individual to postpone incarceration, in part in light of

---

[6] There are only four hospitals located in the entirety of Bristol County.

risk of vulnerability to the coronavirus) *United States v. Barkman*, No. 3:19-cr-0052-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020). On March 22 the New Jersey Supreme Court issued a consent order for the presumptive release of approximately 1,000 persons by March 26.

21.    Despite the directives from the CDC, the extraordinary measures being taken by government officials to ensure social distancing, and the lack of adequate medical and cleaning supplies, Defendants have failed to protect one of the most vulnerable populations: civil immigration detainees.

22.    Defendants' response to the threats the pandemic poses to immigrants has been abysmal and haphazard. Following public outcry, on March 17, 2020, ICE issued a statement that it would modify its enforcement efforts in apparent recognition of the need for alternatives to detention to protect public health.

23.    The next day, however, in response to a lawsuit for the release of vulnerable ICE detainees in Washington state, the agency again demonstrated its failure to appreciate the threats the COVID-19 pandemic presents, stating that "Plaintiffs' assertion that detention *per se* poses an increased risk of health complications or death from COVID-19 is purely speculative."[7] ICE's head-in-the-sand response to the threats of this pandemic will prove deadly to immigrant detainees if it is not remedied through this Court's intervention.

24.    On March 19, 2020, two medical subject matter experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties blew the whistle to Congress, writing "regarding the need to implement immediate social distancing to reduce the likelihood of exposure to detainees, facility personnel, and the general public, ***it is essential to consider releasing all***

---

[7] Respondents—Defendants' Opposition at 8, Dawson v. Asher, ECF No. 28, Case No. 20-0409 (W.D. Wash. Mar. 18, 2020).

***detainees who do not pose an immediate risk to public safety.***"[8] On multiple occasions since at least February 25, 2020, these experts had sounded the alarm within the agency on the imminent risks to the health of immigrant detainees and the public at large presented by COVID-19 unless swift mitigation measures, including decreasing the number of immigrant detainees, are taken.

25.      Instead, Defendant Hodgson, the Sheriff of Bristol County, issued a statement on March 19, 2020 noting that although 80% of the individuals detained at BCHOC are immunocompromised, and thus particularly vulnerable to exposure to COVID-19, he refused to take *any* measures to release anyone from custody.

26.      Inside Bristol County Immigration Detention Facilities, Defendants are not consistently taking even the less aggressive precautionary measures the Department of Homeland Security ("DHS") claims it is taking. To take one critical example, Defendants are introducing daily new detainees in with the general population without any mandatory quarantine period.

27.      This echoes a concern of the two DHS medical experts, who say that "the track record of ICE facilities implementing [early screening, testing, isolation and quarantine] protocols historically has been inconsistent." Moreover even if ICE was consistently taking these precautions, the DHS experts have explained that they "won't be enough" without rapidly "releas[ing] those who do not pose an immediate danger to public safety." Defendants stubbornly refuse to heed the advice of public health experts, including their own.

28.      No "social distancing" has taken place in Defendants' facilities – and it cannot. Plaintiffs are unaware of any meaningful safety measures enacted by Defendants since the inception of this crisis.

---

[8] Letter from Scott A. Allen, MD and Josiah Rich, MD, MPH to Congressional Committee Chairpersons, dated Mar. 19, 2020, available at https://assets.documentcloud.org/documents/6816336/032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.pdf (emphasis in original).

29.     Currently, there are approximately 57 immigration detainees at BCHOC in Unit B, and an unknown additional number of immigration detainees in Correira. All of them are at imminent risk. Their confinement conditions are a tinderbox, that once sparked will engulf the facility.

30.     The inevitable viral spread in confined and crowded areas has already been evidenced by the rapid spread of COVID-19 in nursing homes and cruise ships. Detention facilities pose the same risk.  "'It's a vulnerable situation,' John Sandweg, an acting head of ICE during the Obama administration, told CBS News. 'You have the exact situation everyone is cautioning against. You have a bunch of people contained in a very small environment.'…'[c]an you imagine if you get an outbreak in these detention facilities? It's going to spread like wildfire,' Sandweg added. "[9]

31.     Plaintiffs, who are not subject to any form of punitive detention, are at risk because of Defendants' flawed choices and the conditions in Bristol County Immigration Detention Facilities. Their failure to follow public health guidance endangers the lives of those Defendants have chosen to detain. Inevitably, one detainee will contract COVID-19, and its spread throughout the facility will be impossible to contain. The only way to effectively inhibit the spread of COVID-19 and to protect Plaintiffs and others is to immediately release Plaintiffs, such that they can actually adhere to guidance from public health authorities and take the steps recommended by the government and medical professionals, and bar future immigrant admissions to the dangerous conditions at The only way to effectively inhibit the spread of COVID-19 and to protect Plaintiffs and others is to immediately release Plaintiffs, such that they can actually adhere to guidance from public health authorities and take the steps recommended by the government and medical

---

[9] Camilo Montoya-Galvez, *"Powder Kegs": Calls Grow for ICE to Release Immigrants to Avoid Coronavirus Outbreak*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-ice-release-immigrants-detention-outbreak.

professionals, and bar future immigrant admissions to the dangerous conditions at Bristol County Immigration Detention Facilities.

32.     Defendants cannot justify continuing to subject Plaintiffs to extraordinary risk of illness and death with any legitimate government objective, particularly in light of the alternatives available to them to maintain custody and control over Plaintiffs. The danger posed by Plaintiffs' detention during the current outbreak of COVID-19 is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk" and violates their constitutional right to safety in government custody. *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Plaintiffs bring this action on behalf of themselves and all other immigration detainees at Bristol County Immigration Detention Facilities, to remedy grave violations of their constitutional rights that imminently threaten them with serious illness and death.

33.     Unless this Court intervenes to order the release of the Plaintiffs, they, along with many other detained individuals and outside communities, will face dramatically increased chances of contracting COVID-19, becoming seriously ill, and dying.

## PARTIES

34.     Petitioner-Plaintiff MARIA ALEJANDRA CELIMEN SAVINO is an immigration detainee in Correira. Ms. Celimen Savino suffers from asthma, a condition for which she has been previously hospitalized. She is at high risk for severe illness, exacerbated by the imminent risk of exposure to COVID-19 and the lack of safety precautions taken by Bristol County Officials or ICE.

35.     Petitioner-Plaintiff JULIO CESAR MEDEIROS NEVES is a Brazilian national and immigration detainee in BCHOC. Mr. Medeiros Neves suffers from extreme depression and anxiety which has been exacerbated by the imminent risk of exposure to COVID-19 and the lack of safety precautions taken by BCHOC or ICE. He is one of the signatories to repeated pleas to ameliorate the situation made to Defendants by persons confined in Unit B.

36.     Respondent-Defendant THOMAS HODGSON is named in his official capacity as Sheriff of Bristol County where he maintains supervision and control over Bristol County Immigration Detention Facilities which detains named Plaintiffs and other civil immigration detainees.

37.     Respondent-Defendant STEVEN J. SOUZA is sued in his official capacity as the Superintendent of Bristol County House of Corrections. He has custody of Plaintiffs because ICE contracts with Bristol County House of Corrections to house immigration detainees, including Plaintiffs.

38.     Respondent-Defendant TODD LYONS is sued in his official capacity as the acting Boston Field Office Director for U.S. Immigration and Customs Enforcement. He has responsibility for and authority over the detention and removal of noncitizens within the Boston Region, which includes Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

39.     Respondent-Defendant CHAD WOLF is named in his official capacity as the acting Secretary of the U.S. Department of Homeland Security. Defendant Wolf is responsible for enforcing federal laws concerning, for example, border control and immigration, including the INA provisions at issue in this case. Defendant Wolf has direct authority over ICE, which is responsible for the civil detention of immigrants in the United States.

40.     Respondent-Defendant MATTHEW T. ALBENCE is named in his official capacity as the acting Deputy Director and Senior Official Performing Duties of the Director for ICE. Defendant Albence oversees civil detention of immigrants in the United States.

## **VENUE**

41.     Venue in the District Court for the District of Massachusetts is proper under 28 U.S.C. § 1391(b) because Respondent-Defendant Hodgson resides in this District, Petitioners-Plaintiffs are detained in this District, and this District is the site of the injury at issue.

## JURISDICTION

42.     Defendant-Respondent Hodgson and all Plaintiffs reside within the jurisdiction of this Court.

43.     This case arises under the Fifth Amendment to the United States Constitution and the Rehabilitation Act, 29 U.S.C. § 794(a).

44.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 2201-02, and § 2241, and Article 1, Section 9, clause 2 of the United States Constitution.

45.     The United States has waived sovereign immunity for this action for declaratory and injunctive relief against one of its agencies and that agency's officers are sued in their official capacities.  See 5 U.S.C. § 702.

## FACTS

### The COVID-19 Pandemic is Spreading Quickly and
### Poses Grave Risk of Serious Illness and Death

46.     The outbreak of COVID-19 has reached pandemic status.

47.     COVID-19 is easily transmitted and the numbers of confirmed cases and deaths are expected to grow exponentially.

48.     All human beings share an equal risk of contracting and, upon contraction, transmitting the virus that causes COVID-19. Any adult who contracts the virus may experience life-threatening symptoms and death.

49.     New information regarding COVID-19 risk factors is released daily by public health authorities. Beyond the extreme risks to all, the categories of individuals who may have conditions or characteristics that predispose them to complications from COVID-19 are growing – and not fully identified by medical experts.

50.     The COVID-19 virus can severely damage lung tissue, which requires an extensive period of hospitalization and rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.  More is learned each passing day about the extent of permanent injury that may be caused by COVID-19.

51.     COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

52.     People of all ages and medical backgrounds who have experienced serious cases of COVID-19 describe painful symptoms, including vomiting, severe diarrhea, relentless shivering, and suffocating shortness of breath.

53.     Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.

54.     These complications can manifest at an alarming pace. Individuals can show the first symptoms of COVID-19 infection in as little as two days after exposure, and their condition can seriously deteriorate in five days or sooner.

55.     People can also spread COVID-19 but be asymptomatic making testing or seclusion of only those who are symptomatic an ineffective solution.

56.     Most people who develop serious illness will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, even in non-detention settings, and an entire team of dedicated medical care providers.

57.     People who experience serious cases of COVID-19 who do not die should expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity.

58.     There is no vaccine against COVID-19, nor is there any known medication to prevent or treat infection. The only known effective measures to reduce the risk for vulnerable people from illness, injury or death from COVID-19 are to prevent them from being infected in the first place, and to limit community spread. Social distancing or remaining physically separated from known or potentially infected individuals, and vigilant sanitation and hygiene, including repeatedly and thoroughly hand washing with soap and water, are the only known effective measures for protecting people from COVID-19

59.     Nationally, projections by the CDC indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention with as many as 1.5 million deaths in the most severe projections.

60.     In recent days, the number of reported cases of infection in many parts of the country, including the Boston metropolitan area, have shown a frightening and exponential increase, and numerous media outlets and public officials estimate that the reported number of deaths could soon follow suit.

### People Detained at Bristol County House of Corrections are at an Elevated Risk of COVID-19 Transmission, Infection and Illness.

61.     Bristol County Immigration Detention Facilities confine civil immigration detainees in BCHOC Unit B, and the Correira.

62.     Currently there are approximately 57 detainees held on civil immigration violations in Unit B, and an additional unknown number of civil immigration detainees in Correira.

63.     As Plaintiff Medeiros Neves and numerous other BCHOC Unit B detainees wrote to Defendant Hodgson and others in a March 18, 2020 letter (See Exhibit A), the most recent detainee was admitted on March 17, 2020 – well within the time when Defendants and the general public were well aware of the rapid spread of COVID-19.

64.     As Plaintiff Medeiros Neves and other detainees also pointed out in their March 18, 2020 plea for help, a note was posted in Unit B by Defendant Hodgson's office explicitly stating that "…Given the close quarters and need for daily contact, our correctional facilities and jail are extremely vulnerable for residents, staff, volunteers and visitors to be infected." *Id.* This concession is unsurprising given the grim realities of BCHOC.

65.     In institutional settings with close quarters such as BCHOC, people are at imminent risk of severe COVID-19 infection, illness and death. Immigration detention facilities are "congregate environments," places where people live and sleep in close proximity.

66.     Infectious diseases that are communicated by air or touch are more likely to spread in these confined settings and crowded environments. This presents an imminent danger for the spread of COVID-19 to Plaintiffs.

67.     The conditions of immigration detention facilities pose a heightened public health risk for the spread of COVID-19 that is even greater than non-carceral institutions. Immigration detention facilities have even greater risk of infectious spread because of overcrowding, the high proportion of vulnerable people detained, limited access to hygiene products, and scant medical resources. People live in close quarters and cannot achieve the social distancing needed to effectively prevent the spread of COVID-19. Plaintiffs will find it impossible to maintain the recommended distance of 6 feet from others. They must also share or touch objects used by others.

68.     As Petitioner-Plaintiff Medeiro Neves and other civil detainees detailed in the March 23 letter (See Attached Exhibit B):

a.      Beds in the facility where detainees sleep are situated only 3 feet apart.

b.      Meals are inadequate and eaten in close quarters.

c.      Symptomatic guards have entered the premises and interacted with detainees.

69.     On information and belief, no meaningful changes to the hygienic or sanitary policies, products or facilities have been made since the March 23 letter.

70.     On information and belief, BCHOC facilities lack adequate soap, toilet paper, and medical resources and infrastructure to address the spread of infectious disease or to treat people most vulnerable to illness.

71.     Detention centers are integral components of the public health systems in the communities in which they are located. If detainees contract COVID-19 in such a facility, they will require hospitalization in the community threatening to overwhelm local resources. This problem is particularly acute in smaller communities, such as North Dartmouth, Massachusetts, where the Bristol County detention facility is located. Surrounding communities will be unable to provide adequate medical treatment to infected persons.

72.     Moreover, as a result of profound stress and helplessness, immigrant detainees are at risk of having suppressed immune systems putting them at higher risk than the general population of contracting and potentially having more serious infections. Stress and its link to immunosuppression are well documented in the medical literature.

73.     The physical and mental health and well-being of detained immigrants, independent of age or underlying conditions, is worsened and severely harmed by continued immigration detention during the COVID-19 pandemic. All immigrant detainees are at high risk of developing severe, disabling psychological symptoms and distress as a result of their continued immigration detention during the COVID-19 pandemic.

74.     Individuals with underlying mental health conditions are at a high risk of harm from coronavirus. Individuals suffering from mental health conditions including depression, anxiety, schizophrenia and posttraumatic stress disorder (PTSD) are at particularly high risk of worsening of their symptoms as a result of being detained amid the coronavirus pandemic.

75.     For instance, Harlan Perez is an immigration detainee in Unit B at BCHOC who suffers from schizophrenia, anxiety and depression. *See Perez v. Souza*, No. 1:20-cv-10414-PBS (D.Mass.), ECF No. 1 at ¶ 2. Such exacerbation of psychological symptoms can result in severe harm. For example, individuals with depression are at increased risk of suicidality.

### ICE's Responses to COVID-19 and Its Inadequate Healthcare System Will Not Protect Plaintiffs

76.     ICE issued an "Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)" and has established a webpage entitled "ICE Guidance on COVID- 19." These documents (collectively the "ICE Protocols") will not protect Plaintiffs. The protocols also do not address: imminent shortages of medical supplies and staffing or education of detained people and staff about the virus, amongst other critical issues.

77.     Further, there is substantial evidence that ICE's COVID-19 protocols are not being followed in detention centers throughout the country, including Bristol County Immigration Detention Facilities, and that ICE is otherwise failing to provide an adequate response, which exacerbates the risk of harm to Plaintiffs.

78.     Evidence further establishes that these serious defects are far from anomalous, but rather systemic in nature. Indeed, the attached declarations paint an alarming picture of ICE's inadequate responses to COVID-19 across the entire country, including failures to: test for COVID-19, provide basic and necessary sanitation supplies such as hand sanitizer, check symptoms, provide necessary education about COVID-19 to detained people and staff,  provide people with protective gear (e.g., masks), increase medical staffing, respond to sick calls, and assess medically vulnerable detained people and increase precautionary measures. As a direct consequence, medically vulnerable people feel like they are "sitting ducks" and are "scared for [their] life.".

79.     Importantly, the COVID-19 pandemic—and ICE's unreasonable response to it—will significantly strain ICE's already broken medical care system. Long before the COVID-19 outbreak, numerous reports (including by DHS itself) have identified serious and substantial flaws in ICE's medical care system. For example, a 2017 OIG report that assessed care at certain ICE facilities identified "long waits for the provision of medical care[.]"[10] Other reports echo these alarming findings about substandard medical care in ICE facilities.[11]

---

[10] Off. of Inspector Gen., Off. of Homeland Sec., OIG-18-32: Concerns About ICE Detainee Treatment and Care at Detention Facilities, at 7 (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

[11] See, e.g., U.S. Gov't Accountability Off. GAO-16-23: Additional Actions Needed to Strengthen Mgmt. and Oversight of Detainee Med. Care (Feb. 2016), https://www.gao.gov/assets/680/675484.pdf; Human Rts. Watch, Am. Civil Liberties Union, Nat'l Immigr. Just. Ctr. & Det. Watch Network, Code Red: The Fatal Consequences of Dangerously Substandard Med. Care in Immigr. Det, at 15, 19, 25, 46 (June 2018), https://www.hrw.org/sites/default/files/report_pdf/us0618_immigration_web2.pdf; Human Rts. First, Prisons and Punishment: Immigr. Det. in Cal., at 10-13 (Jan. 2019), https://www.humanrightsfirst.org/sites/default/files/Prisons_and_Punishment.pdf; J. David McSwane, ICE Has Repeatedly Failed to Contain Contagious Diseases, Our Analysis Shows. It's a Danger to the Pub., PROPUBLICA (Mar. 20, 2020), available at https://www.propublica.org/article/ice-has-repeatedly-failed-tocontain-

**The Only Way to Reduce the Risk of A COVID-19 Outbreak at BCHOC is to Immediately Reduce the Population at the Facility by Release.**

80.     Risk mitigation is the only known strategy that can protect people from COVID-19, and Defendants through actions and statements have demonstrated that they are unwilling and unable to implement meaningful risk mitigation measures. Accordingly, public health experts with experience in immigration detention and correctional settings have recommended that detention centers immediately reduce their populations.

81.     Furthermore, the routine practice of transferring immigrant detainees from one facility to another, throughout the nationwide immigration detention network, makes the likelihood of COVID-19 spread and infection even more likely. Given such conditions and practices, one would be hard-pressed to think of a more effective means for the spread of COVID-19 infection than immigration detention.

82.     Plans for separating suspected COVID-19 exposed or infected individuals within a given facility or by transferring to specialized quarantine facilities is neither effective nor feasible as a response to the threat of infection or infectious spread within a detention facility.

83.     As per CDC guidelines, when individuals become symptomatic and considered "at risk" of being infected with/contagious to others for COVID-19, they are supposed to self-isolate, not isolate within groups. Putting individuals with symptoms in a group-like isolation setting risks to those who were not infected with COVID-19, despite having similar symptoms to those who may be infected. In other words, for individuals who did not have COVID-19 before being placed in be infected. In other words, for individuals who did not have COVID-19 before being placed in group

---

contagious-diseases-our-analysis-shows-its-a-danger-to-the-public (analysis of DDRs demonstrates that ICE facilities have "long histories of mishandling infectious diseases that can rapidly spread outside their walls.").

isolation, many may contract COVID-19. This is exacerbated by substantial and increasing limitations on access to testing, even for those who have symptoms of COVID-19, because of a major shortage of testing materials. It would be unlikely that in these immigration detention facilities, all who are symptomatic could be tested prior to any form of group isolation.

### Class Action and Representative Habeas Allegations

84.     Respondent-Defendants have continued to hold and admit civil immigration detainees to BCHOC despite the warnings of the CDC and medical community and despite their inability to manage an outbreak if one were to occur.

85.     All individuals in BCHOC and Carreiro are subject to this same disregard for health and safety and are subject to the same policies of confinement and hygiene.

86.     Petitioner-Plaintiffs Celimen Savino and Medeiro Neves seek certification of a class under Federal Rule of Civil Procedure 23, to challenge Defendants' detention of civil ICE detainees at BCHOC during the current COVID-19 pandemic, or in the alternative certification of the proposed class as a representative habeas class. *See United States ex rel. Sero v. Preiser*, 506 F.2d 1115 (2d Cir. 1974)

87.     Plaintiffs Celimen Savino and Medeiro Neves seek certification of a class consisting of all individuals who are now or will be held in civil immigration detention in BCHOC. -Plaintiffs satisfy all of the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as those of Rule 23(b)(2).

88.     **Numerosity -** The proposed representative class is sufficiently numerous as to make joinder impracticable.  The numerosity requirement imposes only a "low threshold," *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009), such that "a class size of forty or more will generally suffice in the First Circuit." *Reid v. Donelan*, 297 F.R.D. at 189.  There are substantially more than forty civil immigration detainees currently being held at BCHOC.

89.     **Commonality -** The proposed representative class presents common questions of law and fact, including (1) whether civil detention in a manner likely to result in the life-threatening infection of detainees violates constitutional protections; and (2) whether in the face of the COVID-19 pandemic, the conditions of confinement at BCHOC fail to ensure the detainees' safety and health in a manner that amounts to punishment.

90.     **Typicality -** Plaintiffs Celimen Savino and Medeiro Neves' claims are typical of the representative class they seek to represent. Like all class members, both Ms. Celimen Savino and Mr. Medeiro Neves are currently (1) civilly detained in immigration detention in Bristol County Immigration Detention Facilities; (2) subject to the close confinement and lack of hygiene that characterize immigration detention at Bristol County Immigration Detention Facilities and; (3) subject to infection, illness, and death from COVID-19 were it to spread.

91.     **Adequacy -** Petitioner-Plaintiffs are able to fairly and adequately protect the interests of the proposed representative class. Undersigned counsel at Lawyers for Civil Rights and the Jerome N. Frank Legal Services Organization at Yale Law School have extensive experience litigating complex civil rights matters, immigration cases, and class action lawsuits.

92.     Defendants have acted or refused to act on grounds that apply generally to the class. Moreover, because members of the proposed representative class all seek the same relief, this relief is appropriate respecting the class as a whole to ensure that members of the proposed are given consistent relief and to satisfy the health and safety standards at the core of their challenge.

93.     Plaintiffs and members of the proposed class seek a *writ of habeas* corpus to remedy their unconstitutional detention in life-threatening conditions at Bristol County Immigration Detention Facilities.

## STATEMENT OF RELATED CASE

94.     Petitioners Celimen Savino and Medeiro Neves state that, pursuant to Local

Rule 40.1(g), this Petition for a Writ of Habeas Corpus and Complaint for Declaratory and

Injunctive Relief is related to *Reid v. Donelan*, No. 3:13-cv-30125-PBS (D. Mass.) and *Brito v.*

*Barr*, No. 1:19-cv-11314-PBS (D. Mass.).

95.     Per Local Rule 40.1(g)(1), "some or all of the parties are the same." The

Director of the Boston Field Office of Immigration and Customs Enforcement and the

current Bristol County Sheriff, Thomas M. Hodgson, are defendants in *Reid* and in the present

petition, and the Superintendent of BCHOC Souza, the Secretary of DHS, and the Director of

ICE are defendants in *Brito*.

96.     Additionally, this case involves "the same or similar claims or defenses," Local

Rule 40.1(g), as those at issue in *Reid* and *Brito*, including allegations that the incarceration of

civil immigration detainees in Massachusetts violates the Fifth Amendment.

97.     In addition, some members of the *Brito* and *Reid* classes, and persons who will

vest into the *Reid* class when their detention lasts six months, are detained now at BCHOC,

and as such are members of the proposed class herein as well.

## CLAIMS FOR RELIEF

### Count I (Violation of Fifth Amendment Right to Due Process--Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement as to All Defendants)

98.     Plaintiffs reallege and incorporate by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

99.     The Fifth Amendment to the U.S. Constitution guarantees that civil detainees,

including all immigrant detainees, may not be subjected to punishment. The government violates

this substantive due process right when it subjects civil detainees to treatment and conditions of

confinement that amount to punishment or does not ensure the detainees' safety and health.

100.     Defendants have subjected Plaintiffs to conditions of confinement that include the imminent risk of contracting COVID-19, for which there is no vaccine, known treatment, or cure.

101.     Defendants are subjecting Plaintiffs to imminent risk of physical, emotional and mental harm in violation of Plaintiffs' rights under the Due Process Clause.

102.     Defendants continue to admit new ICE detainees to Bristol County Immigration Detention Facilities, in reckless disregard of and deliberate indifference to the dangerous conditions there and the inability of Bristol County Immigration Detention Facilities to provide minimal protection against COVID-19.

103.     As public health experts in correctional medical care and infectious disease agree, individuals and families in immigration detention are at grave risk of COVID-19 infection.

104.     Alternatives are available that would preserve and protect both Plaintiffs' health and well-being and that of the broader community.  Release either on personal recognizance or subject to monitoring or supervision would cause no burden on Defendants and would place Plaintiffs at substantially lower risk of contracting COVID-19, with all of its attendant threats to health and life.

105.     Accordingly, Defendants are subjecting Plaintiffs to detention conditions that amount to punishment and that fail to ensure their safety and health.

### Count II (Violation of the Rehabilitation Act – Failure to Provide Reasonable Accommodation to Persons with Disabilities)

106.     Section 504 of the Rehabilitation Act requires federal agencies to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

107.     DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30; see also 29 U.S.C. § 794(a).

108.     The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

109.     The removal proceedings are a benefit or program administered by DHS and Plaintiffs are entitled to participate in the removal process. The services, programs, and activities within the detention centers where DHS detains Plaintiffs receive substantial federal financial assistance.

110.     Plaintiffs' underlying medical conditions, and those of other members of the proposed class of all immigration detainees who are or will be held at Bristol County Immigration Detention Facilities, qualify as disabilities for purposes of the Rehabilitation Act. 29 U.S.C. § 705(2)(B); 42 U.S.C. § 12102.

111.     By exposing them to a heightened risk of contracting COVID-19, Defendants are preventing Plaintiffs from participating in the removal process by reason of their disability.

112.     By failing to take account of their special vulnerability to severe illness or death if they were to contract COVID-19, Defendants are preventing Plaintiffs from participating in the removal process by reason of their disability.

113.     By failing to provide Plaintiffs adequate protection from COVID-19 through the only effective means to reduce the risk of severe illness or death, Defendants have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of removal proceedings and the services, programs, and activities within the detention centers with respect to Plaintiffs.

114.     The only available "reasonable accommodation" that would mitigate Plaintiffs'

disability is release from detention. Defendants have failed to implement this reasonable

accommodation, which would not be unduly burdensome nor require a fundamental alteration in

the removal process or the programs and activities of the detention center.

115.     Defendants' ongoing detention of Plaintiffs constitutes discrimination because it is

either disparate treatment of, or at the very least has a disparate impact on, people with qualifying

disabilities who are at severe risk of serious illness or death if they were to contract COVID-19.

116.     For these reasons, Defendants' ongoing detention of Plaintiffs violates the

Rehabilitation Act.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request this Court to:

1.      Issue a Writ of Habeas Corpus and order the immediate release of Plaintiffs or
placement in community-based alternatives to detention such as conditional release, with
appropriate precautionary public health measures, on the ground that their continued
detention violates the Due Process Clause and/or the Rehabilitation Act;

2.      In the alternative, issue injunctive relief ordering the immediate release of Plaintiffs
and all similarly situated detainees in Bristol County Immigration Detention Facilities with
appropriate precautionary measures.

3.      Immediately order Defendants to implement public health guidance and protocols
designed to prevent the transmission of COVID-19;

4.      Prohibit the placement of new detainees in Bristol County Immigration Detention
Facilities until all public health protocols designed to prevent the transmission of COVID-19
have been implemented;

5.      Require Defendants to immediately effectuate the release of Plaintiffs and all
similarly situated detainees as BCHOC upon the posting of the appropriate bond, if bond
was previously set by ICE or an Immigration Judge;

6.      Declare that Defendants' detention of Plaintiffs is unconstitutional in violation of the
Fifth Amendment and/or the Rehabilitation Act;

7.      Award Plaintiffs their costs and reasonable attorneys' fees; and

8.      Grant such further relief as the Court deems justice to require.

                                   /s/Oren Nimni
                         Oren Nimni (BBO #691821)
                         Oren Sellstrom (BBO #569045)
                         Ivan Espinoza-Madrigal[†]
                         Lawyers for Rights
                         61 Batterymarch Street 5th Floor
                         Boston, MA 02110
                         (617) 988-0606
                         onimni@lawyersforcivilrights.org

                         Grace Choi, Law Student Intern[*]
                         Kayla Crowell, Law Student Intern[*]
                         Laura Kokotailo, Law Student Intern[*]
                         Aseem Mehta, Law Student Intern[*]
                         Alden Pinkham, Law Student Intern[*]
                         B. Rey, Law Student Intern[*]
                         Megan Yan, Law Student Intern[*]
                         Reena Parikh[†]
                         Michael Wishnie (BBO# 568654)
                         Jerome N. Frank Legal Services Organization
                         P.O. Box 209090
                         New Haven, CT 06520
                         Phone: (203) 432-4800
                         michael.wishnie@ylsclinics.org

---

[†] Motion for admission *pro hac vice* forthcoming.
[*] Motion for Law Student Appearance forthcoming.