**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| _____ | ) | |
| Maria Alejandra Celimen Savino, *et al.*, | ) | |
| | ) | |
| *Petitioners-Plaintiffs,* | ) | |
| | ) | Case No. 1:20-cv-10617-WGY |
| v. | ) | |
| | ) | |
| Thomas Hodgson, Bristol County Sheriff | ) | |
| in his Official Capacity, *et al.*, | ) | |
| | ) | |
| *Respondents-Defendants.* | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 5

FACTS .................................................................................................................................. 8

    I.     The COVID-19 Pandemic is Spreading Quickly and Poses Grave Risk of Serious Illness and Death ....................................................................................................................................... 8

    II.    Detention Facilities and Other Institutions that Harbor Individuals in Close Contact Are Especially Susceptible to a Deadly Outbreak of the Virus ................................................... 10

    III.    Conditions in Bristol County Detention Facilities Pose a Considerable Risk to the Health of Detainees and to Public Health At Large. ....................................................................... 13

LEGAL ARGUMENT ...................................................................................................... 16

    I.     In The Absence of Emergency Relief and Humanitarian Release, Medical Experts Confirm That Plaintiffs Will Suffer Infection, Illness, and Death. ................................................... 17

    II.    Plaintiffs are likely to succeed on the merits of their claims. ....................................... 18

    III.    The Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor. ............... 21

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Alongi v. AMCO LLC,* 2015 WL 12766154 (D. Mass. Sept. 23, 2015) ...................................... 17

*Basank v. Decker*, No. 20-cv-2518 (AN) (S.D.N.Y. Mar. 27, 2020) ...................................... 7, 21

*Bell v. Wolfish*, 441 U.S. 520 (1979) ......................................................................... 20

*CellInfo, LLC v. Am. Tower Corp.*, 352 F.Supp. 3d 127 (D. Mass. 2018) .................................. 17

*Cirelli v. Town of Johnston School District*, 888 F.Supp. 13 (D. R.I. 1995) .............................. 17

*Coronel v. Decker*, No. 20-cv-2472 (AJN) (S.D.N.Y. Mar. 27, 2020) ......................................... 7

*DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189 (1989) .............................. 19

*Farmer v. Brennan*, 511 U.S. 825 (1994) ................................................................... 20

*Helling v. McKinney*, 509 U.S. 25 (1993) ................................................................. 8, 19

*Hutto v. Finney*, 437 U.S. 678 (1978) ....................................................................... 19

*In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-mj-71055, 2020 WL
1307109, (N. D. Cal. March 19, 2020) ..................................................................... 7

*Jimenez v. Wolf*, No. 18-10225-MLW (D. Mass. Mar. 26, 2020) ............................................... 7

*Largess v. Supreme Judicial Court for State of Massachusetts*, 317 F. Supp. 2d 77 (D. Mass.
2004) ................................................................................................... 17

*Monga v. Nat'l. Endowment for Arts*, 323 F.Supp. 3d 75 (D. Me. 2018) .................................... 17

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005) .............................. 18

*United Parcel Service, Inc. v. Local 25 of Intern. Broth. Of Teamsters, Chauffeurs,
Warehousemen and Helpers of America (Local 25)*, 421 F.Supp. 452 (D. Mass. 1976) ......... 17

*United States v. Barkman*, No. 3:19-cr-0052-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) .................................................................................................................. 7

*United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, (S.D.N.Y. Mar. 19, 2020) ..... 7

*Westenfelder v. Novo Ventures (U.S.), Inc.*, 797 F.Supp. 2d 188 (D. Mass. 2011) ...................... 17

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................... 17

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ................................................................................. 20

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .............................................................................. 19, 22

**Statutes**

8 U.S.C. § 1182(d)(5) .................................................................................................................. 23

8 U.S.C. § 1225(b) ...................................................................................................................... 23

8 U.S.C. § 1226(a) ...................................................................................................................... 22

8 U.S.C. § 1226(c) ...................................................................................................................... 23

# INTRODUCTION

Petitioners-Plaintiffs ("Plaintiffs") are civil immigration detainees held by Respondents-Defendants ("Defendants") at the Bristol County House of Corrections ("BCHOC") and C. Carlos Carreiro Immigration Detention Center ("Carreiro") (collectively, "Bristol County Immigration Detention Facilities"), who respectfully seek emergency relief—humanitarian release and a temporary prohibition against new immigration admissions—from this Court because they are at imminent risk of contracting COVID-19.  This extraordinary request is amply supported by life-threatening conditions of confinement, and the unprecedented circumstances surrounding the cascade of infections and death caused by the current global pandemic. Plaintiffs are kept in close quarters, are not provided with adequate medical care, are not able to distance themselves from others exhibiting symptoms, and are not equipped with materials to practice adequate hygiene to protect themselves. They seek relief on behalf of themselves and all other persons who are now – or will be in the future – held by Defendants in civil immigration detention in the Bristol County Immigration Detention Facilities.

Despite the overwhelming consensus of public health authorities and experts—including doctors contracted by the U.S. Department of Homeland Security[1]—Defendants have repeatedly and unjustifiably refused to take critical and urgent steps to safeguard Plaintiffs' health and to prevent the spread of COVID-19.

Recognizing the urgency of present circumstances, judges, prosecutors and correctional authorities across the country have been ordering humanitarian releases to protect individuals and the public health. Such releases not only protect the people with the greatest vulnerability to serious illness and death COVID-19 from transmission of the virus, they also contribute to

---

[1] Letter from Scott A. Allen, MD and Josiah Rich, MD, MPH to Congressional Committee Chairpersons, dated Mar. 19, 2020, available at https://assets.documentcloud.org/documents/6816336/032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.pdf.

greater risk mitigation for all people in custody or working in a prison, jail, or detention center, and reduces the burden on the surrounding community's limited medical and health care infrastructure, as it lessens the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.

Defendants stand apart from law enforcement and jail officials in Los Angeles, Oakland, New Jersey, New York City, Cleveland, Nashville, Houston, San Antonio, Charlotte, and countless other jurisdictions that are actively releasing thousands of individuals —both civil detainees and, in many cases, people serving sentences for criminal convictions —because of the imminent threat COVID-19 poses inside jails.

Every day, more court rulings explain the health risks—to inmates, guards, and the outside community at large—present in large prison populations. *See, e.g.*, *Jimenez v. Wolf*, No. 18-10225-MLW (D. Mass. Mar. 26, 2020) (ordering release of immigrant detainee in the midst of the COVID-19 pandemic and noting that "being in a jail enhances risk" and that in jail "social distancing is difficult or impossible"); *United States v. Stephens*, No. 15-cr-95-AJN, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (ordering the release of inmate in Federal Bureau of Prisons custody due, in part, to risk posed by COVID-19 in the facility); *In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-mj-71055, 2020 WL 1307109, at *1 (N. D. Cal. March 19, 2020) (ordering change to conditions of bail for an individual to postpone incarceration, in part, in light of risk of vulnerability to the coronavirus); *United States v. Barkman*, No. 3:19-cr-0052-RCJ-WGC, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020). On March 22, the New Jersey Supreme Court also issued a consent order for the presumptive release of approximately 1,000 persons by March 26.

Just this morning, on March 27, 2020, Judge Alison Nathan from the Southern District of New York granted a similar temporary restraining order filed by immigration detainees seeking humanitarian release in *Coronel v. Decker*, No. 20-cv-2472 (AJN) (S.D.N.Y. Mar. 27, 2020) (finding "likelihood of success on the[ ] claim the Government's actions constitute deliberate indifference to Petitioners' medical needs" and on procedural due process claim). So did Judge Analisa Torres, in a separate action on behalf of a different group of immigration detainees seeking humanitarian release. *Basank v. Decker*, No. 20-cv-2518 (AN) (S.D.N.Y. Mar. 27, 2020) (finding likelihood of success, granting TRO, and ordering immediate release on recognizance of petitioners).

This series of favorable rulings makes sense because the pandemic presents the paradigmatic situation in which emergency relief is necessary. The Eighth Amendment protects all those in detention against "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). As civil immigration detainees, Plaintiffs enjoy even greater constitutional protections than those outlined in *Helling* because their confinement is meant to be non-punitive; they are merely awaiting the conclusion of pending immigration proceedings. The widespread presence of the virus has materially changed detention conditions as to renders Plaintiffs' ongoing civil immigration detention unconstitutional. Conditions that may not have been likely to cause serious illness before the COVID-19 outbreak are now breeding grounds for the virus, and Defendants failure to take steps to mitigate this risk increase the likelihood that such harms will occur. Therefore, Plaintiffs respectfully urge this Court to follow the prevailing precedent and to order their immediate humanitarian release, and that of the other members of the class

they propose to represent, because of the life-threatening conditions in Bristol County Immigration Detention Facilities.

In the alternative, Plaintiffs respectfully request that the Court temporarily restrain Defendants from admitting new detainees in the Bristol County Immigration Detention Facilities, and grant the immediate release of the most medically vulnerable detainees, including the named Plaintiffs, until such a time as an expedited hearing on a preliminary injunction can be held on behalf of the full class. Plaintiffs also urge that Defendants be required to thoroughly and professionally disinfect and sanitize the Bristol County Immigration Detention Facilities. Finally, because there is no likelihood of harm to Defendants, Plaintiffs respectfully request that the Court dispense with any requirements for security.

## FACTS[2]

### I. The COVID-19 Pandemic is Spreading Quickly and Poses Grave Risk of Serious Illness and Death

Since January 21, 2020, when the first case was reported in the United States, COVID-19 has spread like wildfire into every region of this country. Declaration of Oren Sellstrom ("Sellstrom Decl."), Exhibit A. A respiratory illness that spreads from person to person contact, transmitted mainly between people who are in close contact with one another, Declaration of Gregg Gonsalves ("Gonsalves Decl."), ¶ 15, but may also be carried on "surface[s] or object[s]

---

[2] The information described below is based on public reports from the Center for Disease Control ("CDC"), World Health Organization ("WHO") and the accompanying declarations of two medical and public health experts: Allen S. Keller, MD, who has extensive experience reporting on conditions of detention in ICE facilities, Declaration of Allen Keller (Keller Decl.), ¶¶ 2-3, and Gregg S. Gonsalves, Ph.D., an epidemiologist at the Yale School of Medicine and School of Public Health. The descriptions of conditions at Bristol County House of Corrections are drawn from March 18, 2020 and March 23, 2020 letters by Plaintiffs and similarly situated detainees to Defendant Hodgson (ECF 1, Exhibits A and B), as well as declarations from Plaintiff Julio Cesar Medeiros Neves, Plaintiff Maria Alejandra Celimen Savino, immigration attorney Ira Alkalay, who has multiple immigration clients housed in Bristol County, putative class members Cesar Francisco, Carlos Menjivar-Rojas, and Cesar Francisco Vargas Vasquez, as well as Cristina Oritz Ortiz and Yesenia Leyva, who are family members of putative class member Francisco Ortiz Ortiz.

that ha[ve] the virus on them," the virus produces mild to severe symptoms that can include fever, coughs, and shortness of breath. Sellstrom Decl., Ex. A. But in over 15% of cases, the illness is severe or deadly. Gonsalves Decl., ¶ 3. For thousands of patients, hospital-grade respirators are required to take any breaths, as the virus can progress from a mere fever to "life-threatening pneumonia," or septic shock, multi-organ failure, and death. *Id*, ¶ 2-3**.** As of March 27, 2020, there is neither a vaccine for COVID-19 nor a specific antiviral treatment. Sellstrom Decl., Ex. A. No one is immune. Gonsalves Decl., ¶ 5**.** Indeed, even young and healthy individuals have been found shockingly susceptible, as those between the ages of 20 and 44 represent 20% of all COVID-19 hospitalizations in the United States. *Id***.**

COVID-19 was declared a global pandemic by the World Health Organization (WHO) on March 12, 2020. The United States leads the world in confirmed coronavirus cases, with 68,440 infections and 994 deaths, as of March 26, 2020. Sellstrom Decl., Exhibit C at 2. COVID-19 is present in all fifty states, as well as the District of Columbia, Puerto Rico, Guam, and the Virgin Islands. *Id.* In Massachusetts, since the first confirmed case on February 1, 2020, the number of infections has grown exponentially, with 2,417 confirmed cases of COVID-19 in the Commonwealth as of March 26, 2020, to say nothing of the "thousands of people" who are unable to be tested and are likely "carrying a potentially fatal disease that is easily transmitted." Gonsalves Decl., ¶¶ 10, 11.

In response to the pandemic, Governor Charlie Baker declared a state of emergency on March 10, 2020 and issued subsequent emergency orders on March 15, 2020 and March 23, 2020 to close schools until May 4, 2020, close all nonessential businesses, and prohibit gatherings of more than 10 people. *Id*., ¶ 12. The purpose of these measures was to encourage

residents to "practice social distancing at all times . . . to limit the spread of this highly contagious and deadly virus." *Id.*

Globally, the WHO has reported that as of March 26, 2020, there are 462,684 confirmed cases (49,219 in the previous 24 hours) and 20,834 deaths (2,401 in the previous 24 hours). Sellstrom Decl., Exhibit D, at 1. Those over the age of 50, as well as those who are immuno-compromised or have pre-existing medical conditions, ranging from diabetes to chronic respiratory disease, are especially at risk of serious symptoms or death. *Id.* at 10.

Without a single known immunity, treatment, vaccine, or cure, the only available effective measure to prevent serious illness or death from COVID-19 is to "prevent individuals from being infected with the virus." Gonsalves Decl., ¶ 5. Accordingly, since the inception of the virus, infectious disease experts and epidemiologists have consistently recommended individuals and institutions engage in key preventative measures to limit viral transmission, including "maintaining physical distances," avoiding individuals with "fever or respiratory symptoms," performing hand hygiene, and cleaning and disinfecting objects and surfaces. Sellstrom Decl., Exh. D at 2; *see also* Gonsalves Decl., ¶ 17 (observing that because "community spread" is at "the root" of the pandemic, containment and social distancing, including "not touching common surfaces," staying "at least 6-12 feet from other people," and "identifying and isolating people who are ill," are among "the best methods of prevention").

## II.   Detention Facilities and Other Institutions that Harbor Individuals in Close Contact Are Especially Susceptible to a Deadly Outbreak of the Virus.

Despite these recommendations from public health experts around the world, basic hygienic and social distancing measures are largely absent in overcrowded, ill-managed prisons and other places of detention. In general, detention facilities, which are designed to "maximize control" over the incarcerated population, rather than to "minimize disease transmission or to

efficiently deliver health care," are enclosed environments, akin to the nursing homes and cruise ships that have formed the epicenters of multiple COVID-19 outbreaks in the United States and abroad. Gonsalves Decl., ¶ 16. Unsurprisingly, jails and prisons have been loci for historical viral outbreaks, including during the 2009 H1N1 epidemic and a 2012 influenza outbreak in Maine. *Id.* ¶¶ 16, 25. This pattern is already being repeated across the world. In China alone, over 500 cases of COVID-19 were reported across four detention facilities in both correctional officers and detainees. *Id.* ¶ 27. Inmates have also tested positive in county jails in both New Jersey and New York. *Id.* ¶ 28.

On March 15, 2020, the WHO Regional Office for Europe published Interim Guidance on "Preparedness, prevention, and control of COVID-19 in prisons and other places of detention." Sellstrom Decl., Exhibit E. In particular, the WHO highlighted that detained individuals are "likely to be more vulnerable to the coronavirus disease . . . because of the confined conditions in which they live together for prolonged periods of time," and that prisons, jails, and similar settings "may act as a source of infection, amplification and spread of infectious disease within and beyond prisons," such that "[p]rison health is therefore widely considered as public health." *Id.* at 1. The WHO emphasized that the provision of health care for people in places of detention is a "State responsibility" as well as that detained individuals should "enjoy the same standards of health care that are available in the outside community, without discrimination on the grounds of their legal status." *Id.* at 3. The WHO made numerous recommendations for reducing the risk of a spread of coronavirus within a detention facility, including the "provision of adequate space between people, adequate air exchange, and routine disinfection of the environment (preferably at least once daily)," as well as "distributing food in room/cells instead of a common canteen" and supplying soap, water, and personal towels in

"rooms/cells night and day." *Id.* at 9 and 13. These recommendations are echoed by the Center for Disease Control's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Sellstrom Decl., Exhibit F, which has called for, among other things, signage through facilities communicating the symptoms of COVID-19 and hand hygiene instructions that is "understandable for non-English speaking persons," encouraging staff to stay home when sick, and providing "sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies." *Id.* at 6, 7.

Beyond these preventative measures, there are continued calls to release detainees in order to promote greater social distancing, provide sufficient numbers of hygienic supplies, and prevent burnout and overloading among detention staff. For example, in Iran, amidst reports the pandemic had spread to Iranian prisons, Secretary of State Mike Pompeo has called for the immediate release of detained U.S. citizens on the ground their detention "amid increasingly deteriorating conditions defies basic human decency." Gonsalves Decl., ¶ 27. Additionally, in acknowledgment of the "serious public health risks posed by prisons and detention centers," the United Nations High Commissioner for Refugees has urged governments to "release prisoners and detainees" in the name of public health and safety. *Id.*, ¶ 31.

In accordance with recommendations from public health experts and epidemiologists, law enforcement and jail officials from around the country are releasing individuals —both civil detainees and, in many cases, people serving sentences for criminal convictions —because of the threat COVID-19 poses inside jails and the vulnerability of these individuals. *See, e.g.,* Maura Dolan, et al., *California releases more jail inmates amid coronavirus crisis*, L.A. Times (March 20, 2020), https://www.latimes.com/california/story/2020-03-20/california-releases-more-jail-inmates-amid-coronavirus-crisis?; Quinn Wilson, *KCSO: Inmate releases based on mitigating*

*spread of COVID-19, reserved for non-violent offenders*, Bakersfield Californian (March 19, 2020), https://www.bakersfield.com/news/breaking/kcso-inmate-releases-based-on-mitigating-spread-of-covid-/article_10ffc8a2-6a3d-11ea-b7b5-7b06de300554.html; *see also* Board of Correction City of New York, Letter from BOC re NYC Jails and Covid-19 (March 19, 2020) available at https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Letter- from-BOC-re-NYC-Jails-and-COVID-19-2020-03-21.pdf.

### III.    Conditions in Bristol County Detention Facilities Pose a Considerable Risk to the Health of Detainees and to Public Health At Large.

As of March 27, 2020, detainees in Bristol County Facilities are subject to living conditions that violate nearly every recommendation of infectious disease experts across the globe—including the CDC and WHO—and, as such, are susceptible to a deadly outbreak of COVID-19. As reported by Ira Alkalay, an attorney with multiple clients who are presently Immigrations and Customs Enforcement (ICE) detainees at Bristol County House of Corrections (BCHOC), bunk beds in Unit B, a unit housing up to sixty-six immigration detainees, are located "between one and three feet apart," leaving detainees without "adequate space to practice social distancing, which requires keeping six feet apart." Declaration of Ira Alkalay, ¶ 4. Detainees eat meals off of plastic rays, which are "passed through three or four individuals before reaching a detainee for meals." *Id.*, ¶ 4. There are only four operational showers and two urinals for sixty-six detainees, and soap is "watered down and inadequate for proper hygiene." *Id.*, ¶ 7.

Perhaps most startlingly, there appear to be no policies in place to separate healthy inmates from those who are ill and potentially exposed; detainees have been assigned bunks next to individuals who have "test[ed] positive for tuberculosis," or who must wait weeks to receive medical appointments, even when suffering from breathing issues. *Id.*, ¶¶ 9-11. Plaintiff Julio Cesar Medeiros Neves, who is presently detained in Unit B, is currently held in "the same room

as 49 other people," and so has no opportunity to separate himself from other detainees to slow or stop any viral spread. Declaration of Julio Cesar Medeiros Neves ("Neves Decl."), ¶¶ 2-6. Even amidst the presence of correctional officers with flu-like symptoms, as well as other detainees who are critically ill, detainees like Mr. Neves have not received basic hygienic supplies such as "sanitizer, disinfectant, or antiseptic" products. *Id.* ¶¶ 12, 14-15; *see also* Declaration of Yessenia Leyva, ¶ 4 (noting that at least two guards have come into the facility with coronavirus symptoms, including one guard who coughed incessantly). Despite Bristol County's awareness of the horrifying conditions in their facilities—indeed, a March 23 letter signed by 52 detainees housed in Unit B highlighted the issue of multiple ill guards, overcrowded living conditions, a lack of signage in any language, and a lack of decontamination procedures—the facilities have failed to implement basic protocols to protect these vulnerable populations. ECF 1, Exhibit B; *see also* Declaration of Carlos Menjivar-Rojar, ¶¶ 7-9 (reporting that in Unit B, there is "no toilet paper, no napkins" and that without proper soap, bleach, or disinfectant, detainees are "pretty much just washing our hands with water."). By contrast, in a display of naked cruelty, Defendants' only response to the pandemic was to end visits by family members to individuals inside of the facility—despite the fact that families never had physical contact, but spoke over the phone or through glass, as well as that correctional officers continue to arrive at the jail. Declaration of Cristina Oritz Ortiz, ¶ 5.

These conditions occur through Bristol County's facilities. According to Plaintiff Maria Alejandra Celimen Savino, who is detained in Alley EB in the C. Carlos Carreiro Immigration Detention Center, detainees lack access to basic necessities like toilet paper and standards for sanitation are "very poor," with all cleaning in the unit conducted by detainees. Declaration of Maria Alejandra Celimen Savino ("Savino Decl."), ¶ 8, 10. Ms. Savino, who has suffered from

asthma since she was a child, is at especially high risk for COVID-19, but due the conditions of her civil detention, she is unable to engage in any kind of social distancing or preventative hygiene. *Id.*, ¶ 5-7, 11-13. Other detainees, who are living with health conditions that place them at increased risk of severe COVID-19 symptoms, including weak immune systems, leukemia, diabetes, tuberculosis, emphysema and chronic obstructive pulmonary disease (COPD), are precluded from taking even basic steps to protect themselves because of the policies imposed and perpetuated by Defendants. ECF 1, Exh. B, at 6. For example, despite having asthma and only one working lung, Cesar Francisco Vargas Vasquez has been denied protective gear, as well as access to toilet paper and disinfectant. Declaration of Cesar Francisco Vargas Vasquez, ¶¶ 3, 5, 10. Mr. Vasquez has even been deprived of basic medical necessities, including an unexpired inhaler and medical attention for his injured hand. *Id*., ¶¶ 3-4; *see also* Ortiz Declaration, ¶¶ 4, 6 (describing conditions endured by her detained brother who suffers from respiratory difficulties, asthma and hernias and has a pacemaker, but is denied food beyond bread, coffee, and crackers as well as "supplies for personal cleaning.").

As indicated above, medical experts have been clear that the conditions of confinement in facilities such as Bristol County are "unsafe and pose a danger to detained immigrants" in the midst of the present COVID-19 pandemic. Declaration of Allen Keller, ¶ 5. Dr. Allen Keller, an Associate Professor at New York University School of Medicine in the Departments of Medicine and Population Health with over 25 years of experience evaluating and treating vulnerable populations and evaluating prison conditions, has opined that the fatal combination of poor health conditions, insufficient hygiene, psychological stress, and close confinement has rendered immigration detention facilities "unsafe environments for immigrant detainees" such that

"continued detention in these facilities poses an immediate risk and danger to their health and well-being and to the community." *Id.*, ¶¶ 1, 34.


## LEGAL ARGUMENT

For a temporary restraining order, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The standard for issuing a temporary restraining order is substantially similar as that for a preliminary injunction. *Largess v. Supreme Judicial Court for State of Massachusetts*, 317 F. Supp. 2d 77, 81 (D. Mass. 2004). Relief depends on: (i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest. *See id.; see also Alongi v. AMCO LLC,* 2015 WL 12766154 at *1 (D. Mass. Sept. 23, 2015) (granting preliminary injunction where issuance of order would "not cause undue inconvenience or loss" to defendant); *CellInfo, LLC v. Am. Tower Corp.*, 352 F.Supp.3d 127 (D. Mass. 2018) (granting preliminary injunction); *Westenfelder v. Novo Ventures (U.S.), Inc.*, 797 F.Supp. 2d 188, 191 (D. Mass. 2011) (same); *United Parcel Service, Inc. v. Local 25 of Intern. Broth. Of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 25)*, 421 F.Supp. 452, 458-59 (D. Mass. 1976); *accord Monga v. Nat'l. Endowment for Arts*, 323 F.Supp. 3d 75, 95-96 (D. Me. 2018) (granting TRO of immigrant high school student based on citizenship-based eligibility rule for national poetry reading competition; in relevant part, court observed one-time

opportunities "constitute irreparable harm" that outweighed order's impingement on discretionary program administration with "generalized goals"); *Cirelli v. Town of Johnston School District*, 888 F.Supp. 13, 16 (D. R.I. 1995) (granting TRO enjoining defendants from violating plaintiff's First Amendment rights and noting even "temporary restraint on expression may constitution irreparable injury").

In this case, as discussed below, all four factors overwhelmingly favor Plaintiffs.

**I.      In The Absence of Emergency Relief and Humanitarian Release, Medical Experts Confirm That Plaintiffs Will Suffer Infection, Illness, and Death.**

Medical and public health experts confirm that Defendants' actions will cause severe injury and harm to Plaintiffs. This harm, serious illness or even death, is irreparable, as it "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Immediate relief and humanitarian release are essential to address the imminent hazards of COVID-19 on Plaintiffs.

When Plaintiffs contract COVID-19 as a result of their close confinement they will have contracted an illness with no known cure. Gonsalves Decl., ¶ 5. This is true for all civil immigration detainees as the disease does not discriminate based on age or health status. *Id.*, ¶¶ 5, 7. It is particularly true for Plaintiffs Celimen Savino and Medeiros Neves because they suffer from asthma, depression, and anxiety—all medical conditions that place them at much higher risks of developing serious and possibly lethal medical complications if they become infected. *Id.* ¶¶ 4, 7. Moreover, due to the close confinement conditions in Bristol County Immigration Detention Facilities, if one Plaintiff or detained person were to contract the virus, it is highly likely that it would spread to all Plaintiffs, subjecting them to the serious harm this illness would cause. *See* Keller Decl., ¶ 13. Judges Nathan and Torres in the Southern District of New York

readily found irreparable harm for groups of civil immigration detainees, and for similar reasons, so should this Court.

Thus, the imminent infection, illness, and death that Plaintiffs face constitutes irreparable harm that this Court can help prevent.

## II.     Plaintiffs are likely to succeed on the merits of their claims.

Immigrant detainees, whether or not they have prior criminal convictions, are unquestionably civil detainees held pursuant to civil immigration laws.  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  The Due Process Clause of the Fifth Amendment, which provides significantly greater protection than the Eighth Amendment's ban on cruel and unusual punishment, safeguards the rights of civil detainees while in custody.  However, even the Eighth Amendment imposes on the Government an affirmative duty to provide conditions of reasonable health and safety to those in its custody:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being . . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment[.]

*DeShaney v. Winnebago County Dept. of Soc. Servs*., 489 U.S. 189, 199-200 (1989). Conditions that pose an unreasonable risk of imminent harm violate the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass. Thus, prison authorities cannot "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling*, 509 U.S. at 33. For example, the Supreme Court has held that inmates cannot be comingled with others experiencing illness such as hepatitis or venereal disease. *Hutto v. Finney*, 437 U.S. 678, 682 (1978). An

Eighth Amendment violation is established even though the plaintiff cannot yet "prove that he is currently suffering serious medical problems caused by" the exposure. *Helling*, 509 U.S. at 32.

While Plaintiffs would clearly succeed on a claim under the Eighth Amendment, the Due Process Clause of the Fifth Amendment provides even greater protection to civil immigrant detainees. While the Eighth Amendment prohibits punishment that is "cruel and unusual," civil detention and the Fifth Amendment's due process protections prohibit "punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."). Civil detainees are entitled to "more considerate treatment" than their criminal counterparts. *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). And while convicted persons must show "deliberate indifference" on the part of prison officials to establish a violation of the Eighth Amendment, *Farmer v. Brennan*, 511 U.S. 825, 828 (1994), there is no such requirement for civil detainees challenging their conditions of confinement. If placing an inmate in a situation creating an elevated risk of potentially lethal infection constitutes "cruel and unusual punishment" in violation of the Eighth Amendment – as was found in *Hutto* – placing civil immigration detainees in life-threatening conditions with an imminent risk of lethal COVID-19 infection amounts to a clear violation of the Fifth Amendment. Plaintiffs are precisely in this untenable and unconstitutional position.

In a decision issued today in *Basank v. Decker*, the Court stated well the due process analysis:

> Immigration detainees can establish a due process violation for unconstitutional conditions of confinement by showing that a government official "knew, or should have known" of a condition that "posed an excessive risk to health," and failed to take appropriate action. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) ("Deliberate indifference . . . can be established by either a subjective or objective standard: A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the

defendant-official knew, *or should have known*, that the condition posed an excessive risk to the plaintiff's health or safety." (internal quotation marks, citation, and alterations omitted)). The risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious. It can no longer be denied that Petitioners, who suffer from underlying illnesses, are caught in the midst of a rapidly-unfolding public health crisis. The Supreme Court has recognized that government authorities may be deemed "deliberately indifferent to an inmate's current health problems" where authorities "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Petitioners need not demonstrate that "they actually suffered from serious injuries" to show a due process violation. *Darnell*, 849 F.3d at 31; *see Helling*, 509 U.S. at 33. Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to their future health" is sufficient. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35) (alteration omitted).

*Basank*, slip op., at 11-12 (footnote omitted).

Alarmingly, Defendants' guards have reported to work with coronavirus symptoms. Neves Decl., ¶ 12. Just two days ago, in the midst of the public health crisis and contagion, a new immigration detainee was brought into the facility. *Id.* at ¶ 14. The new detainee "got very sick. He was very sick all night, and [Defendants] took him out." *Id.* Even after this illness and sickness, Plaintiffs "have not received any protection. No sanitizer, disinfectant or antiseptic." *Id.*, ¶ 15. In fact, there are no sanitation or decontamination crews, the cleaning is done by inmates. Savino Decl., ¶ 10 ("The standards of sanitation are very poor, and I am forced to touch things that are potentially contaminated by diseases, including tables, chairs, dishes, and cutlery."). Plaintiffs cannot wash their hands frequently with soap. They cannot engage in social distancing – maintaining a distance of six feet from other persons – because the Bristol County Immigration Detention Facilities "do not provide [ ] the space for that." *Id.*, ¶ 11. Plaintiffs must sleep merely feet apart from other individuals in detention, who have not been tested for COVID-19, and may even be exhibiting symptoms. Plaintiffs cannot engage in the preventative measures that those outside of detention can undertake to thoroughly protect themselves from

coming into contact with the virus, nor can they control whom they come in to contact with on a daily basis, since guards, contractors, and vendors regularly enter the facility, Keller Decl., ¶ 14, and other detained individuals are transported between immigration detention facilities regularly. *Id.* ¶ 11.

Under these circumstances, the question is not if the unconstitutionally dangerous conditions in the Bristol County Immigration Detention Facilities will lead to the spread of COVID-19, but when, how quickly, and how many will die. Plaintiffs are literally being held in tinderboxes waiting to be ignited. Defendants know and should know that Plaintiffs and members of the putative class are at grave peril and risk of death due to their confinement in close quarters and without adequate space to distance themselves from each other, not to mention the arrival of new admissions and the lack of adequate soap, toilet paper, and other necessities of virus-preventing hygiene. Since exposure to lethal COVID-19 infection is imminent – and clearly banned by the Fifth Amendment – Plaintiffs are highly likely to succeed on the merits of their claim.

### III. The Public Interest and Balance of Equities Weigh Heavily in Plaintiffs' Favor.

Both the balance of equities and the public interest heavily favor the Plaintiffs. In normal times, crowding and close quarters, the sharing of toilets, sinks, and showers, and communal food preparation and service may be considered uncomfortable. However, these conditions present a deadly threat to Plaintiffs lights in light of COVID-19. This threat is compounded daily, as guards come through the facility after being in contact with outside communities, and as other detainees are transferred in to Bristol County Immigration Detention Facilities. The threat and exceptional risk COVID-19 poses to Plaintiffs vastly outweighs any interest Defendants may have in maintaining Plaintiffs' detention.

Since immigration proceedings are civil and non-punitive, "[t]here is no sufficiently strong special justification . . . for indefinite civil detention." *Zadvydas*, 533 U.S. at 690. In fact, Immigration and Customs Enforcement ("ICE") has significant discretion to release immigration detainees, see 8 U.S.C. § 1226(a), and has a long-standing practice of releasing for humanitarian reasons even those whose detention has been mandated under particular immigration detention statutes, see 8 U.S.C. § 1182(d)(5); § 1225(b); § 1226(c). ICE regularly uses alternatives to detention to maintain custody and control over non-citizens in immigration proceedings, such as supervised release, electronic ankle monitors, home confinement, and telephonic monitoring. Since Defendants can and have routinely released immigration detainees for humanitarian reasons, they cannot object to the reasonableness of such relief under the life-threatening conditions in the Bristol County Immigration Detention Facilities.

## CONCLUSION

Plaintiffs' motion for a temporary restraining order should be granted.

March 27, 2020                                                    Respectfully Submitted,

/s/ Oren Sellstrom
Oren Nimni (BBO #691821)
Oren Sellstrom (BBO #569045)
Lauren Sampson (BBO #704319)
Ivan Espinoza-Madrigal[†]
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0608
osellstrom@lawyersforcivilrights.org

Grace Choi, Law Student Intern[*]
Kayla Crowell, Law Student Intern[*]
Laura Kokotailo, Law Student Intern[*]
Aseem Mehta, Law Student Intern[*]

Alden Pinkham, Law Student Intern[*]
B. Rey, Law Student Intern[*]
Megan Yan, Law Student Intern[*]
Reena Parikh[†]
Michael Wishnie (BBO# 568654)
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520
Phone: (203) 432-4800
michael.wishnie@ylsclinics.org

---

[†] Motion for admission *pro hace vice* forthcoming.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2020, the above-captioned document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

   /s/   Oren M. Sellstrom