# AFFIDAVIT OF NICHOLAS J. RENCRICCA, MD, PHD

Now comes Nicholas J. Rencricca, MD, PhD, duly sworn and under oath and says and deposes as follows:

1. I am the Regional Medical Director for CPS and Director of Utilization Review as well as the Medical Director, Bristol County House of Correction. I am an employee of Correctional Psychiatric Services (CPS), which has a contract with the Bristol County Sheriff's Office to provide comprehensive medical services to inmates and detainees at Bristol County House of Corrections ("BCHOC"). I am also the Medical Director, Barnstable County Sheriffs Office, and the Regional Medical Director, Bristol and Barnstable County Correctional Facilities. I have held these positions since November of 2014. What I state in this affidavit is not intended to include all of the facts known to me regarding my knowledge or the steps taken at BCHOC to minimize the risk of a COVID-19 coronavirus infection, some of which have been included in other affidavits submitted to the Court, I believe.

2. I serve as the Chairperson on the Continuous Quality Improvement (CQI) Committee. As Medical Director, I am committed to providing the highest quality medical care to the detained and incarcerated population. I also provide clinical and administrative oversight of the health services staff. I have over 25 years of medical and correctional experience. I have published numerous research articles and book chapters, consulted on innumerable research projects.

3. I have attended the following educational institutions and obtained the degrees listed:

    St. Francis College, Brooklyn, NY, B.S. - Biology, 1962;
    St. John's University, Jamaica, NY, M.S. – Physiology, 1964;
    Boston College, Chestnut Hill, MA, Ph.D., Physiology, 1967;
    Tufts University School of Medicine - St. Elizabeth's Hospital, Boston - Post-Doctoral NIH-NHI Research Fellow in Hematology, 1967-70; and
    University of Massachusetts Medical School, M.D.,1991.

    In addition, I have taken various continuing medical education courses.

4. I am certified in Internal Medicine by the National Board of Physicians and Surgeons, and I am a certified Correctional Health Professional (CCHP) through a program of the National Commission on Correctional Health Care. I am currently licensed as a physician in Massachusetts; I was previously licensed in New York, New Hampshire and Florida, but these licenses are inactive. I am also a member of American College of Correctional Physicians.

5. I have received various awards and honors, including the Correctional Medical Services Award of Recognition for Physician of the Year – 2001 and Recipient of Department of Correction Professional Excellence Contract Volunteer Award, 2004. I was also an invited guest, People's Republic of China (Beijing, Nanjing, Suzhou, Shanghai), People to People - Citizens Ambassador Program, Hematology/Blood Transfusion Delegation, where I presented a paper entitled "Hemopoietic Stem Cell Impairment During the Anemia of Virulent Murine Malaria Infection."

6. CPS has 54.4 full time staff members which include administrative and line medical staff and mental health staff. Currently two of our mental health clinicians are both being set up to see inmates via remote telehealth rather than in person as they have immediate family who are high risk for catching COVID-19. All other medical staff are on site with the exception of me. Since March 30, 2020, I have being seeing inmates/detainees via telehealth.

7. All medical sick slips, representing inquiries or health concerns from detainees and inmates, are picked up twice a day and detainees/inmates are seen by nursing staff within 24 hours. Mental health slips are also picked up twice a day and triaged. All crisis mental health detainees/inmates are seen immediately and emergent slips are addressed within 24 hours by a mental health clinician. Detainees/inmates submitting routine requests are currently receiving a letter with packets of material. It is anticipated once remote access is set up for mental health, routine mental health slips will be addressed.

8. I, along with Regional Clinical Director Deb Jezard, RN, drafted a document entitled "CPS Clinical Guideline for COVID-19/CORONAVIRUS" ("CPS Clinical Guideline"). This document was intended to educate and guide CPS staff in dealing with the health issues stemming from the global coronavirus pandemic.

9. The CPS Clinical Guideline lists the possible symptoms of a COVID-19 infection and states that upon identification of any of the following symptoms, the patient should immediately be masked:
   - Fever
   - Cough
   - Shortness of breath
   - Loss of smell or taste
   - Sore throat
   - Tiredness
   - Diarrhea

10. The CPS Clinical Guideline also provides that if a patient presents with fever and any other symptoms then the medical staff is to perform a rapid test for Influenza A and B. If the influenza test is negative, then medical staff is to test for COVID-19. If a COVID-19 test is positive, then staff are instructed to:

    a. Monitor vital signs, especially temperature and oxygen saturation twice a day;

    b. Offer acetaminophen 650 mg. twice per day or as needed for coronavirus symptoms for one week;

    c. Monitor the patient's respiratory status to include oxygen saturation, trouble breathing, persistent chest pain or pressure, new onset of confusion or inability to arouse and any signs of cyanosis. Nurses are to notify the on-call doctor immediately if any symptoms are present and discuss possible transport to the local emergency room;

      d. Restrict patient movement unless emergent for anyone in isolation. Any movement while in isolation requires that staff wear a mask with shield, gloves and gown.

11. The CPS Clinical Guideline also adopts the CDC recommendations (as of March 24, 2020) that medical isolation of a patient with suspected COVID-19 infection be maintained until all the following criteria have been met:

    For individuals who will be tested to determine if they are still contagious:

    The individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND

    The individual's other symptoms have improved (e.g., cough, shortness of breath) AND

    The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart.

    For individuals who will NOT be tested to determine if they are still contagious:

    The individual has been free from fever for at least 72 hours without the use of fever-reducing medications AND

    The individual's other symptoms have improved (e.g., cough, shortness of breath) AND

    At least 7 days have passed since the first symptoms appeared.

    For individuals who had a confirmed positive COVID-19 test but never showed symptoms:

    At least 7 days have passed since the date of the individual's first positive COVID-19 test AND

    The individual has had no subsequent illness.

12. The CPS Clinical Guideline provides for restriction of patients from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns.

13. If an incarcerated/detained individual who is a COVID-19 case is released from custody during their medical isolation period, staff is instructed to contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning.

14. Additionally, in terms of guidance for nurses and maintaining consistency in dealing with detainees/inmates, I am aware of "talking points" CPS Health Services Administrator Maureen Atkins, RN created which I understand were disseminated to medical staff via email. These talking points appear to be based on the CDC guidelines and are consistent with them. Nursing staff have been educated on appropriate precautions and protocols.

15. COVID-19 health information has been posted in all units and visiting areas. Staff have access to CDC materials, including posting the link/url for the CDC website on all medical area computer equipment. A training website for medical staff has been developed as well as a COVID-19 power point. BCHOC medical staff has access to masks, disinfectant/sanitizer and other personal protective equipment.

16. Nursing staff have also been instructed to use any detainee/inmate interaction as a time to educate the detainee/inmate regarding COVID-19, including that all inmates need to wash their hands frequently, avoid crowds and stay apart at least 6 feet whenever possible, and to report any shortness of breath or concerns of fever immediately to either nursing or security.

17. Additionally, I understand that signs have been posted in all units in English, Spanish, Portuguese and Chinese, indicating that if a detainee/inmate feels sick, they should notify medical staff and have a mask applied immediately. As stated, detainees/inmates are also being educated during medical encounters on the signs and symptoms of a COVID-19 infection.

18. Upon receiving a new detainee/inmate, medical staff screen the individuals for signs and symptoms of infection. This includes temperature checks, taking a recent medical history and observing the individual for any signs of sickness. If an individual appears symptomatic on admission a mask is applied immediately, the individual is placed in isolation and clinical care guidelines are followed (as outlined above) thereafter.

19. We are also taking steps to ensure that BCHOC staff does not inadvertently introduce COVID-19 into the facility by educating staff and screening them for raised temperatures or other signs of illness. Staff have been instructed not to work if they feel ill and to report any symptoms for follow up. Staff have also been educated regarding both their own protection as well as CDC guidelines for eliminating virus transmission.

20. We are also monitoring and reviewing all detainees/inmates who are known to have chronic disease or other comorbidities which would make them more susceptible to a COVID-19 infection.

21. While it is clear that a prison setting poses particular challenges from an infectious disease standpoint, the risk of infection is tempered by the degree of control we have over access to the facility. We are screening incoming detainees/inmates carefully and taking steps to isolate them as necessary. We have a highly educated and trained staff that is acutely aware of the risks posed by the pandemic. We are also providing a level of medical care to the detainees/inmates that they are unlikely to receive outside of BCHOC.

22. I am well aware that certain medical conditions, or comorbidities, can make an individual more susceptible to becoming sick. As stated above, we have taken extra precautions to monitor the health of any detainee or inmate known to have such a condition. In my opinion, releasing such persons without an adequate plan for alternative medical care could raise, rather than lower, the risk for those individuals.

23. I also know that not all medical conditions present the same risk for increased susceptibility to a viral infection. In this regard, an individualized approach is more appropriate than a blanket response.

24. It is clear that this pandemic presents unique challenges and that the situation is changing daily. I am confident that we are doing all that we can to reduce the risk of a COVID-19 outbreak within BCHOC. Our rate of confirmed cases in the detainee/inmate population (zero to date) reflects that.

25. After I reviewed the draft of this affidavit and providing my feedback, I learned that a nurse working for CPS at BCHOC has tested positive for COVID-19. This is, of course, disappointing news. However, it appears that the nurse was working the third shift and had limited contact with the detainee/inmate population. I am told that as soon as she felt ill, she self-isolated and left the BCHOC facility within an hour or so without any contact with detainees or inmates. Given that the positive result came back late yesterday, staff are working to determine the facts of what occurred and who, if anyone, may have been in contact with this nurse. We will take all steps to isolate such individuals, if there are any, and to monitor their health status in accordance with the CPS Clinical Guideline protocol outlined above. While we cannot guarantee that there will be no future cases within the facility, we are trying very hard. And there is certainly no guarantee for anyone released from the facility, either.

Signed under penalty of perjury this 2nd day of April, 2020

*/s/ Nicholas J. Rencricca*
Nicholas J. Rencricca, MD, PhD