UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
MARIA ALEJANDRA CELIMEN SAVINO,         )
JULIO CESAR MEDEIROS NEVES,             )
and all those similarly situated,       )
                                        )
                    Petitioners,        )
                                        )        CIVIL ACTION
         v.                             )        NO. 20-10617-WGY
                                        )
STEVEN J. SOUZA, Superintendent of )
Bristol County House of Corrections)
in his official capacity,               )
                                        )
                    Respondent.         )
                                        )
_____

YOUNG, D.J.                                      April 8, 2020

**MEMORANDUM & ORDER**

## I.   INTRODUCTION

     This habeas petition reflects the petitioners' dire

personal circumstances and legal grievances.  Yet it also speaks

to the shared anxieties of a world brought to its knees by the

pandemic of the novel coronavirus, dubbed COVID-19.  It reaches

the Court at an especially grim moment.[1]  The petitioners are

civil immigration detainees who say they are held in tight

quarters and unable to keep safe distance from others who may --

_____
     [1] See Sarah Westwood, Surgeon General: This Week Will Be
Like a 'Pearl Harbor' and '9/11' Moment, CNN (Apr. 5, 2020 1:25
pm), https://www.cnn.com/2020/04/05/politics/jerome-adams-
coronavirus/index.html.

and with time, inevitably will -- carry the highly contagious virus.  They demand release or implementation of social distancing and other hygienic practices recommended by infectious disease experts.

Pending before this Court are their petition for a writ of habeas corpus, their motion for class certification, and their motion for a preliminary injunction.  The Court is not yet ready to rule on the underlying habeas petition or the motion for a preliminary injunction.  Rather, the Court <u>ALLOWS</u> the motion for class certification, with slight modification, and takes this opportunity to explain its reasoning with respect to bail.  For the health and safety of the petitioners -- as well as the other inmates, staff, and the public -- the Court will expeditiously consider bail for appropriate detainees.

## A.    Factual Background

The named petitioners are two of approximately 148 individuals (the "Detainees") detained by Immigration and Customs Enforcement ("ICE") on civil immigration charges and held at the Bristol County House of Corrections ("BCHOC") in North Dartmouth, Massachusetts.  Pet. Writ Habeas Corpus ("Pet.") ¶ 1, ECF No. 1; Opp'n Mot. TRO ("Opp'n"), Ex. A, Aff. Sheriff Thomas H. Hodgson ("Hodgson Aff.") ¶ 6(o), ECF No. 26-1.[2]

_____

[2] Though Sheriff Hodgson's affidavit, dated March 29, 2020, states that there are 148 ICE detainees in the BCHOC, the

The Detainees are held in two on-site facilities: ninety-two are in a separate ICE facility called the C. Carlos Carreiro Immigration Detention Center ("Carreiro"), and the rest are housed in a portion of the BHCOC called "Unit B" together with non-immigration pre-trial detainees.  Id.; Pet. ¶ 1; Opp'n 2.[3]

Since February, the respondent ("the government") asserts, the medical team and administration of BCHOC "have instituted strict protocols to keep inmates, detainees and staff safe and take all prudent measures to prevent exposure to the COVID- 19 infection."  Hogdson Aff. ¶ 5.  Entrance into the facilities by outsiders is now generally prohibited; attorneys, clergy, and staff are "medically screened prior to entrance by questions relating to COVID-19 symptoms and by body temperature assessment."  Id. ¶ 6(a)-(d).  Inmates and detainees who are over 60-years-old or are immuno-compromised "are being specially monitored."  Id. ¶ 6(k).  In addition:

> All housing units are sanitized no less than three
> times per day.  Fresh air is constantly circulated by
> opening windows and utilizing handler/vents throughout
> the day.  All feeding is done inside the housing or

government provided the Court (in a submission dated April 1, 2020) with a list of 147 names received from ICE that it represented as a complete roster of ICE detainees at BCHOC.  The Court expects that this discrepancy be cleared up quickly.

[3] The government explains that "[o]nly detainees who have been classified by ICE as high risk, typically based upon violent behavior (and not in any way related to COVID-19), are housed with non-immigration pre-trial inmates, but this is not in the general population."  Opp'n 2.

cells and inmates do not congregate for meals in the
main dining hall.  Outside recreation is done as usual
daily except that it is now done on split schedule to
prevent close inmate-to-inmate contact.

Id. ¶ 6(f).  According to BCHOC's medical director, Dr. Nicholas

J. Rencricca, "we are doing all that we can to reduce the risk

of a COVID-19 outbreak within BCHOC."  Aff. Nicholas J.

Rencricca, MD, PhD ¶ 24.  As of April 8, 2020, "there have been

no inmates or immigration detainees who have presented with, or

have tested positive for, COVID-19" at BCHOC, though one "unit

intake nurse tested positive for COVID-19" and she last showed

up to work on March 24.  Decl. Debra Jezard ¶ 8; Def.'s Input

Apr. 8 List 1, ECF No. 58.

     The Detainees dispute much of this.  They allege, for

instance, that "BCHOC facilities lack adequate soap, toilet

paper, and medical resources and infrastructure to address the

spread of infectious disease or to treat people most vulnerable

to illness."  Pet. ¶ 70.  They also state that "[h]ygiene is . .

. unavailable and unavailing under the[ir] conditions," id. ¶ 6,

and that they "are unaware of any meaningful safety measures

enacted by Defendants since the inception of this crisis," id. ¶

28.  Their "confinement conditions are a tinderbox," the

Detainees warn, "that once sparked will engulf the facility."

Id. ¶ 29.  Yet there are important aspects of the Detainees'

allegations that are substantially undisputed.  Chief among
these is the challenge of social distancing in BCHOC.

The Centers for Disease Control and Prevention ("CDC")
states that "COVID-19 spreads mainly among people who are in
close contact (within about 6 feet) for a prolonged period," and
therefore recommends that everyone practice "social distancing"
-- even among those with no symptoms, since the virus can be
spread by asymptomatic people.  CDC, Social Distancing,
Quarantine, and Isolation (reviewed Apr. 4, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/social-distancing.html (last accessed Apr. 6, 2020).  The
CDC thus advises that everyone "[s]tay at least 6 feet (2
meters) from other people."  Id.  The CDC has issued guidance
specifically for prisons and detention centers that beat the
same drum.  CDC, Interim Guidance on Management of Coronavirus
Disease 2019 (COVID-19) in Correctional and Detention
Facilities, at 4 (Mar. 23, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-
correctional-detention.pdf ("Although social distancing is
challenging to practice in correctional and detention
environments, it is a cornerstone of reducing transmission of
respiratory diseases such as COVID-19."); id. ("Social
distancing is the practice of increasing the space between
individuals and decreasing the frequency of contact to reduce

the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic).").

The Detainees assert that they "find it impossible to maintain the recommended distance of 6 feet from others" and they "must also share or touch objects used by others."  Pet. ¶ 67.  They specifically allege that their beds "are situated only 3 feet apart" and that "[m]eals are inadequate and eaten in close quarters."  Pet. ¶ 68.  Indeed, the government has provided the Court with photos of the sleeping quarters in the facility and this appears to be an accurate description.[4]  In one unit the "cell size" is listed as 30 feet by 10 feet (300 square feet), and the photo shows three bunk beds (sleeping six people) lining the wall.  Other images supplied include a photo labeled "Bunk Area" that shows a large room packed with rows of bunk beds.  None appears to enjoy anything close to six feet of isolation.  One of the named petitioners, Mr. Neves, avers that he "is being held in the same room as 49 other people," that his "bed is too close to other people," and that he is "not able to

---

[4] The government protests that "not every bed is filled and the minimal distance is believed to be between ends, not the long sides of beds."  Def.'s Suppl. Br. 9 n.6, ECF No. 41.  The CDC's guidelines are concerned with people, not furniture, so the Court does not see what bearing the government's distinction (whether the beds are measured from their length or width) has upon the safety of the Detainees.

engage in 'social distancing.'"  TRO Mem., Ex. 8, Decl. Julio
Cesar Medeiros Neves ¶¶ 4-6, ECF No. 12-8.

The COVID-19 global pandemic threatens all of us.  Yet
"[t]he combination of a dense and highly transient detained
population presents unique challenges for ICE efforts to
mitigate the risk of infection and transmission."  Opp'n, Ex. 2,
Memorandum from Enrique M. Lucero, ICE, to Detention Wardens &
Superintendents 1 (Mar. 27, 2020), ECF No. 26-2.  As the Supreme
Judicial Court of Massachusetts recently explained in reference
to statewide correctional facilities, including BCHOC,
"correctional institutions face unique difficulties in keeping
their populations safe during this pandemic."  Committee for
Pub. Counsel Servs. v. Chief Justice of the Trial Court, No.
SJC-12926, 2020 WL 1659939, at *3 (Mass. Apr. 3, 2020).  Indeed,
BCHOC's medical director acknowledged the obvious fact "that a
prison setting poses particular challenges from an infectious
disease standpoint," while asserting that "the risk of infection
is tempered by the degree of control we have over access to the
facility."  Renricca Aff. ¶ 21.

The Detainees have provided affidavits from two physicians
who have recently visited Detainees on site.  Dr. Nathan
Praschan of Massachusetts General Hospital states that "[t]he
best-known methods of preventing infectious spread," such as
"social distancing, frequent hand washing, and sanitation of

surfaces . . . are unavailable to . . . [these] detainees, who sleep, eat, and recreate in extremely close quarters and do not have access to basic hygienic supplies."  Decl. Dr. Nathan Praschan ¶ 9.  Dr. Matthew Gartland of Brigham and Women's Hospital avers that "based on my own experience visiting Bristol County House of Corrections, I do not believe that . . . [these] detainees, can be adequately protected from the virus that causes COVID-19.  This is based on a lack of private sinks or showers and inadequate hand soap supplies, and hand sanitizers, as well as inadequate allowance for social distancing, screening for symptoms and exposure to the virus, testing of individuals with symptoms, and appropriate quarantine and isolation facilities."  Decl. Dr. Matthew Gartland ¶ 16.

### B.  Procedural History

The Detainees filed a habeas petition as a putative class action in this Court on March 27, 2020.  Pet.  The petition asserts two claims: (1) violation of due process as a result of confinement in conditions "that include the imminent risk of contracting COVID-19," id. ¶¶ 98-105; and (2) violation of section 504 of the Rehabilitation Act for failure to provide reasonable accommodations, in the form of protection against COVID-19, to Detainees with medical conditions, id. ¶¶ 105-116.

On the same day, the Detainees filed a motion for a temporary restraining order ("TRO"), ECF No. 11, and a motion

for class certification, ECF No. 13.  As these motions refer
only to the due process claim, the Detainees do not seek a TRO
or class certification for their claim under the Rehabilitation
Act.  See Mem. Supp. Mot. Temporary Restraining Order ("TRO
Mem."), ECF No. 12; Mem. Supp. Pls.' Mot. Class Cert. ("Class
Cert. Mem."), ECF No. 14; Reply Resp.-Def.'s Opp'n Mot. TRO
("Pet'rs' Reply") 16 n.6.  The Government has opposed both
motions.  See Opp'n; Def.'s Suppl. Br., ECF No. 41.

The Court held an initial hearing on March 30, 2020,
converting the motion for a TRO into a motion for a preliminary
injunction.[5]  ECF No. 27.  At the next hearing, on April 2, 2020,
the Court provisionally certified five subclasses and took the
other matters under advisement.  Electronic Clerk's Notes, ECF
No. 36; see Order, ECF No. 38 (listing twelve members of first
subclass).  The following day, the Court held another hearing at
which it was informed that the Government voluntarily agreed to
release six members of the first subclass.  The Court deemed the
case moot as to those individuals, ordered release on bail under
certain conditions for three other members of the subclass,[6] and

---

[5] All hearings in this matter have been held remotely by
video conference in light of the danger posed by COVID-19.

[6] The bail order was as follows:

The Court grants bail to Henry Urbina Rivas, Robson
Maria-De Oliveira, and Jervis Vernon pending
resolution of the habeas corpus petition, upon all

either denied bail without prejudice or continued the matter for
the rest of the subclass.  Order, ECF No. 44.  The Court
notified the parties that it would consider bail for fifty
additional detainees, id. ¶ 6, and later set a schedule for
considering those fifty individual bail applications at a rate
of ten per day beginning on April 7, 2020.  Order, ECF No. 46.
It has since ordered bail for several more Detainees.  See ECF
Nos. 54-55.

---

bail conditions deemed appropriate and imposed by ICE,
and the following additional terms and conditions as
to each of them: (a) release only to an acceptable
custodian; (b) such custodian will pick the releasee
up outside the facility by car; (c) releasee will be
taken from the facility to the place of residence
previously identified to ICE (ICE shall notify the
state and local law enforcement authorities about
their presence and the[] details of their bail
status); (d) releasees are to be fully quarantined for
14 days from date leaving facility to the residence;
(e) during and after the 14-day quarantine, releasees
will remain under house arrest, without electronic
monitoring, and shall not . . . leave the residence
for any reason save to attend immigration proceedings
or attend to their own medical needs should those
needs be so severe that they have to go to a doctor's
office or hospital (in which case they shall notify
ICE as soon as practicable of their medical
necessity); (f) releasees are not to be arrested by
ICE officers unless: (i) upon probable cause a warrant
is issued by a United States Magistrate Judge or
United States District Judge that they have violated
any terms of their bail, or (ii) there is a final
order of removal making them presently removable from
the United States within two weeks. The Court may, sua
sponte or on motion of the parties, modify or revoke
the bail provided herein.

Order ¶ 2, ECF No. 44.

## II.   ANALYSIS

This opinion tackles three issues.  First, the Court rejects the government's argument that the Detainees lack Article III standing because their risk of injury is too speculative.  Next, the Court certifies a general class of Detainees for their due process claim of deliberate indifference to a substantial risk of serious harm.  Though there are indeed pertinent and meaningful distinctions among the various Detainees, there is a common question of unconstitutional overcrowding that binds the class together.  Nor, contrary to the government's assertion, is there a statutory bar to class certification in this case.  Finally, the Court explains its rulings and authority in ordering bail for certain Detainees.

### A.   Article III Standing

To satisfy constitutional standing in federal court, a habeas petitioner (like other litigants) "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990)).  The government argues the Detainees' "claims of future injury are hypothetical" and "conjectural" because "crowding in and of itself does not cause COVID-19 infection if none in the group has contracted COVID-19."  Opp'n 15.

The Court disagrees.  The Supreme Court has held that "future injuries" may support standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  Department of Commerce v. New York, 139 S. Ct. 2551, 2565 (2019) (quoting Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014)).  In this moment of worldwide peril from a highly contagious pathogen, the government cannot credibly argue that the Detainees face no "substantial risk" of harm (if not "certainly impending") from being confined in close quarters in defiance of the sound medical advice that all other segments of society now scrupulously observe.[7]  See TRO Mem., Ex. 1, Decl. Alan S. Keller, M.D. ¶ 10, ECF No. 12-1 ("[T]he risk of COVID-19 infection and spread in immigration detention facilities,

---

[7] Amazingly, the government appears to make this argument. At the April 2 hearing, the government emphasized that no Detainee or inmate in BCHOC has yet tested positive for COVID-19 and argued that "if the Court starts from the position that the Court's goal here is to reduce the concentration of inmates it has jumped past the presence, or non-presence, of the virus to an assumption that the virus is present and therefore we're going to do everything we can to increase social distancing." In a later filing the government reiterated the point: "It is ICE's position, for the record, that release of none of the listed individuals is required for either their safety or the safety of the remaining civil detainee population at BCHOC." Defs.' Input Regarding Apr. 7 List 1, ECF No. 50.  Yet the government's quarrel is not with the Court but with the vigorous recommendations of infectious disease experts worldwide, including in the federal government, to maximize social distancing.

including Bristol County, is extremely high.").  This risk of
injury is traceable to the government's act of confining the
Detainees in close quarters and would of course be redressable
by a judicial order of release or other ameliorative relief.

Accordingly, the Court rules that the Detainees easily meet
Article III's standing requirements.

### B.   Class Certification

The Detainees moved to certify the following proposed
class: "All civil immigration detainees who are now or will be
held by Respondents-Defendants at the Bristol County House of
Corrections (BCHOC) and the C. Carlos Carreiro Immigration
Detention Center ("Carreiro") in North Dartmouth,
Massachusetts."  Class Cert. Mem. 9.  At the hearing on April 2,
2020, the Court declined to certify the class as proposed but
provisionally certified five subclasses.  Electronic Clerk's
Notes, ECF No. 36.[8]  The Court does not now revisit that

---

[8] The Court described the five provisionally certified
subclasses as follows:
Group 1: Detainees with no criminal record and no pending
criminal charges.
Group 2: Detainees with medical conditions recognized under
the CDC guidelines as heightening their risk of harm from COVID-
19 and who have minor, non-violent criminal records or minor,
non-violent criminal charges pending.
Group 3: Detainees without the medical conditions of Group
2 but who likewise have minor criminal records or minor,
primarily non-violent criminal charges pending.
Group 4: Detainees with pending criminal charges against
them for violent crimes, either in the United States or abroad.

provisional ruling.[9]  Yet it does, for the reasons given below,

now certify the general class as proposed by the Detainees,

albeit excluding those not yet in custody.

### 1.   Bar on Classwide Injunction in Immigration Matters

The government first argues that the proposed class cannot

be certified because 8 U.S.C. § 1252(f)(1) bars courts (other

than the Supreme Court) from enjoining or restraining the

"operation" of immigration enforcements actions except in their

application to "an individual alien against whom proceedings

under such chapter have been initiated."  Opp'n 9.  The

government cites dicta from <u>Reno</u> v. <u>American Arab Anti-</u>

<u>Discrimination Comm.</u> indicating that classwide injunctive relief

---

Group 5: Detainees with criminal convictions for violent
crimes, either in the United States or abroad.

[9] The government argues, without citation to authority, that
"Rule 23(c)(5) requires that there be a class first before
subclasses are created."  Def.'s Suppl. Br. 8.  The Court has
found only one judicial opinion seemingly endorsing that view,
<u>Sprague</u> v. <u>General Motors Corp.</u>, 133 F.3d 388, 399 n.9 (6th Cir.
1998) (en banc), while the Eleventh Circuit disagrees, <u>Klay</u> v.
<u>Humana, Inc.</u>, 382 F.3d 1241, 1261-62 (11th Cir. 2004).  <u>See</u> 3
William B. Rubenstein, <u>Newberg on Class Actions</u> § 7:29 n.1 (5th
ed. 2019) (citing circuit split); Scott Dodson, <u>Subclassing</u>, 27
Cardozo L. Rev. 2351, 2389 (2006) (concluding that "the best
interpretation" of Fed. R. Civ. P. 23 allows subclasses to be
certified in the absence of a valid general class).  The First
Circuit recently suggested that "[t]he commonality standard
might also be satisfied in some cases by certifying subclasses."
<u>Parent/Professional Advocacy League</u> v. <u>City of Springfield</u>, 934
F.3d 13, 29 n.15 (1st Cir. 2019) (citing Mark C. Weber, <u>IDEA</u>
<u>Class Actions After Wal-Mart v. Dukes</u>, 45 U. Tol. L. Rev. 471,
498-500 (2014)).  In any case, because the Court now certifies
the general class, the question is academic.

[14]

is simply not available in immigration cases.  525 U.S. 471,
481-82 (1999) (describing § 1252(f) as "prohibit[ing] federal
courts from granting classwide injunctive relief against the
operation of [8 U.S.C.] §§ 1221-1231").  Thus, the government
appears to argue, the Court cannot certify this class now
because it will not later be able to provide classwide relief.

Yet section 1252(f) says nothing about declaratory relief,
which the Detainees expressly request here in addition to
injunctive relief.  Pet. 24.  Accordingly, this provision does
not bar declaratory relief and therefore poses no obstacle to
class certification.  See Reid v. Donelan, 390 F. Supp. 3d 201,
226 (D. Mass. 2019) (Saris, C.J.); Rodriguez v. Marin, 909 F.3d
252, 256 (9th Cir. 2018); Alli v. Decker, 650 F.3d 1007, 1014
(3d Cir. 2011).  Seeking to avoid this conclusion, the
government cites a Sixth Circuit decision for the proposition
that declaratory relief may be the "functional equivalent" of a
prohibited classwide injunction.  Opp'n 11 (quoting Hamama v.
Adducci, 912 F.3d 869, 880 n.8 (6th Cir. 2018)).  The Sixth
Circuit opinion was issued after three Justices argued to the
contrary in Jennings v. Rodriguez, 138 S. Ct. 830, 876 (2018)
(Breyer, J., dissenting), but before three other Justices
agreed, see Nielsen v. Preap, 139 S. Ct. 954, 962 (2019)
(plurality opinion).  With six Justices of the current Supreme
Court now on record stating that section 1252(f) does not bar

[15]

declaratory relief, and because that is the better reading of the statute, the Court adheres to that view.  See Reid, 390 F. Supp. 3d at 226; Reid v. Donelan, No. 13-30125-PBS, 2018 WL 5269992, at *7-8 (D. Mass. Oct. 23, 2018) (Saris, C.J.).

This is not to suggest that injunctive relief will be categorically unavailable in this case.  See Marin, 909 F.3d at 256 (allowing a classwide injunction when all members of the class were individuals against whom detention proceedings had been initiated, in accordance with the exception contained in section 1252(f)(1)).  Nor does the Court intimate that it will eventually provide any relief at all, since it has not yet reached the merits.  At this class certification stage, it is enough to establish that the Court could provide a classwide remedy in the form of a declaratory judgment or injunctive relief.  Having established that, the Court rejects the government's argument that section 1252(f) precludes class certification.

### 2.    The Requirements of Rule 23

"To obtain class certification, the plaintiff must establish the four elements of [Fed. R. Civ. P.] 23(a) and one of several elements of Rule 23(b)."  Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997)). Rule 23(a) permits class certification only if:

> (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to establishing these four elements, the Detainees must satisfy one of Rule 23(b)'s categories. The Detainees rely on Rule 23(b)(2), Class Cert. Mem. 16-17, which permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Since numerosity and adequacy appear well-founded, the government challenges only the commonality and typicality of the proposed class. Opp'n 13 ("The proposed class lacks uniformity and the Plaintiffs are not representative of the proposed class members."). Though commonality and typicality are distinct elements under Rule 23(a), the Supreme Court has repeatedly recognized that they "tend to merge." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349 n.5 (2011) (quoting General Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)). Indeed, the government attacks both commonality and typicality with the same set of arguments. The gist of the government's contention on

this score is that the various detainees are not "similarly situated" because they "are of different ages and all present different levels of health at this time."  Opp'n 12. Furthermore, the government points out that some detainees are subject to statutorily mandated detention while others are not, and that "each detainee presents a different risk of flight and/or public safety threat if released."  Id.  Accordingly, the Court treats commonality and typicality together.

To establish commonality under Rule 23(a)(2), one common question is enough.  Wal-Mart, 564 U.S. at 359.  "A question is common if it is 'capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  Parent/Professional Advocacy League v. City of Springfield, 934 F.3d 13, 28 (1st Cir. 2019) (quoting Wal-Mart, 564 U.S. at 350).  It is not critical whether common "questions" are raised; the decisive factor is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  Id. (quoting Wal-Mart, 564 U.S. at 350).

The Detainees frame the common question as follows: "Whether the conditions of confinement at Bristol County Immigration Detention Facilities, under the current conditions and in light of the COVID-19 pandemic, render class members'

confinement a punishment that violates constitutional standards." Class Cert. Mem. 18-19. Here, as is typical in the Rule 23 commonality inquiry, "proof of commonality necessarily overlaps with [the Detainees'] merits contention." Wal-Mart, 564 U.S. at 352. Accordingly, the Court now discusses the merits of the Detainees' constitutional claim, but only to the extent necessary to decide the class certification question. See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

When the government "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses . . . the Due Process Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). The due process guarantee of the Constitution obliges the government "to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health." Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011) (citing City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983) & Farmer v. Brennan, 511

U.S. 825, 835 (1994)).  "Proof of deliberate indifference requires a showing of greater culpability than negligence but less than a purpose to do harm," id. (citing Farmer, 511 U.S. at 835), "and it may consist of showing a conscious failure to provide medical services where they would be reasonably appropriate," id. (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  "To show such a state of mind, the plaintiff must provide evidence that the defendant had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm." Leite v. Bergeron, 911 F.3d 47, 52-53 (1st Cir. 2018) (quoting Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (further citation and internal quotation marks omitted).  "This standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness." Id. at 53 (quoting Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999)).  Courts generally apply the same standard for civil immigration detainees as for pre-trial detainees.  See E. D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019) (stating that "the legal rights of an immigration detainee [are] analogous to those of a pretrial detainee" and collecting cases of other circuits).

With this legal background in mind, it is understandable why the government highlights the differences among the Detainees.  For example, it may be easier for Detainees who are

at heightened risk of harm from COVID-19 to prove the "substantial risk of serious harm" prong of the inquiry than it will be for healthier Detainees who lack special risk factors. Detainees with a serious criminal background might have a tougher time demonstrating that the government could "have easily prevented that harm" by releasing them on bond, for instance.  Indeed, these very considerations guided the Court in provisionally certifying five separate subclasses.

Upon reflection, however, the Court determines that the admittedly significant variation among the Detainees does not defeat commonality or typicality.  At bottom, a common question of law and fact in this case is whether the government must modify the conditions of confinement -- or, failing that, release a critical mass of Detainees -- such that social distancing will be possible and all those held in the facility will not face a constitutionally violative "substantial risk of serious harm."  Farmer, 511 U.S. at 847.  Crucial to the Court's determination is the troubling fact that even perfectly healthy detainees are seriously threatened by COVID-19.  To be sure, the harm of a COVID-19 infection will generally be more serious for some petitioners than for others.  Yet it cannot be denied that the virus is gravely dangerous to all of us.

Consider recent data from the CDC.  In a sample of COVID-19 patients aged 19 and older with no underlying health conditions

or risk factors, approximately 7.2-7.8% were hospitalized

without requiring admission to the Intensive Care Unit ("ICU"),

and an additional 2.2-2.4% were hospitalized in the ICU,

totaling 9.6-10.4%.  If the pool is restricted to patients

between the ages of 19 and 64, all with no underlying health

conditions reported, approximately 6.2-6.7% were hospitalized

without admission to the ICU, and an additional 1.8-2.0%

required the ICU, for a total hospitalization rate of 8-8.7%.

The rates of hospitalization and ICU admittance are

significantly higher for those with underlying health

conditions.[10]  Since COVID-19 is highly contagious and the

quarters are close, the Detainees' chances of infection are

great.  Once infected, taking hospitalization as a marker of

"serious harm," it is apparent that even the young and otherwise

healthy detainees face a "substantial risk" (between five and

ten percent) of such harm.

Likewise, the "deliberate indifference" part of the

inquiry, which asks whether the government "disregards th[e]

---

[10] See Nancy Chow et al., CDC COVID-19 Response Team,
Preliminary Estimates of the Prevalence of Selected Underlying
Health Conditions Among Patients with Coronavirus Disease 2019 —
United States, February 12–March 28, 2020, 69 Morbidity &
Mortality Weekly Report 382, 382-84 (Apr. 3, 2020),
https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.  It
must be emphasized that this data is partial and preliminary.
See id. at 384-85 (listing six limitations on the report's
findings).

risk by failing to take reasonable measures to abate it,"
Farmer, 511 U.S. at 847, is apt to generate a common answer for
the entire class of Detainees.  The question is not so much
whether any particular Detainee should be released -- a matter
as to which the various individuals are surely differently
situated.  Rather, the question is whether the government is
taking reasonable steps to identify those Detainees who may be
released in order to protect everyone from the impending threat
of mass contagion.  Nor does it matter how the density of
Detainees is reduced.  Transfer to less crowded facility,
deportation, release on bond, or simply declining to contest
lawful residence -- any of these methods would effectively
minimize the concentration of people in the facility.  This
affords the government greater flexibility and minimizes the
differences among the various Detainees.

        The case law supports a finding of commonality for class
claims against dangerous detention conditions, even when some
detainees are more at risk than others.  For example, the Ninth
Circuit affirmed class certification for an Eighth Amendment
challenge to inmate medical care policies, explaining that
"although a presently existing risk may ultimately result in
different future harm for different inmates -- ranging from no
harm at all to death -- every inmate suffers exactly the same
constitutional injury when he is exposed to a single statewide

[department of corrections] policy or practice that creates a substantial risk of serious harm." Parsons v. Ryan, 754 F.3d 657, 678 (9th Cir. 2014). Similarly, the Fifth Circuit affirmed class certification of all prisoners in an overheated prison, despite the variations in health and risk among prisoners, because the prison authority's "heat-mitigation measures . . . were ineffective to reduce the risk of serious harm to a constitutionally permissible level for any inmate, including the healthy inmates." Yates v. Collier, 868 F.3d 354, 363 (5th Cir. 2017). Here, too, even the otherwise healthy Detainees face a substantial risk of serious harm from COVID-19. The commonality analysis of Parsons and Yates is persuasive and has been approvingly cited by the First Circuit. See Parent/Professional, 934 F.3d at 28 n.14. Accordingly, the Court rules that the commonality and typicality prongs of the Rule 23(a) analysis are satisfied.

Before certifying the class, the Court pauses to consider the uniformity of remedy required by Rule 23(b)(2). See Wal-Mart, 564 U.S. at 360 (holding that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."). Thus, the Court may certify the class

only if it would be entitled to an "indivisible" remedy.  Id.
The Court concludes that a uniform remedy would be possible in
this case, whether in the form of declaratory relief or
(depending on the proper reading of 8 U.S.C. § 1252(f), as
alluded to above) an injunction ordering the government to
reduce crowding of Detainees.  Cf. Brown v. Plata, 563 U.S. 493,
502 (2011) (affirming classwide injunction of "court-mandated
population limit" in state prisons to remedy Eighth Amendment
violations due to "severe and pervasive overcrowding").

Thus, the requirements of Rule 23 are met and the Court
certifies the general class as proposed by the Detainees, with
one caveat: The Court declines to include those who "will be
held," Class Cert. Mem. 9, but are not yet in custody.  Although
the government has not declared that it will not admit more
detainees to BCHOC during this health crisis, it has agreed to
notify the Court before doing so.  Tr. Hr'g 25, ECF No. 48.  The
Court sees no need to include possible future detainees in this
class.  Moreover, since the situation is rapidly evolving and
future detainees may well be subject to different confinement
conditions than those now obtaining, it may be that the named
representative cannot "fairly and adequately protect the
interests" of those future detainees.  Fed. R. Civ. P. 23(a)(4);
cf. Amchem, 521 U.S. at 625-26 (holding that differences between

currently injured and not-yet-injured members of proposed class

defeated adequacy requirement).

### C.   The Court's Inherent Authority to Order Bail

The Court now turns to explain its decision to order bail

for several Detainees and to consider bail applications for

others.  The First Circuit has explained "that a district court

entertaining a petition for habeas corpus has inherent power to

release the petitioner pending determination of the merits."

Woodcock v. Donnelly, 470 F.2d 93, 94 (1st Cir. 1972) (per

curiam).  Such authority may be exercised in the case of "a

health emergency," where the petitioner has also demonstrated a

likelihood of success on the merits.  Id.  For example, Woodcock

approvingly cited Johnston v. Marsh, in which the Third Circuit

affirmed the decision of the district court granting bail to a

habeas petitioner who, "as an advanced diabetic, was, under

conditions of confinement, rapidly progressing toward total

blindness."  227 F.2d 528, 529-32 (3d Cir. 1955).  In Mapp v.

Reno, the Second Circuit held that "the federal courts have the

same inherent authority to admit habeas petitioners to bail in

the immigration context as they do in criminal habeas case."

241 F.3d 221, 223 (2d Cir. 2001).  A court considering bail for

a habeas petitioner "must inquire into whether 'the habeas

petition raise[s] substantial claims and [whether] extraordinary

circumstances exist[] that make the grant of bail necessary to

make the habeas remedy effective.'" <u>Id.</u> at 230 (alterations in
original) (quoting <u>Iuteri</u> v. <u>Nardoza</u>, 662 F.2d 159, 161 (2d Cir.
1981)).

Other courts, including another session of this Court, have
recently relied on <u>Mapp</u> to order bail for habeas petitioners who
were civil immigration detainees at risk due to the COVID-19
pandemic. <u>See</u> <u>Avendaño Hernandez</u> v. <u>Decker</u>, No. 20-CV-1589
(JPO), 2020 WL 1547459, at *2-4 (S.D.N.Y. Apr. 1, 2020); <u>Jimenez</u>
v. <u>Wolf</u>, Civ. A. No. 18-10225-MLW, Memorandum & Order ("<u>Jimenez</u>
Order"), ECF No. 507 (D. Mass. Mar. 26, 2020) (Wolf, J.). As
expressed during the hearing on April 3, the Court follows these
precedents in construing its authority to order bail for habeas
petitioners under the reigning "exceptional circumstances,"
<u>Glynn</u> v. <u>Donnelly</u>, 470 F.2d 95, 98 (1972), of this nightmarish
pandemic. Like Judge Wolf in <u>Jiminez</u> and Judge Oetken in
<u>Hernandez</u>, this Court ruled that bail was appropriate for some
Detainees on the basis of <u>Mapp</u> and its First Circuit analogues.[11]

---

[11] The First Circuit in <u>Glynn</u> stated that bail should not be
ordered without "a clear case" on both the law and the facts,
and that "Merely to find that there is a substantial question is
far from enough," 470 F.2d at 98, and <u>Woodcock</u> indicated that a
finding of likelihood of success on the merits may be needed,
470 F.2d at 94. This contrasts with <u>Mapp</u>, which required only
(apart from the presence of extraordinary circumstances) that
the petitioner raise "substantial claims." 241 F.3d at 230.
Yet, as Judge Wolf observed, the First Circuit cases were
dealing with a state prisoner convicted of a crime and for that
reason insisted upon a higher standard, <u>see</u> <u>Glynn</u>, 470 F.2d at
98, whereas here "the <u>Mapp</u> test or something similar or perhaps

Additionally, the Court follows the light of reason and the expert advice of the CDC in aiming to reduce the population in the detention facilities so that all those who remain (including staff) may be better protected.  In this respect, the Supreme Judicial Court of Massachusetts has articulated sound principles: "[T]he situation is urgent and unprecedented, and . . . a reduction in the number of people who are held in custody is necessary," but "the process of reduction requires individualized determinations, on an expedited basis, and, in order to achieve the fastest possible reduction, should focus first on those who are detained pretrial who have not been charged with committing violent crimes."  Committee for Pub. Counsel Servs., 2020 WL 1659939, at *9.[12]  The Court will proceed in a similar fashion in diligently entertaining bail applications while the petitions for habeas corpus are pending.

---

less is appropriate."  Jimenez Order, Ex. 1, at 1-2, ECF No. 507-1.  This Court agrees, though it makes little difference because the Detainees released on bail would also satisfy a more exacting standard.

[12] With respect to federal prisons, Congress responded to the pandemic by expressly authorizing the Bureau of Prisons to exceed the statutory maximum period of home confinement if the Attorney General makes a finding of "emergency conditions," CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020), and the Attorney General has now found such an emergency.  See Memorandum of Attorney General William Barr to Director of Bureau of Prisons (Apr. 3, 2020), https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.

**III. CONCLUSION**

The motion for class certification is <u>ALLOWED</u>.  The Court now certifies the following class: "All civil immigration detainees who are now held by Respondents-Defendants at the Bristol County House of Corrections and the C. Carlos Carreiro Immigration Detention Center in North Dartmouth, Massachusetts." The named petitioners in this action, Maria Alejandra Celimen Savino and Julio Cesar Medeiros Neves, are appointed class representatives.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE