UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                      )
**MARIA ALEJANDRA CELIMEN SAVINO**    )
**and JULIO CESAR MEDEIROS NEVES,**   )
                                                      )
**Petitioners-Plaintiffs,**                )
                                                      )     **20-cv-10617 WGY**
**v.**                                      )
                                                      )
**THOMAS HODGSON, et al.,**           )
                                                      )
**Respondents-Defendants.**           )
_____)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO STAY FURTHER RELEASES**

Respondents-Defendants hereby provide the Court with their Memorandum in Support of their Motion to Stay Further Releases. Because of the population reduction effected by transfers, voluntary releases and Court-ordered releases, and as a result of steps taken at the Bristol County House of Corrections ("BCHOC"), adequate social distancing is now possible in all ICE detainee units.

In this Memorandum, the Defendants will address:

1. What we are all aiming for in terms of safety;

2. The physical layout at BCHOC;

3. The current population numbers in each unit;

4. Why there is now sufficient space to practice social distancing; and

5. Why the risk of COVID-19 in BCHOC has been adequately addressed.

**A.  Where the Goalposts Are**

Before discussing the physical layout of the facility, it is important to review what we are

trying to achieve. What the parties, the Court and the Defendants are seeking is to minimize the risk of the detainees getting infected with COVID-19.[1] There are a number of ways in which that can be done. None of the possible steps is exclusive. There is no single right way to do this and there is no way to achieve absolute protection from the virus.

Plaintiffs have painted an unrealistic, black and white picture in which the *only* effective means of protection is the release of all detainees. This is flawed in both logic and pragmatics. First, there is no guarantee that the detainees won't encounter COVID-19 upon release. The Court, detainees' counsel and the government have very little means of knowing, much less controlling, the extent to which the detainees *and their families* practice appropriate precautions against the virus. While the Court has ordered house arrest, the Court neither has authority over, nor insight into, the behavior of those around the detainees. Thus, the risk of the detainees contracting COVID-19 upon release is far from zero.

Conversely, although the Court thinks it astounding that the government makes such an argument, the risk of detainees contracting COVID-19 if they remain at BCHOC is far from 100%. This is underscored by the fact that this litigation is now entering its third week and there are still no cases of COVID-19 in either the inmate or detainee population. In light of the daily exponential increases in the number of confirmed cases in the Commonwealth of Massachusetts, it is clear that the steps taken at BCHOC have been effective.

The Court's approach has been rooted in its firm belief that social distancing is the *sine*

---

[1] The Defendants and the Court are also trying to ensure that the community into which the detainees are released is not endangered by their presence and that they will not flee. The danger to the community is of particular concern given that the majority of the released detainees have significant criminal records, typically involving violent crime, domestic abuse and/or drug trafficking. As has been previously stated, they were detained by ICE for good reasons and in good faith.

*qua non* of infection prevention.  And there is certainly good support for this conclusion, although none of the health experts or governmental organizations have stated that social distancing alone is sufficient.  In fact, the earliest guidance from the Centers for Disease Control ("CDC")  and many other health organizations, both domestic and foreign, stressed washing hands with soap and water as the first line of defense.  Defendants do not dispute the importance of social distancing, but remind the Court that BCHOC is not like the world at large.  This is because BCHOC is able to control who comes into its facility, where they go, and what steps are taken to screen such individuals.  Social interaction, the primary focus of the social distancing recommendations, is much more limited at BCHOC than in the outside world, and those who do interact have been isolated from the greater community for the most part.

It is true that individuals have the potential to exercise even greater control over who they come into contact with *if* they choose to comply with Governor Baker's recommendation that they stay at home.   This is not, at least not yet, a mandatory order.  Even families that choose to comply typically have someone going out to buy food, and many households have one or more people that are working outside the home still.  In addition, it is likely that the families of released detainees will have fewer resources and diminished access to social services both as a consequence of the pandemic and their socio-economic status before the pandemic.  This puts additional economic pressure on them to continue working.

So it is by no means clear that release is a panacea.  The Court has determined that a release of some number of BCHOC detainees is necessary in order to reduce the risk of infection in what the Court sees as inevitable, the virus entering the detainee population.  We are therefore focused on what is the maximum number of detainees that can be housed in each immigration detention unit at BCHOC and still allow detainees to maintain at least a six foot distance between

themselves in accordance with the CDC guidelines.

### B. The Physical Layout at BCHOC

As set forth in the declaration of Superintendent Steven Souza, submitted to the Court on April 10, 2020 and as updated and attached hereto,[2] there are four primary units at BCHOC which house civil immigration detainees and an additional two disciplinary units that may house a small number of immigration detainees. There are also medical units in which a detainee may be segregated; currently, there is one detainee in such a unit. The size of the spaces within each unit are described in the declaration of Superintendent Souza and will not be reviewed here except as relevant.

1. **2 East:** Presently, there are 36 male ICE detainees who are housed in "2 East." 2 East is on the main campus of BCHOC. High risk male ICE detainees are housed there with state pre-trial detainees. This unit is part of our Mods unit and has a capacity for 104 persons. The current population is 54 (36 ICE detainees and 18 state pre-trial inmates). These current 36 ICE detainees are divided into 8 cells, each of which measures 330 square feet (30' x 11'). There are a total of 13 cells at 2 East. Each cell has a capacity for 8 detainees. Because of the size of the 2 East population, no cell is at full capacity. Seven (7) cells are located on the north side of the room, which is divided by a hall, and the other 6 are on the opposite side of the room (south).

Each cell contains 4 double bunk beds in total, 3 on one wall (each bunk bed unit is separated by approximately 7"-34" between the foot end of one bunk and the head end of the next bunk, which means that detainees' heads are at least 6-8 feet apart linearly). There is one

---

[2] The primary changes to Superintendent Souza's declaration are to update the number of detainees in each area. Some of the descriptions of the spaces have been edited for clarity.

more double bunk bed situated 6'-7' across the cell on the other wall, with approximately 8' separating center of each bunk bed (where the occupant's head is) from the center of the bed on the opposite wall. No portion of an occupant in a bed on one wall is closer than 6' to any portion of the occupant of a bed on the opposite wall.  For all of the bunks, the bottom bunk bed is approximately 3' below the upper bunk bed, but it should be kept in mind that there is a solid barrier between the upper and lower bunks upon which the upper mattress sits.  With the current population in 2 East, there is enough space so each of the three bunkbeds on one wall have only a single occupant.  We have arranged it to that the adjacent bunks alternate as to which level, top or bottom, is occupied to increase the distance between detainees' heads.  If the cell has five detainees, both the bottom and top level of the bunk on the opposite side are occupied, but with the head of one detainee over the feet of the other detainee, upon information and belief.  No detainee's head is closer to another detainee's head than 6.7 feet.

  For all of the other areas in 2 East, there is adequate space for social distancing.  For example, there are two bathroom/shower rooms in 2 East, each of which is 21' x  9'. One bathroom has three toilets, five showers, six sinks, and two urinals.  The other bathroom has four toilets, five showers, seven sinks, and one urinal.  The bathroom/shower areas have sufficient space for the current population to practice appropriate social distancing.

  Unit 2 East has one large common area 59' x 30'.  There are six long tables with eight chairs, two medium size tables with four chairs per table, and five round tables with four chairs. This provides seating for 76 detainees, but there are only 54 in 2 East presently (ICE and pre-trial combined).  These tables are spaced between 5'-6' apart and there is rarely, if ever, a time when all detainees are using this area at the same time.  There is also an outside recreational area the size of a football field (160'x 280') which has a walking path, a grass area for activities, and an

asphalt area with a basketball court. All of these areas have sufficient space for the current population to practice appropriate social distancing.

With the present configuration of the cells and placement of the bunk beds, there is more than adequate space for 6' social distancing recommended by the CDC.

**2. ICE A:**

The C. Carlos Carreiro Immigration Detention Center (the "Carreiro Center") is a separate building at BCHOC.  It has two units, Unit A and Unit B.  These are separate and distinct units, with separate housing, dining and recreational areas. Because Units A and B are mirror images of each other, everything is the same except for the number of current detainees housed in each.  Detainees are assigned to Unit A or Unit B based upon ERO's determination of their relative risk of violence and/or flight.  ICE A houses low and medium-low classification detainees, ICE B houses medium-high and high classification.

In Unit A, there are currently 19 ICE detainees, even though there is capacity for 66 detainees.  No other detainees and no inmates are housed in either Unit A or Unit B.  The sleeping area in both Unit A and B is dormitory style, containing no cells. Each unit has 66 beds (33 double bunk beds) which are placed in 5 rows in an area approximately 1624 square feet (28' x 58'). *See* Exhibit 3 attached hereto.  Three rows have seven bunk beds per row (four feet separating each row of bunk beds from the adjacent row, and three feet in between each bunk bed within a row), while the other two rows have six bunk beds per row, with the same four feet of separation between beds. Each bunk bed is seven feet long and four feet wide.  The top and bottom bunks are three feet apart.  *Id.; see also* Declaration of Superintendent Souza.

As of April 12, 2020, the BCHOC has assigned detainees so that only every other row is occupied. Row 1 is occupied by 6  detainees, Row 2 has no detainees, Row 3 has 4 detainees,

while Row 4 is empty, and Row 5 is occupied by 9 detainees. This provides significant space between occupied rows (approximately twelve feet) because of the empty row in the middle. In addition to the separation provided by the empty middle rows, detainees are assigned to every other bunk bed, just one detainee per bunk bed (i.e., top or bottom but not both), except that there are two bunk beds with detainees in adjacent beds within the same row. BCHOC has encouraged the detainees in these two sets of adjacent beds (within a row, not across a row) to sleep head to foot so as to ensure that the detainees' heads are at least seven to eight feet away from any other detainee's head.[3] *Id.*

Beyond the last row of beds, there is a common area about thirteen feet away. The common area approximates 3,100 square feet. There are eight round tables, each eight feet in diameter, with eight chairs for each. These tables are used for dining, playing games and watching TV. Also, there is a separate laundry room which measures 9' x 10', with two washers and two dryers in the room. There is a separate visitors room measuring 13' x 10', as well as a very large bathroom/shower room measuring 19' x 35'. Within the bathroom, there area eight sinks, six showers, three urinals and six toilets. Unit A has a separate classroom that is 18' x 19' in size, where detainees can read and study. No formal classes are being held due to the pandemic. Finally, it has an outdoor recreational area that is 30' x 54'. Each of these areas is sufficiently sized so that the current detainee population can practice appropriate social distancing if they wish to do so. The laundry room cannot handle more than two detainees using it at a time, but this is not an impediment to social distancing because of the function of that room. *Id.*

---

[3] This is in accordance with CDC guidelines for correctional facilities; *see* section D below at note 2.

Lastly, Unit A has a separate dedicated medical office measuring 14' x 12'. This room is staffed by a nurse who dispenses medication to the detainees as prescribed and attends to detainee medical calls as needed. Detainees visit the office one at a time when summoned. Should a detainee require greater care, he is transported to the main campus to the larger medical unit. *Id.*

### 3. ICE B:

As stated, ICE B is a mirror image of ICE A, so all of the dimensions set out above apply to ICE B as well. Presently, ICE B has 30 immigration detainees. There are no other types of inmates or detainees housed there. *Id.*

As of now, BCHOC has kept every other row empty in ICE B, but this means that eight bunk beds have the top and bottom bunks filled. *See* Exhibit 3 hereto (drawings of sleeping arrangements and distances between detainees in bed). BCHOC is going to be encouraged to rearrange the detainees along the lines of the "ideal" configuration in Exhibit 3, which would eliminate any double bunking (i.e., there would only be one person in either the top or the lower levels but not both). As shown in the last page of Exhibit 3, this would allow a minimum distance between sleeping detainees of at least seven feet, and in many cases almost nine and one-half (9.4') feet. The detainees will be encouraged to alternate top and bottom bunks to further increase the separation between them; this is what allows approximately nine and one-half feet of separation. *See* Exhibit 3 at p. 4.

### 4. EB Unit:

Unit "EB" is on the main campus. Currently, there are 14 women in EB, 4 of whom are ICE detainees, while the remaining are state pre-trial detainees. There are a total of 16 cells in EB. They are 80 square feet in size (8' x 10'). 8 cells are located on the ground level and

another 8 are on the mezzanine level. Each of the 16 cells has a single double bunk bed. All detainees and inmates in EB are in a cell by themselves, including the four female ICE detainees. EB has one common bathroom on each levels with two toilets and two sinks each. The bathroom on the ground level, which is 7' x 9', has a single shower, while the mezzanine level has two showers. There is a 33' x 20' common area, and off of that there is a separate education/program room measuring 10' x 12'. The common area has one large table and sixteen chairs, as well as two additional small tables with four chairs each. Lastly, there is an outside recreation area located off the common area which is approximately 1,500 square feet in size. The common area, recreation area, main area, and education/program room are all sufficiently sized to allow the detainees (civil and pre-trial) to practice social distancing.

### C. The Current Population Numbers in Each Unit

The absolute numbers of detainees in each unit are not especially relevant for determining if appropriate social distancing can be practiced. Moreover, except for Units A and B in the Carreiro Center, the other units are different physically. However, it is worth noting that the total number of ICE civil immigration detainees has been reduced from 148 at the outset of this litigation to 92 as of today. That represents a reduction of almost thirty-seven percent (37%). Well more than one in three detainees has been released or transferred. Given that the detainee population was well below capacity at the outset, even before these reductions, the level is now sufficiently low that appropriate six foot social distancing is fully achievable.

As stated above, the detainee numbers are:

> ICE A – 19;
> ICE B – 30;
> 2 East – 36;
> EB – 4;
> HSU – 1;
> EA – 1; and

EE – 1.[4]

### D. There Is Sufficient Space to Practice Social Distancing at BCHOC

The CDC has identified social distancing as a "cornerstone" of correctional and detention facilities effort to reduce the risk of the coronavirus:

> **Social Distancing** – Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19.

CDC website at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (*accessed* April 12, 2020).  The CDC recommends that facilities "[e]xplore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak." *Id.*  As stated above, not only is BCHOC not overcrowded, it is significantly under capacity.

The CDC also makes a number of suggestions for managing social distancing within a detention facility, but recognizes that the suggestions will have to be adapted for each institution's particular situation.  The suggestions are:

Implement social distancing strategies to increase the physical space between

---

[4] The HSU is a medical unit, while EA is a female disciplinary unit and EE is a male disciplinary unit.  Because the detainees in these units are in cells/rooms by themselves, no discussion of social distancing is necessary.

incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms). Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities.

Example strategies with varying levels of intensity include:

**Common areas**:

- Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)

**Recreation**:

- Choose recreation spaces where individuals can spread out
- Stagger time in recreation spaces
- Restrict recreation space usage to a single housing unit per space (where feasible)

**Meals:**

- Stagger meals
- Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
- Provide meals inside housing units or cells
- Group activities:
- Limit the size of group activities
- Increase space between individuals during group activities
- Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
- Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out

**Housing**:

- If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)

- Arrange bunks so that individuals sleep head to foot to increase the distance between them[5]

- Rearrange scheduled movements to minimize mixing of individuals from different housing areas

**Medical**:

- If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering sick call.

- Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

*Id.*

BCHOC has been following all of these recommendations since before this litigation began. *See* Declarations of Superintendent Souza, Dr. Rencricca (attached to Defendants' Opposition to the TRO motion) and Director of Clinical Services Jezard (same).

### E. The Risk of COVID-19 in BCHOC Has Been Adequately Addressed

The CDC has updated its guidance regarding COVID-19 for correctional and detention facilities. The CDC does *not* recommend large-scale release of detainees, however. *See* CDC website https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html (*accessed* April 12, 2020).

---

[5] This is one of the suggestions made by the Defendants to which the Court responded that the CDC guidelines concern people, not furniture. *See* Memorandum of Opinion, April 9, 2020.

As stated on the CDC webpage for correctional and detention facilities, the institutions should take the following steps (organized into preparatory, prevention and management components):

**PREPARE**

- Coordinate with local public health department and other correctional/detention facilities.
- Require staff and visitors to stay home if sick.
- Offer seasonal flu shots because limiting cases of flu can help speed the identification of people with COVID-19.
- Provide no-cost access to soap and encourage frequent hand washing.
- Plan for how to medically isolate and care for sick people.
- Plan for potential staff shortages.

**PREVENT COVID-19 from entering your facility from the community**

- Limit non-medical transfers in and out of the facility.
- Screen all new entrants, staff, and visitors prior to entering the facility.
- Be on the lookout for symptoms and address them immediately.
- Clean and disinfect the facility.
- Reinforce good hygiene practices.
- Use multiple social distancing strategies.
- Communicate regularly.

**MANAGE COVID-19 if there are cases in your facility**

- Activate your emergency plan and notify public health officials.
- Give any person who is sick a face mask and separate them from others.

> - Send sick staff home.
> - Quarantine any close contacts.
> - Clean and disinfect the facility.
> - Screen for COVID-19 symptoms as part of release planning.
> - Restrict non-medical transfers in and out of the facility.
> - Cancel group gatherings.
> - Suspend visitation and provide virtual alternatives if possible.
> - Use multiple social distancing strategies.

*Id.* BCHOC, as managed by the Bristol County Sheriff's Office and in coordination with the medical contractor CPS, is currently, and has been, practicing ***all*** of these CED recommendations, with the possible exception of flu vaccines (as to which additional information is being sought). All of these recommendations were included in the CPS Medical Guidance developed by Dr. Rencricca and Director of Clinical Services for the Correctional Psychiatric Services, Inc. ("CPS") Deb Jezard. This document was attached as an exhibit to Defendants' Opposition to the Motion for a Temporary Restraining Order, along with declarations of Dr. Rencricca and Director Jezard.

Plaintiffs have argued that all detainees are at a greater risk for infection not just because of their physical setting but also due to underlying medical conditions. Plaintiffs claim that the stress of detention alone is a sufficient medical condition to justify release. While there is no doubt that detention is stressful, home confinement in the midst of the pandemic has also proven stressful. More importantly, the CDC recognizes a limited group of underlying conditions as making a COVID-19 infection more risky. These include:

> - People with chronic lung disease or moderate to severe asthma;

- People who have serious heart conditions;

- People who are immunocompromised (Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications);

- People with severe obesity (body mass index [BMI] of 40 or higher);

- People with diabetes;

- People with chronic kidney disease undergoing dialysis; and

- People with liver disease.

*See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (*accessed* April 12, 2020).  While this list covers a number of conditions, it does not include all medical conditions and it does not include mental illness or stress.[6]

Given the significant reduction in detainee population by almost 38%, and given the generous sizing of the areas within each of the four main units where ICE detainees are held, it is clear that the detainees can practice appropriate social distancing of six feet of separation *should they choose to do so*.  *See* Declaration of Nelly Floriano, previously submitted to the Court and appended hereto.  Nursing Supervisor Floriano stated: " I am confident that the detainee population is sufficiently low so as to allow adequate social distancing (separation of six feet or more) to be practiced in all of the detainee units." *Id.* at ¶ 7.  It is not possible to ensure that the

---

[6] Persons with asthma are encouraged to avoid stress, however, as it can trigger an asthma attack. *See* CDC website at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (*accessed* April 12, 2020).

detainees will always *practice* social distancing, despite have the room to do so and having notices up in three languages explaining the necessity for it. But it is no more possible to guarantee that the detainees will practice social distancing upon release. In fact, there is some evidence that socio-economic realities make practicing social distancing outside of an institution very challenging. *See, e.g. The Coronavirus Class Divide: Space and Privacy*, New York Times online ed., April 13, 2020, available at https://www.nytimes.com/2020/04/12/us/politics/coronavirus- poverty-privacy.html (last accessed April 13, 2020 at 6:03 p.m.).

The Court has expressed particular concern regarding the sleeping arrangements for detainees. With the current reduced population, there are almost no detainees occupying both the top and bottom bunks of a single bunk bed. For almost all detainees, there is only one person per bunk bed, and they have been encouraged to alternate top and bottom bunks for additional separation. As stated above, this means that there is almost ten and one-half (10.5) feet between the head of one detainee and the head of the next. *See* Exhibit 3 at p. 4. Since COVID-19 is spread via water droplets containing the virus coming out of the mouth or nose of an infected person primarily, and the nose, mouth and eyes are the most susceptible area of a person exposed to the virus, the head-to-head distance is important. And, as stated above, it is the focus of the CDC in its recommendations for detention and prison facilities. This method of transmission is why social distancing is recommended in the first place, and why masks are now recommended for those who cannot self-isolate. As stated on the CDC website:

> -- The virus is thought to spread mainly from person-to-person.
>
> -- Between people who are in close contact with one another (within about 6 feet).
>
> -- Through respiratory droplets produced when an infected person coughs, sneezes or talks.

> -- These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.

CDC website at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (accessed April 13, 2020 at 6:13 p.m.).  While it is certainly true that the virus can also be transmitted by touching a surface that an infected person has touched, this is *not* addressed by social distancing so much as by proper hand washing, avoiding touching one's face, and disinfecting common areas—all of which are being done or encouraged at BCHOC.

## CONCLUSION

Plaintiffs will undoubtedly argue that there is *no* safe level of detainees at BCHOC.  This argument is factually wrong and reflects the truth that the goal of the class action is to release as many detainees as possible, regardless of how much the risk of infection at BCHOC is reduced and regardless of the level of danger a detainee may pose for release or flight.[7]

While Defendants disagree with the Court's view of its authority to address conditions of confinement through habeas corpus petitions, and to issue class-wide relief notwithstanding the prohibition in the INA at 8 U.S.C. § 1252, it is clear that something well short of the release of all detainees will satisfy the Court's goal of reducing the risk of a coronavirus outbreak at the facility.  Defendants believe an appropriate reduction has been achieved and ask the Court, therefore, to stay any additional releases of detainees.

Should the Court be disinclined to stay the release of detainees on the basis that social

---

[7] It is worth noting in this regard that Plaintiffs have not stood down regarding a single individual detainee, regardless of how violent the detainee's criminal history or whether the detainee lacks any comorbidities for the virus.  There is not one detainee who should not be released in their view no matter that there is no COVID-19 among the detainees or inmates and no matter how many steps BCHOC takes to reduce the risk of infection.  Even one detainee would be too much in their view.

distancing is practicable at BCHOC in light of the considerable reduction in the detainee population, then Defendants ask the Court to stay further release of detainees while Defendants determine whether to seek a stay from the First Circuit Court of Appeals.

                Respectfully submitted,

                ANDREW E. LELLING,
                United States Attorney

By: */s/ Thomas E. Kanwit*
     Thomas E. Kanwit
     Michael Sady
     Assistant U.S. Attorneys
     U.S. Attorney's Office
     John J. Moakley U.S. Courthouse
     1 Courthouse Way, Suite 9200
     Boston, MA  02210
     (617) 748-3100
     thomas.kanwit@usdoj.gov
     michael.sady@usdoj.gov

April 14, 2020

## CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:   April 14, 2020                */s/ Thomas E. Kanwit*
                                                Thomas E. Kanwit