## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

MARIA ALEJANDRA CELIMEN SAVINO,
JULIO CESAR MEDEIROS NEVES, and all
those similarly situated,

        Petitioners-Plaintiffs,

      v.

STEVEN J. SOUZA,

Respondent-Defendant.

Case No. 1:20-cv-10617 WGY

## PLAINTIFFS' SUPPLEMENTAL BRIEFING IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ....................................................................................3

    I.      COVID-19, CDC Guidance, And The Dangers Of Congregate Living .................3

    II.     Class Members Are Not Currently Able To Socially Distance At BCHOC ..........4

    III.    There Is A Lack Of Adequate Sanitation At BCHOC .............................................8

    IV.    There is Insufficient Personal Protective Equipment at BCHOC ..........................10

    V.     The Actual Number of COVID-19 Cases At BCHOC Is Unknown, Because BCHOC Conducts Hardly Any Testing...............................................................11

    VI.    Defendants Are Not Taking Reasonable Steps To Mitigate Substantial Health Risks To Class Members .......................................................................................12

ARGUMENT ..........................................................................................................13

    VII.    Plaintiffs Have A High Likelihood Of Success On The Merits............................13

         a.      The Conditions At BCHOC Are Unreasonably Unsafe, Rendering Them Unconstitutional..............................................................................13

         b.      Defendants Have Taken Insufficient Steps In Light of Known Risk, Rising To the Level of Deliberate Indifference, and Such Conduct Will Continue Absent An Injunction ........................................................14

    VIII.   The Potential For Irreparable Harm Is Great ........................................................17

    IX.    The Balance Of Hardships And Public Interest Favor Plaintiffs ...........................18

    X.     A Preliminary Injunction Is Warranted.................................................................19

CONCLUSION.......................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Brito v. Barr*, 395 F. Supp.3d 135 (2019)......................................................................19

*DeShaney v. Winnebago Cty Dept. of Soc. Servs.*, 489 U.S. 189 (1989).......................13

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13 (1st Cir. 2006).............13

*Farmer v. Brennan*, 511 U.S. 825 (1994) .....................................................................15

*Fox v. Lappin*, 441 F.Supp.2d 203 (D. Mass. 2005)......................................................20

*Fraihat v. U.S. Immigration and Customs Enforcement*, Case No. 5:19-cv-01546-
    JGB-SHK (C.D. Cal. Apr. 20, 2020), ECF No. 132.........................................12

*Glossip v. Gross*, 135 S. Ct. 2726 (2015) (Breyer, J. dissenting)..................................20

*Gomes v. DHS*, Civil No. 20-cv-00453-LM (D.N.H.)....................................................19

*Kane v. Winn*, 319 F.Supp.2d 162 (D. Mass. 2004) ......................................................20

*Leite v. Bergeron*, 911 F.3d 47 (1st Cir. 2018)..............................................................15

*Reid v. Donelan,* 390 F.Supp.3d 201 (D.Mass., 2019) ..................................................19

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005)........... 17-18

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ...............................................................14-15

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ..................................................................13, 18

## STATUTES, RULES, AND REGULATIONS

8 U.S.C. §§ 1182(d)(5), 1225(b), 1226(c), 1226(a)................................................... 18-19

Fifth Amendment ..................................................................................................... *passim*

Eighth Amendment ....................................................................................................13, 17

## OTHER AUTHORITIES

Brie Williams, MD, MS & David Cloud JD, MPH, *The Ethical Use of Medical
    Isolation – Not Solitary Confinement – to Reduce COVID-19
    Transmission in Correctional Settings* ................................................................5

*Chicago's Jail Is Top U.S. Hot Spot As Virus Spreads Behind Bars,* NEW YORK
TIMES (April 8, 2020),
https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-
chicago.html ...................................................................................................................4

Bristol County Sheriff's Office Twitter Account (last accessed May 5, 2020)
https://twitter.com/BristolSheriff/status/1257767668561489921 .......................................8

LOS ANGELES TIMES (May 5, 2020),
https://www.latimes.com/california/story/2020-05-05/coronavirus-covid-
19-deaths-terminal-island-prison-california-fauci .............................................................4

*Mass virus testing in state prisons reveals hidden asymptomatic infections; feds
join effort,* USA TODAY (April 25, 2020),
https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-
testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/ ...........................11

*Pandemic,* CENTERS FOR DISEASE CONTROL AND PREVENTION,
https://www.cdc.gov/coronavirus/2019-ncov/php/principles-contact-
tracing.html ...................................................................................................................11

*Situation Briefing* (Apr. 19, 2020), https://www.cdc.gov/coronavirus/2019-
ncov/cases-updates/summary.html ....................................................................................4

Chloe Taylor, *Coronavirus Outbreak Likely to Go On for Two Years, Scientists
Predict,* CNBC (May 1, 2020),
https://www.cnbc.com/2020/05/01/coronavirus-pandemic-likely-to-last-
for-two-years-scientists-predict.html .................................................................................4

# INTRODUCTION

In the six weeks since this case was filed, much has changed.  Tens of thousands of residents of the Commonwealth have been diagnosed with COVID-19, and thousands have died. The grim upward march has now begun at the Bristol County House of Correction (BCHOC) as well: one, then two, now eleven staff infected in BCHOC facilities and just this week the first confirmed case among the detainee population.  So too, scientific knowledge about the virus has evolved on an almost daily basis, with more symptoms being added to the Centers for Disease Control and Prevention (CDC) list, and growing evidence of COVID-19's long-term effects.

Another notable change since this case was filed: upwards of 40 people who were previously being held by Defendants in the densely-packed confines of BCHOC are now safely quarantining at home due to this Court's orders – still within the control of ICE, many with electronic monitoring, but no longer in BCHOC's desperately unsafe congregate environment.

But while much has changed, much has also stayed the same.  The virus remains highly contagious and potentially lethal, and the CDC therefore continues to advise that social distancing must be the "cornerstone" of any effective public health response.  Yet that critical preventative measure continues to be impossible at BCHOC, with contact among detainees and staff throughout the day "unavoidable," in the words of Superintendent Souza.  Class members are still sleeping in congregate cells or rooms, often right next to or on top of one another. Communal bathrooms are still shared by up to 54 individuals, with no regular cleaning, much less sanitation between each use.  And class members still eat meals prepared in a congregate kitchen facility by approximately 40 individuals from another unit.

Defendants' response to the challenges posed by the pandemic also remains largely unchanged.  Most notably, Defendants' pre-litigation failure to look carefully at how to reduce

the detainee population to decrease the risk of infection has not been rectified – and indeed has only grown more glaring as the virus now threatens to take hold in the facility.  Even after this Court made clear on April 8, 2020 that "the question is whether the government is taking reasonable steps to identify those Detainees who may be released in order to protect everyone from the impending threat of mass contagion," Mem. & Order, ECF 64 at 23, Defendants' stance has remained unchanged: no one needs to be released, and no one should have been released. Further, and most importantly to the point of this motion: Defendants are fully prepared to go back to the pre-lawsuit density levels if only this Court will allow it.

The Court should not do so.  The evidence that Plaintiffs have amassed in the record – from numerous class members, doctors, and public health experts, and from the admissions of Defendants themselves – amply justifies the entry of a Preliminary Injunction to further reduce the density level at BCHOC and ensure the health and well-being of those remaining inside. Plaintiffs have demonstrated a high likelihood of success on the merits: that their continued detention would violate the Fifth Amendment, which entitles immigration detainees to "reasonable safety."  The possibility of irreparable harm could hardly be more clear than it is here, and the balance of hardships tips decidedly in Plaintiffs' favor.  Finally, the public interest would be well-served by an injunction.  This virus knows no walls, meaning that flattening the curve for class members benefits the community at large.

Plaintiffs therefore respectfully request that a Preliminary Injunction be entered, to reduce BCHOC's population density to a level that provides class members with the reasonable safety that the Constitution demands.  And for those individuals not released, this Court should require Defendants to comply with the same sort of minimal public health standards ordered by other courts during this once-in-a-century public health crisis.

2

## FACTUAL BACKGROUND

**I.**   **COVID-19, CDC Guidance, And The Dangers Of Congregate Living**

The Court is familiar with COVID-19, as well as with public health guidance on how to combat and control the disease.  Accordingly, Plaintiffs will not repeat that background in depth here, other than to highlight the following:[1]

*The virus is highly contagious, spread by person-to-person contact*.  COVID-19 is easily spread through expelled droplets when people are in close proximity to one another.  Individuals who contract the virus may spread it even if they have not yet shown symptoms.  Some individuals never exhibit symptoms at all but may nonetheless still spread the disease.  *See* Gonsalves Decl. at ¶ 10.  The CDC has therefore emphasized that social distancing is the "cornerstone" of an effective public health response.  Individuals should maintain a distance of at least 6 feet from each other to avoid spreading the virus.  More recent research shows that the virus may be spread across even longer distances, making 6 feet the *minimum* effective distance.

*The virus also can be spread through shared surfaces*.  The virus also lives for hours on surfaces and may be spread by people touching shared surfaces.  *See id*. at ¶ 15.  Accordingly, the CDC and other experts have warned that it is critical to avoid contact with shared surfaces.

*In over 15% of cases, the virus causes severe illness or death*.  The virus causes severe illness or death in over 15% of those infected.  *See id*., ¶ 3.  For those who recover, the long-term effects of the virus are as yet unclear but thought to be significant.  Singer Decl. ¶ 12.

---

[1] Evidence pertaining to these background issues can be found throughout the record, including at Mem. in Support of Mot. for TRO, ECF 12, at 8-13; Decl. of Allen S. Keller, M.D., ECF 12-1; Decl. of Gregg Gonsalves, ECF 12-2; Reply Decl. of Gregg Gonsalves, ECF 33-5; Briefing on the Individual Appls. for Bail, Tuesday, April 7, 2020, ECF 52, at 3-5; Suppl. Decl. of Dr. Matthew Gartland, ECF 68-1; Decl. of Frederick L. Altice, ECF 68-2; Decl. of Mary T. Bassett, MD, MPH, ECF 68-3; Suppl. Decl. of Allen S. Keller, M.D., ECF 91-4; Decl. of Dr. Elizabeth Singer (MD, MPH, FACEP), ECF 91-5; Second Suppl. Decl. of Dr. Matthew Gartland, ECF 91-7.  Plaintiffs rely on all of the evidence in the record to date to support their Preliminary Injunction Motion.

*Certain categories of people are at particularly high-risk, but the virus can harm or kill anyone.* The CDC has advised that certain people with pre-existing medical conditions are at higher risk for severe illness if they contract COVID-19. However, scientists are racing to learn more about the disease, and as more becomes known each day about how the disease is spread, who may be vulnerable, and the long-term effects of infection. *See* Keller Decl. ¶ 27; CDC, *Coronavirus Disease (COVID-19): Situation Briefing* (Apr. 19, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html. In any event, it is now well known that the virus can strike anyone down. *See* Gonsalves Decl. ¶ 5.

*Congregate living settings are especially vulnerable.* Given the importance of social distancing, congregate living settings – cruise ships, nursing homes, detention facilities – have been among the hardest hit. In the Cook County Jail in Chicago, for instance, two inmates tested positive for COVID-19 in late March; within 2 weeks, more than 350 people were infected; and by now six inmates and a guard have died. At the Terminal Island prison in San Pedro, California, six inmates have died and over 60% of the population has tested positive.[2]

*There is a long road ahead.* The pandemic continues to evolve, and scientists predict it will be with us for months, if not years, and expect additional waves over time.[3]

## II.     Class Members Are Not Currently Able To Socially Distance At BCHOC

It is not currently possible for class members to engage in social distancing at BCHOC. In all of the daily necessities of life – sleeping, using the bathroom, accessing medical care, eating meals, and other activities – BCHOC is much too densely populated to allow individuals

---

[2] *See See Chicago's Jail Is Top U.S. Hot Spot As Virus Spreads Behind Bars,* New York Times (April 8, 2020) *available at* https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html; *6th Terminal Island Prisoner Dies of COVID-19*, Los Angeles Times (May 5, 2020) *available at* https://www.latimes.com/california/story/2020-05-05/coronavirus-covid-19-deaths-terminal-island-prison-california-fauci.

[3] *See, e.g.*, Chloe Taylor, *Coronavirus Outbreak Likely to Go On for Two Years, Scientists Predict*, CNBC (May 1, 2020), https://www.cnbc.com/2020/05/01/coronavirus-pandemic-likely-to-last-for-two-years-scientists-predict.html.

to stay 6 feet away from each other.  The tight spaces and congregate living that characterize

BCHOC are in fact the antithesis of the CDC's social distancing recommendations.

As set forth in previous briefings, class members are held in four different units.  *See,*

*e.g.*, ECF 83-1 (Apr. 14, 2020 Souza Declaration).  Units A and B house only male ICE

detainees; each of these units consists of an open room with rows of bunk beds.  *Id.* at 5-7.  As of

late last week, Unit A held approximately 11 individuals, and Unit B held approximately 26

individuals.[4]  *See* Souza Dep.at 168, 182-83.  The EB Unit is the women's unit and includes both

ICE detainees (currently 5) and women being held in criminal custody pre-trial (currently

believed to be 5-6).  *See* Souza Dep. at 188.  2 East is a men's unit that houses both ICE

detainees (36) and criminal pre-trial detainees (18).  *See* Souza Decl. ¶ 4; Souza Dep. at 194.

Congregate sleeping is the norm at BCHOC, with only the EB unit detainees in single

cells.  In 2 East, for example, 4-5 detainees sleep in a single cell that measures only 11 feet wide

and 30 feet long.  *See* Souza Dep. at 195; Souza Decl. ¶ 4.  With bunkbeds against both walls of

each cell and lined up end-to-end, class members are packed in, and in some cases literally right

on top of each other.  *See* Souza Dep. at 197; Souza Decl. ¶ 4 (individuals continue to share

bunkbeds in 2 East).  An aisle of only 6-7 feet runs between the bunk beds, meaning that it is

impossible for a detainee to get up and walk out of his cell without coming within feet if not

inches of his cellmates.  *See id.*  To illustrate the spatial limitations of BCHOC, Plaintiffs

submitted architectural diagrams completed to scale, based on the information provided by

---

[4] As previously raised with the Court, all detainees in Unit B were moved out of the unit on Friday, May 1, 2020. They are currently housed in individual segregation units but are expected to move back to Unit B at some point in the future.  As raised by the Court's questions as posed in ECF 144, there are significant differences between quarantine or medical isolation and administrative segregation or "solitary confinement," the latter of which is neither an appropriate nor effective public health and medical response to the current pandemic.  *See* Brie Williams, MD, MS & David Cloud JD, MPH, *The Ethical Use of Medical Isolation – Not Solitary Confinement – to Reduce COVID-19 Transmission in Correctional Settings*, Amend at University of California, San Francisco (April 9, 2020).  Plaintiffs will be prepared to discuss these issues more fully with the Court at the May 7, 2020 hearing.

Superintendent Souza.[5]  One diagram shows sleeping detainees in red, and a standing detainee in blue.  The blue shaded area or circle marks a 6-foot radius around the standing person:



Similarly, in Units A and B, there continue to be rows of dormitory-style bunk beds.  *See* Souza Dep. at 184-85; Souza Decl. ¶¶ 11, 14.  Following court-ordered releases, Defendants have attempted to move class members around within those beds to create more space, but the density does not allow adequate spacing.  Numerous class members are still sleeping in rows of beds right next to each other.  *See* Fall Decl. ¶ 5.  When people inevitably pass through the aisles, individuals are in even closer proximity to each other.  *See* ECF 91-6, Exhs B, C.

---

[5] *See* ECF 91-6, Declaration of Jen Shin and Accompanying Exhibits.  Ms. Shin based the renderings on the dimensions specified in Superintendent Souza's Declaration and corroborated the actual physical layout where possible.  *See id.*



Bathrooms are similarly cramped.  In the women's unit (EB), 9 women share tiny bathrooms that measure only 7 feet by 9 feet.  Souza Decl. ¶ 3.  Into these tight spaces are crammed two toilets, two sinks, and a shower.  *Id.*  Similarly, tight quarters exist in the men's units, with 2 East bathrooms shared by up to 54 individuals.  Souza Decl. ¶ 4.  These bathrooms – which are only 9 feet wide and 21 feet in length – contain four toilets, five showers, seven sinks, and a urinal.  Souza Decl. ¶ 7.  The bathrooms in Units A and B similarly each have six toilets, three urinals, eight sinks, and six showers – frequently in use at the same time.  Souza Decl. ¶ 12; Souza Dep. at 209.  In each bathroom, the sinks, toilets, and showers are lined up closely to one another.  *See also* ECF 91-6, Exhs B, C, D:



The communal areas used during other times such as at mealtime and during recreation likewise allow no room for social distancing.  De Jesus Concepcion Decl. ¶¶ 6, 7; Wafula Decl. ¶

14.  As Superintendent Souza candidly conceded, coming within six feet of others during the day at BCHOC is "unavoidable."  *See* Souza Dep. at 68.

Moreover, people are constantly moving in and out of the facilities.  While Defendants stopped detainees from having even non-contact visits because those "can't currently happen safely," Souza Dep. at 306, correctional officers, nurses, and other staff who work at BCHOC come and go with each shift, creating constant traffic in and out of the facility.  A common medical unit serves ICE detainees as well as state inmates and pre-trial detainees.  Floriano Dep. Tr. (Rough) at 16; 69.  Many BCHOC staff, including the nurses and mental health workers, regularly come into close contact with both ICE detainees and inmates, *id*. at 19-20, 74,, and some work second jobs at nursing homes or other correctional facilities, increasing the risk of cross-contamination even more.  *Id*. at 71.  Since this litigation began, eleven of these staff members, including a nurse and a mental health worker, have tested positive for the virus.[6]

Moreover, class members in 2 East and in the EB unit share their close quarters with an ever-changing population of non-ICE detainees.  Souza Decl. ¶ 4.  Individuals from state custody are also routinely transferred into the other units of immigration.  *See*, *e.g*., ECF 109.

With quarters this close, with staff moving in and out of the facility every day, and with a regular stream of new detainees moving into the space, it is simply not possible for class members to socially distance at BCHOC.

## III.    <u>There Is A Lack Of Adequate Sanitation At BCHOC</u>

The dangers of congregate living at BCHOC do not just rest in the fact that close quarters make it impossible for class members to socially distance.  The COVID-19 virus can live for hours on surfaces, making the many shared surfaces at BCHOC another significant risk factor.

---

[6] *See* Hodgson Dep. Tr. 127:10-16; *see also* Bristol County Sheriff's Office Twitter Account (last accessed May 5, 2020) https://twitter.com/BristolSheriff/status/1257767668561489921.

As noted above, the bathrooms in particular are shared by scores of individuals and are in use throughout the day and night.  *See*, *e.g.*, Declaration of Altagracia Baez Guerrero ¶ 5; Declaration of Amiry Carlos Dias ¶ 5.  No type of seat covering or disinfecting wipe is provided for detainees to even attempt to clean any of these bathroom surfaces before use.  *See* Fall Decl. ¶ 3.  Nor is any regular cleaning done of these facilities.  Even following the outbreak of the COVID-19 pandemic and the increasingly dire warnings from public health professionals, BCHOC has no professional cleaning crews of any kind.  Souza Dep. at 211.  While Defendants claim to have protocols and procedures in place for sanitation, including supposed regular cleanings performed by "detainees or staff," in fact no one is monitoring that such cleaning is happening.  Superintendent Souza – the individual who is supposedly most knowledgeable about BCHOC's sanitation and hygiene procedures – testified that he has not set foot in any of the units in question for the last 3-4 weeks.  Souza Dep. at 168 (Unit A), 182 (Unit B), 188 (EB Unit), 193 (2 East).

Class members themselves, who live in the units and experience their conditions every day, attest to the poor conditions on the ground.  Detainees or inmates from state custody previously did some of the cleaning.  Fall Decl. ¶ 3.  Now, even this has stopped, and correctional officers tell class members it is "not their job" to clean.  *Id*.; Declaration of Conroy Lewis ¶ 2.  The result is as one might expect: filthy bathrooms with standing water and trash strewn on the floor.  *Id*. ¶ 4.; Castillo Martinez Decl. ¶ 4; Dias Decl. ¶ 6.  Toilets are open-lidded, frequently clogged, and dirty.  Fall Decl. ¶ 4; Lewis Decl. ¶ 4 .

Other shared surfaces, such as tables, chairs, and phones, are similarly used by dozens or more individuals throughout the day, without any kind of regular cleaning, much less disinfecting between each use.  Hand sanitizer and soap frequently runs out; and no provision is

made to give detainees personal cleaning materials for their bunks or for use on shared spaces. *See*, *e.g*., Declaration of Jhony Bonilla Ochoa ¶ 11; Castillo Martinez Decl. ¶ 9; Declaration of Aires Da Graca ¶ 8; Guerrero Decl. ¶ 5.  Even at mealtime, when hand-to-mouth contact raises the risk of infection substantially, no wipes or other cleaning materials are given to detainees to wipe down surfaces before eating.  Souza Dep. at 219 ("Those wipes are for staff to clean the control areas and computers and so forth.").

Meal preparation is similarly problematic, conducted by scores of different people in a congregate kitchen.  Souza Dep. at 76 ("So we may have a total of, say, 40 inmates that work in the kitchen during three specific shifts").  Notably, these are not even workers from the same population of civil immigration detainees; they are individuals from a different part of the facility that houses sentenced inmates, creating yet more cross-contamination.  *Id.* at 214 ("All of the kitchen workers are sentenced inmates.").

## IV.    <u>There is Insufficient Personal Protective Equipment at BCHOC</u>

Provision of Personal Protective Equipment (PPE) at BCHOC is inadequate, and use is sporadic.  Since this litigation commenced, staff have been provided with masks.  But use is inconsistent.  Class members report that staff often have their masks on, but up around their foreheads or down at their chins.  Fall Decl., ¶ 7; Declaration of Jhony Bonilla Ochoa ¶ 7. While staff are issued 5 masks, detainees have only been given one each – despite a stockpile of 2,000 masks in the facility.  Souza Dep. at 85, 89, 96.  Detainees are told to clean their own masks but given no replacement masks while they are doing so.  Fall Decl. ¶ 6; Castillo Martinez Decl. ¶ 7; Guerrero Decl. ¶ 6.  Staff sometimes wear gloves, sometimes not.  Floriano Dep. (Rough) at 53.  Class members are given no gloves at all.  Souza Dep. at 120.

V.      **The Actual Number of COVID-19 Cases At BCHOC Is Unknown, Because BCHOC Conducts Hardly Any Testing.**

Testing and contact-tracing at BCHOC is insufficient and ad hoc.  Although public health professionals advise that many individuals have and can spread the virus, despite remaining asymptomatic, BCHOC conducts no testing of asymptomatic individuals.  Souza Dep. at 163-64 (new arrivals not tested); *id.* at 318 (no asymptomatic testing); Hodgson Dep. (Rough) at 132 (same).  This stands in stark contrast to the growing number of detention facilities, including the federal Bureau of Prisons, that are ramping up testing to cover their entire populations, including those who are asymptomatic.[7]  And while Defendant claims to test any detainee who reports two or more from a list of common COVID-19 symptoms, class member medical records indicate otherwise, with many such individuals going untested.  Floriano Dep. (Rough) at 98-99; *see*, *e.g.*, Class Member Progress Notes at 2 (noting that individual reported fever and cough on April 5, 2020, but not noting a test); May 4, 2020 Inmate Testing Sheet (showing just 25 inmates tested for COVID-19).  Contact tracing for those who have tested positive is also irregular at best, further inhibiting any possibility of containing the virus. *See, e.g.*, Souza Dep. at 279-80 (limited contact tracing for Sheriff's Office employees, no written policies describing contract tracing); 288:4-7 (unsure whether contact tracing has been done for medical staff).[8]

Even despite this lack of consistent or widespread testing, the virus has clearly breached the facility walls.  A steadily growing number of facility staff have tested positive, and just this week the inevitable occurred: a class member tested positive for COVID-19 as well.  That

---

[7] *See Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort*, USA TODAY (April 25, 2020) *available at* https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/.

[8] The CDC describes contact tracing as a "core disease control measure" and "a key strategy for preventing further spread of COVID-19." *See Contact Tracing: Part of a Multipronged Approach to Fight the COVID-19 Pandemic*, CENTERS FOR DISEASE CONTROL AND PREVENTION, *available at* https://www.cdc.gov/coronavirus/2019-ncov/php/principles-contact-tracing.html.

detainee has been at BCHOC since November, and therefore could only have become infected at

BCHOC.  Hodgson Dep. (Rough) at 127-28, 131.  He was housed in Unit B, most recently in

close proximity with approximately 25 other detainees. Souza Dep. at 182-83.  It is

inconceivable that he is the only detainee who has contracted the virus.

**VI.**     **Defendants Are Not Taking Reasonable Steps To Mitigate Substantial Health Risks To Class Members**

Defendants have failed to take reasonable measures to mitigate the threat posed by

COVID-19 to the health and well-being of class members.  Defendants have not analyzed the

detainee population to determine if voluntary releases would be possible for any individuals.

Neither Sheriff Hodgson nor Superintendent Souza nor Nelly Floriano, the Nursing Supervisor,

has ever had any discussions with ICE about voluntary releases of medically-vulnerable

individuals, even though ICE publicly claims to have "evaluated its detained population based

upon the CDC's guidance for people who might be at higher risk for severe illness as a result of

COVID-19 to determine whether continued detention was appropriate."[9]  No public health

experts have been consulted to analyze whether additional steps should be taken to minimize

risk, and the unsafe and unsanitary conditions described above have all been allowed to persist.

Floriano Dep. (Rough) at 20-24, 26, 104-05; Souza Dep. at 231-32, 234, 236; Hodgson Dep.

(Rough) at 35-36.  In fact, despite the overwhelming public health guidance to the contrary,

Defendants have repeatedly taken the position that BCHOC is safe no matter the population

density.  Hodgson Dep. (Rough) at 82; Floriano Dep. (Rough) at 30-32; Souza Dep. at 242-43.

---

[9] Not only is such screening purportedly required by ICE's own guidance, it has also been mandated as part of a nationwide class action.  *See Fraihat v. U.S. Immigration and Customs Enforcement*, Case No. 5:19-cv-01546-JGB-SHK, at 38 (C.D. Cal. Apr. 20, 2020), ECF No. 132, at 28 (requiring ICE to identify and track high-risk individuals in custody and make timely custody redeterminations).  Yet there is no evidence that any such conversations have even occurred at BCHOC, and certainly no releases have transpired on these grounds.

**ARGUMENT**

On a motion for preliminary injunction, the Court analyzes four factors: (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the relative hardships; and (4) the effect on the public interest. *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006). Each overwhelmingly favors Plaintiffs.

## VII.   Plaintiffs Have A High Likelihood Of Success On The Merits.

### a.   The Conditions At BCHOC Are Unreasonably Unsafe, Rendering Them Unconstitutional.

Plaintiffs have a high likelihood of succeeding on their claim that their continued detention violates the Fifth Amendment. In light of the COVID-19 pandemic and the close quarters described above, BCHOC is unreasonably unsafe. It is thus unconstitutional for Defendant to continue to hold class members there.

Immigrant detainees, whether or not they have prior criminal convictions, are unquestionably civil detainees held pursuant to civil immigration laws. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Due Process Clause of the Fifth Amendment, which provides significantly greater protection than the Eighth Amendment's ban on cruel and unusual punishment, safeguards the rights of civil detainees while in custody. As this Court has stated:

> When the government "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety— it transgresses … the Due Process Clause."

ECF 64 at 19 (quoting *DeShaney v. Winnebago Cty Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).). As described above, Defendants have failed to provide reasonable safety.

It is not enough for Defendants to mouth the right words, to simply say that they "are following all of the CDC guidelines." Souza Dep. at 250. The question is whether the conditions at the facility actually provide the reasonable safety that the Constitution requires.

They do not – as the individuals who actually live there have continuously attested to, in sobering detail.  Nelly Floriano, the Nursing Supervisor responsible for the medical health of ICE detainees at BCHOC, may state in a declaration that she is "in the detainee units every work day" and therefore "confident that the detainee population is sufficiently low so as to allow adequate social distancing . . . to be practiced in all of the detainee units."  Floriano Decl., ¶¶ 1, 7.  But in fact, she has never even seen the bathrooms in any unit, let alone the cells that are most over-crowded in 2 East.  Floriano Dep. at 41-43, 45-46.  Class members who actually live in these cramped spaces paint a starkly different picture.  They describe units as "really crowded; there are constantly many people in any given room" with "people . . . always around each other's bunks." Declaration of Amiry Carlos Dias ¶ 2; Declaration of Isaac Doe ¶ 4.  Class members are "living in the same room, breathing the same air." Declaration of Amaury Reyes Batista ¶ 3.  Because of the congregate living, with dozens of people per unit, it is "impossible to be able to effectively social distance." Dias Decl. ¶ 2. This is because individuals are on top of each other every day, with shared bathrooms, recreation space, and meals.  Doe Decl. ¶ 5.  Even where changes have been made to sleeping arrangements to try and create some distance, there are simply too many people held in these units for this to be viable.  *Id*. ¶ 3 (describing attempts to change sleeping arrangements in 2 East but noting its ineffectiveness "because there are too many people in the Unit to [limit the number of people per cell]").

      b.    <u>Defendants Have Taken Insufficient Steps In Light of Known Risk, Rising To the Level of Deliberate Indifference, and Such Conduct Will Continue Absent An Injunction</u>

As this Court has recognized, the government must "at least" refrain from treating civil immigration detainees with deliberate indifference.  ECF 64 at 19.  This is so because deliberate indifference is the standard for a violation of a criminal detainee's rights, and civil detainees are entitled to "more considerate treatment" than their criminal counterparts. *Youngberg v. Romeo*,

14

457 U.S. 307, 321-22 (1982).  Thus, if civil detainees prove deliberate indifference, they *ipso facto* will prevail on a Fifth Amendment claim.

Plaintiffs have a high likelihood of succeeding even under the higher deliberate indifference standard.  As this Court has stated, where a safety risk is known, the deliberate indifference inquiry "asks whether the government disregards the risk by failing to take reasonable measures to abate it."  ECF 64 at 22-23 (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)); *see also id*. at 20 (a defendant is deliberately indifferent when it has "actual knowledge of impending harm, easily preventable, and yet fail[s] to take the steps that would have easily prevented that harm") (citing *Leite v. Bergeron*, 911 F.3d 47, 52-53 (1st Cir. 2018)).  Here, it is undisputed that Defendants have actual knowledge of the harms caused by COVID-19.  Souza Dep. at 270-71; *see also id*. at 275 (staff provided with hazard pay due to risks of infection).  Yet they have failed to take numerous reasonable measures that would have abated that risk.

Most notably, Defendants have not viewed release of class members – even under strict conditions such as electronic monitoring and home confinement – as an option to reduce risk of infection.  Certainly Defendants undertook no voluntary releases before this lawsuit was filed.  But even after the lawsuit was filed and this Court made clear that "the question is whether the government is taking reasonable steps to identify those Detainees who may be released in order to protect everyone from the impending threat of mass contagion," ECF 64 at 23, Defendants *still* took no such steps.  *See* Souza Dep. at 229-30.  Even as to medically vulnerable class members, Defendants did not analyze the population to ascertain if any should be released or even monitored more closely.  Souza Dep. at 81-82, 236-37; Floriano Dep. Tr. (Rough) at 95-96 (Q: "Is there any difference between how you treat [high-risk] detainees compared to detainees

who are not at higher risk?  A: No, there's no difference right now.  No.  Not that I'm aware of.
Q: So you're not taking any additional steps to monitor those folks?  A: No.").

To the contrary, Defendants objected to release of *every one* of the individuals who came
before this Court on an application for bail, insisting each day that "release of none of the listed
individuals is required for either their safety or the safety of the remaining civil detainee
population at BCHOC," even as to individuals with no criminal records or pending charges and
those with significant health issues that made them uniquely vulnerable to COVID-19.[10]  Nor did
Defendants ever alter their stance about the necessity of release to reduce risk of infection, even
after numerous class members had been successfully released to their homes to safely quarantine
there without incident.  In fact, BCHOC's nursing supervisor believes that population density is
irrelevant to risk analysis.  *See* Floriano Dep. (Rough) at 34.

Even more critically – and crucial to the need for injunctive relief – Defendants have
made clear that, in their view, it would be perfectly fine to return to the population levels that
existed at the start of this lawsuit.  It is Defendants' position that BCHOC could safely house
today the exact same number of individuals that it held before the Court ordered releases.  Souza
Dep. at 242-43 (asserting that BCHOC could safely house "at least" 140 individuals); Floriano
Dep. (Rough) at 30:16-24 (same).  Sheriff Hodgson, who runs the facility, believes the Court's
bail orders were unnecessary and has not imposed any limit on the number of ICE detainees
BCHOC will accept.  Hodgson Dep. Tr. (Rough) at 82-83.  Unless the Court imposes strict limits
through a preliminary injunction, it is inevitable that pre-litigation density will return.

---

[10] *See* ECF 50 (April 7 Input); ECF 58 (April 8 Input); ECF 67 (April 9 Input); ECF 75 (April 10 Input); ECF 79
(April 13 Input); ECF 80 (April 14 Input); ECF 85 (April 15 Input); ECF 88 (April 16 Input); ECF 94 (April 17
Input); ECF 102 (April 20 Input); ECF 105 (April 21 Input); ECF 111 (April 22 Input); ECF 116 (April 23 Input).

Rather than analyze the health and safety risk in light of the current pandemic, Defendants continue to simply fall back on arguments that they are "under capacity."  Yet this fails to acknowledge that what may be a facility's safe capacity in normal times is simply not relevant given the global health crisis of COVID-19.  After all, public schools have safe "capacities" too, and yet State governments across the country have essentially deemed the safe capacity of schools at the current moment to be zero.  But Defendants have not consulted any public health experts about what BCHOC's safe capacity would be in this pandemic.  Souza Dep. at 231.  Defendants' repeated "business as usual" stance and refusal to even *consider* viable options such as supervised release evinces precisely the type of deliberate indifference in the face of known risk that the Supreme Court has held violates the Eighth Amendment.  It thus violates the less stringent Fifth Amendment standard applicable to civil immigration detainees.

On any number of other matters, Defendants purport to recognize the importance of public health measures but have dug in and asserted there is nothing else they could do protect class members.  *See* Souza Dep. at 230 ("I believe we're doing everything we possibly can."); Floriano Dep. Tr. (Rough) at 32-33 (same).  Thus, while acknowledging that "preventing infection requires vigilant social-distancing," Souza Dep. at 308, Defendants have maintained conditions that make social-distancing – much less vigilant social-distancing – impossible.  While knowing of serious COVID-19 outbreaks in detention facilities throughout the country, Defendants have taken no steps to ascertain whether BCHOC is doing anything different from any of those facilities.  Souza Dep. at 217, 311-15; Floriano Dep. Tr. (Rough) at 104:3-105:12.

## VIII.   <u>The Potential For Irreparable Harm Is Great.</u>

Medical and public health experts confirm that Defendants' actions will cause severe injury and harm to Plaintiffs.  This harm, serious illness or even death, is irreparable, as it "cannot adequately be compensated for either by a later-issued permanent injunction, after a full

adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).   Immediate relief and humanitarian release are essential to address the imminent hazards COVID-19 places upon Plaintiffs.  Plaintiffs who contract COVID-19 as a result of their close confinement will have contracted an illness with no known cure that has led to a breathtaking loss of life.  Gonsalves Decl., ¶ 5. This is true for all class members, as the disease does not discriminate based on age or health status.  *Id.*, ¶¶ 5, 7. And even absent a present outbreak, detainees sit as kindling waiting for a match to inevitably be struck.  As a result, they currently are experiencing additional harms and reporting extreme levels of anxiety and fear.  *See*, *e.g*., ECF 91-2 Supplemental Decl. of Menjivar-Rojas; ECF 91-4 Supplemental Decl. Keller ¶ 69; Guerrero Decl. ¶ 2 (describing panic attacks); Declaration of Isaac Doe ¶ 23 ("We're right on top of each other.  We're sitting ducks.").

## IX.   The Balance Of Hardships And Public Interest Favor Plaintiffs.

Both the balance of equities and the public interest heavily favor the Plaintiffs.  In normal times, crowding and close quarters, the sharing of toilets, sinks, and showers, and communal food preparation and service may be considered uncomfortable.  However, these conditions present a deadly threat to Plaintiffs in light of COVID-19.  This threat is compounded daily, as staff come through the facility after being in contact with outside communities, and as other transfers-in still occur from criminal custody.  The threat and exceptional risk COVID-19 poses to the class vastly outweighs any interest Defendants may have in maintaining their detention.

Since immigration proceedings are civil and non-punitive, "[t]here is no sufficiently strong special justification . . . for indefinite civil detention." *Zadvydas*, 533 U.S. at 690.  In fact, ICE has significant discretion to release immigration detainees, *see* 8 U.S.C. § 1226(a), and has a long-standing practice of releasing for humanitarian reasons even those whose detention has been mandated under particular immigration detention statutes, *see* 8 U.S.C. § 1182(d)(5); §

1225(b); § 1226(c).  ICE regularly uses alternatives to detention to maintain custody and control

over non-citizens in immigration proceedings, and is doing so for individuals whom the Court

has released on bail.  Defendants should not object to them here given the life-threatening

conditions that exist in the immigration units of BCHOC.

## X.  **A Preliminary Injunction Is Warranted.**

In light of the above, all of the requirements for issuance of a Preliminary Injunction are

fully satisfied.  Accordingly, Plaintiffs respectfully request a preliminary injunction that:

1.  Orders Defendant to release a specified number of individuals within a specific

timeframe.  Alternatively, the Court could accomplish this through individualized bail

determinations.  While the Court's orders to reduce BCHOC's density have begun to alleviate

the problem, much more remains to be done to reduce density to a level at which all individuals

could safely socially distance.  If the Court is not inclined to order Defendant to reduce the

population, the Court could continue on the efficient, workable path that it has been on in

considering individual applications for bail.  Approximately 60 class members have been fully

briefed and are under advisement and could be released at any time on the same conditions that

the Court has ordered for other class members over the past several weeks.

Plaintiffs believe that the burden should be placed on Defendants to justify continued

detention for any particular class member through clear and convincing evidence that the class

member is a danger to the community, or to show by a flight risk by a preponderance of the, and

show that alternatives to detention have been considered.  *See Gomes v. DHS*, Civil No. 20-cv-

00453-LM (D.N.H.) (ordering that at the bail hearings, the respondents will have the burden to

prove by clear and convincing evidence that each petitioner is either a danger to the public or a

flight risk). *See also Reid v. Donelan,* 390 F.Supp.3d 201 (D.Mass., 2019); *Brito v. Barr*, 395 F.

Supp.3d 135 (2019).

2.     <u>Enjoins Defendants from increasing the population above a level the Court</u> <u>determines to no longer be unreasonably unsafe.</u>  Any injunction that does not include a provision enjoining Defendants from increasing the population will be fruitless and create a never-ending cycle of releases and new admissions.  Since the point of the Court's releases to date has been to reduce the overall density, an injunction enjoining Defendants from admitting new individuals is critical; otherwise, the Court's efforts will have been for naught.

3.     <u>Enjoins Defendants from maintaining unreasonably unsafe conditions for the</u> <u>remaining detainees</u>.  Although this is a habeas action, the Court is empowered to remedy otherwise unconstitutional conditions of confinement.  *See Fox v. Lappin*, 441 F.Supp.2d 203, 205-06 (D. Mass. 2005) "some conditions of confinement are appropriately brought as habeas petitions."); *see also Kane v. Winn*, 319 F.Supp.2d 162, 215 (D. Mass. 2004).  Such a remedy is appropriate here, and an injunction should include enjoining congregate sleeping spaces, ensuring adequate spacing in bathrooms, requiring regular professional cleaning of the facility, and ensuring provision of soap and sanitizer, as well as PPE.[11]

Finally, the Court has also taken under advisement Defendants' suggestion that a Special Master be appointed.  Plaintiffs agree that, should the Court issue a Preliminary Injunction, appointment of a Special Master to oversee compliance would be appropriate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that a Preliminary Injunction issue.

---

[11] While, to limit the spread of COVID-19, congregate sleeping facilities should be enjoined, class members remaining in the facility should not be subject to treatment that functionally mirrors solitary confinement, which is medically inappropriate, ineffective, and unlawfully punitive. *See Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J. dissenting) (stating that "it is well documented that such prolonged solitary confinement produces numerous deleterious harms."); *see also* note 8, *supra*.

May 6, 2020
Respectfully Submitted,

\_\_\_/s/ Oren Sellstrom

Oren Nimni (BBO #691821)
Oren Sellstrom (BBO #569045)
Lauren Sampson (BBO #704319)
Ivan Espinoza-Madrigal[†]
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0606
onimni@lawyersforcivilrights.org

Grace Choi, Law Student Intern[*]
Kayla Crowell, Law Student Intern[*]
Laura Kokotailo, Law Student Intern[*]
Aseem Mehta, Law Student Intern[*]
Alden Pinkham, Law Student Intern[*]
Bianca Rey, Law Student Intern[*]
Megan Yan, Law Student Intern[*]
Reena Parikh[†]
Michael Wishnie (BBO# 568654)
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520
Phone: (203) 432-4800
michael.wishnie@ylsclinics.org

Lisa Pirozzolo (BBO #561922)
John Butts (BBO #643201)
Vinita Ferrera (BBO #631190)
Felicia Ellsworth (BBO #665232)
Nicole M.F. Dooley (BBO #690539)
Annaleigh Curtis (BBO #696165)
Michael Brown (BBO #695276)
Rama Attreya (BBO #699395)
Gary Howell-Walton (BBO #705470)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 021009
Lisa.Pirozzolo@wilmerhale.com

---

[†] Admitted *pro hac vice*.
[*] Motion for law student appearances pending.

21

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that, on May 6, 2020 a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of this court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.


Date: May 6, 2020

<u>/s/ Lisa Pirozzolo</u>
Lisa Pirozzolo