UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
MARIA ALEJANDRA CELIMEN SAVINO,         )
JULIO CESAR MEDEIROS NEVES,             )
and all those similarly situated,      )
                                        )
        Plaintiffs-Petitioners,         )
                                        )          CIVIL ACTION
        v.                              )          NO. 20-10617-WGY
                                        )
STEVEN J. SOUZA, Superintendent of      )
Bristol County House of Correction      )
in his official capacity,               )
                                        )
        Defendant-Respondent.           )
                                        )
_____

YOUNG, D.J.                                        May 12, 2020

## MEMORANDUM OF DECISION

## I.  INTRODUCTION

The Constitution dictates that the government reasonably safeguard those in its custody, for the power to incarcerate implies the duty to protect.  How far does that duty go amidst the global pandemic of the COVID-19 virus?  That is the enigma this Court, like others across the nation, has grappled with in this case.  A class of civil immigration detainees held in the Bristol County House of Correction, citing this unparalleled health crisis, press this Court to release them from confinement in tight and allegedly unsanitary quarters.  The government refuses to play ball.

The Court has matched the unusual health emergency with an unusual procedural maneuver.  Before addressing the merits of the petition, the Court relied on its inherent authority expeditiously to review bail applications for all of the detainees in the class, one by one, and released almost a third of them to house arrest under strict conditions.  These releases have meaningfully reduced the crowding at the detention center and, one hopes, hindered the virus' spread.  The Court then turned to the pending motion for a preliminary injunction and, after briefing and oral argument, preliminarily ordered the government (1) to test all detainees and staff who come into contact with them; and (2) not to admit any more detainees to this facility.[1]  This memorandum lays out the Court's reasoning.

As explained more fully below, the Court reaches three essential conclusions.  First, withholding this preliminary injunction would likely cause the detainees irreparable harm because some number of them would get seriously ill or die.  Second, the government's response likely amounts to deliberate indifference to a substantial risk of serious harm to the detainees' health.  This deliberate indifference is proven by the government's near-blanket opposition to the release of

---

[1] The preliminary injunction was issued orally at the hearing held by video conference on May 7, 2020.  ECF No. 168.  The full order is recorded at the end of this memorandum.  The Court modified the order on May 11, 2020.  ECF No. 172.

detainees throughout the bail process (though it did somewhat reduce the population through limited bond releases and deportations), as well as by its minimal efforts at testing and contact tracing.

Third, the balance of the equities and the public interest weigh in favor of the injunction.  In so finding, the Court notes that this injunction does not prohibit the government's (and the public's) two primary interests in enforcing the immigration laws -- deporting those unlawfully present and confining those who are dangerous or flight risks.  Yet, to the extent it reduces the risk of an uncontainable outbreak in the facility, the injunction secures the safety of the detainees, the guards and other staff, their families, and ultimately the public at large.  The scale thus tips lopsidedly toward the interim equitable relief ordered by the Court.

## II.  PROCEDURAL BACKGROUND

The named plaintiffs-petitioners are two of 148 individuals (the "Detainees") detained by Immigration and Customs Enforcement ("ICE") on civil immigration charges who, at the start of this litigation, were held at the Bristol County House of Correction ("BCHOC") in North Dartmouth, Massachusetts.  Pet. Writ Habeas Corpus ("Pet.") ¶ 1, ECF No. 1; Opp'n Mot. Temporary Restraining Order ("Opp'n TRO"), Ex. A, Aff. Sheriff Thomas H. Hodgson ("Hodgson Aff.") ¶ 6(o), ECF No. 26-1.  On March 27,

2020, the Detainees filed a purported class action suit alleging, as relevant here, that the conditions of their confinement violated their due process rights and seeking release. See generally Pet. The gravamen of the complaint was that the facility was simply too crowded to practice social distancing in accordance with ubiquitous medical advice, id. ¶¶ 67-68, and that the conditions were otherwise unhygienic, id. ¶ 70. The Detainees also filed a motion for class certification, ECF No. 13, and a motion for a temporary restraining order, ECF No. 14, which the Court converted into a motion for a preliminary injunction at the initial hearing held on March 30, 2020.[2]

At a hearing on April 2, 2020, the Court provisionally certified five subclasses, ECF No. 36, and later that day put together a list (using information from a spreadsheet helpfully provided by the respondent, or "the government") of twelve Detainees with no criminal history or pending criminal charges, ECF No. 38. The next morning, counsel for the government informed the Court that ICE would voluntarily release six of those individuals on Orders of Supervision. At a hearing that same day, the government told the Court that ICE would not voluntarily release anyone else. Tr. Hr'g (Apr. 3, 2020) 6:4-8,

---

[2] All hearings in this matter have been held remotely by video conference in light of the danger posed by COVID-19.

ECF No. 48.  The Court ordered bail for three Detainees at that hearing and requested that the parties supply (jointly or separately) a list of fifty names to consider for bail.  Id. at 8, 15-17.  Neither party opted to select fifty candidates.  On April 8, 2020, the Court certified the general class of presently incarcerated Detainees and explained the basis for its bail procedures.  Savino v. Souza (Savino I), __ F. Supp. 3d __, No. 20-10617-WGY, 2020 WL 1703844 (D. Mass. Apr. 8, 2020).

Over the next several weeks, the Court received briefing from the parties relating to each Detainee's criminal and medical histories, as well as other pertinent information, and assessed each one individually.  True to its word, ICE systematically opposed bail for every Detainee after the initial six.  For each group the Court considered, the government stated: "It is ICE's position, for the record, that release of none of the listed individuals is required for either their safety or the safety of the remaining civil detainee population at BCHOC."  ECF Nos. 50, 58, 67, 75, 79, 80, 85, 88, 94, 102, 105, 111, 116.[3]  The Court ruled on the bail applications that were relatively clear cases -- whether granting or denying --

---

[3] The only cracks in this wall of refusal were two Detainees whom the government offered as substitutes in place of individuals the Court had previously ordered released on bail. See ECF Nos. 51, 63.

and took the rest under advisement.[4]  Between the filing of the

case and the preliminary injunction, six Detainees were released

by ICE on Orders of Supervision, forty-four were granted bail by

this Court, fifteen were released on bond through the

immigration courts, fifteen were (or were soon scheduled to be)

deported, and five new individuals were added by ICE.  Of the

148 Detainees held at BCHOC at the start of the litigation,

there remained 80 after the Court's last bail order on May 5,

2020.  ECF No. 147; Opp'n Mot. Prelim. Inj. ("Opp'n") 5, ECF No.

---

[4] Detention for immigrants awaiting deportation is roughly
equivalent to denying bail to a person accused of crime.  In
both cases the goals are the same: to minimize danger to the
community and curtail the risk of flight.  As an experienced
trial judge at both the state and federal levels, I have been
struck by the fact that the great bulk of these 148 detainees --
not all but most -- would have been admitted to bail on terms
were they American citizens facing criminal charges.  The fact I
did not release more is due solely to the proper respect I owe
to the administrative hearing officers within the executive.

If this small cohort is at all reflective of the nearly
thirty thousand detainees in ICE custody across the nation, it
would appear we are spending millions of our national treasure
to lock up thousands of people who might better be released on
strict bail conditions without impairing the safety of our
citizens or the operations of our government.  See Detention
Statistics, https://www.ice.gov/detention-management (last
accessed May 11, 2020) (listing 28,865 immigration detainees in
custody as of May 2, 2020); see also ICE, U.S. Immigration and
Customs Enforcement Fiscal Year 2019 Enforcement and Removal
Operations Report 5, 8,
https://www.ice.gov/sites/default/files/documents/Document/2019/
eroReportFY2019.pdf (stating that 50,165 individuals, on
average, were daily in ICE custody in fiscal year 2019, with an
average length of stay of 34.3 days).

164; id., Ex. A, Third Decl. Steven Souza ("Third Souza Decl.")
¶ 9, ECF NO. 164-1.

The Court received briefing on the motion for a preliminary
injunction.  Pls.' Suppl. Mem. Supp. Mot. Prelim. Inj. ("Pls.'
Suppl. Mem."), ECF No. 150; Opp'n.  After a hearing held on May
7, 2020, the Court orally issued the preliminary injunction and
explained its reasoning.  ECF No. 168.  This memorandum of
decision further explicates the basis for the preliminary
injunction.  See Fed. R. Civ. P. 52(a).

## III. THRESHOLD ISSUES

Before embarking on the preliminary injunction discussion,
the Court briefly detours to address several threshold hurdles
raised by the government.  First, the government argues that the
Detainees lack constitutional standing for this preliminary
injunction.  Opp'n 27-28.  The Court disagrees for the reasons
articulated in its prior opinion certifying the class.  Savino
I, 2020 WL 1703844, at *4; see also Helling v. McKinney, 509
U.S. 25, 33 (1993) ("It would be odd to deny an injunction to
inmates who plainly proved an unsafe, life-threatening condition
in their prison on the ground that nothing yet had happened to
them.").

Second, the government argues that the Detainees cannot
challenge the conditions of confinement in a habeas action,
which is limited to challenges to the fact or duration of

confinement.  Opp'n 19-20 (quoting <u>Jenkins</u> v. <u>Spaulding</u>, No. 19-10078-MPK, 2019 WL 1228093 (D. Mass. Feb. 22, 2019) (Kelley, M.J.); <u>Kane</u> v. <u>Winn</u>, 319 F. Supp. 2d 162, 213-15 (D. Mass. 2004)).  Even were habeas actions so limited,[5] the Detainees have styled their action as <u>both</u> a habeas petition under 28 U.S.C. § 2241 <u>and</u> a complaint seeking declaratory and injunctive relief. Pet. 1.  That being so, a cause of action for equitable relief relating to their conditions of confinement is available wholly apart from habeas.  <u>See</u> <u>Simmat</u> v. <u>U.S. Bureau of Prisons</u>, 413 F.3d 1225, 1231-33 (10th Cir. 2005).  Moreover, this preliminary injunction is not itself habeas relief, but rather "interim equitable relief [whose purpose] is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." <u>Trump</u> v. <u>International Refugee Assistance Project</u> (<u>IRAP</u>), 137 S. Ct. 2080, 2087 (2017) (citing <u>University of Tex.</u> v. <u>Camenisch</u>, 451 U.S. 390, 395 (1981)).  Thus, the Court does not see why this preliminary

---

[5] The Court need not decide whether this is indeed the law in the First Circuit, and if so whether that rule applies to detainees in federal custody.  <u>Compare</u> <u>Gonzalez-Fuentes</u> v. <u>Molina</u>, 607 F.3d 864, 873-74 (1st Cir. 2010) (prisoners' challenge to conditions of state confinement must be brought under 42 U.S.C. § 1983, not habeas), <u>with</u> <u>United States</u> v. <u>DeLeon</u>, 444 F.3d 41, 59 (1st Cir. 2006) ("If the conditions of incarceration raise Eighth Amendment concerns, habeas corpus is available."), <u>and</u> <u>Brennan</u> v. <u>Cunningham</u>, 813 F.2d 1, 4 (1st Cir. 1987); <u>cf.</u> <u>Aamer</u> v. <u>Obama</u>, 742 F.3d 1023, 1035-38 (D.C. Cir. 2014).

injunction must stick within habeas' fact-of-confinement domain.[6]
"Once invoked, the scope of a district court's equitable powers
. . . is broad, for breadth and flexibility are inherent in
equitable remedies."  Brown v. Plata, 563 U.S. 493, 538 (2011)
(omission in original) (internal quotation marks and citations
deleted).

Finally, the government contends that 8 U.S.C. § 1252(f)
bars the Court from issuing any classwide injunctive relief.
Opp'n 25-27.  The Supreme Court has observed that section
1252(f) "prohibits federal courts from granting classwide
injunctive relief against the operation of §§ 1221-1231, but
specifies that this ban does not extend to individual cases."
Reno v. American-Arab Anti-Discrimination Committee, 525 U.S.
471, 481-82 (1999).  That provision, however, does not apply
here for two reasons.

First, section 1252(f)(1) does not apply to "individual
alien[s] against whom [immigration] proceedings . . . have been
initiated" -- a category that embraces all class members here.

---

[6] The Supreme Court has stated that "[i]f a request for a
permanent injunction does not sound in habeas, it follows that
the lesser included request for a temporary stay (or preliminary
injunction) does not either."  Nelson v. Campbell, 541 U.S. 637,
647 (2004).  Yet the Court is unaware of a case stating that
when a permanent injunction does sound in habeas (as here, given
that the petitioners seek release), the Court's equitable powers
in fashioning an appropriate preliminary injunction are
constrained.

See Rodriguez v. Marin, 909 F.3d 252, 256 (9th Cir. 2018).
Second, section 1252(f)(1) denies this Court the "jurisdiction
or authority to enjoin or restrain the operation" of certain
immigration statutes.  8 U.S.C. § 1252(f)(1).  Yet the Court's
preliminary injunction simply requires COVID-19 testing and
halts admissions of new detainees to a particular facility,
matters as to which the immigration statutes are silent.  The
statute does say that "[t]he Attorney General shall arrange for
appropriate places of detention for aliens detained pending
removal or a decision on removal," 8 U.S.C. § 1231(g)(1), but
the First Circuit has explained that "section 1231(g) fails to
'specify' that individualized transfer decisions are in the
Attorney General's discretion."  Aguilar v. U.S. ICE, 510 F.3d
1, 20 (1st Cir. 2007).  To the extent section 1231(g)(1) grants
transfer authority, merely taking one facility off the list of
possible detention centers while litigation ensues does not
"enjoin or restrain the operation" of the statute absent some
showing that the Attorney General cannot arrange for a detainee
to be housed in another appropriate place.

Having cleared these threshold obstacles, the Court moves
on to discuss the grounds for its preliminary injunction.

## IV.   THE PRELIMINARY INJUNCTION

### A.   Legal Standard

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." IRAP, 137 S. Ct. at 2087. The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Benisek v. Lamone, 138 S. Ct. 1942, 1945 (2018) (quoting Camenisch, 451 U.S. at 395 (1981). It "serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties . . . as far as possible in the respective positions they occupied when the suit began." Francisco Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 15 (1st Cir. 2009) (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953) (Frank, J.)).

"To secure a preliminary injunction, a plaintiff must show: '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020) (quoting Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)). "[T]he first two factors, likelihood of

success and of irreparable harm, [are] 'the most important' in
the calculus." Bruns v. Mayhew, 750 F.3d 61, 65 (1st Cir. 2014)
(quoting González-Droz v. González-Colón, 573 F.3d 75, 79 (1st
Cir. 2009)).  "[T]he measure of irreparable harm is not a rigid
one; it has been referred to as a sliding scale, working in
conjunction with a moving party's likelihood of success on the
merits," such that a greater likelihood of success on the merits
permits "somewhat less" of a showing of irreparable harm.
Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st
Cir. 2009) (quoting EEOC v. Astra USA, Inc., 94 F.3d 738, 743
(1st Cir. 1996)).

**B.  Likelihood of Irreparable Harm**

The Court presumes that, in ordering the release on bail of
a portion of the Detainees, it has substantially reduced the
risk of infection for those who remain.  Yet the threat
persists.  As of May 7, when the preliminary injunction was
issued, the record indicates that eleven BCHOC staff members,
one ICE detainee, and one state inmate had tested positive for
COVID-19.  See Pls.' Suppl. Mem. 8 & n.6.[7]  Twenty-four ICE

---

[7] See also Bristol County Sheriff's Office
(@BristolSheriff), Twitter (May 5, 2020, 4:22 PM),
https://twitter.com/BristolSheriff/status/1257767668561489921
(last accessed May 8, 2020) (press release stating that a state
inmate tested positive for COVID-19, seven staff members who
tested positive were away recovering, and four staff members who
tested positive had returned to work).

detainees had tested negative (six refused to be tested), and
the rest had never been tested.  Decl. Oren Sellstrom Supp.
Pls.' Mot. Prelim. Inj. ("First Sellstrom Decl."), Ex. B, Inmate
Testing Chart ("Testing Chart") (May 4, 2020) (listing five
negative tests of ICE detainees); Third Souza Decl. ¶ 5 (adding
nineteen more).  As of April 28, about twenty-two staff members
had tested negative.  Decl. Oren Sellstrom Supp. Pls.' Mot.
Prelim. Inj. ("Second Sellstrom Decl."), Ex. D, Dep. Steven
Souza ("Souza Dep.") 288, ECF No. 151-4.  According to the
Special Master's Weekly Report filed in the Supreme Judicial
Court on May 4 regarding state inmates, BCHOC had administered
just twenty-three COVID-19 tests, nineteen of which were for
inmates.  Committee for Pub. Counsel Servs. v. Chief Justice of
the Trial Court, SJC-12926, Special Master's Weekly Report (May
4, 2020) App. 4, available at https://www.mass.gov/doc/sjc-
12926-special-masters-weekly-report-5420/download (last accessed
May 8, 2020).  In sum, the virus is clearly present in BCHOC,
though its current prevalence is unknown.

The Court acknowledges and commends the significant steps
that BCHOC has taken in order to prevent the spread of COVID-19
at the facility and treat anyone infected.  The Centers for
Disease Control and Prevention ("CDC") has issued guidance for
correctional facilities and detention centers.  CDC, Interim
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in

Correctional and Detention Facilities ("Interim Guidance") (Mar.
23, 2020), https://www.cdc.gov/coronavirus/2019-
ncov/downloads/guidance-correctional-detention.pdf.   ICE has
also issued a document requiring every facility housing
immigration detainees to, among other standards, comply with the
CDC's recommendations.   ICE, COVID-19 Pandemic Response
Requirements ("Pandemic Response Requirements") (Apr. 10, 2020),
https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCle
anFacilities.pdf.   The government vigorously asserts that BCHOC
has followed all of these recommendations.   Def.'s Mem. Supp.
Mot. Stay Further Releases 12-14, ECF No. 83.   The Court
previously noted several protective measures BCHOC has put in
place since February, including restricting contact with
outsiders, performing temperature screenings, and splitting up
detainees during meals and recreation.   Savino I, 2020 WL
1703844, at *1-2.   The Court recognizes the commendable efforts
of the BCHOC staff, who have been operating in difficult and
risky conditions where much is unknown.   It is necessary to
point this out given that, while the Court and the attorneys
have been conferring remotely due to the pandemic, the dedicated
professionals at BCHOC continue to perform their duties on site.
That is no small thing.

Nonetheless, there remain critical safety gaps that
establish a likelihood of irreparable harm in the absence of

[14]

preliminary equitable relief.  Testing of both staff and detainees has been minimal, so the real infection rate is a mystery.  Measures to isolate the carriers and prevent the disease's spread cannot succeed without testing.  The CDC has cautioned for some time that even asymptomatic individuals may be infected with COVID-19 and spread the virus.  See, e.g., Souza I, 2020 WL 1703844, at *2 (citing CDC, Social Distancing, Quarantine, and Isolation (reviewed Apr. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html).  Indeed, asymptomatic spreaders have been called the "Achilles' heel" of prevention strategies.[8] Recognizing this weakness, the "Testing Blueprint" released by the White House, CDC, and Food and Drug Administration ("FDA") recommends that "congregate living settings" should "actively" perform "sentinel monitoring," which "involves targeted, voluntary testing of asymptomatic individuals."[9]  The logic is simple.  As the Director-General of the World Health Organization put it, "[y]ou cannot fight a fire blindfolded.

---

[8] Monica Gandhi, Deborah S. Yokoe, & Diane V. Havlir, M.D., Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19, New England J. of Medicine (Apr. 24, 2020), https://www.nejm.org/doi/10.1056/NEJMe2009758.

[9] White House, CDC & FDA, Testing Blueprint 3 & n.1 (Apr. 27, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/04/Testing-Blueprint.pdf.

And we cannot stop this pandemic if we don't know who is
infected."[10]

A related problem is the "insufficient and ad hoc" contact
tracing of Detainees and BCHOC staff who may have interacted
with COVID-19-positive individuals.  Pls.' Suppl. Mem. 11.  The
White House, CDC, and FDA advise that "contact tracing can help
prevent or contain outbreaks, especially within . . . congregate
living settings in which the residents are particularly
vulnerable to rapid spread."  Testing Blueprint 6.  "Contact
tracing . . . is a key strategy for preventing further spread of
COVID-19."[11]  Particularly in "congregate living settings," the
CDC stresses, contact tracing "is a priority."[12]

While BCHOC made some efforts at contact tracing for
employees who tested positive, there were no follow-up tests
ordered for those with whom the employees may have come into
contact and no written policy related to contact tracing at all.
Souza Dep. 279-80, 288.  Nor is there any evidence that those

---

[10] World Health Organization, WHO Director-General's Opening
Remarks at the Media Briefing on COVID-19 (Mar. 16, 2020),
https://www.who.int/dg/speeches/detail/who-director-general-s-
opening-remarks-at-the-media-briefing-on-covid-19---16-march-
2020 ("We have a simple message for all countries: test, test,
test.").

[11] CDC, Contract Tracing: Part of a Multipronged Approach to
Fight the COVID-19 Pandemic ("CDC Contact Tracing") 1 (Apr. 29,
2020), https://www.cdc.gov/coronavirus/2019-
ncov/downloads/php/principles-contact-tracing-booklet.pdf.

[12] Id. at 2.

who came into contact with COVID-19-positive employees or detainees practiced quarantining as if they were symptomatic themselves, as the CDC expressly recommends.  CDC, FAQs for Administrators, Staff, People Who Are Incarcerated, and Families ("CDC FAQs for Detention Centers") (Apr. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/316368A_FS_COVID19_CorrectionDetention.pdf ("Close contacts of the sick person (who have been within 6 feet of the sick person or have had direct contact with infectious droplets, such as from a cough or squeeze) should self-quarantine at for 14 days home and follow CDC recommended steps for people who are sick with COVID-19 symptoms.").

Of particular concern is the contradictory evidence in the record regarding monitoring of those Detainees who are especially vulnerable to COVID-19.[13]  In an affidavit dated April 2, 2020, BCHOC's medical director averred that "[w]e are also monitoring and reviewing all detainees/inmates who are known to have chronic disease or other comorbidities which would make them more susceptible to a COVID-19 infection."  Aff. Nicholas

---

[13] See CDC, People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed May 8, 2020) ("Based on currently available information and clinical expertise, **older adults and people of any age who have serious underlying medical conditions** might be at higher risk for severe illness from COVID-19.") (emphasis in original).

[17]

J. Rencricca, MD, PhD ¶ 20.  The sheriff swore to similar effect.  Hodgson Aff. ¶ 6(k).  Yet when asked in depositions conducted nearly a month later, BCHOC's nursing supervisor for ICE detainees and its superintendent denied that vulnerable detainees were subject to special monitoring or protocols. Sellstrom Decl., Ex. B, Dep. Nelly Floriano (Rough Tr.) 95-96, ECF No. 151-2; Souza Dep. 81-82.  Moreover, ICE requires detention centers to notify ICE "12 hours after identifying any detainee who meets the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19." Pandemic Response Requirements 5-6.  ICE says it will then "review the case to determine whether continued detention is appropriate," id. at 14.  The record is devoid of any such notification or consideration for release.  See Souza Dep. 236-37; Pls.' Suppl. Mem. 12 n.9.  This is obviously worrying.

Additionally, the chances of a more dangerous outbreak would rise were additional detainees to be added to the mix. ICE acknowledges that "[t]he combination of a dense and highly transient detained population presents unique challenges for ICE efforts to mitigate the risk of infection and transmission." Opp'n TRO, Ex. 2, Mem. from Enrique M. Lucero, ICE, to Detention Wardens & Superintendents 1 (Mar. 27, 2020), ECF No. 26-2; see also Interim Guidance 2 (listing "transfer of incarcerated/detained persons between facilities and systems"

and "admitting new entrants" as examples of "many opportunities for COVID-19 to be introduced into a correctional or detention facility"); CDC FAQs for Detention Centers 1 ("Because of close contact and the number of people in correctional and detention facilities (including prisons and jails), staff and people who are incarcerated are at greater risk for the spread of germs."). Barring the government from adding new detainees ameliorates the twin problems of detainee density and transience, thus lowering the chances of further spread.

The Court does not disagree with the government's protestation that "[i]rreparable harm cannot be assumed from the fact of the pandemic alone." Opp'n 12. It is the government's response to the pandemic that matters. On the evidence in the record, it appears highly likely that serious harm would have followed from the Court's inaction. Had the Court stayed its hand, little or no progress would have been made at BCHOC towards accurately determining the virus' presence among the detainees and staff and towards effectively separating potential carriers from others -- and it is likely that the gains in density reduction achieved through the bail orders would be jeopardized by new arrivals. This is not a case where "the defendants implemented many of th[e] measures [in the preliminary injunction] before the plaintiffs even filed the complaint." Swain v. Junior, ___ F.3d ___, No. 20-11622-C, 2020

WL 2161317, at *5 (11th Cir. May 5, 2020) (per curiam).  The
government has resisted widespread testing and has continued to
accept new detainees.  Accordingly, the Court found that the
Detainees showed a likelihood of irreparable harm.

### C.   Likelihood of Success on the Merits

The Detainees' claim on the merits is that the conditions
of their confinement violate the Due Process Clause of the Fifth
Amendment.  Pet. ¶¶ 98-105.  Underlying their claim is the
cardinal principle that when the government "so restrains an
individual's liberty that it renders him unable to care for
himself, and at the same time fails to provide for his basic
human needs -- e.g., food, clothing, shelter, medical care, and
reasonable safety -- it transgresses . . . the Due Process
Clause."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489
U.S. 189, 197 (1989).

The barebones constitutional demand on the government is
"to refrain at least from treating a pretrial detainee with
deliberate indifference to a substantial risk of serious harm to
health."  Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir.
2011) (citing City of Revere v. Massachusetts Gen. Hosp., 463
U.S. 239, 244 (1983) & Farmer v. Brennan, 511 U.S. 825, 835
(1994)).  "Proof of deliberate indifference requires a showing
of greater culpability than negligence but less than a purpose
to do harm," id. (citing Farmer, 511 U.S. at 835), "and it may

consist of showing a conscious failure to provide medical services where they would be reasonably appropriate," id. (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  "To show such a state of mind, the plaintiff must provide evidence that the defendant had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm."  Leite v. Bergeron, 911 F.3d 47, 52-53 (1st Cir. 2018) (quoting Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018)) (further citation and internal quotation marks omitted).  "This standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness."  Id. at 53 (quoting Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999)).  Courts generally apply the same standard for civil immigration detainees as for pre-trial detainees.  See E. D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019) (stating that "the legal rights of an immigration detainee [are] analogous to those of a pretrial detainee" and collecting cases of other circuits).

There is little doubt that the Detainees would likely demonstrate at trial a substantial risk of serious harm to their health arising from their conditions of confinement amidst the COVID-19 outbreak.  The CDC states that "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread

once introduced." Interim Guidance 2. "Social distancing," the
CDC explains, "is the practice of increasing the space between
individuals and decreasing the frequency of contact to reduce
the risk of spreading a disease (ideally to maintain at least 6
feet between all individuals, even those who are asymptomatic)."
Id. at 4. Social distancing "is a cornerstone of reducing
transmission of respiratory diseases such as COVID-19." Id.
Were it not for the Court's bail orders and preliminary relief -
- all of which expire upon a ruling on the merits, and thus
cannot decide the merits -- the Detainees would be packed
together in close quarters where social distancing is
impossible. See Savino I, 2020 WL 1703844, at *2 (describing
close living quarters before bail releases). This threat would
be compounded by lackluster testing and contact tracing, as well
as inattention to those with special vulnerabilities. The virus
is present in BCHOC and is hardly going to stop in its tracks.

There is still much to learn about the COVID-19 virus and
its confoundingly uneven assault on humanity.[14] Though COVID-19
surely poses a greater threat to those with CDC-recognized
heightened risk factors, "it cannot be denied that the virus is
gravely dangerous to all of us." Savino I, 2020 WL 1703844, at

---

[14] James Hamblin, Why Some People Get Sicker Than Others,
The Atlantic (Apr. 21, 2020),
https://www.theatlantic.com/health/archive/2020/04/coronavirus-immune-response/610228/.

*7.[15]  Given what is now (preliminarily) known about the virus
and the facts on the ground in BCHOC, the Detainees would likely
show a substantial risk of serious harm resulting from their
confinement in such conditions.

The more difficult question is whether the Detainees have
shown that the government is likely deliberately indifferent to
that risk.[16]  The staff at BCHOC have admirably taken significant
steps toward protecting the Detainees from COVID-19.
Nonetheless, the Detainees have demonstrated at least three
cavernous holes in the government's mitigation strategy -- holes
it has obstinately refused to plug throughout this litigation.

---

[15] See Nancy Chow et al., CDC COVID-19 Response Team,
Preliminary Estimates of the Prevalence of Selected Underlying
Health Conditions Among Patients with Coronavirus Disease 2019 —
United States, February 12–March 28, 2020, 69 Morbidity &
Mortality Weekly Report 382, 382-84 (Apr. 3, 2020),
https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.

[16] At oral argument, counsel for the Detainees suggested
that the deliberate indifference standard must be satisfied only
in the Eighth Amendment context, not for civil detainees whose
claim lies in the Fifth Amendment's due process right.  The
distinction matters little, however, because the First Circuit
has stated that "[t]he two standards are not all that far
apart." Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011).
Several circuits now hold, after Kingsley v. Hendrickson, 135 S.
Ct. 2466 (2015), that the inquiry under the Due Process Clause
is purely objective, with a subjective inquiry reserved for the
Eighth Amendment context.  See Banks v. Booth, No. 20-849(CKK),
2020 WL 1914896, at *6 (D.D.C. Apr. 19, 2020) (citing cases).
Yet the First Circuit has continued to conduct the subjective
inquiry in due process cases even after Kingsley.  See Miranda-
Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016);
Couchon v. Cousins, No. 17-10965-RGS, 2018 WL 4189694, at *6 (D.
Mass. Aug. 31, 2018) (Stearns, J.).

See Farmer, 511 U.S. at 846 (holding that, in determining deliberate indifference, district court has "discretion" to consider "developments that postdate the pleadings and pretrial motions").

First, the government has steadfastly objected to the release on bail of all Detainees after the first six (and two others it wished to substitute for two whom the Court released). The exigencies of the moment demand flexibility.  Both state and federal governments have recognized the need to release some incarcerated individuals in order to allow for minimal social distancing.  Congress responded to the pandemic by authorizing the Bureau of Prisons to exceed the statutory maximum period of home confinement if the Attorney General makes a finding of "emergency conditions."  CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020).  The Attorney General has found such an emergency.[17]  The Massachusetts Supreme Judicial Court has ordered that, "[t]o decrease exposure to COVID-19 within correctional institutions, any individual who is not being held

---

[17] See Memorandum of Attorney General William Barr to Director of Bureau of Prisons (Apr. 3, 2020), https://www.justice.gov/file/1266661/download; Memorandum of Attorney General William Barr to Director of Bureau of Prisons (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (directing the Bureau of Prisons "to prioritize the use of [its] various statutory authorities to grant home confinement to inmates seeking transfer in connection with the ongoing COVID-19 pandemic").

without bail . . .  and who has not been charged with an
excluded offense (i.e., a violent or serious offense . . .) is
entitled to a rebuttable presumption of release." Committee for
Pub. Counsel Servs. v. Chief Justice of the Trial Court, 484
Mass. 431, 435, 142 N.E.3d 525, 530 (2020).  ICE itself requires
that "[e]fforts . . . be made to reduce the population to
approximately 75% of capacity." Pandemic Response Requirements
13.  As mentioned above, ICE also requires that BCHOC report the
identities of vulnerable detainees and promises to "review the
case to determine whether continued detention is appropriate."
Id. at 14.  The Court has not seen evidence of any reporting to
ICE or of a review of Detainees at BCHOC for possible release.

The directives of the Attorney General, the Supreme
Judicial Court, and ICE's nationwide policy do not encapsulate
the Constitution's demands in this crisis.  The Court mentions
these policies for a different reason: they highlight that
diverse governmental actors see the need for serious thought and
actual efforts to release those whose confinement is not worth
the cost.  In this case, the authorities have displayed the
contrary mindset.  Where elasticity is vital, they are rigid;
where life hangs upon a carefully drawn line, they opt for near-
blanket incarceration.  That is evidence of deliberate
indifference. See Battista v. Clarke, 645 F.3d 449, 453 (1st
Cir. 2011) (affirming preliminary injunction issued after

[25]

finding of deliberate indifference stemming from prison
authorities' "composite of delays, poor explanations, missteps,
changes in position and rigidities . . . taken to an extreme");
Pesce v. Coppinger, 355 F. Supp. 3d 35, 47 (D. Mass. 2018)
(Casper, J.) (issuing preliminary injunction on basis of
likelihood of deliberate indifference when prison authorities
"implemented a blanket policy prohibiting the use of methadone
treatment . . . without any indication that they would consider
[the plaintiff's] particular medical history and prescribed
treatment in considering whether departure from such policy
might be warranted").

In fairness, ICE has made some headway on its own.  Through
a combination of deportations, bond releases by immigration
officials, and the six releases on Orders of Supervision, ICE
has managed to transfer about thirty individuals out of BCHOC
since the start of this litigation (though it has also added
five in).  Yet the record tends to show that the government
never formulated a plan to determine a safe population level or
how to reach that mark.  Souza Dep. 231-34.  The few bond
releases were conducted "in the normal course," not as part of a
strategy to reduce the density of detainees, and even those
dried up in mid-April.  Def.'s Input Apr. 22 List 2, ECF No.
111.  Deportations are always a slow business and the pandemic
has introduced new complexities.  It has been apparent from the

start that these mechanisms alone would not reduce the population to a density that could safely withstand the COVID-19 onslaught.  The government was indifferent.

When this Court forced individual bail applications upon the government, it resisted all of them.  Day in and day out, the Court was told that "[i]t is ICE's position, for the record, that release of none of the listed individuals is required for either their safety or the safety of the remaining civil detainee population at BCHOC."[18]  Opposition was understandable for some of the forty-four whom the Court admitted to bail, but at least twenty-five of those had either no criminal records or minimal or nonviolent ones (e.g., fraud, operating under the influence, larceny, drug possession, or failure to appear) along with mitigating circumstances that indicated little continued threat to the public.  Several also had health conditions elevating their risk from the virus.  ICE is free to disagree with this Court's determination regarding this or that individual's aptness for release.  A wholesale blockade on bail, however, cannot be justified when the government proffers no alternative method of reducing the population to a safe number.

---

[18] That refrain calls to mind "Bartleby, the Scrivener," who met every reasonable request with a firm "I would prefer not to."  Herman Melville, The Piazza Tales 51-52 (1856).

The government began this litigation suggesting, contrary to all known expert guidance, that social distancing was unnecessary because the virus could somehow be kept out of BCHOC.  Savino I, 2020 WL 1703844, at *4 n.7.  Even after the fallacy of this view became apparent, as eleven staff members and one Detainee tested positive, the government continued to argue that "BCHOC is not like the world at large" since it "is able to control who comes into its facility, where they go, and what steps are taken to screen such individuals.  Social interaction, the primary focus of the social distancing recommendations, is much more limited at BCHOC than in the outside world."  Opp'n 29.  This thinking flies in the face of the CDC's direct warnings that detention centers are hardly impregnable fortresses and that, in fact, they are more susceptible to outbreaks once the virus penetrates.  Interim Guidance 2 ("There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress . . . ."); id. ("Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.").  The government's purported rationale for refusing to work toward a safe population level was beyond "the realm of reason."  Kosilek

v. <u>Spencer</u>, 774 F.3d 63, 92 (1st Cir. 2014) (en banc) (quoting <u>Battista</u>, 645 F.3d at 454).

The other acute flaws in the government's prevention strategy are the lack of testing and contact tracing. The record indicates that BCHOC tested no Detainees before April, five in April, and at least twenty on May 1 (following a violent clash between Detainees and staff that broke out, it seems, over an effort to test certain Detainees). Testing Chart; Third Souza Decl. ¶ 5. Yet it is apparent that many Detainees and staff have not yet been tested; nor does the record demonstrate adequate contact tracing. <u>See</u> <u>supra</u> IV.B (discussing evidence of testing and contact tracing). Without robust testing and contact tracing, the spread of the virus cannot be known or contained.[19] Keeping individuals confined closely together in the presence of a potentially lethal virus, while neither knowing who is carrying it nor taking effective measures to find out, likely displays deliberate indifference to a substantial risk of serious harm. That is what the evidence shows here.

---

[19] <u>See</u> <u>Testing Blueprint</u> 3 (recommending "targeted, voluntary testing of asymptomatic individuals" in "congregate living settings" to assess and contain potential spread); <u>CDC Contact Tracing</u> 1-2 ("Contact tracing . . . is a key strategy for preventing further spread of COVID-19," and "is a priority" in "congregate living settings.").

On these facts, taken together, the Court found that the
Detainees would likely succeed on the merits of their due
process claim.

**D.   Balance of the Hardships and the Public Interest**

The Supreme Court has stated in the immigration context
that the final two factors -- "assessing the harm to the
opposing party and weighing the public interest" -- typically
"merge when the Government is the opposing party." Nken v.
Holder, 556 U.S. 418, 435 (2009).  Accordingly, the Court will
analyze these factors together.

The hardship caused to the Detainees by remaining in unsafe
conditions needs no further elaboration.  Moreover, the Supreme
Court has noted that "[o]f course there is a public interest in
preventing aliens from being wrongfully removed, particularly to
countries where they are likely to face substantial harm." Id.
at 436.  Thus, allowing harm to befall the Detainees is contrary
to the public interest as well.

On the other side of the scale, this preliminary
injunction causes minimal hardship to the government or injury
to the public.  The primary interests that the government (and
the public) have in operating this detention system are twofold:
ensuring the deportation of those unlawfully present and
confining those deportable individuals who may be dangerous to
the public.  This preliminary injunction does not meaningfully

impede either of these objectives, since it neither prohibits the government from deporting any Detainee nor prevents it from confining a new individual in a different facility.[20]  The hardship to the government here, such as it is, boils down to providing tests.  That burden pales in comparison to the public health benefits of thwarting the spread of COVID-19 within this detention center.  Indeed, the public has a powerful interest in ensuring that there is not an outbreak within the detention center that is then primed to spread via the staff to the wider community.

This latter point is paramount.  The government's "custodial duty" has both "inward" and "outward" aspects: that is, the government must guard the health and safety of those incarcerated within its facility, as well as protect the outside public from dangerous detainees.  United States v. Volungus, 595 F.3d 1, 8 (1st Cir. 2010).  In one sense, this case exposes the tension between those dual responsibilities.  The Detainees legitimately complain of unsafe crowded quarters amidst the COVID-19 pandemic and demand release, while the government -- just as legitimately -- objects that many of the petitioners are too dangerous to let out.  The Court has sought to balance these considerations by making individualized bail determinations,

---

[20] There is no evidence in the record suggesting that ICE has nowhere else to put new detainees other than BCHOC.

releasing to house arrest enough detainees as to hamper the virus' spread but not those who pose real danger to the public.

Yet the dichotomy is somewhat misleading here.  Even the government's "outward" protective duties of custody, those it owes to the public at large, are jeopardized by locking up as many inmates as possible.  The virus, if allowed to thrive in the detention centers, will migrate back into our neighborhoods. At least eleven officers or other staff, one immigration detainee, and one state inmate at Bristol County House of Correction have already tested positive for COVID-19; many others have yet to be tested.  Employees returning to their homes after their shifts may expose their families, friends, bus drivers, cashiers, and doctors.  The chain of infection thus grows.  Were the government to loose an uncontainable viral outbreak from within its detention centers, it would betray its duty to the public, not just to the detainees.  Seen in this light, the government's "inward" and "outward" custodial duties converge upon the need to deny the virus a habitat inside the facility.  This convergence suggests that the balance of hardships and the public interest weigh heavily in favor of a preliminary injunction.

V.    **CONCLUSION**

Having found that all factors point towards awarding interim equitable relief, the Court issued the following preliminary injunction:

1. As soon as reasonably possible, all immigration detainees at Bristol County House of Correction and staff who come into contact with them must be tested for COVID-19.  The Court shall be satisfied with a polymerase chain reaction (PCR) test approved by the Food and Drug Administration for this purpose.  The test shall be provided at no cost to the detainees or BCHOC staff; if there are costs, ICE is to bear them.  Anyone covered by this order may decline to be tested, but a declination shall be treated as a positive COVID-19 result and that person shall be presumed to be carrying the COVID-19 virus.

2. No new immigration detainees may be admitted to Bristol County House of Correction.  Any detainee who was already admitted but has left or will leave the facility, for whatever reason, shall not return.

3. The above orders shall automatically dissolve upon the latter of the following two events: (a) the Judicial Conference of the United States rescinds its authorization under the CARES Act for the use of video

[33]

and teleconferencing during certain proceedings;[21] (b) the
Supreme Judicial Court rescinds the rebuttable
presumption of release for certain inmates it has
described in Committee for Pub. Counsel Servs. v. Chief
Justice of the Trial Court, 484 Mass. 431, 142 N.E.3d 525
(2020).

4. At a hearing held on May 11, 2020, the Court modified the
preliminary injunction as follows: No immigration
detainee shall be transferred from the Bristol County
House of Correction to another detention center until the
testing required by the preliminary injunction has been
performed and the Court has been informed that the test
was negative.  If the individual declines the test, then
that person may be moved upon proper notice to the Court
so long as existing ICE protocols having to do with the
health of the individual are followed.  The order in this
paragraph shall dissolve together with the rest of the
preliminary injunction.

**SO ORDERED.**

/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[21] See Judiciary Authorizes Video/Audio Access During COVID-
19 Pandemic (Mar. 31, 2020),
https://www.uscourts.gov/news/2020/03/31/judiciary-authorizes-
videoaudio-access-during-covid-19-pandemic.