**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|   |   |   |
|---|---|---|
| **MARIA ALEJANDRA CELIMEN SAVINO** | ) | |
| **and JULIO CESAR MEDEIROS NEVES,** | ) | |
|  | ) | |
| **Petitioners-Plaintiffs,** | ) | |
|  | ) | **20-cv-10617 WGY** |
| **v.** | ) | |
|  | ) | |
| **THOMAS HODGSON, et al.,** | ) | |
|  | ) | |
| **Respondents-Defendants.** | ) | |

_____)


## DEFENDANTS' MOTION FOR RECONSIDERATION

### I. OVERVIEW

Respondents-Defendants hereby request that the Court reconsider its decision on

Plaintiffs' Motion for a Preliminary Injunction (docket # 175, hereinafter "Decision"). With due

respect for the careful consideration given by the Court, Defendants believe that a second look is

warranted.

It is clear from the Decision that the Court is frustrated by what it sees as Defendants'

near-complete refusal to take steps to reduce the risk of an outbreak of COVID-19 within the

Bristol County House of Corrections facility ("BCHOC"). In this Motion for Reconsideration,

Defendants hope to show the Court that Defendants did, in fact, make very serious efforts to

reduce the risk of infection, including by releasing and agreeing to the release of detainees, and

that Defendants' litigation responses do not comprise a complete picture. Put another way,

although the parties disagree about the extent of remedial action required, and perhaps the form

of such action, Defendants have not been deliberately indifferent as that phrase is defined by the

Supreme Court and the First Circuit.

## II. DEFENDANTS' POSITION REGARDING RELEASE
## IS NOT EVIDENCE OF DELIBERATE INDIFFERENCE

### A. The Context of the Releases Is Important

The Court finds great fault with what it calls Defendants' steadfast, obdurate refusal to initiate the releases of detainees on their own. It is important to recall how this case began to place this issue in proper perspective. The complaint was filed on March 27, 2020. At that time, BCHOC had taken extensive measures to prepare for and to combat the threat of infection. It had instituted the "CPS Clinical Guideline" which adopted the recommendations of the Massachusetts Department of Public Health and the Centers for Disease Control ("CDC") for preventing infection, monitoring detainees, screening detainees and staff, isolating those who might be positive (staff and detainees) and testing.[1] *See, e.g.*, Affidavit of Nicholas Rencricca, ex. 1 to docket # 35 and attachment thereto.

Although the Court has assumed otherwise, there was no *evidence* that the steps taken by Defendants were inadequate at that time. Indeed, as the Court is well aware, for the first six weeks of this litigation there was not a single confirmed case of COVID-19 within the inmate or detainee population, while the rate of infection in the Commonwealth at large was skyrocketing. Indeed, to date (almost eight weeks into the litigation and three months into the pandemic) there has been only a single positive test among the detainee population, and that result is highly doubtful as the same individual tested negative, along with eighteen of his Unit mates, just two days later. *See* Declaration of Judy Borges, Assistant Deputy Superintendent of Medical Services, attached hereto as Exhibit 1, and Fourth Declaration of Superintendent Steven Souza,

---

[1] "CPS" is the acronym of Correctional Psychiatric Services, which has a contract with the Bristol County Sheriff's Office to provide comprehensive medical services to inmates and detainees at BCHOC. *See* Affidavit of Nicholas Rencricca, ex. 1 to docket # 35, ¶ 1.

attached hereto as Exhibit 2.

Thus, at the outset of the litigation, while there were certainly reasons to be concerned about the coronavirus and its potential spread in any congregate living situation, there was nothing to indicate that the steps taken by Defendants were inadequate. Especially considering those steps were in accord with all *then-available* guidance and buttressed by the fact that there were no known cases of COVID-19 among the detainee population or staff at that time.

The litigation was certainly not brought on the basis of "let's get together and talk about what can be done at Bristol." Rather, Plaintiffs sought (and still seek) the immediate release of *all* detainees, regardless of the statute controlling their detention, their age or health, their criminal history or their potential for flight, as well as a complete ban on placing any new detainees at the facility for the indefinite future. The uncontested fact that a detainee had been convicted of rape and was subject to an Interpol Red Notice, abused his spouse and children, or been convicted of trafficking fentanyl made no difference to Plaintiffs—they still wanted the detainee released.

Against this backdrop, at the second hearing on April 2, 2020, without proposing that ICE on its own review all the detainees for release, the Court assembled five subclasses of detainees. Dkt. # 36. The classes were organized by their comorbidities for the coronavirus and the extent of their criminal history. The Court then asked ICE to consider releasing a group of twelve detainees in group one voluntarily. ICE agreed to release six of the twelve and informed the Court that it was releasing two more detainees on bond. Defendants urged the Court not to release the remaining six detainees owing to its perception of their dangerousness. The Court released three of those detainees. Dkt. # 44. One of the released detainees had been convicted in the United Kingdom for rape, robbery, assault causing serious bodily harm, and handling stolen

goods.  Defendants immediately sought reconsideration and, mindful of the Court's goal of

reducing detainee population, offered to release a different detainee that ICE did not consider to

be a threat to the community.  Dkt. # 51.  This is precisely the type of cooperative approach to

reducing the detainee population that the Court denies Defendants possessed.[2]  This offer was

accepted by the Court, although a similar offer subsequently made was not.  Dkt. # 63.

Without explanation, the Court dropped the subclass categories at the next hearing on the

following day, April 3, 2020, and proposed instead that the parties prepare a joint list of the 50

highest priority detainees to be considered for release.  Dkt. # 43. The Court indicated that if the

parties could not agree on a joint list, the Court would come up with its own list.  It did not

explain what criteria would be used.  After the Court selected 50 detainees, the process of daily

lists of ten detainees with input from each side went forward.[3]  *See, e.g.,* dkt. # 46.

At the outset, the Court made it clear that it was going to release a number of detainees in

order to make social distancing more feasible within BCHOC.  *See*, *e.g.*, Transcript, 4/3/20,

*passim.*  The roles and procedure were set by the Court:  it would select a daily list of ten

detainees and the parties would provide input regarding their merits for release.[4]  *See id.* at pp.

---

[2] The Court released two individuals, including one with recent charges of Risk of Injury
to a Child (Urbina-Rivas) and another who had repeatedly failed to comply with the conditions
of his prior ICE release who was a risk of flight (DeOliveira).  Defendants' objections to the
release of these two were well-founded.

[3] Plaintiffs indicated immediately that they would not propose a list, as they felt it would
mean putting the interests of some clients over the interests of other clients.  Faced with this, and
with the Court indicating that if the parties could not agree on a list, the Court would come up
with its own list, ICE also declined the Court's offer since the Court had not indicated it would
use one side's list if there was only one list submitted.  "So if you give me two lists or give me
an overlapping list, you're not going to know until Sunday at 4:00 what the Court's list is."
Transcript, 4/3/20, at p. 22.

[4] The Court did not explain what criteria it was using to select its lists of detainees and

21-23; *see also* dkt. 46.  Having set the procedure and put it in motion, the Court now faults Defendants for not having agreed to release detainees, all lawfully detained, of its own accord or in response to the daily lists.  "Yet the record tends to show that the government never formulated a plan to determine a safe population level or how to reach that mark." Memorandum of Decision, docket # 175 (hereinafter "Decision") at p. 26.  This is like the Court getting in the driver's seat, picking the destination and blaming the passengers for not driving the car.[5]  The Court dictated the process, including the solicitation of input regarding the suitability of release, and the Defendants provided it.

The Court chides Defendants for rejecting the notion that population reduction was necessary.  In this, the Court perhaps overstates the case.  First, Defendants did not categorically rule out a reduction in detainees.  As the Court has recognized, Defendants reduced the detainee population by 21 through various means and acquiesced to the further reduction by 28.[6]  Importantly, the number of detainees released by ICE directly (transfers and release on Orders of Supervision) along with the releases on bond by Immigration Judges have resulted in the reduction of the detainee population at BCHOC by 36, which is a reduction of almost 25%

the criteria were not apparent to Defendants.

[5] In fact, Defendants did try to assist the Court with input on the most dangerous or flight-likely detainees.  Further, the Court concedes that it "forced individual bail applications upon the government," Decision at 18, but implies that this came only after Defendants had an opportunity to reduce the detainee population of their own.  The process was put in place by the Court in the first week of litigation, with no invitation by the Court for Defendants to suggest an alternative means of achieving detainee safety.  Nor at any point did the Court, nor Plaintiffs, signal what an appropriate level of reduction would be.

[6] The fact that five detainees were added is a consequence of criminal inmates being released to an ICE detainer and not of new arrests in the public domain.  As such, this was not deliberate on Defendants' part.

without accounting for what the Court was doing at the same time.[7]

Second, the Court selectively quotes Defendants' filings regarding the daily detainee lists. "Day in and day out, the Court was told that "[i]t is ICE's position, for the record, that release of none of the listed individuals is required for either their safety or the safety of the remaining civil detainee population at BCHOC." *Id.*, at 18. This statement was made to protect Defendants' rights, hence the phrase, "*for the record.*" Moreover, it is a statement of Defendants' view of whether a reduction was necessary and was not a statement of opposition to any release, which the Court had made clear was going to happen. Thus, Defendants then went on to state: "Recognizing that the Court will order the release of some detainees, Defendants suggest that of the first group of ten, the following individuals cannot be safely released into the community" and listed four individuals. Thus, out of the first list of ten, Defendants signaled their acquiescence to the release of six and released a seventh individual (Harlan Perez). This hardly constitutes "[a] wholesale blockade on bail." Decision at 27.

In response, the Court released eight detainees, including three out of the four that Defendants urged the Court *not* to release. The released detainees included persons with multiple firearms convictions (Morales), convictions for trafficking in crack cocaine (Smith), and extensive history of violent crime, including assault and battery with a dangerous weapon and assaults/threats against women (Thomas).[8]

---

[7] The Court cites an aspirational goal of ICE nationally to reduce the detainee population to 75%, but this is of *capacity*, not as a percentage of the detainee population where capacity was not full (which it was not at BCHOC). *See* Decision at 25. Even as a percentage of detainee population, that was met long ago. The present detainee population is 73, one detainee less than half the original population when the suit was filed, and represents no more than 30% of capacity.

[8] Defendants inadvertently mixed up the criminal history of two detainees. The Court

On that same date, April 7, 2020, the Court invited the parties to address "whether given the number of cells and the common areas in the detention facility there is some number of detainees who might occupy the facility and yet be adequately spaced? Much like a nursing home or retirement facility. The views of physicians and public health professionals will be gratefully received. We shall discuss this matter at the hearing ordered for Thursday, April 9, 2020 at 2:00 PM." Dkt. # 55.  Clearly, the Court signaled three things: first, by releasing three of the four detainees as to whom Defendants had strongly objected, the Court was not inclined to agree with Defendants regarding the danger to the community or risk of flight of particular detainees.  Second, the Court opened the door for a discussion of whether there was some number of detainees which would be safe with respect to social distancing.   In this regard, although it was an inquiry and not a determination, the Court for the first time recognized that release of every single detainee (as advocated by Plaintiffs) might not be necessary.[9]

For the second list of ten, Defendants again protected the record by stating their continued belief that detainee safety did not require the release of any detainees but specified that

---

denied bail to the detainee that Defendants represented had an extensive criminal record including assault and battery with a dangerous weapon and drug trafficking convictions.  When Defendants attempted to correct their mistake, the Court refused to reconsider the release of the detainee whose record demonstrated a significant risk to the community (Schnaider).  *See* dkt. # 63.

[9] It was in this context that Defendants suggested that BCHOC is not like the outside world in terms of access.  The Court finds this position ludicrous, but it is a fact that human entry into BCHOC has been much more limited than interaction is on the outside.  Moreover, BCHOC instituted screening procedures which further differentiated it from society at large.  These facts, along with numerous other precautions taken by Defendants, are reflected in the far lower rate of infection in the BCHOC "community" than in the Commonwealth as a whole.  To this day, nearly two months after dire predictions of a facility outbreak, there has been only one positive detainee and that result was almost surely a false positive.  *See* Declaration of Judy Borges, attached hereto as Exhibit 1.

of the ten, there were six who should not be released.  Defendants candidly expressed their concern regarding the criminal history and flight risk of a number of the people released by the Court, pointing out that most of the people on the list would fall into category four of the five subclasses initially set out by the Court and as to which the Court appropriately expressed its unlikeliness to release any of the detainees who fell into that group.  The Court chose not to engage in a dialogue with Defendants on the issue however.[10]  In response to Defendants' input regarding the April 8, 2020 list, the Court released *all six* of the individuals that Defendants had suggested should not be released.  Again, the Court signaled, quite unmistakably, that it was not going to agree with Defendants and released individuals who posed a risk of flight due to passport fraud and illegal reentry (Peguero-Vazquez), or a danger to the community due to domestic violence, aggravated assault with a weapon, extortion and drug trafficking (Vargas), pending charges of assault with a dangerous weapon (knife) and assault and battery with a dangerous weapon and domestic violence (Jaramillo-Quiroz), and trafficking in fentanyl (Mota).  Two others presented risks of flight due to a lack of ties to the area and use of false identities and documents (Hussein and Ferreira).[11]

On April 9, 2020, Defendants proposed to the Court an additional condition of release, that ICE be allowed to place released detainees on electronic monitoring.  Again, this is an

---

[10] In addition, reflecting their **ongoing** efforts to improve conditions at BCHOC, on April 8, 2020, Defendants informed the Court that they had reconfigured the sleeping arrangements to increase the space between detainees.

[11] The Court has expressed its view that ICE has detained persons the Court does not think require detention, *see, e.g.*, dkt. # 175 at n. 4.  But all detainees are and were subject to detention in accordance with relevant statutory authority and the records of the released detainees are replete with violent crimes, drug trafficking and domestic abuse, so there is a difference of opinion on that.  The Court did not, however, address the risk of flight, even though that is one of the two statutory bases for detention.

affirmative step taken by Defendants attempting to balance the Court's objective of reducing the detainee population and yet protecting the community and ensuring that released aliens would not flee.  Of the April 9th list of ten, Defendants recommended that six could not be released safely and one, a woman, need not be released because there was no issue with social distancing for the female detainees.  This was in response to very significant criminal histories.  In contrast to the Court's take on the individuals coming up for consideration, Defendants were surprised that most of the people being considered for release would have fallen into categories four or five of the Court's original structure.  For example, one was recently charged with enticing a child under the age of sixteen and assault and battery (Arreaga). Another had recently been charged with striking his girlfriend in the head with a glass bottle so forcefully that he caused her to lose consciousness (Beltran-Araujo).  He was also charged with risk of injury to a child.  Another on the list amassed 30 arraignments in Massachusetts since 2007, including convictions for assault and battery on a child, assault and battery, possession of a firearm with defaced number, firearm identification card, and disorderly conduct (Portillo).  The last detainee objected to had convictions for two counts of trafficking in cocaine, for which he received a 10-year sentence (Corleto).  In short, these are not incidental, benign records and Defendants' objections were not frivolous nor raised to be obstructive.[12]  The Court nonetheless admitted three of these detainees to bail, including Beltran-Araujo and Corleto.  Dkt. # 73.

The process continued in this manner.  Defendants acquiesced to additional releases until April 21, by which time the Court had rejected the Defendants' motion to stay without

---

[12] Moreover, Defendants respectfully disagree with the Court's view that the people as to whom Defendants objected to release would likely be released on bail in a criminal case were they United States citizens and also notes this view to be the quintessential comparison of apples and oranges.

considering the argument that a sufficient reduction had been achieved.  Here are the numbers:

| Date | Number of Detainees Defendants Acquiesced to Release |
|------|------------------------------------------------------|
| 4/7  | 6 |
| 4/8  | 4 |
| 4/9  | 3 |
| 4/10 | 6 |
| 4/13 | 0 (4 scheduled for removal) |
| 4/14 | 1 (plus 1 released on bond) |
| 4/15 | 3 |
| 4/16 | 4 |
| 4/17 | 0 |
| 4/20 | 1 |
| 4/21 | 0 |
| 4/23 | 0 |
| 4/27 | 0 |
| Total | **28** |

Thus, Defendants agreed to the release of more than one-half of the detainees released by the Court.  When this number (28 detainees acquiesced to) is added to the 6 released on orders of supervision and the 15 transferred out of Bristol for removal, the actual total number of detainees that Defendants agreed to the release of, or directly caused the release of, is **49**.[13]  That is **111%** of the total number of releases made by the Court (44).  Clearly, Defendants were engaged in good faith in the release process.

---

[13]  This number does not give Defendants any credit for the 15 detainees releases by Immigration Judges, when in fact ICE could have sought a review of the decision to release with the Board of Immigration Appeals but chose not to.  When the Court refused to engage on the question it had posed (i.e., what is a sufficient reduction in detainee population), and which lay at the heart of the Court's approach, it was the Court, not Defendants that was "not playing ball." By April 21, 2020, Defendants believed a sufficient reduction in detainee population had been achieved and thereafter Defendants did not agree to further releases until the Court addressed the target reduction question.

### B. **The Issue of How Much Reduction Is Enough Was Never Decided**

On April 7, 2020, the Court entered the following order:

> Judge William G. Young: ELECTRONIC ORDER entered. In
> accordance with the Order entered on April 5, 2020, docket entry
> 46 the following detainees shall be submitted to bail and released
> forthwith: Montes-Santos, Pascual; Figueroa-Moralis, Julio; Smith,
> Donovan; James, Andrea; Thomas, Joko; Thomas, Akeim;
> Sanchez-Lopez, Victor; Paul, Schnaider. Notice has been made
> that Harlen, Perez has previously been released and therefore is
> dismissed from the class. **The Court inquires whether given the
> number of cells and the common areas in the detention facility
> there is some number of detainees who might occupy the
> facility and yet be adequately spaced? Much like a nursing
> home or retirement facility.** The views of physicians and public
> health professionals will be gratefully received. We shall discuss
> this matter at the hearing ordered for Thursday, April 9, 2020 at
> 2:00 PM. Said hearing shall be held remotely by video/telephone.
> (Hearing set for 4/9/2020 02:00 PM remotely before Judge
> William G. Young by video/telephone.)(Gaudet, Jennifer)
> (Entered: 04/07/2020)

Docket # 55 (emphasis supplied).  In response to the Court's inquiry regarding whether there was

a level of population reduction which would render the conditions relatively safe for the

remaining detainees, Defendants submitted two declarations on Thursday, April 9, 2020.  One

was from Superintendent Steven Souza of BCHOC.  That declaration went through the areas

where detainees are held at BCHOC in painstaking detail, providing both dimensions and the

current number of detainees housed in each.  The second declaration was from Nelly Floriano,

the Nursing Supervisor for ICE detainees at BCHOC, who reviewed the prevention and

treatment practices at the facility and offered an opinion regarding the ability of ICE detainees to

maintain social distance.

Defendants followed up the declarations with a brief on Tuesday, April 14, 2020.  The

brief addressed the current detainee population at BCHOC within each unit where immigration

detainees are held.  Attached to the brief was an updated declaration of Superintendent Souza.[14]

Together, these submissions made the case that the reduction in population to date, coupled with

steps taken by BCHOC to reconfigure sleeping arrangements, meal taking, and other activities

made social distancing much more feasible and compliant with all CDC recommendations (given

the inherent limitations of a detention facility, which even the CDC recognizes).

Defendants did not undertake to brief the issue of whether social distancing is feasible at

BCHOC lightly or as some folly of their own invention.  The Court made it clear, both in the

April 7th order quoted above and in repeated comments during various hearings, that the

rationale of reducing the detainee population was because social distancing is one of the essential

defenses to the spread of the COVID-19 virus.  Because social distancing was possible, for the

most part, and the Court had expressed its particular interest in social distancing, Defendants

reasonably asked that the Court not release any additional detainees at that time.  The detainee

population at BCHOC had been diminished by thirty-eight  percent (38%) from the level at the

outset of the litigation at that time.[15]

In response, the Court stated the following in its denial of the motion to stay:

> We are in the midst of a pandemic unprecedented in our lifetime.

---

[14] A third exhibit had diagrams showing how the bunk beds in the two main units, ICE A and ICE B, were occupied and how detainees might be reassigned to increase the distance among them.  This is another example of Defendants attempting to find solutions to the problem defined by the Court. The government also submitted two videos which showed the detainee facilities at BCHOC.  At the hearing on April 9, 2020, it was clear that the Court had not had sufficient time to review the videos, but it is unclear if it has done so since.  Part of the challenge of this case has been the relentless pace.  There are over 180 docket entries in just over seven weeks.  Plaintiffs are represented by 17 attorneys with the assistance of at least 8 law students; Defendants are represented by two attorneys from the U.S. Attorney's Office, one of whom cannot work on this case full-time.

[15] The current population has been reduced by more than ***half*** of what it originally was (from 148 to 73).

>Past experience is an uncertain guide to meeting the challenges of today. Thus, while the Court notes the revised ICE regulations concerning detainees, it is simply not presently in a position to issue any blanket stay which would, as a practical matter, go far to determining the merits of this case, ignoring the many other issues raised by the class. Instead, the Court will continue, on an individual basis, to work through the difficult issues of bail in the present crisis. That done, probably by the end of next week, we shall together schedule proceedings promptly to address the merits. Moreover, compelling issues of individual, institutional, and community health preclude the luxury of a stay so counsel can 'consider their appellate options.' The motion is denied.

Dkt. # 86.

The Court's statement was, frankly, perplexing.  Defendants did not ask for a "blanket stay" but asked that the Court not release any additional detainees because the criteria which the Court itself set forth, that detainees be able to maintain six feet of separation, had been met (at least from Defendants' perspective).  The Court did not address the evidence presented by Defendants whatsoever.  Indeed, by its opaque reference to the revised ICE Guidelines and "past experience is an uncertain guide," it does not appear that the Court even considered the central tenet of Defendants' brief—that sufficient reduction had occurred to allow social distancing.  Again, this is precisely the question as to which the Court *solicited* the parties' input.[16]  At the core of the Motion to Stay was the issue, which the Court itself teed up but then refused to address, of whether there was a safe level of detainee population.  While this is a difficult issue to resolve, the Court put itself in this position by making social distancing the key factor in addressing the concerns presented by Plaintiffs.  The Court has not, to this day, decided that

---

[16]  Nothing in the submission by Defendants asked the Court to take guidance from past actions. The revised ICE guidelines were not even mentioned in Defendants' brief.  Defendants did reference the revised CDC guidance, but not in the context of change so much as to demonstrate that BCHOC has been meeting the CDC guidance since before this case was filed.

13

issue.[17]

## C.  __The Court Decided the Preliminary Injunction Motion on Other Grounds__

At the preliminary injunction hearing, the Court effectively dropped its effort to determine what is a safe level of detainees at BCHOC.  Nor did the Court address a comparison of the conditions of released detainees to those still detained, despite repeated requests from Defendants.  Throughout the litigation, the Court has apparently accepted Plaintiffs' exaggerations of how bad conditions are within BCHOC and how safe conditions outside of BCHOC are.[18]

Defense counsel had suggested, during the last hearing prior to the preliminary injunction hearing, that the Court consider appointing a special investigator or master to tour BCHOC and investigate the actual conditions.  This was a creative and cooperative attempt by Defendants to move the dispute forward and provide the Court with an independent assessment of the actual

---

[17] The CDC guidance for correctional facilities recognizes that social distancing is not easy in the correctional setting: "Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19." https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed 5/15/20). It is important to keep in mind, moreover, that social distancing does *not* mean, as Plaintiffs would have it, that two persons cannot *ever* be within six feet of each other even for a moment. As the CDC guidance on contact tracing cited by the Court states: "Based on our current knowledge, a close contact is someone who was within 6 feet of an infected person *for at least 15 minutes* starting from 48 hours before illness onset until the time the patient is isolated." CONTACT TRACING, Part of a Multipronged Approach to Fight the COVID-19 Pandemic available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/principles-contact-tracing-booklet.pdf (last accessed May 15, 2020)(emphasis supplied).

[18] At the preliminary injunction hearing on May 7, 2020, the Court did express doubts as to whether it could address the conditions at BCHOC in a habeas petition, but it has not inquired as to the relative safety of detention versus release and assumed that release is safer for both the released detainees and those left behind.

facts on the ground.  Although the Court expressed interest in the idea, it did not take it up. After

determining that Plaintiffs must show that Defendants were deliberately indifferent to their

medical needs on their Fifth Amendment claim, the Court focused primarily on Plaintiffs'

likelihood of success on the merits.  According to the Court, Plaintiffs were likely to succeed

because Defendants:

1. Did not release a sufficient number of detainees on their own initiative;

2. Did not conduct wide scale testing of asymptomatic personnel and detainees; and

3. Did not conduct contact tracing for persons who tested positive.

With all due respect, Defendants believe the Court got this wrong.

**1. Release of Detainees:**  As indicated, Defendants were not as reluctant to release

detainees as the Court has said.  The difference between the "for the record" statement, which

was consistent with Defendants' position, and their recommendation of a subset of detainees who

should not be released can only mean one thing:  Defendants were open to a release of the other

detainees on the daily lists but wanted to reserve their rights.[19]

As the Court indicated, Defendants are directly responsible for a reduction of the

detainee population by 21 detainees.[20]  That is almost half of the number (44) released by the

---

[19] Since the Court was releasing detainees based on its "inherent authority," and not based on a class-wide determination on the merits, and not explaining its reasoning as to any release, it is understandable that Defendants felt compelled to preserve their position that release was not necessary.

[20] As stated by the Court, 6 detainees were released by ICE on order of supervision and another 15 were transferred out of BCHOC as part of their removal.  Because, as stated above, ICE has no control over when a criminal inmate will be released to ICE, the addition of five detainees has no bearing on ICE's willingness to release detainees.  It cannot be considered evidence of indifference.

Court.  Moreover, if one adds the number of detainees as to whom Defendants indicated their acquiescence for release (28), the total number is 49 (21 plus 28).  Thus, while the Court has characterized Defendants as setting up a "wholesale blockade on bail," Decision at 27, this is not a fair or accurate characterization.  Even before taking into account the detainees as to whom Defendants acquiesced to their release, Defendants are responsible for 26% of the total reduction, while the Court is responsible for 55%.  And of that 55%, Defendants essentially agreed to 28, i.e., *more than half the detainees released by the Court were persons as to whom Defendants indicated release would be acceptable.* Put another way, Defendants agreed to a 33% reduction in the <u>total</u> detainee population even without considering their decision not to seek stays of or appeal any Immigration Judge bond decisions.

But more important than the numbers is the paradigm.  The Court finds evidence of deliberate indifference in Defendants' unwillingness to reduce the detainee population not so much as an existing practice prior to the litigation's inception, but *after* the complaint was filed.  This might be evidence of indifference if the Court had said, "we have a problem, what can we do about it?" and Defendants refused to do anything.  Such is not the case, as BCHOC was taking action.  But the reality is that the Court said *it* was going to reduce the detainee population through bond determinations, so that was (as Defendants acknowledged in writing, *see, e.g.,* dkt. #50:  "[r]ecognizing that the Court will order the release of some detainees") a foregone conclusion.  The fact that Defendants articulated the lawful basis for the detainees to remain in ICE custody and disagreed with many, but not all, of the Court's decisions on who should be released is not evidence of deliberate indifference because the Court was releasing detainees – and, as said, fully half of those releases were with Defendants' tacit approval.

Crucially, neither the Court nor Plaintiffs ever suggested, much less established, what a

safe number of detainees would be.  Since Defendants had taken extensive steps to prevent

COVID-19 from entering the facility and containing an outbreak if it arose, and has done so

quite successfully, it is hardly a clear sign of their deliberate indifference that they did not proffer

an alternative method of reducing the population to an [unknown] safe number.  Decision at

27.[21]   Moreover, 55 of the original 148 detainees were subject to mandatory detention (31

pursuant to 8 U.S.C. § 1226(c) due to their criminal convictions and 24 pursuant to 8 U.S.C. §

1231), and Defendants indicated this to the Court.  As stated by the Supreme Court in *Jennings*

regarding § 1226(c):

> The Attorney General may release aliens in those categories "only
> if the Attorney General decides ... that release of the alien from
> custody is necessary" for witness-protection purposes and "the
> alien satisfies the Attorney General that the alien will not pose a
> danger to the safety of other persons or of property and is likely to
> appear for any scheduled proceeding." § 1226(c)(2). Any release
> under those narrow conditions "shall take place in accordance with
> a procedure that considers the severity of the offense committed by
> the alien."

*Jennings v. Rodriguez,* 138 S. Ct. 830, 837-838, 200 L. Ed. 2d 122 (2018).  Defendants agreed to

the release of, directly released or transferred 59 detainees; out of the remaining 89, 55 were

subject to mandatory detention.  Thus, only 34 detainees were truly "in play," and there was no

deliberate indifference.

---

[21] The Court's frustration with Defendants appears to stem in part from its disagreement
with American correctional practices, which the Court believes are over-inclusive, and from
what Defendants believe is a somewhat inaccurate characterization of Defendants' willingness to
take protective measures against the virus.  Again, such differences do not establish that
Defendants were deliberately indifferent to the threat of COVID-19.  Dr. Rencricca's affidavit
alone makes it clear they were not, as do the other declarations submitted by Defendants.  *See,
e.g.,* dkt. # 35.

### 2.  Wide Scale Testing of Asymptomatic Individuals Was Not the Standard

The second leg of the Court's deliberate indifference finding is that Defendants failed to conduct wide scale testing of detainees and staff who were asymptomatic.  This was not, however, the standard of care when the lawsuit was filed and it is not the standard now.  While many experts urged more testing, citing the success of South Korea, for example, there was no consensus that the ideal of widespread testing could be accomplished.[22]  There simply were not enough reliable test kits available.  No congregate living facility, to counsel's knowledge, was testing all residents without regard to whether they were symptomatic or not.

"The record indicates that BCHOC tested no Detainees before April, five in April, and at least twenty on May 1…" Decision at 29.  But no one was recommending widespread testing for asymptomatic persons before the end of April.  In fact, FDA is apparently still not recommending widespread use of reverse transcription polymerase chain reaction (RT-PCR) testing in asymptomatic populations:

> At this time, most EUA-authorized SARS-CoV-2 molecular diagnostics are authorized for use in individuals suspected of COVID-19 by their healthcare providers. Testing of asymptomatic individuals who are suspected of COVID-19 is at the discretion of the healthcare provider ordering the test.

FAQs on Testing for SARS-CoV-2, available at https://www.fda.gov/medical-devices/emergency-situations-medical-devices/faqs-testing-sars-cov-2 (last accessed 5/8/20).

Similarly, the CDC says on its website:

### Who should be tested

---

[22] *See, e.g.,* Quammen, David. "The Warnings," published in The New Yorker, May 8, 2020, in which epidemiologist Ali S. Khan noted that the United States had a "failure of imagination" regarding the risk of an epidemic and that the failure to test was widespread in this country, despite the example of South Korea's success with testing.

> To learn if you have a current infection, viral tests are used. But
> not everyone needs this test.
>
> Most people will have mild illness and can recover at home
> without medical care and may not need to be tested.
> CDC has guidance for who should be tested, but decisions about
> testing are made by state and local health departments or
> healthcare providers.

CDC website, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html

(accessed 5/18/20).  CDC does suggest prioritization of testing in long-term care facilities (not

prisons), which have been hit hard by the coronavirus:

> Another population in which to prioritize testing of minimally
> symptomatic and even asymptomatic persons are long-term care
> facility residents, especially in facilities where one or more other
> residents have been diagnosed with symptomatic or asymptomatic
> COVID-19.

CDC: Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19), available at

https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html, last accessed 5/18/20.

In a March 15, 2020 letter from FDA to Robert R. Redfield, MD, Director of the  Centers

for Disease Control and Prevention, at p. 2, the FDA said: "Accordingly, testing is now intended

for the qualitative detection of nucleic acid from the SARS-CoV-2 in upper and lower respiratory

specimens collected from individuals who meet COVID-19 clinical and/or epidemiological

criteria (for example, clinical signs and symptoms associated with COVID-19, contact with a

probable or confirmed COVID-19 case, history of travel to a geographic locations where

COVID-19 cases were detected, or other epidemiologic links for which COVID-19 testing may

be indicated as part of a public health investigation)."   https://www.fda.gov/media/134919/
download (last accessed 5/8/20).[23]

Mass. DPH is also not recommending widespread testing.  *See* DPH website on COVID-
19:

> **Should I be tested?**
>
> If you develop symptoms of COVID-19, call your
> healthcare provider and tell them about your symptoms.
> They will help you decide whether testing is appropriate.
> For detailed information, visit the CDC's webpage: Testing
> for COVID-19.

https://www.mass.gov/info-details/covid-19-testing#should-i-be-tested?- (last accessed

5/17/20).[24]

---

[23] Moreover, in  "Policy for Coronavirus Disease-2019 Tests During the Public Health Emergency (Revised)," FDA stated that "Nothing in this guidance is intended to impact or supersede CDC's recommendations regarding which patients should be tested for COVID-19." *Id.*, at n. 6 (available at https://www.fda.gov/media/135659/download, last accessed 5/8/20).

[24] The Court references "sentinel testing," citing White House, CDC & FDA, Testing Blueprint 3 & n.1 (Apr. 27, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/04/Testing-Blueprint.pdf.  Dkt. 175 at n. 9.  This White House guidance says:  "Sentinel monitoring involves targeted, voluntary testing of asymptomatic individuals at "sentinel sites," which are selected locations that are likely to see cases of the disease."   "State plans should also prioritize the testing needs of vulnerable and otherwise high-risk populations, including the elderly and healthcare workers…" *Id.* at p.4.  " This can be accomplished through sentinel monitoring systems at critical locations, including senior and other congregate living settings and Federal and federally supported health clinics," *id.* p.6.  Nothing in the guidance specifically targets correctional facilities.  But much more importantly, this was only issued on April 27, 2020 (*see, e.g.*, https://www.usatoday.com/story/news/politics/2020/04/27/white-house-unveils-coronavirus-blueprint-expand-state-testing/3032782001), and cannot show deliberate indifference by Defendants as to events that occurred prior to that date because (i) there was no accepted policy that widespread testing should be done before that date; and (ii) the White House guidance does not establish such a policy even now.  At most, it recommends more testing, but that was not the recommendation of the White House, or CDC, prior to April 27, 2020. The same point holds for the article cited by the Court in footnote 8 of the Decision, dkt. #

The upshot of all of this is that there was, and is, no clear policy that widespread testing of asymptomatic individuals is required.  Certainly there were experts who recommended widespread testing, not just in congregate living situations, but in the community as a whole. But this was always tempered by the relative unavailability of reliable testing kits and never became the standard ***such that the failure to conduct asymptomatic testing at Bristol is evidence of deliberate indifference.***

Nor did the Court express a view, prior to the preliminary injunction hearing, that widespread testing should occur.[25]  The Court asked for reports on who was being tested among detainees and what the results were, and even that request came relatively late in the course of this case.  The Court is correct in its view that the pandemic is an enormous challenge and a fluid

---

175. It was published on April 24, 2020 and while it may be informative generally, it cannot be taken as establishing a minimal standard of medical care regarding COVID-19 in correctional facilities because it is focused solely on nursing homes.  Moreover, it was published late in this litigation, so even if an article regarding testing at nursing homes could somehow establish a standard of care for correctional facilities, and the Defendants could be assumed to be current in their medical journal reading, it was not published until April 24, 2020.

[25] In the most recent inquiry prior to the preliminary injunction hearing, the Court said "The Court will propound at least the following two questions at Thursdays hearing: To plaintiffs' counsel: Since it appears uncontroverted that certain detainees refused to be tested, isn't the Court entitled to assume they feared a positive test with the consequence of quarantine and collateral restrictions? To defense counsel: How many detainees remain in custody at the site (whether original class members or add ons) Exactly where are they and under what conditions are they being held? The numbers in each particular location within (or outside) the site. What opportunity, if any, do they have to intermingle and with whom?  Dkt. #144.  This indicated that the Court's focus remained on social distancing.  And, although the Court asked for results of testing in a previous docket entry, that was not related to widespread testing of asymptomatic individuals.  *See* Dkt. #132:  " The Court addresses counsel regarding outstanding detainees. The government shall submit a list of detainees that have been removed and to which country they have been deported to. A hearing on the motion for preliminary injunction is set for Thursday, May 7, 2020 at 10:00 AM by video. The Court takes the matter of appointing a special master under advisement. A report as to the results of COVID-19 testing shall be supplied.

one, with practices and guidance changing over the course of the last six weeks.  For example,
when the lawsuit was filed at the end of March, facial masks were not recommended for
asymptomatic individuals while in public.  Now they are required in many jurisdictions and
recommended by national authorities.  Accordingly, as soon as this recommendation was issued,
BCHOC distributed masks to all staff and detainees.  This is, again, a sign not of rigid
indifference but of earnest attempts to protect people and keep up with the changing guidance.

This is not to say that widespread testing of asymptomatic individuals is a bad idea
necessarily.[26]  It is not to say that Defendants would never have agreed to some plan for
increased testing.[27]  But it is very much to say that the Court is wrong that the minimum standard
of care throughout this litigation (or even now) requires such testing.  Having never suggested,
much less demanded, widespread testing of asymptomatic individuals, and given that none of the
available guidance indicates that such testing is required, what the Court has done is make its
view of "best practices" the minimum standard of care.[28]  And because Defendants did not meet

---

[26] In a case involving similar claims by a purported class of pre-trial detainees at
Plymouth County Correctional Facility, Judge Sorokin said "The petitioners in this case have not
suggested the Constitution requires institution-wide testing, nor have they asked for it. The Court
highlights DOC's approach to testing because it appears eminently sensible, and it shows that
DOC's response to this virus—like PCCF's, in many ways—is something that necessarily is
constantly evolving as more information and more resources become available."  *Baez v. Moniz*,
20-10753-LTS (D.Mass.  May 18, 2020, docket # 65).

[27] "The government has resisted widespread testing and has continued to accept new
detainees. Accordingly, the Court found that the Detainees showed a likelihood of irreparable
harm." Decision at 20.  But neither the Court nor any public entity urged Defendants to conduct
widespread testing, so there is no evidentiary basis for the claimed resistance.  And any new
detainees have come from the criminal side of BCHOC and been medically screened prior to
transfer, so it cannot be said that this is evidence of indifference either.

[28] Defendants do not believe that the Court's views were informed by expert testimony on
this subject, although there have been so many filings in this case that a passing reference to it
could have escaped counsel.

what the Court has deemed the minimum standard of care, they must be deliberately indifferent.

Defendants disagree that widespread testing is the minimum standard of care, and find it

particularly problematic that the Court reached its conclusion without providing the parties an

opportunity to brief and argue the issue.  Nothing in the Court's comments prior to the

preliminary injunction hearing foreshadowed this as an issue, much less one of three central

issues.

      Moreover, testing of individuals provides at best a snapshot in time.  If every detainee

and staff member could all be tested on May 15, 2020, within two or three days we would know

who was infected (within the accuracy limits of the testing).  But this would not tell us who was

infected on May 18, 2020, necessarily, because all of those individuals would have had

additional contacts in the interim.  Particularly with the staff, who go home everyday, there are

additional opportunities for exposure.  So from this hypothetical, we can see that widespread

testing has benefits in that we might learn of infected individuals who were asymptomatic, and

who we would not otherwise have known about, and take steps could be taken to isolate them.

That would be helpful.  But it is not a panacea.  Unless it is done regularly, the information

becomes outdated fairly quickly.  Additionally, routine testing of asymptomatic individuals is not

clearly practical on a widespread basis.  Like many things concerning this pandemic, there is a

balancing that must be accomplished.  At bottom, regardless of the pros and cons of widespread

testing, the one clear fact is that it was not and is not the standard of care.

      **3.**  **The Court's Position on Contact Tracing Is Similarly Flawed**

      Just as with wide scale testing of asymptomatic individuals, the Court essentially sprung

its theory of contact tracing as part of the minimum standard of care on the parties when issuing

its decision at the preliminary injunction hearing.

"Without robust testing and contact tracing, the spread of the virus cannot be known or contained.  Keeping individuals confined closely together in the presence of a potentially lethal virus, while neither knowing who is carrying it nor taking effective measures to find out, likely displays deliberate indifference to a substantial risk of serious harm." Decision at 29.  There are several assumptions made in these statements.  First, at no point have Defendants knowingly kept individuals confined in close proximity in the presence of the virus.  As established at the outset of the litigation, BCHOC has extensive procedures to isolate symptomatic individuals.  The Court might well respond, "but what of the fact that individuals can be infected and remain asymptomatic?"  That is precisely the debate that has been going on in the United States over the last two months, and as stated above, there was no consensus that widespread testing of asymptomatic individuals was required.  When there is no medical consensus, the failure to test everyone cannot be deliberate indifference.

With regard to contact tracing, BCHOC was doing the same form of contact tracing done by most other Sheriffs' Offices, looking at who positive individuals had come into contact with through staff schedules, video records and interviews.  The Court never asked for evidence of the contact tracing, however, so its reference to the "silence" of the record is misplaced.[29]

Nor was contact tracing the standard of care for correctional facilities at the outbreak of the litigation.  The Court cites CDC guidance on contact tracing that came out on April 29, 2020 and was directed to health departments, not correctional facilities.[30]  Once again, the Court has

---

[29] For example, in docket #132, the Court stated as regards testing:  "A report as to the results of COVID-19 testing shall be supplied."  This was not interpreted to mean contact tracing since the Court had not mentioned it.

[30] Decision at n. 11, *citing* CDC, Contract Tracing: Part of a Multipronged Approach to Fight the COVID-19 Pandemic ("CDC Contact Tracing") 1 (Apr. 29, 2020),

determined what it considers to be best practices and imposed that standard on Defendants to find deliberate indifference.

### III.  THE LAW DOES NOT PERMIT A FINDING OF DELIBERATE INDIFFERENCE ON THESE FACTS

As stated, the Court based its deliberate indifference finding on Defendants purported unwillingness to release detainees, to conduct widespread testing and to do contact tracing. Decision, *passim*.  The Court appears to say that it may consider Defendants' conduct after the complaint and petition were filed, while at the same time rejecting the notion that the collective process by which Defendants and the Court released some 65 detainees cannot be considered for purposes of determining Defendant's deliberate indifference.  Decision at 23-24.  "Were it not for the Court's bail orders and preliminary relief -- all of which expire upon a ruling on the merits, and thus cannot decide the merits -- the Detainees would be packed together in close quarters where social distancing is impossible. See Savino I, 2020 WL 1703844, at *2 (describing close living quarters before bail releases)."  Decision at 22.   However, as stated above, Defendants participated in the bail review process, and differentiated between Defendants' view that a reduction was not necessary (for the record) and Defendants' position regarding specific detainees – which was more nuanced.  Moreover, Defendants were directly responsible for almost half as many reductions as the Court and also participated in the reduction of new admissions to the facility by seeking not to add detainees other than those currently incarcerated in the Bristol criminal population.  All of this stands upon the uncertain foundation that the Court never determined what a safe level of detainees at BCHOC actually is.  Instead,

---

https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/principles-contact-tracing-booklet.pdf

the Court assumed that whatever the number of detainees at the facility, it was too many even as

that number went down by more than one-third of the original population.  While this general

view finds support in commentary about the risks of congregate facilities in the abstract, it

provides no guidance as to what a safe level is and how that is determined. How then can the

Court know that its release of 44 detainees, as opposed to the release or transfer of 21 by

Defendants (and acquiescence in the release of another 28) and another 15 by Immigration

Judges, is what tipped the scales?  It cannot, and that means that the Court cannot say that

Defendants deliberately and indifferently looked at a known risk (i.e., if detainees are not

reduced by X percentage there will be a much higher risk of infection) and ignored that risk.

It is clear that there were opportunities for a more cooperative approach to reduce the risk

that were missed.  For instance, in similar litigation in the District of New Hampshire, Plaintiffs

are setting forth individuals with high risk medical conditions or advanced age as candidates for

immediate bail hearings.  *See Gomes v. Wolf*, 20-cv-00453-LM (D. NH 2020).  But the fact that

Defendants did not (nor did Plaintiffs, of course) set forth a list of detainees for immediate bail

hearings is not evidence of indifference.   At most, it is evidence that neither side was prepared to

go along with the way the Court, *ad hoc* and without input from the parties, chose to approach

the situation.  That being said, the threshold to measure deliberate indifference is exceedingly

high.  As articulated by the First Circuit:

> The criteria for identifying whether government action offends the
> guarantee of substantive due process hinge on the nature of the
> challenged government action.  When challenging executive action
> under the imprimatur of substantive due process, the threshold
> question is whether the behavior of the governmental officer is ***so
> egregious, so outrageous, that it may fairly be said to shock the
> contemporary conscience.***  This mantra reflects a realization that
> challenges to executive action must be viewed through the prism of
> a particular need to preserve the constitutional proportions of
> constitutional claims, lest the Constitution be demoted to what we

have called a font of tort law.

> Consistent with this need to refrain from constitutionalizing
> ordinary misfeasance or malfeasance, the "shock the conscience"
> standard erects a high hurdle for would-be claimants. As a result,
> liability for negligently inflicted harm is categorically beneath the
> threshold of [substantive] due process. Indeed, the requisite
> arbitrariness and caprice must be stunning, evidencing more than
> humdrum legal error. That strain of exaggerated arbitrariness
> historically has involved deliberate decisions of government
> officials to deprive a person of life, liberty, or property. Thus,
> executive branch action that sinks to the depths of shocking the
> contemporary conscience is much more likely to find its roots in
> conduct intended to injure in some way unjustifiable by any
> government interest.'

*Aguilar v. U.S. Immigration & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 21-22

(1st Cir. 2007)(emphasis supplied, internal citations and quotation marks omitted).

The Court cites *Battista v. Clarke*, 645 F.3d 449, 454–55 (1st Cir. 2011), in support of its

conclusion that Defendants in this case were deliberately indifferent.  This case, however, is

nothing like *Battista*.  In that case, over fifteen years elapsed between Battista's first request for

hormone therapy treatment and the lawsuit, and ten years between when doctors opined that

hormone therapy treatment was indicated and the lawsuit.  Along the way, Battista sought to

mutilate herself and the prison did nothing to address this risk of harm.  *Id.*  In the present case,

BCHOC has taken steps all along to reduce the risk of infection—perhaps not in the way the

Court might wish, but it cannot be said that they did nothing as in *Battista*, where the First

Circuit said:

> Yet this would be a much harder case if defendants had proffered a
> persuasive and untainted professional judgment that—while
> hormone therapy would help Battista—the dangers, security costs
> and other impediments made it infeasible. For the problem is not
> one of callous guards or inept medical care but of conflicting
> considerations.

*Id.*

In the current case, Defendants have offered professional opinions from ICE regarding the dangers of releasing detainees, almost all of whom were ordered detained by Immigration Judges.  And Defendants have submitted an affidavit of an experienced doctor who has over twenty-five years of experience in institutional medicine to the effect that BCHOC has a solid, comprehensive plan in place for COVID-19 which complied with all available guidance.  *See* Affidavit of Nicholas Rencricca, M.D., Exhibit 1 to dkt. # 35.  This case is, therefore, nothing like *Battista.*[31]

The Court also cites *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 47 (D. Mass. 2018), a case in which Judge Casper found that a prison's blanket refusal to consider methadone treatment for a potential inmate with opioid abuse disorder constituted deliberate indifference.  In the present case, however, Defendants took steps to address the risk of COVID-19.  This case is therefore not like the *Pesce* case where there was a single means of dealing with plaintiff's medical needs—i.e., give methadone – which was refused.  And, as argued above, because the Court is wrong that Defendants have not released detainees or considered their particular medical needs, *Pesce* is also not on point.

Much closer to this case is *Baez v. Moniz*, 20-10753-LTS (D.Mass.  May 18, 2020, docket # 65).  In that case, a purported class of pre-trial detainees made claims similar to the

---

[31] Moreover, in *Battista*, the defendants changed their position during the litigation in such a manner as to eviscerate the Court's faith in their proffered explanations: "It was only after what the judge perceived to be a pattern of delays, new objections substituted for old ones, misinformation and other negatives that he finally concluded that he could not trust the defendants in this instance."  *Id*. at 455.  That has not occurred here- in this case Defendants have been steady in their explanations and have given the Court no cause to doubt their sincerity or integrity.

class of plaintiffs in this case regarding the risk of infection with COVID-19.  Judge Sorokin

denied the preliminary injunction motion because he found that plaintiffs could not show that the

Plymouth County Correctional Facility ("PCCF") had been deliberately indifferent to the "three

broad types of risk COVID-19 creates in a congregate setting like a prison: the danger that

the virus will be brought into the setting; the risk that the virus will spread within the setting once

there, and the need to monitor whether and to what extent the virus may be present in the

setting." *Id.*, at 15.  The steps that PCCF has taken to minimize these three categories of risk are

virtually all steps that have been taken by BCHOC.[32]

---

[32] All of the following steps have been taken by **both** PCCF and BCHOC: All detainees
and inmates entering the facility are screened for symptoms, then held in individual cells in an
intake quarantine unit for fourteen days. Staff are encouraged to stay home if they are sick,
temperatures are checked upon their arrival, and they have face masks they are required to wear
while working if they are within six feet of others. Only essential people are permitted to enter,
with all family visits suspended, as are programming run by outside volunteers and work details
requiring detainees to leave the facility. Travel outside the facility has been limited, with most (if
not all) court appearances occurring by video. When a new inmate demonstrates symptoms, he is
promptly tested and placed in isolation; if the results of the test are positive, he is placed in an
isolated cell. When staff members tested positive, efforts were made to identify those who had
close contact with them—including, on multiple occasions, reviewing security camera footage to
trace the person's contacts—and steps were taken to quarantine the relevant people. Face masks
have been distributed to all detainees and staff on multiple occasions, with policies adopted
requiring their use when detainees leave their housing units and when staff has close contact with
detainees. The overall population of the facilities has been steadily declining since the beginning
of April, and the (proposed or actual) classes of plaintiffs have diminished in size as well. All
housing units that include federal detainees are substantially under their capacity at both
institutions.  Steps have been taken to increase sanitization and to decrease close interaction at
meal times.  BCHOC has actually gone further in this regard, by delivering meals to detainees.
Face masks were distributed to all detainees and staff on multiple occasions and all detainees are
required to wear a face mask anytime they leave their cell or bunk area.  Staff are required to
wear face masks if they are working within the secure perimeter and if they come into close
contact with other individuals.  Medical staff received training on how to detect and treat
COVID-19, adopted testing criteria based on state and federal guidelines, and took steps to
identify and monitor detainees with known risk factors making them especially vulnerable to the
virus (as regards BCHOC, *see* affidavit of Dr. Nicholas Rencricca, which Defendants submit is
more persuasive than the deposition testimony of Ms. Floriano, who was likely confused by the
question posed regarding disparate treatment of detainees with comorbidities – in any event, her

In addition, the Court's conclusion regarding deliberate indifference is anchored to a view of the litigation's course that fails to reflect the rapid and adversarial pace of the litigation. In just under eight weeks, the parties and the Court have created more than 180 docket entries and participated in at least seven hearings.  So when the Court says "[y]et the record tends to show that the government never formulated a plan to determine a safe population level or how to reach that mark," this is a bit like the Court having gotten in the driver's seat and blaming the passengers for not helping steer the car.  Decision at 26.  The Court faults Defendants for not being more aggressive to reduce the detainee population "to a density that could safely withstand the COVID-19 onslaught."  *Id.,* 26-27.  But the problem is that this takes Defendants' actions out of the reality of what the Court was doing, as if Defendants' disagreement over who should be released and the necessity of continued releases somehow nullified what the Court was doing. Plaintiffs were pushing for release of *all* detainees, so it was principally the Court that was pushing the idea of releases to a safe level of population.  So the Court put the mechanism in place without a firm idea of the end goal – what a safe population level is.  Even if this can be justified for expediency's sake, it cannot be the basis of shifting blame to Defendants for not coming up with the answer to a question the very premise of which was one with which Defendants disagreed. And, more to the point, when the Court invited input on that very question and Defendants attempted to answer it, their extensive submission was batted away with a marginal order that gave Defendants' submission no consideration whatsoever.[33]

---

answer does not reflect policy or practice at BCHOC). In addition, the BCSO medical vendor (CPS) updates its medical staff and all BCSO staff as to any changes in federal and state guidelines on any and all matters pertaining to COVID-19 regularly.

[33] *See* p. 12, *supra.*

The Court concedes that Defendants have not sat idly by in the face of the pandemic threat: "[t]he Court acknowledges and commends the significant steps that BCHOC has taken in order to prevent the spread of COVID-19 at the facility and treat anyone infected." *Id.* at 13. "The Court recognizes the commendable efforts of the BCHOC staff, who have been operating in difficult and risky conditions where much is unknown." *Id.*, at 14. And, at the April 3, 2020 hearing, the Court said, "I want to address the letter that Mr. Kanwit has filed on behalf of the respondents, ICE. But my question -- I much appreciate it. It shows that the -- [in] these proceedings, people are understanding the Court's concerns and I'm very grateful. I mean that sincerely. …Here now certain individuals are being released by ICE, and I express my appreciation for that." Transcript, 4/3/20, at p. 4-5.[34]

Yet, the Court seems to exaggerate the threat of BCHOC as an incubator of the COVID-19 virus:

> The virus, if allowed to thrive in the detention centers, will migrate back into our neighborhoods. At least eleven officers or other staff, one immigration detainee, and one state inmate at Bristol County House of Correction have already tested positive for COVID-19; many others have yet to be tested. Employees returning to their homes after their shifts may expose their families, friends, bus drivers, cashiers, and doctors. The chain of infection thus grows. Were the government to loose an uncontainable viral outbreak from within its detention centers, it would betray its duty to the public, not just to the detainees.

Decision at 32.[35]  But there is no evidence that the 11 were infected *within* BCHOC and bringing

---

[34] In light of this and similar statements by the Court, its reference to Herman Melville's character, Bartleby the [Reluctant] Scrivener, is mystifying and denigrates the enormous efforts made by ICE and the Bristol County Sheriff's Office, who day in and day out, are on the front lines.

[35] To similar effect, the Court stated that it "presumes that, in ordering the release on bail

it out, versus contracting it on the outside.  And the one positive detainee was likely a false

positive.  *See* Declaration of Steven Souza, Ex. 1. The statistics support Defendants' position that

the risk of infection in the greater Massachusetts community exceeds that within BCHOC.  Over

the course of this litigation, the rate of infection outside BCHOC has greatly exceeded the rate

inside.  While this is not to say that additional precautions are unwarranted, it very much

indicates that Defendants' alleged failures do not constitute deliberate indifference.[36]

The Court disagrees with the relative weight given by Defendants to the competing

considerations of security and safety versus risk of infection.  But even if the Court's different

weighing of those concerns is the better view, which Defendants do not concede, that does not

make the disagreement into deliberate indifference.  As the Circuit Court has said:

> Any professional judgment that decides an issue involving
> conditions of confinement must embrace security and
> administration, and not merely medical judgments.... The
> administrators are responsible to the state and to the public for
> making professional judgments of their own, encompassing
> institutional concerns as well as individual welfare. Nothing in the
> Constitution mechanically gives controlling weight to one set of
> professional judgments.

---

of a portion of the Detainees, it has substantially reduced the risk of infection for those who
remain. Yet the threat persists."  Dkt. # 175 at p. 12.  "In sum, the virus is clearly present in
BCHOC, though its current prevalence is unknown." *Id.* at 13.  But there has been only one
positive test among detainees, and likely a false positive at that.  And as to the staff, their
positive tests (11 out of approximately 600 employees) do not show that the virus is "clearly
present in BCHOC," only that the staff could potentially have contracted it outside and possibly,
but not definitely, transmitted it to others.  But given the very limited positive results, it is
unclear if such transmission has actually occurred at BCHOC.  For example, not *one* of the unit
mates of the detainee who tested positive also tested positive, and, in fact, that one detainee
tested negative on re-testing.  *See* declaration of Steven Souza, Exhibit 2 hereto, ¶ 13.

[36] The Court notes that many have not been tested, which is true, although testing of the
detainees is largely complete.  But it cannot be said that the failure to conduct widespread testing
of asymptomatic individuals "shocks the conscience" when neither the CDC nor DPH were
recommending it.

*Cameron v. Tomes,* 990 F.2d 14, 20 (1st Cir.1993)(cited in *Battista*, at p. 455).  Similarly, Judge Stearns recently said:

> While I am as concerned as any judge with the impact of COVID-19 on prisoners, unless society is to make the decision that all prisoners should be released because of the pandemic, there must be a means of differentiating those acceptably eligible for release from those who, if released, pose an unacceptable risk to others.

*United States v. Pereira*, 19-cr-10446-RGS, May 10, 2020 Memorandum and Order at p. 4 (*also citing Christie v. Commonwealth*, 484 Mass. 397, 398 (2020)(a judge must balance the risks posed by releasing a defendant (i.e., flight and danger to others or to the community through further criminal acts with the pandemic-related risk if kept in custody).

## IV.  <u>The Burden on Defendants Has Not Been Adequately Considered</u>

"…Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings. Detention during those proceedings gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made." *Jennings v. Rodriguez,* 138 S. Ct. 830, 836, 200 L. Ed. 2d 122 (2018).

At many points in its Decision, the Court refers to the "silence" of the record or the absence of evidence.  Frequently, as with contact tracing, this is notwithstanding that the Court did not ask for evidence on that subject, nor did the parties have reason to anticipate the Court's interest given that prior to the preliminary injunction hearing the Court's focus almost entirely on the social distancing question.  Similarly, on the issue of whether the Court's order restricting ICE from placing any new detainees in the BCHOC civil immigration population creates a burden on ICE, the Court never said before the preliminary injunction that ICE could not place new detainees at BCHOC.  So of course the record is silent.  And, in fact, there is a burden on

33

ICE. *See* Declaration of Alan Greenbaum, attached hereto as Exhibit 3. According to Assistant Field Office Director Greenbaum, not being able to transfer the five to ten detainees who are released per month from BCHOC criminal confinement to ICE detention will create a greater risk of detainees being exposed to, or exposing others to, COVID-19 as they are transferred between detention facilities and result in significant additional expenses associated with placing detainees on transfer flights.[37] *Id.*, ¶ 4. This is, of course, one of the issues raised by Plaintiffs in this litigation, i.e., the increased risk of infection stemming from inter-facility transfers. Moreover, many facilities now require a 14-day quarantine for newly admitted individuals which can further delay administrative removal proceedings and lead to prolonged detention at government expense. Finally, most of the other institutions in the region have some type of litigation pending relating to COVID-19 and seeking to restrict the admission of new detainees, thus further complicating ICE's ability to place detainees. *Id.; see, e.g., Yanes, et al. v. Martin, et al.*, (D.R.I. 2020), case number 1:20-cv-00216-MSM-PAS (concerning Wyatt); *Gomes v. Wolf*, 20-cv-00453-LM (D.N.H. 4/17/20)(concerning Strafford); *Augusto v. McDonald*, 20-cv-10865-ADB (D.MA, 4/8/20)(concerning Plymouth).

And, as was previously pointed out, a release of a criminal inmate to an ICE detainer may occur with little to no warning. It makes much more sense, from a pandemic perspective, to allow BCHOC to screen such a person and then transfer him into civil detention at BCHOC where there is continuity of medical care, familiarity with the individual and an opportunity to observe him or her over time prior to the transfer. The alternative, that the individual is shipped off to another facility that does not know him, is *precisely* the kind of inter-facility transfer that

---

[37] Such transfers may require additional flight operations by ICE chartered aircraft in and out of the region, at an approximate cost of $85,000 per flight. *Id.*, ¶ 4.

Plaintiffs' experts decried as increasing the risk of infection and is certainly a burden on ICE as well.

The prohibition on transfers *out* from BCHOC, absent a negative virus test or a refusal, should also be reconsidered.  First, the petition and complaint in this case concern Bristol County House of Corrections detainees and the risk of infection *at Bristol*.  *See* Defendant's Reply to Plaintiffs' Further Brief, dkt. # 179.  Moreover, as argued therein, the requested restrictions on Defendants would deeply involve the Court in micromanaging ICE's affairs, essentially requiring a separate phase of litigation to review the conditions at each and every location to which ICE proposes to transfer a detainee.  That is neither workable nor appropriate.  As the Court itself has said, "[b]e it remembered that this is a habeas class action, not institutional reform litigation."[38]  Dkt 144.  There is, also, reason to doubt the Court's authority to prevent a transfer out; *see, e.g., Gomes v. Dept. of Homeland Security*, 20-cv-00453-LM (D.N.H., May 19, 2020)(copy submitted to the Court on May 22, 2020).

There is also a very significant burden on the Bristol County Sheriff's Office.  Within hours of the Court's preliminary injunction decision, the portion of the order requiring staff testing was widely discussed among staff.  *See* Declaration of Steven Souza, Exhibit 2 hereto.  Many staff expressed a reluctance to be tested.  *Id.*  The impact of refusals on BCHOC's ability

--------

[38] The Court also said "it is not the function of this Court to micromanage the detention facility or ICE's priorities."  Transcript, 4/3/20, at p. 16.  At the preliminary injunction hearing, the Court ordered testing of all detainees and staff that come into contact with detainees, but did not restrict transfers *out* of BCHOC.  In response to a notice of intent to transfer two detainees out, the Court modified its order to prevent such transfers absent a testing of the intended transferees and a negative result or a refusal to be tested.  The Court now appears to be insisting not just that any intended transferee be cleared of COVID-19, but also that all detainees and staff be tested before such transfers occur.  *See* dkt. # 180 and 181.

to operate, and to maintain a safe environment for both detainees/inmates as well as the public, is significant.  Under the CDC guidelines, DPH guidelines and BCHOC's own medical guidelines (which comport with state and federal guidelines),  a presumed positive test means that correctional and other staff who never showed symptoms must stay out of work for between 7 and 14 days and until they are medically cleared by their doctor to return.[39]  *Id.*  Significant disruptions to staffing and the schedules can be expected.  *Id.*

Also, the cost of testing the 600 staff members at BCHOC that might come into contact with detainees has recently been quoted at $200 per test.  CPS is not under contract to provide such services for staff, so BCHOC has obtained a quote from a third-party vendor.  Upon information and belief, this is how the *voluntary* testing of Department of Corrections ("DOC") staff is being conducted.  At that rate, testing all staff would cost ICE, for just one facility out of many hundreds nationwide, at least $120,000.  Given that the testing represents merely a "snapshot" in time, that is a lot of money for not a lot of benefit.[40]

### V.  <u>Released Detainees Are Not Complying with the Court's Order</u>

In preparing this brief, it has come to the attention of undersigned counsel that numerous detainees who have been released have been violating the conditions of their release. At least

---

[39] Because this is unpaid time, staff will resent the economic pressure pushing them to be tested despite being asymptomatic.

[40] Many additional questions have been raised regarding the testing of staff.  For example, What rights do the employees have, particularly if they are asymptomatic?  Would people who are tested be required to isolate at home until the results come back, as current BCHOC policy states? Will those who refuse tests be required to stay out of work, and, if so, who is going to pay them?  They cannot be forced to use sick time and BCSO would not pay them under current policies.  Is there a plan for retesting (at another $120,000) in light of the fact that staff goes home every day?  How will BCHOC replace staff that are required to stay at home?  Who will pay for those additional costs?

nine of the 44 individuals released by the Court on bail have violated the conditions of their
release by leaving home multiple times during the quarantine period and afterwards when they
are subject to house-arrest.[41]  That is twenty percent (20%). And many of these have been
multiple violations.  For example, Ranferi Ramirez-Maldonado left home (7) times in less than a
month.  Not to be outdone, Gabino Del Angel Moran left his house (214) times between April 10
and May 8, 2020.  Desmond Joseph left his house (78) times in a one-month stretch.  And
although Carlos Gutierrez Deleon may not have violated his stay-at-home condition as many
times with "only" (8) violations, an identified caller independently reported that he did not obey
quarantine orders and remain in house. The caller also stated that Gutierrez Deleon was out
drinking and doing drugs.[42]

    The Defendants have maintained throughout this litigation, which is still less than two
months old, that while the danger of COVID-19 is significant, it is a mistake to compare an
overly pessimistic view of what is likely to happen within BCHOC with an equally unrealistic
and too rosy view of what is going on upon release.  Given the extremely low level of positive
tests at BCHOC, and now with the information that detainees are essentially thumbing their
noses at the Court, exposing themselves and their family to greater risks of infection, it is time

---

[41] The Court ordered: "Once they're there they are to quarantine themselves for 14 days
from the day they in fact leave 14 the detention facility. That's a full quarantine, they
are not to leave the house for any reason. Thereafter they remain under house arrest…. They are
not to leave, save to attend immigration proceedings or to attend… to their own medical needs
should those needs be so severe that they have to actually go to a doctor's office or to a hospital."
Transcript 4/3/20 at p. 9.

[42] One of the individuals that ICE agreed to release, Kokou Aziabo, violated the
conditions of his release by ICE as well.  He left his home 46 times during the first two weeks of
his release.  From April 6, 2020 through May 8, 2020 (when the data was compiled), Aziabo left
his home an astounding 104 times.  The first two days he left his home 17 times.

for the Court to re-assess.

This is why Defendants sought information regarding the home situation.  Without that information, the Court is assuming that the home situation is safer, without looking at the actual facts.  We do not know anything about how many people are in a particular home, whether they are working outside the home, what size the various rooms are, how many bathrooms there are—in short, all of the things the Court considered in making a generalized determination that population reduction in BCHOC was required to allow social distancing.[43]  There is no assurance that appropriate isolation and social distancing will occur upon release.  This is made all the more clear by the extensive disregard for the Court's release order shown by at least 20% of the released detainees.  It should order Plaintiffs to provide the discovery fairly sought by Defendants and it should take a good, hard look at whether its operating assumptions regarding release are supported by the evidence.

## CONCLUSION

The Court is absolutely correct that the coronavirus pandemic is a challenge unprecedented in our lives.  But the Court's determination that more should have been done is an argument with broader social policy regarding detention, and is less about whether Defendants have acted with such complete neglect as to meet the constitutional standard.  Defendants participated in the release of detainees, they took extensive steps to minimize the risks to detainees, and they complied with all available guidance from the CDC and DPH.  They were not deliberately indifferent.

---

[43] These facts are material if the Court is making a determination that the detainees are safer outside BCHOC than they are inside, as opposed to an assumption.  *See* Dkt. # 180.

Respectfully submitted,

ANDREW E. LELLING,
United States Attorney


By:   */s/ Thomas E. Kanwit*
Thomas E. Kanwit
Michael Sady
Assistant U.S. Attorneys
U.S. Attorney's Office
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3100
thomas.kanwit@usdoj.gov
May 22, 2020                          michael.sady@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Thomas E. Kanwit*
Dated:   May 22, 2020                          Thomas E. Kanwit