DECLARATION OF ASSISTANT FIELD OFFICE DIRECTOR
<u>ALAN GREENBAUM</u>

Pursuant to the authority of 28 U.S.C. § 1746, I, Alan Greenbaum, an Assistant Field Office Director for U.S. Department of Homeland Security, United States Immigration and Customs Enforcement, Enforcement and Removal Operations, Burlington, Massachusetts, declare as follows:

1. I am an Assistant Field Office Director ("AFOD") for U.S. Department of Homeland Security, United States Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE").  I have held this position since August 2017.

2. In my official duties as an AFOD in Burlington, Massachusetts, I am responsible for managing the detention of individuals in order to initiate removal proceedings or to effectuate removal orders and for scheduling and execution of removal orders for detained aliens in ICE custody in the ERO Boston area of responsibility (AOR).  I am familiar with ICE policies and procedures for detaining individuals as well as releasing individuals from ICE custody.

3. As an AFOD for ICE ERO Boston, I am also responsible for communicating and providing guidance as it relates to the transfer of detainees between detention facilities within the Boston AOR and out of the Boston AOR to effectuate removal from the United States.

4. The Court's May 7, 2020 order preventing ICE from placing additional detainees at the Bristol County House of Corrections (Bristol) negatively impacts ICE's ability to carry out its statutorily-mandated missions.  Without the ability to place additional detainees at Bristol, ICE will face increased operational challenges in detaining aliens with serious

criminal histories and that are clear flight risks and/or pose a danger to the community.
For example, monthly about 5 to 10 aliens detained at Bristol in state custody on state
criminal charges are released to ICE detainers and placed in ICE custody in Bristol
detention units that only hold ICE detainees.  If these aliens who are already at Bristol
cannot be housed in the immigration units at Bristol, they will have to be transported to
another facility.  Not only will this result in significant additional expenses associated
with placing detainees on transfer flights, it also creates a greater risk of detainees being
exposed to, or exposing others to, COVID-19 as they are transferred between detention
facilities. I understand that this is one of the issues raised in this litigation, i.e., the
increased risk of infection stemming from inter-facility transfers.  Such transfers may
require additional flight operations by ICE chartered aircraft in and out of the AOR.
Such flights cost approximately $85,000 per flight.  Many facilities now require 14-day
quarantine for newly admitted individuals which can further delay administrative removal
proceedings and lead to prolonged detention at government expense.  Finally, most of the
other institutions in the AOR have some type of litigation pending relating to COVID-19,
thus further complicating ICE's ability to place detainees.

5. The Court's May 11, 2020 amendment to the May 7, 2020 order, which prohibits ICE
from transferring any detainees currently at Bristol until they have been tested for
COVIC-19 and a negative result is received (except for detainees who refuse to be tested)
further impedes ICE's ability to conduct its operations.  For example, ICE has in the past
transferred detainees for disciplinary or health issues.  The Court's order means that ICE
cannot do that for at least two to three days and, if the detainee tests positive, for an
indefinite time.

6. The Court's May 7, 2020 order also requires that all ICE detainees and Bristol County staff coming into contact with detainees be tested for COVID-19, at ICE expense. ICE has begun efforts to ensure compliance with the Court's order. Based on the number of staff and the current number of ICE detainees at Bristol, ICE estimates this could require in excess of 690 (613 staff and 80 detainees) tests be performed to comply with the Court's order. The majority of those ordered to be tested by the Court do not fall under current Center for Disease Control guidelines of persons who should be prioritized for testing. I also understand that the medical services provider at Bristol, CPS, has no contractual obligation to test staff and that many staff members may refuse testing. FDA approved COVID-19 tests are estimated to cost approximately $55.00 per test. Compliance with the Court's order to test this large number of individuals is estimated to cost in excess of $37,000.

7. Given reported difficulties in obtaining large quantities of testing nationwide, complying with this order to provide testing to individuals for whom guidelines do not call for testing may reduce the ability for others to obtain testing.

8. Further, although I am not a medical expert, I understand that if a staff member at Bristol is tested on one day and goes to the grocery store the following day and contracts COVID-19 there, the result of the test might be negative but not reflect the actual condition of the staff member. In other words, a test provides no assurance that someone who tests negative will remain negative. It can only help identify those who are positive but asymptomatic (as any with symptoms under current protocols must not work until medically cleared).

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the Twelfth day of May , 2020

Alan Greenbaum
Assistant Field Office Director
U.S. Department of Homeland Security
United States Immigration and Customs Enforcement
Burlington, Massachusetts