**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MASSACHUSETTS**

---

MARIA ALEJANDRA CELIMEN SAVINO,
JULIO CESAR MEDEIROS NEVES, and all
those similarly situated,

Petitioners-Plaintiffs,

v.

STEVEN J. SOUZA,

Respondent-Defendant.

Case No. 1:20-cv-10617 WGY

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY**
**PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION. ..................................................................................................................4

LEGAL STANDARD…………………………………………………………………...4

ARGUMENT

I.      The Court's Prohibition On Transfers-in Is Critical And Necessary To Prevent
        Increased Risk Of A COVID-19 Outbreak ..........................................................5

        A.      Defendant's Argument..............................................................................5
        B.      Plaintiffs' Response .................................................................................6

II.     Defendants' Excuses For Not Complying With The Staff Testing Component Of The
        Preliminary Injunction Are Speculative, Premature, And Overblown ...........................12

        A.      Defendant's Argument..............................................................................12
        B.      Plaintiffs' Response .................................................................................14

III.    Defendants' Portrayal Of Alleged Violations Of Bail Conditions Is Selective And
        Inaccurate, And Does Not Justify Any Changes To The Preliminary Injunction ............17

        A.      Defendant's Argument..............................................................................17
        B.      Plaintiffs' Response .................................................................................18

IV.     The Court's Orders Are Protecting the Rights of Class Members And Preventing
        Harm To Them, BCHOC Staff, And The General Public .................................................21

CONCLUSION.....................................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Agostini v. Felton*, 521 U.S. 203 (1997) .................................................................5, 14

*Ahmed v. Rosenblatt,* 118 F.3d 886 (1st Cir.1997) ........................................................4

*CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618 (1st Cir. 1995) ..........................................................................................................................8

*Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33 (1st Cir. 2006) ......................4

*Lepore v. Vidockler*, 792 F.2d 272 (1st Cir. 1986) ............................................5, 12, 13

*Roger Edwards LLC v. Fiddes & Sons, Ltd*., 427 F.3d 129 (1st Cir. 2005) ......................... *passim*

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) .........................................5

*Savino v. Souza,* 2020 WL 1703844, ___ F.Supp.3d ___ *(Savino I)*..........................7, 15

*Savino v. Souza,* 2020 WL 2904923, ___ F.Supp.3d ___ *(Savino II)* .................................. *passim*

*United States v. Kayser–Roth Corp.,* 272 F.3d 89 (1st Cir. 2001) .................................4

## STATUTES, RULES, AND REGULATIONS

8 U.S.C.A. § 1226(a) ....................................................................................................11

8 USC §1182(d)(5) .......................................................................................................11

Federal Rule of Civil Procedure 60(b)................................................................. *passim*

## OTHER AUTHORITIES

GAO, *Alternatives to Detention* (Nov. 2014), *available at* https://www.gao.gov/assets/670/666911.pdf ....................................................11

CDC*, Interim Guidance Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed May 30, 2020) ........................7

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, Who We Are, *available at* https://www.ice.gov/about ..............................................................14

## INTRODUCTION

After briefing, expedited but targeted discovery, and extensive hearings in this matter, the Court on May 7, 2020 entered a narrow and carefully crafted preliminary injunction, which it explained in a detailed written opinion. *Savino v. Souza*, ___ F.Supp.3d ___, 2020 WL 2404923 (D. Mass. May 12, 2020) (*Savino II*). Following Defendant's motion to reconsider, treated as a motion to modify, the Court has directed Plaintiffs to address three specific issues:

1. The "[p]roblem of transfer between institutions caused by this Court's bar on adding additional detainees at Bristol";
2. "Operational problems caused by the requirement that all staff be tested"; and
3. "The allegations that certain detainees released on bail are violating their bail conditions."

ECF 186. As explained below, Defendant has not demonstrated that any of these three issues – to the extent they exist at all – require any changes to the preliminary injunction. Accordingly, Defendant's motion should be denied in its entirety.

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) sets forth the conditions under which a preliminary injunction may be modified. *Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33, 37-38 (1st Cir. 2006). As the First Circuit has explained, the circumstances warranting modification of a preliminary injunction under Rule 60(b) are limited:

> For example, under Rule 60(b)(1) the defendant would have to show "mistake, inadvertence, surprise, or excusable neglect," as those terms are used within the rule. Under Rule 60(b)(5) the defendant would have to show that "it is no longer equitable that the judgment should have prospective application," and that there has been the kind of "significant change" in circumstances that the Rule requires. *See, e.g., United States v. Kayser–Roth Corp.,* 272 F.3d 89, 95–96 (1st Cir. 2001). Under Rule 60(b)(6), the defendant would have to show that there are "exceptional circumstances justifying extraordinary relief." *Ahmed v. Rosenblatt,* 118 F.3d 886, 891 (1st Cir.1997).

*Id*. at 38; *see also Lepore v. Vidockler*, 792 F.2d 272, 274 (1st Cir. 1986) ("since rule 60(b) provides for extraordinary relief, a motion thereunder may be granted only in exceptional circumstances.").

The party seeking relief bears the burden of demonstrating that one of the conditions of Rule 60 has been met, *see Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992), and may not rely on mere speculation.  *Roger Edwards LLC v. Fiddes & Sons, Ltd*., 427 F.3d 129, 136 (1st Cir. 2005).  Moreover, relief is normally not appropriate when based on conditions that were known or foreseen at the time the order was issued.  *Agostini v. Felton*, 521 U.S. 203, 217 (1997) ("Ordinarily . . . modification should not be granted where a party relies upon events that actually were anticipated at the time the order was entered.").

## ARGUMENT

## I.    The Court's Prohibition On Transfers-in Is Critical And Necessary To Prevent Increased Risk Of A COVID-19 Outbreak.

The Court's preliminary injunction provides that "[n]o new immigration detainees may be admitted to Bristol County House of Correction."  *Savino II*, 2020 WL 2404923 at *11.   In explaining its reasons for enjoining the admission of any new immigration detainees, the Court noted that "the chances of a more dangerous outbreak would rise were additional detainees to be added to the mix." *Id.* at *6.  As such, this Court concluded that "[b]arring the government from adding new detainees ameliorates the twin problems of detainee density and transience, thus lowering the chances of further spread." *Id.*  Defendant has presented no valid reason under Rule 60(b) justifying a change in this portion of the preliminary injunction.

### A.  Defendant's Argument

Defendant seeks to undo the increased safety achieved by this Court's orders, arguing that the inability to incarcerate additional persons in BCHOC results in "a burden on ICE."  *See*

ECF 185 (Defendant's Motion for Reconsideration ("Def. Brf.") at 34.  Defendant relies on the

Declaration of Alan Greenbaum, an Assistant Field Officer for ICE, who speculates that transfers

to other facilities "may require additional flight operations by ICE chartered aircraft in and out of

the AOR [area of responsibility].  Such flights cost approximately $85,000 per flight."

Declaration of Alan Greenbaum ("Greenbaum Dec.") ¶ 4. Mr. Greenbaum also posits that there

may be potential operational burdens or complications to transfers because of active litigation or

quarantine procedures at other facilities, which may cause "administrative delay." *Id.*  Finally, he

hypothesizes that ICE transfers to other facilities "create a greater risk of detainees being

exposed to, or exposing others to, COVID-19…."  *Id.* ¶ 4.

### B.  Plaintiffs' Response

The Court's order enjoining new admissions is instrumental in combatting the spread of

COVID-19 and protecting the constitutional rights of class members in two important ways: 1)

by addressing population density; and 2) by limiting the potential vectors by which COVID-19

can be introduced into the facility.  Defendant's request to be allowed to admit 5-10 new

individuals each month to immigration detention would entirely undermine all that the Court has

done to reduce the population density since the inception of this litigation, and would quickly

return BCHOC to its former state.  Particularly in light of the population density issue, none of

the issues raised by Defendant regarding transfers even comes close to meeting the standards of

Rule 60(b) justifying modification of the preliminary injunction.  To the extent that any burdens

actually exist, they are normal bureaucratic issues faced by numerous facilities across the country

that do not justify the extraordinary relief that Defendant requests.

**Population Density.** There is complete medical consensus that social distancing is one of the most critical tools to combat the spread of COVID-19.[1]  This Court and many other courts have recognized that social distancing is vital, and that Plaintiffs' inability to socially distance in Bristol County has led to extremely dangerous conditions.  *See*, *e.g.*, *Savino v. Souza,* 2020 WL 1703844, ___ F.Supp.3d ___ (*Savino I*), at \*4 n.7 (highlighting "the vigorous recommendations of infectious disease experts worldwide, including in the federal government, to maximize social distancing.").  Further, it is abundantly clear that reducing population density is critical to allow social distancing to occur: "[w]ere it not for the Court's bail orders and preliminary relief … the Detainees would be packed together in close quarters where social distancing is impossible." *Savino II*, 2020 WL 2404923 at \*7.

Despite the clarity of the need to social distance and the value of population reduction in aiding social distancing, Defendant again asks this Court to allow them to add more people to the immigration detention population.  In doing so, Defendant ignores entirely the impact that new admittees would have on density and on the ability to socially distance.  *See* Def. Brf. at 34-35.  However, the impact is plain: Whether a person is transferred from state confinement at Bristol, from a separate facility, or from the community at large, their admission would increase density and make social distancing all the more impossible.  *Savino II*, 2020 WL 2404923 at \*7 (noting that "it is likely that the gains in density reduction achieved through the bail orders would be jeopardized by new arrivals").

Currently, the Court has a clear picture of the population density, the testing status, and the individual circumstances of each detainee. The bar on admission of detainees is thus a

---

[1] *See, e.g.*, *CDC Interim Guidance Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (noting that social distancing is a "cornerstone of reducing transmission of respiratory diseases such as COVID-19.").

quintessential example of preserving the status quo. *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). Defendant seeks to admit 5-10 additional individuals per month from Bristol's criminal population, and an unspecified number from elsewhere. *See* Greenbaum Dec. ¶ 4. At this rate, the population at Bristol County would be back to the dangerous density it had at the inception of this case within a matter of months, if not weeks.

**New Vectors of Infection.** This Court's injunction on new admittees has also helped to limit the potential vectors of infection who may come in contact with immigrant detainees. By seeking to introduce people from outside Bristol County immigration detention into the population, Defendant proposes to multiply the number of vectors of infection.

The introduction of new people should not be allowed. The state inmate population – from which Defendant primarily highlights it would like to transfer-in – provides a telling example of the dangers of doing so. In Bristol's criminal detention population, there is no universal testing order and no hard limit on new admittees, leading to regular changes in the population. The difference between the two populations in the same facility is striking. In BCHOC's criminal detention population, as of May 31, 2020, 122 COVID-19 tests have been administered to detainees/prisoners, out of a total population of approximately 600. *See* Declaration of Oren Sellstrom In Support Of Opposition To Defendant's Motion For Reconsideration ("Sellstrom Dec."), Ex. D. Of those 122 inmates who have been tested, 38 have tested positive. *Id.* This is a positive rate of over 30%, with the total number of cases still unknown because of minimal testing. In contrast, because of this Court's bail orders and continuing oversight, Bristol's immigration detention population has been reduced, has achieved

nearly universal testing, and as of the filing of this brief has reported only one positive case among detainees.

The COVID-positive rate within the criminal population provides strong evidence that, absent this Court's intervention, Bristol County's policies would have resulted in similar conditions within immigration detention.  The high rate of positive cases and the lack of testing or appropriate contact tracing in the criminal detention population also means that any transfers to the immigration population could have serious – if not fatal – consequences.  Defendant's request that those from a population with such a high rate of infection be transferred into immigration detention defies logic and demonstrates further knowing indifference to the safety of detainees and staff in Bristol.  In fact, the only precaution Defendant cites is the medical screening protocol that this Court has already found insufficient to counter the risks inherent in adding to the population.  *See*, *e.g.*, *Savino II*, 2020 WL 2404923 at *6.

Defendant responds to the Court's concerns about population density and infection spread by arguing that not admitting new people into Bristol County Immigration Detention is overly burdensome.  As an initial matter, Defendant fails to note that most state criminal facilities in Massachusetts do not have immigration detention wings at all, and thus inmates are simply released from custody when their sentence is served, or ICE may pick them up and transport them elsewhere.  Defendant does not explain why having Bristol operate in the same manner as nearly every other federal, state, county, or municipal jail in the Commonwealth is so problematic.

Defendant argues that it is somehow more dangerous for inmates to not be admitted to Bristol's immigration detention because they will be transported to other facilities and "create a greater risk of detainees being exposed to, or exposing others to, COVID-19…" Def. Brf. at 34;

Greenbaum Dec. at ¶ 4.  It defies common sense and the logic of this Court's orders for Defendant to argue that those from the criminal population "create a greater risk of…exposing others to COVID-19" and then request that they be transferred into immigration detention where Plaintiffs will be the victims of that risk.[2]

As to cost, Defendant cites Mr. Greenbaum's declaration as saying that "such transfers *may* require additional flight operations by ICE chartered aircraft in and out of the AOR. Such flights cost approximately $85,000 per flight."  Greenbaum Dec. ¶ 4 (emphasis supplied).  No evidence has been presented that any flights have actually been chartered since the Court's preliminary injunction was entered nearly one month ago. Nor are flights even necessary to transfer state inmates from Bristol County to other sites in southern New England where ICE maintains cells.  In fact, no evidence of any kind has been presented as to actual additional costs incurred because of additional transfers.  Even if such evidence were to be produced, the cost of potentially transferring 5-10 detainees per month does not begin to outweigh the interests of Plaintiffs in keeping population density at Bristol low and limiting the potential vectors by which COVID-19 can be introduced into the facility.[3]

---

[2] For the class of individuals before this Court – the current immigration detainees at BCHOC – there is clearly no benefit, and significant potential for harm, from allowing new admittees to the facility.  Elsewhere, Defendant emphasizes this very point.  *See* Def. Brf. at 35 ("the petition and complaint in this case concern Bristol County House of Corrections detainees and the risk of infection *at Bristol…*") (emphasis in original).  Defendant's argument in favor of allowing additional individuals to be transferred into Bristol does not address this point, but rather solely focuses on ICE's supposed concern for individuals currently outside the facility.  In light of Defendant's deliberate indifference to the safety of the class, together with ready alternatives for those who might otherwise be transferred in, ICE's concerns ring hollow.

[3] The government's credibility on these and other points must also be assessed in light of the remarkable assertions elsewhere in its brief that its statements should not always be taken at face value.  For example, the government insists that its repeated "on the record" objections to voluntary releases in this case were meant with a wink – in effect, that the Court should have *known* that the government did not mean what it said.  Likewise, the government claims that its objections before Immigration Judges considering whether to grant bond to certain class members should count now as voluntary release – implying, apparently, that its representations to Immigration Judges should not have been believed either.  Regardless of whether Mr. Greenbaum's statements about costs and charter flights are intended to fall into this category, Defendant presents no actual probative evidence to support its argument.

Finally, Defendant's arguments all rest on the flawed assertion that ICE *must* detain those released from criminal custody.  ICE has within its broad discretion to arrest or not arrest those it suspects of immigration violations.  *See* 8 U.S.C. § 1226(a).  Even ICE's own guidance directs that offices undertake an individualized evaluation of detainees for possible release because of COVID-19.[4]  Additionally, even for those subject to "mandatory detention," ICE is not prohibited from employing alternatives to detention.  *See* 8 U.S.C. §1182(d)(5).  In this very case it has employed, for example, GPS monitoring. These alternative tools of supervision obviate the need to transport a detainee to a new facility, eliminate even the speculative costs posited by the government, and assuage any fears that a detainee might become infected in another facility. The established costs of the Alternative to Detention Program, averaging $10.55 per day, are far less than the average $158 daily cost of detention itself, much less the speculative $85,000 for a charter flight.[5]  These tools would be particularly useful if other facilities, subject to similar litigation, are unable to accept new arrivals. The refusal of Defendant to consider release or alternatives to detention has underpinned many of their unlawful actions in this case. *See Savino II*, 2020 WL 2404923 at *9 (stating, regarding the government's consideration of releases, "Where elasticity is vital, they are rigid; where life hangs upon a carefully drawn line, they opt for near-blanket incarceration.").  Defendant now seeks to use that same failure to consider alternatives as evidence that this Court's orders are unworkable. The barriers pointed to by Defendant are almost entirely products of their own design, and thus, easily remedied; certainly, no modification of the Court's order is warranted.

---

[4] *See*, *e.g*., https://www.ice.gov/doclib/coronavirus/attk.pdf.
[5] *See* GAO, *Alternatives to Detention* (Nov. 2014), *available at* https://www.gao.gov/assets/670/666911.pdf, at 18.

## II.   **Defendant's Excuses For Not Complying With The Staff Testing Component Of The Preliminary Injunction Are Speculative, Premature, And Overblown.**

The portion of the Court's preliminary injunction as to staff testing requires that "[a]s soon as reasonably possible, all immigration detainees at Bristol County House of Correction and staff who come into contact with them must be tested for COVID-19." *Savino II*, 2020 WL 2404923 at *11. The injunction states that any staff may decline to be tested; if so, "a declination shall be treated as a positive COVID-19 result and that person shall be presumed to carry the COVID-19 virus." *Id.* The injunction specifies the type of test to be used (an FDA-approved PCR test) and that testing must be provided at no cost to staff. *Id.*

Because the operational concerns that Defendant raises are speculative, premature to the extent they are relevant at all, and not mandated by the Court's order, Defendant has not met their heavy burden of showing "exceptional circumstances" or other conditions justifying extraordinary relief under Rule 60(b). *Lepore*, 792 F.2d at 274.

### A.   **Defendant's Argument**

Defendant apparently seeks to eliminate the staff testing order in its entirety, on the basis of two primary arguments: that staff testing would cost money and that it would be difficult to implement.

As to cost, Defendant estimates that at least 613 staff at BCHOC come into contact with immigration detainees at BCHOC. Greenbaum Dec. ¶ 6. Mr. Greenbaum states that ICE estimates each test would cost $55.00, amounting to approximately $33,715 to test all staff covered by the Court's order. *Id.*[6] The Director of Medical Services for the Bristol County

---

[6] The total dollar figure that Mr. Greenbaum puts in his declaration ($37,000) includes testing for the 80 detainees. The number cited above is calculated just for staff (613 x $55.00).

Sheriff's Office, Judy Borges, provides a different cost estimate of $200/test, for a total cost for

staff testing of $120,000.  Declaration of Judy Borges ("Borges Dec.") ¶ 6.[7]

      As to practical questions raised by the requirement of staff testing, Mr. Greenbaum posits

that "many staff members may refuse testing."  Greenbaum Dec. ¶ 6.  Superintendent Souza

similarly declares that "many correctional officers and staff members have said that they will not

agree to be tested because they consider the testing procedure to be extremely invasive and

uncomfortable…."  Fourth Declaration of Steven Souza ("Souza Dec.") ¶ 4.  Superintendent

Souza outlines a number of issues that he surmises will arise if staff members refuse testing: that

"they will be required by CDC and BCHOC guidelines to not work for 14 days," which in turn

would mean that "BCHOC cannot be adequately staffed."  *Id*. at  ¶¶ 5, 9.  For those staff who

agree to be tested, Superintendent Souza states that they "will have to remain out of work" while

results are pending, which he states "typically take up to 3 days."  *Id*. ¶ 6.  Finally,

Superintendent Souza states that testing takes 10-15 minutes for each person tested, for a total of

up to 175 hours, and that "it could easily take a month to get everyone tested."  *Id.* at ¶ 11.[8]

      Similarly, Ms. Borges states that what she characterizes as "[m]andatory testing" of

BCHOC staff "raises a number of difficult personnel issues…."  Borges Dec  ¶ 4.  Ms. Borges

states some of her concerns in general terms (*e.g*., "what rights" do employees have); others are

similar to those raised by Superintendent Souza (*e.g*., whether staff who refuse testing will be

required to stay at home).  Ms. Borges also asks whether there is a plan for retesting "in light of

the fact that staff goes home every day."  *Id.*

---

[7] Defendant does not explain the difference between the two costs estimates.  Ms. Borges states that she is "aware of a bid" for testing of staff and appears to base her estimate on that.  *Id.* at ¶ 3.  No further details about the bid are provided, such as whether Defendant received other bids.  Neither the bid request nor the bid itself has been provided.

[8] This time estimate includes the time to test detainees as well.  Subtracting the time estimate for 80 detainees would presumably reduce this estimate by approximately 20 hours (80 detainees x 15 min.).

### B. **Plaintiffs' Response**

As the Court has correctly found, "[w]ithout robust testing and contact tracing, the spread of the virus cannot be known and contained." *Savino II*, 2020 WL 2404823 at \*10.  None of the issues raised by Defendant regarding staff testing come close to the circumstances justifying extraordinary relief under Rule 60(b).  To the contrary, Defendant's concerns are run-of-the-mill bureaucratic issues of the type that arise with any change.  Notably, Defendant raises their concerns with the Court without having even attempted compliance.

Defendant's cost argument may be easily disposed of.  ICE has an annual budget of approximately $8 billion.[9]  Coming up with $33,715 – or even the higher estimate of $120,000 – for BCHOC staff testing cannot conceivably be deemed to be an exceptional circumstance that would justify extraordinary relief.  Moreover, that testing would entail a cost to ICE was known when the preliminary injunction was issued and was specifically addressed in the Court's order.  *See Agostini*, *supra*, 521 U.S. at 216 (costs that are known at the outset "do[] not constitute a change in factual conditions warranting relief under Rule 60(b)(5).")  Defendant's cost estimate – exceedingly minimal when compared to ICE's overall budget and in light of the significant public health implications – does not warrant modifying the preliminary injunction.

Defendant's remaining concerns are also insufficient to justify a modification of the Court's preliminary injunction.  It has now been almost a month since the Court announced its ruling, which required staff testing "[a]s soon as reasonably possible," and yet Defendant has apparently not even offered any such testing to staff.  Defendant's May 29, 2020 report to the Court on the status of staff and detainee testing states boldly that "No testing of staff has been undertaken to date explicitly in response to the Court's order."  Defendants' Corrected Report

---

[9] *See* UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, Who We Are, *available at* https://www.ice.gov/about.

Regarding Testing, ECF 192, at 2.[10]  While 137 staff have reportedly been tested, approximately

half of these tests appear to have pre-dated the Court's order, and Defendants explicitly state that

all of the tests were "voluntarily undertaken by the staff members on their own and not in

response to the Court's order."  *Id.*[11]

Moreover, Defendant provides no evidence to support their speculation that "many staff

members may refuse testing."  *See supra*.  Instead, their assertions appear to be based primarily

on employee chatter immediately following the Court's ruling.  Def. Brf. at 35 ("Within hours of

the Court's preliminary injunction decision, the portion of the order requiring staff testing was

widely discussed among staff.").  Particularly in light of the high burden placed on Defendant to

justify modifying an injunction, the lack of any factual record to support such a departure is

striking.  Where relief is sought under Rule 60(b), "something far more specific and telling is

required than general speculation."  *Roger Edwards LLC*, *supra*, 427 F.3d at 136.  This is not a

case where Defendant has attempted compliance with the Court's order, run up against

widespread resistance, and then returned to the Court for guidance.  Rather, Defendant has

simply chosen not to even try.[12]

Notably, Superintendent Souza's declaration, dated May 12, 2020, also sets forth a

parade of horribles for *detainee* testing, including all of the costs and time and administrative

headaches that he hypothesized would be associated with that testing.  *See* Souza Dec. ¶ 11.  Yet

---

[10] Oddly enough, elsewhere in their brief, Defendant takes the Court to task for having previously found that "[t]he government has resisted widespread testing."  *See* Def. Brf. at 22 (citing *Savino II*, 2020 WL 2404923 at *7).  Defendant claims that because the Court had not urged Defendant to conduct widespread testing before entry of the preliminary injunction, "there is no evidentiary basis for the claimed resistance."  *Id.*  Yet one page later – now in the face of a *Court order* – Defendant actively resists such testing.

[11] It is unclear whether the number of staff tests is 137 or 132.  Defendant's report to the Court starts by stating that "137 staff members have been tested," but then goes on to state that "[o]ut of 132 staff that have been tested, 32 tests were positive for the coronavirus."  ECF 192.

[12] Defendant's stance thus has a somewhat familiar ring to it.  *See Savino*, *supra*, 2020 WL 2404923 at *1 ("The government refuses to play ball.").

shortly after the date of Superintendent Souza's declaration, Defendant apparently decided to go ahead and comply with this part of the Court's order.  Ten days later, Ms. Borges signed *her* declaration, stating that "all immigration detainees at BCHOC have been tested except for seven that refused testing …."  Borges Dec. ¶ 2.  Ms. Borges reports no problems associated with detainee testing, from either a cost or an operational perspective.  Where there's a will, there's a way.[13]

Moreover, the operational issues with staff testing – even if they actually came to pass – would not present insurmountable hurdles, and are decidedly not the type of extraordinary circumstances that would justify a change to the preliminary injunction.  If some staff refuse to be tested, Defendant can make their own operational decisions about how to proceed.  The presumption that the Court has established – that any staff who refuse to be tested will be presumed by the Court to carry the virus – is plainly an adjudicative tool and not a personnel rule.  There is nothing about this presumption that abrogates any employee rights or instructs BCHOC to follow certain personnel procedures with respect to those individuals.  Rather, it is simply a means for this Court to appropriately assess the factual circumstances at issue in the case as it continues to evaluate Defendant's response to the safety of those detained at BCHOC.

Certainly, the Court has made clear that no staff are to be tested against their will, so Defendant's vague question of "what rights do employees have?" is a non-issue.  Nor does the

---

[13] Moreover, it now appears that most, if not all, of the 7 class members referenced by Ms. Borges will be tested as well.  When provided with the spreadsheet showing that certain class members had refused testing, Plaintiffs' counsel contacted these individuals to ensure that their refusals were knowing and voluntary and not based on misinformation.  For example, several class members had reported that they were told by Correctional Officers that simply agreeing to a test – whether or not they were symptomatic and/or tested positive – would mean that they would be put into isolation for 14 days.  Defendant's counsel has since confirmed to Plaintiffs' counsel that this is not Defendant's testing protocol, and Plaintiffs' counsel have communicated this information to class members.  Another monolingual Spanish speaking class member has a nasal septum injury and was unable to inquire about the safety of a nasal swab test to the non-Spanish speaking BCSO staff offering testing.  The parties are in contact to resolve these and other similar testing issues.  The ultimate number of class members refusing testing is likely to be substantially less than seven.

Court's order dictate that Defendant must act one way or the other as to any non-tested staff. Notwithstanding Mr. Borges' reference to "mandatory testing," the Court's order is simply to *offer* testing. *See Savino II*, 2020 WL 2404923 at *10 ("The hardship to the government here, such as it is, boils down to providing tests.")  Moreover, the Court has shown itself to be more than available to Defendant and Plaintiffs alike throughout this litigation.  Were any actual, non-hypothetical, issues to arise once testing was underway, Defendant could return to the Court at that point.[14]

In short, nothing in the record supports Defendant's request to eliminate the staff testing requirement from the Court's preliminary injunction.

### III.    Defendant's Portrayal Of Alleged Violations Of Bail Conditions Is Selective And Inaccurate, And Does Not Justify Any Changes To The Preliminary Injunction.

In their Motion, Defendant alleges for the first time in this litigation, having never before raised it to Plaintiffs' counsel, that certain detainees released on bail are purportedly violating their bail conditions.  As explained below, Defendant's filing presents a highly selective and inaccurate picture of what is actually happening on the ground.  To be clear: Plaintiffs and their counsel take the Court's orders with the utmost seriousness, and counsel have taken prompt and ongoing action to convey the Court's orders to class members.  The more complete factual picture set forth below is not intended to indicate otherwise.  Rather, it is set forth solely to counter Defendant's claim that "detainees are essentially thumbing their noses at the Court…." Def. Brf. at 37.  This is emphatically not what is occurring.

---

[14] Again, the comparison to detainee testing is instructive.  Once Defendant decided to implement this portion of the order, few issues actually arose; those that did arise were dealt with quickly and easily; and in the end nearly universal testing has been achieved.  *See* note 13, *supra*.

### A.  **Defendant's Argument**

In support of their allegations, Defendant submits the declaration of Immaculata Guarna-Armstrong, Assistant Field Office Director for ICE.  Ms. Guarna-Armstrong states that "[f]or each alien released by Judge Young, ICE provided such alien with an Order of Recognizance or an Order of Supervision setting forth the terms and conditions of such release, to include the Court ordered terms and conditions."  Declaration of Immaculata Guarna-Armstrong ("Guarna-Armstrong Dec.") ¶ 8.  Ms. Guarna-Armstrong states that these Orders "included Judge Young's standard bail order" that mandated compliance with ICE conditions, as well as 14-day quarantine and house arrest thereafter. *Id*. ¶ 9.[15]  Ms. Guarna-Armstrong then lists nine detainees who she states have violated bail conditions, by leaving their residence either during quarantine or the house arrest.  The number of alleged violations varies: one detainee is alleged to have violated the conditions seven times; another is alleged to have violated the conditions 105 times during the 14-day quarantine period and "between four and nineteen violations each day" during the following two weeks.  *Id*. ¶ 18.  Ms. Guarna-Armstrong provides no further detail about any contact that ICE may have had with these detainees during these periods, nor about how, if at all, ICE investigated the alleged violations.

### B.  **Plaintiffs' Response**

ICE has *not* provided each releasee with an Order "setting forth the terms and conditions of such release, to include the Court ordered terms and conditions."  *Id*. ¶ 8.  Rather, the release papers given to class members have been haphazard and inconsistent.  Some contain the Court's

---

[15] Ms. Guarna-Armstrong does not state how she comes by her asserted knowledge of detainees' release orders.  She does not, for example, state that she reviewed the release orders to prepare her declaration, nor does she attach them to her declaration.  Ms. Guarna-Armstrong also states that "ICE ERO Boston officers explained the contents of the [Orders] to the aliens ordered released by Judge Young prior to release."  *Id*. ¶ 10.  Again, she does not explain how she comes by this knowledge.

conditions; others do not; still others contain some but not all of the Court's conditions. *See* Sellstrom Dec. ¶ 7.[16] For example, some detainees' release paperwork lists the Court's 14-day quarantine as a bail condition but omits the subsequent house arrest condition. *Id*., Ex. A. Other detainees' release papers are internally inconsistent, for example telling the individual they are on house arrest but also stating a condition that "[y]ou do not travel outside New York for more than 48 hours without first having notified this agency office of the dates and places, and obtaining approval from this agency office of such proposed travel." *Id*., Ex. B; *see also id*., Ex. C (same, with condition not to "travel outside Maine for more than 48 hours" without obtaining ICE approval).

Verbal instructions have also varied widely. ICE contracts out its Alternatives to Detention programs to a private company called BI, Inc., which in turn operates the Intensive Supervision Appearance Program ("ISAP"). ISAP staff are often the primary point-of-contact for released individuals.[17] Unfortunately, ISAP staff's verbal instructions to class members have often been at variance with the Court's conditions. For example, ISAP staff have told numerous detainees that they can leave the house, as long as they are home on designated days of the week for phone check-ins. *See* Sellstrom Dec. ¶ 8 (detainee told by ISAP to be available to check in on Thursdays but that he is otherwise free to leave to house because he is being monitored electronically); *id.* (detainee told by ISAP to be home Wednesdays between 8:00 am- 4:00 pm); *id.* (detainee told by ISAP he could leave house so long as he was home on Tuesdays and Fridays). ISAP staff have told other class members that they can travel, as long as travel is not

---

[16] For just this reason, early on in this litigation, Plaintiffs' counsel asked Defendant to provide them with copies of release paperwork for each class member. *See id.* ¶¶ 3-6. Defendant refused, stating that counsel should just get the paperwork directly from class members. Plaintiffs accordingly have attempted to do so, and have gathered some of this documentation. Particularly given that Defendant has now put the release paperwork at issue with their Motion, Plaintiffs renew their request to be provided with the complete set of release papers for all released class members.

[17] Class members do not typically distinguish between what entities are giving them instructions, and do not necessarily distinguish ISAP from ICE.

outside the Northeast.  *Id*. ¶ 9.  ISAP staff told yet another person that she would be considered compliant with release conditions as long as "she stayed in Brooklyn."  *Id*.  Some released class members were contacted by ISAP following the 14-day quarantine period, to let them know that the quarantine period was over and that they could now leave the house.  *Id*.  No class members have reported to Plaintiffs' counsel that they have been informed or warned by ICE or ISAP that they were in violation of their bail conditions.  *Id*. ¶ 12.[18]

Plaintiffs have no evidence that ISAP staff intentionally misled class members.  Whether the errors originated with ISAP staff laboring in the time of pandemic, or in the failure of ICE to inform its own contractors of this Court's bail conditions, the detainees have been extremely diligent in trying to do what is required of them – recognizing that their safety and freedom is at stake.  For example, several released class members have repeatedly sought to confirm with ISAP and ICE exactly what they must do to comply with their release conditions, and to fix GPS malfunctions.  *Id*. ¶ 10.  Class members who attempted to contact their assigned ICE officers regarding the conditions of their release did not receive calls back.  *Id.*  Plaintiffs' counsel, for their part, have consistently informed class members of the Court's conditions: both on release and throughout the last week since receiving Defendants' motion.

Plaintiffs' counsel will continue to emphasize the importance of complying with the Court's conditions, and to try to explain the confusing and conflicting messages that class members have been receiving in their ICE paperwork and from ISAP.  However, to the extent that Defendant is trying to use class members' alleged non-compliance against them, Defendant

---

[18] The fact that ISAP was giving this advice to class members is consistent with, and explains to some degree, the gaps in the Guarna-Armstrong Declaration, such as why ICE would allow someone to violate conditions of detention 214 times without ever speaking to them about it.  *See* note 15, *supra*.  Should the Court desire more specific information about any particular class member(s), Plaintiffs will provide it in whatever form would be helpful for the Court.

and their agents should also be required to give accurate and consistent information to class members.  In any event, the sparse factual record provided by Defendant to the Court on this motion does not justify any modifications to the preliminary injunction.

**IV.  The Court's Orders Are Protecting the Rights of Class Members And Preventing Harm To Them, BCHOC Staff, And The General Public.**

In light of the Court's order construing Defendant's Motion as a motion to modify the preliminary injunction and asking Plaintiffs to respond on a shortened timeline, Plaintiffs do not here respond to the various other points raised in Defendant's Motion.  Should the Court wish Plaintiffs to respond to any of the other points raised in Defendant's Motion, Plaintiffs stand ready to do so.

For now, it suffices to say that Plaintiffs do not agree with virtually anything in Defendant's motion, which is a stunning exercise in revisionist history.  In particular, Plaintiffs vigorously disagree with Defendant's underlying premise: that all was well at BCHOC back in March 2020 when the population density was 148 – and that should never have changed.  The evidence put forth by Plaintiffs disproves that premise, and the Court has rightly recognized that the failure of Defendant to act likely constitutes deliberate indifference.

It is quite clear that the Court's early and decisive action in ordering class member releases has prevented significant harm.  As a recent comprehensive review of the early response to the COVID-19 pandemic in Massachusetts found:

> Even hours mattered in those critical days.  The math was well known and simple:  The faster governments act after learning of community transmission, the better their chance of slowing the disease before it spins out of control, the smaller the number who will die.

BOSTON GLOBE, *The inside story of how coronavirus spread in Massachusetts* (May 31, 2020), *available at* https://apps.bostonglobe.com/metro/graphics/2020/05/coronavirus-tale/.  The

Court's orders in the early days of the pandemic indisputably slowed the spread of the disease by lowering the detainee population. One need look no further than Bristol County's criminal population for confirmation of this point. In that part of the facility – still at or near its March 2020 density – there has been an extraordinary and alarming rise in positive cases in the inmate population. By contrast, in Bristol County's immigration detention – where this Court has taken the effort and care to individually analyze how the population density can be decreased – there has been only one positive test. That difference is striking, and the class, the BCHOC staff, and the public at large have the Court to thank for that.

The pandemic is far from over, however, and the threat to class members remains very real. *Savino II*, 2020 WL 2404923 at *7 ("The virus is present in BCHOC and is hardly going to stop in its tracks."). As Defendants' filing makes clear, the risk of future infection to class members remains high. In particular, what individual class members have identified as the "revolving door" and "steady stream" of BCHOC staff coming in and out of the facility represents a serious and obvious danger – one that Defendant, who refuses to test staff, continues to willfully disregard . Defendant states in their recent filing that there are 613 BCHOC staff who come into contact with class members. *See* Greenbaum Dec. ¶ 6; Souza Dec. ¶ 11; Borges Dec. ¶ 3. Given CDC guidance for individuals to minimize the number of people they come into contact with, the 613 number is staggering.[19] As Defendants correctly state: "Particularly with the staff, who go home everyday, there are additional opportunities for exposure." Def. Brf. at 23; *see also* Greenbaum Dec. ¶ 8 (noting that there is no assurance that staff who test negative

---

[19] It also reinforces the correctness of the Court's ruling that Defendant's assertions that BCHOC is a safe environment "flies in the face of the CDC's direct warnings that detention centers are hardly impregnable fortresses and that, in fact, they are <u>more</u> susceptible to outbreaks once the virus penetrates. <u>Interim Guidance</u> 2 ("There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress ....")…." *Savino II*, 2020 WL 2404923 at *9.

"will remain negative" and that a staff member could be "tested on one day and go[] to the grocery store and contract[] COVID-19 there"); see also Borges Dec.¶ 4 (noting that "staff goes home every day").  This problem is all the more alarming given that approximately one-quarter of staff who *have* been tested have tested positive for the virus.  *See* ECF 192 at 2.

Meanwhile, as this Court has recognized, many class members who are still detained have no reason to be there, as they can be adequately monitored in the safety of their own homes. Among those who are still detained, many are still sleeping in congregate 11-foot wide cells with 3-4 other individuals in the 2 East Unit.  Medically vulnerable class members are still being held in a facility that is deliberately indifferent to their needs and risk of infection.  And since the time of their initial bail applications to this Court, several detainees have prevailed in their immigration cases – yet the government still holds them in dangerous conditions while it contemplates whether to appeal those rulings.[20]  In the days ahead, now with negative test results for nearly all the class members who remain incarcerated at Bristol, Plaintiffs urge the Court to resume adjudicating pending bail applications.

## CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied in its entirety.

June 2, 2020

Respectfully Submitted,

/s/ Oren Sellstrom
Oren Nimni (BBO #691821)
Oren Sellstrom (BBO #569045)
Lauren Sampson (BBO #704319)
Ivan Espinoza-Madrigal†

---

[20] Darwin Bonilla Garcia and Keith Williams both fall into this category.  Both were fully briefed on April 20, 2020, and their bail applications are under advisement with this Court.  *See* ECF 100, Ex. 3 (Bonilla Garcia); Ex. 8 (Williams).  Both have also tested negative for COVID-19.  ECF 192. To the extent it would be helpful for the Court to have updated information on any other individual class members, or to have information on pending bail applications grouped in some manner (*e.g.*, by housing unit or by medical condition), Plaintiffs stand ready to do so.

Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0606
onimni@lawyersforcivilrights.org

Grace Choi, Law Student Intern[*]
Kayla Crowell, Law Student Intern[*]
Aseem Mehta, Law Graduate[*]
Alden Pinkham, Law Graduate[*]
Daniel Phillips, Law Graduate[*]
Fernando Quiroz, Law Student Intern[*]
Bianca Rey, Law Student Intern[*]
Megan Yan, Law Graduate[*]
Reena Parikh[†]
Muneer Ahmad[†]
Michael Wishnie (BBO# 568654)

Jerome N. Frank Legal Svcs. Org.
P.O. Box 209090

New Haven, CT 06520
Phone: (203) 432-4800
michael.wishnie@ylsclinics.org

Lisa Pirozzolo
John Butts
Vinita Ferrera
Felicia Ellsworth
Nicole M.F. Dooley
Annaleigh Curtis
Michael Brown
Rama Attreya
Gary Howell-Walton

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 021009
Lisa.Pirozzolo@wilmerhale.com

---

[†] Admitted *pro hac vice*.

[*] Motion for law student appearances pending.

## CERTIFICATE OF SERVICE

I hereby certify that, on June 2, 2020 a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of this court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.


Date:   June 2, 2020

__ /s/ Oren Sellstrom_____
Oren Sellstrom (BBO #569045)