**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

                              )

**MARIA ALEJANDRA CELIMEN SAVINO**    )
**and JULIO CESAR MEDEIROS NEVES,**    )

                              )

**Petitioners-Plaintiffs,**          )

                              )     **20-cv-10617 WGY**

     **v.**                    )

                              )

**THOMAS HODGSON, et al.,**        )

                              )

     **Respondents-Defendants.**    )

_____)

**DEFENDANTS' MEMORANDUM REGARDING**
**THE APPROPRIATE LEVEL OF DETAINEE POPULATION**

### A.  General Concerns Regarding Setting a "Safe" Limit of Detainees

The Court has again invited the parties to suggest what is a safe level of detainee

population at the Bristol County House of Corrections ("BCHOC").  Two months ago it first

asked for input regarding the appropriate level of detainee population.  *See* Docket # 55.  In

response to the Court's inquiry regarding whether there was a level of population reduction

which would render the conditions relatively safe for the remaining detainees, Defendants

submitted two declarations on Thursday, April 9, 2020.  One was from Superintendent Steven

Souza of BCHOC.  *See* Docket Entry Nos. 67 & 69.  That declaration went through the areas

where detainees are held at BCHOC in painstaking detail, providing both dimensions and the

current number of detainees housed in each.  The second declaration was from Nelly Floriano,

the Nursing Supervisor for ICE detainees at BCHOC, who reviewed the prevention and

treatment practices at the facility and offered an opinion regarding the ability of ICE detainees to

maintain social distance.  *See also* Docket Entry No. 83 and exhibits thereto.  Defendants also

submitted videos which showed the detention facilities at BCHOC.  *See* email communication to Jennifer Gaudet, Courtroom Clerk, April 9, 2020 with links to two videos.

Defendants followed up the declarations with a brief on Tuesday, April 14, 2020.  The brief addressed the (then-) current detainee population at BCHOC within each unit where immigration detainees are held.  Attached to the brief were an updated declaration of Superintendent Souza and drawings of the current and social distancing-optimized layouts in the dormitories.  Together, these submissions made the case that the reduction in population at that point, coupled with steps taken by BCHOC to reconfigure sleeping arrangements, meal taking, and other activities made social distancing much more feasible and compliant with all CDC recommendations (given the inherent limitations of a detention facility, which even the CDC recognizes). The detainee population at BCHOC had been diminished by thirty-eight  percent (38%) from the level at the outset of the litigation at the time the Motion to Stay was filed; presently, the detainee population has been reduced by **66%** from the original level (from 148 to 66).

In response to Defendants' filings in early April, the Court entered a minute order on the docket that did not address the issue of population density as to which the Court had invited comment, nor was the issue discussed at the April 9, 2020 hearing or any subsequent hearing. *See* Dkt. # 86.

In the Preliminary Injunction decision, the Court did not make a finding that conditions at BCHOC did not allow for social distancing.  Instead, the Court focused on Defendants' alleged resistance to the release of detainees, its claimed lack of contact tracing and testing of

asymptomatic individuals.[1] In light of this history, and given that the Court has held it against

Defendants when they expressed their view that the safety of detainees did not require further

reduction of the population (notwithstanding Defendants' clear acquiescence to more than half

the total number of detainees released), Defendants, frankly, proceed with some measure of

trepidation.

The current situation is that BCHOC has a virtually-perfect record of no confirmed

positives among the detainee population. The extent to which this is due in part to the releases

by the Court is anyone's guess. Given that there was no coronavirus among the detainees at the

(below capacity) level of 148, nor at 125, or when the detainee population dropped below 100, it

is speculative how much impact any one factor has had on the outcome. BCHOC has taken a

number of steps to prevent the introduction of the virus into BCHOC and to limit its spread if it

came into the facility. No one knows which steps, or what combination of measures, is

responsible for the remarkable limit of COVID-19 among the ICE detainees.

But what we do know, with absolute certainty, is that in the three months of the

pandemic, BCHOC has been successful in keeping the virus out of the immigration detainee

population. As stated in previously submitted declarations to the Court, in the last ten weeks,

there has been a single positive test of a detainee, and that person tested negative two days later.

---

[1] As argued in Defendants' Motion for Reconsideration, Defendants believe that the Court was incorrect as to the facts underlying this conclusion and that Defendants could be deliberately indifferent in failing to test asymptomatic individuals or to conduct contact tracing when neither the CDC nor the Massachusetts Department of Public Health recommended such steps. Even if the Court were correct regarding Defendants' opposition to releasing detainees, and it is not correct, that is insufficient to establish conduct which "shocks the conscience," particularly since Defendants have successfully implemented all recommended procedures and kept COVID-19 out of the detainee population.

All of his unit mates tested negative, suggesting that the initial positive was very likely a false

positive. *See* Declaration of Judy Borges, submitted with the Motion for Reconsideration, dkt. #

185.

This is not a situation in which there was an outbreak and it was subsequently controlled

by population reduction and quarantining.  There never was an outbreak.  The Court assumed

that whatever the number of detainees was at the outset of the litigation, it was too many.  The

problem with this assumption is that the starting number could have been twice as high.  Or it

could have been half as much.  And the Court would likely have assumed that the starting

number was too high wherever it fell on that continuum, from 74 to 296.  Put another way, there

was no fact or science-driven determination that the initial number of detainees was too many.

All the Court had was the general opinion of doctors, who either had never been to BCHOC or

not been there recently, to the effect that the virus would likely spread quickly in a congregate

setting such as BCHOC.  While the danger of an outbreak was (and, to a lesser extent, still is)

real, we now know it has not come to pass.[2]

The lack of a clarity regarding what constitutes a safe detainee population density has

dogged this litigation throughout.  Plaintiffs have refused to offer what they believe is a safe

number or range.[3]  It should not be for Defendants to pick the number, when Defendants had no

---

[2] None of the expert opinions submitted by Plaintiffs have suggested what a safe level of detainees would be.  It is possible that the reduction in detainees achieved by the Court's bail orders (more than half of which Defendants agreed to) *and* the voluntary releases or transfers by ICE *plus* the release on bond by Immigration Judges has prevented an outbreak, no one can say for certain that is the case.  All of the other steps taken by Defendants may have kept the virus out of the detainee population such that social distancing was not a factor.

[3] Nor have Plaintiffs agreed that a single class member should not be released regardless of how dangerous or likely to flee.  Even now, Plaintiffs are blaming Defendants for their lack of compliance with the Court's bail order.

reason to think that the starting number was too high.[4]   Nor, given the absence of evidence that

the starting number was dangerous given the capacity of the facility, and in light of all of the

other steps taken by BCHOC to comply with all available guidance on the coronavirus, can it be

said that Defendants' view reflects deliberate indifference.

It is difficult to differentiate the degree of danger presented by various ranges of

population.  We can all agree that the risk of person-to-person transmission is reduced if there

are only twenty detainees.  But it will not be zero, because it only takes a single infected person

having contact with another person for the infection to spread.  And that infected person might

not be a detainee.  So even if there were two detainees left, one could be infected by an

asymptomatic guard and then infect the other detainee.

This is unlikely, for many reasons.  And, moreover, it must be remembered that release is

no panacea.  Just as a single infected guard could spread the virus to detainees, so could a

released detainee's wife, brother, cousin, etc. who may not be socially isolated.

It is understandable that the Court has struggled with this issue and not made a

determination to date.  Given that the Court held it against Defendants when they did not pick a

list of 50 detainees to be prioritized for bail review, and then distorted Defendants' position

regarding the daily lists of ten detainees, Defendants are in an impossible situation.  It is akin to

---

[4] Time and again, the Court and Defendants have disagreed on this fundamental point. The Court has been incredulous that Defendants did not embrace the concept of population density reduction, notwithstanding that there was no specific evidence that the starting level was unsafe.  There was an *assumption that something had to be done* because the pandemic was, and remains, dangerous.  While Defendants, Plaintiffs and the Court agree that the coronavirus presents risks to congregate living situations, surely the question of what to do in response depends in part on the relative crowdedness of a particular facility.  If one institution is at half capacity, and another is at full capacity, it does not matter that they both have 148 detainees.

the Court asking a criminal defendant what the defendant thinks is the appropriate sentence when the defendant is still contesting his guilt.   If Defendants suggest that 148 detainees is a safe level, they will earn the Court's opprobrium.  The Court will say Defendants are refusing to "play ball."  Even if Defendants were willing to suggest a number, whatever number they suggest will likely be cut down by the Court. Moreover, if Defendants pick a number or range below 148, Plaintiffs will use that as an admission that the starting level was dangerous.  This would potentially prejudice Defendants on appeal.

Plaintiffs will argue that there is no safe level, ignoring the bedrock fact that the detainees have remained safe from the virus to date.[5] The coronavirus did not enter or spread the detainee population when there were 148 detainees; it did not enter or spread when there were 100 detainees, which is less than one-third of the capacity for immigration detainees at BCHOC as currently configured.   In the end, the Court will have to use its best judgment and pick a number that is likely to be arbitrary.

In determining what a safe level of detainees is, it is worth noting that the CDC guidance for correctional facilities recognizes that social distancing is not easy in the correctional setting: "Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19." https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed 5/15/20).  It is important to keep in mind, moreover, that social distancing does *not* mean, as Plaintiffs would have it, that two

---

[5] Plaintiffs are constrained by their desire to achieve class-wide relief, which is likely to be impossible.  Although the case has been brought upon a claim that the risk of infection of COVID-19 violates the class members' Fifth Amendment rights, it has always been about getting all of the detainees released.

persons cannot *ever* be within six feet of each other even for a moment.  As the CDC guidance

on contact tracing cited by the Court states: "Based on our current knowledge, a close contact is

someone who was within 6 feet of an infected person *for at least 15 minutes* starting from 48

hours before illness onset until the time the patient is isolated." CONTACT TRACING, Part of a

Multipronged Approach to Fight the COVID-19 Pandemic available at

https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/principles-contact-tracing-

booklet.pdf (last accessed May 15, 2020)(emphasis supplied).

Because of the population reduction effected by transfers, voluntary releases and Court-

ordered releases, and as a result of steps taken to prevent and limit the virus, adequate social

distancing (within the CDC parameters)  is now possible in all ICE detainee units.  Moreover,

because the current detainee population is decidedly below capacity, there is room for some re-

population without significantly increasing the risk.

B.  **Shared Goals**

What the parties, the Court and the Defendants are seeking is to minimize the risk of the

detainees getting infected with COVID-19.[6]  There are a number of ways in which that can be

done.  None of the possible steps is exclusive.  There is no single right way to do this and there is

no way to achieve absolute protection from the virus.  *See, e.g.,* Declaration of Alysse Wurcel,

M.D., attached hereto as Exhibit A.

Plaintiffs have painted an unrealistic, black and white picture in which the *only* effective

---

[6] The Defendants and the Court are also trying to ensure that the community into which
the detainees are released is not endangered by their presence and that they will not flee.  The
danger to the community is of particular concern given that the majority of the released detainees
have significant criminal records, typically involving violent crime, domestic abuse and/or drug
trafficking.  As has been previously stated, they were detained by ICE for good reasons and in
good faith.  And, as the Court is aware, some of the released detainees have violated their bail.

means of protection is the release of all detainees.  This is flawed in both logic and pragmatics.

First, there is no guarantee that the detainees won't encounter COVID-19 upon release.  The

Court, detainees' counsel and the government have very little means of knowing, much less

controlling, the extent to which the detainees *and their families* practice appropriate precautions

against the virus.  While the Court has ordered house arrest, the Court neither has authority over,

nor insight into, the behavior of those around the detainees.  And not all detainees are complying

with their conditions.  Thus, the risk of the detainees contracting COVID-19 upon release is far

from zero.

Conversely, the risk of detainees contracting COVID-19 if they remain at BCHOC is far

from 100%.  This is underscored by the fact that this litigation is now entering its eleventh week

and there are still no cases of COVID-19 in the detainee population.  In light of the daily

increases in the number of confirmed cases in the Commonwealth of Massachusetts over that

time, it is clear that the steps taken at BCHOC have been effective.

The detainees have all been quarantined together for months, and so the possibility of any

one of them being infected is extremely low.  This has been confirmed by the recent round of

testing, in which not a single detainee tested positive.  Therefore, social distancing is much less

of an issue because the virus cannot be transmitted from an uninfected individual to any other

person (with certain unlikely exceptions).  This is not to say that social distancing should be

ignored, as it remains an important defense against the spread of the virus *if* it gets introduced

(through a staff member, for example).  But now that we know that all the detainees are negative,

and there are no recently introduced detainees, the risk of transmission from proximity is greatly

reduced.  It will happen only if an infected person, such as a guard, is not detected by the

screening in place due to being asymptomatic *and* that person (and the detainees) fail to exercise

all of the other precautions in place – i.e., wearing masks, avoiding proximity for more than a moment, washing hands routinely, etc.  This means that if a detainee passes by another detainee's bed briefly, the risk of transmitting the virus is extremely low because (a) none of the detainees are presently infected; and (b) the CDC's guidance indicates contacts for less than fifteen minutes are not significant enough to justify contact tracing if an infection is found.

On the other hand, it is by no means clear that release is a panacea.   While it is true that individuals have the potential to exercise even greater control over who they come into contact with *if* they choose to isolate, it does not mean that they will in fact do so.  We know that many detainees did not self-quarantine upon release even when they were ordered to do so.  And now, with most businesses opening, there is a much smaller likelihood that released detainees will stay at home.

### C.  BCHOC Would Be Well Below Capacity with Additional Detainees

Presently, Bristol is significantly below capacity.  The current detainee population versus the capacity is:

| Location | Capacity | Current Population |
|---|---|---|
| ICE  A | 66 | 14 |
| ICE B | 66 | CLOSED[7] |
| 2 East | 104 | 35 |
| EE Unit | 16 | 15 (originally from ICE B Unit) |
| EA Unit | 1 | 1 (female) |

---

[7] Owing to a riot by the detainees formerly housed in ICE B, that unit is uninhabitable presently.  For the layout of the units, the Court is referred to the attachments to the Motion to Stay, dkt. # 83.

| EC Unit | 32 | 1 detainee (15 inmates) |
| EB Unit | 38 | 0 |

Thus, the total capacity of these units is 323.  The total occupancy, including the non-ICE

inmates in Unit EC, is 81 (66 ICE detainees plus 15 non-ICE in Unit EC).  This is twenty-five

percent (25%) of capacity.  Even if the arrangements return to the pre-pandemic setup, and

without using units EE, EC and EB, the "normal" capacity at BCHOC for ICE detainees is 212.[8]

The current detainee population is just over 30% of the normal capacity.  Defendants believe that

a 70% reduction from capacity is greater than necessary under any analysis.

**D.  Social Distancing Is Possible at BCHOC and Is Just One of the Precautions**

BCHOC has been following all of the available recommendations from ICE, CDC and

the Massachusetts Department of Public Health since before this litigation began.  *See*

Declarations of Superintendent Souza, Dr. Rencricca (attached to Defendants' Opposition to the

TRO motion) and Director of Clinical Services Debra Jezard (same).  It has updated its practices

to conform to the guidance as it has evolved, by, for example, screening employees before every

shift outside the facility and distributing and requiring the use of face masks.

While the CDC has updated its guidance regarding COVID-19 for correctional and

detention facilities, it still does *not* recommend large-scale release of detainees, however.  *See*

CDC website https://www.cdc.gov/coronavirus/2019-ncov/community/correction-

---

[8]  The current capacity if the isolation units are not used and 2 East is not fully dedicated to immigration detainees (neither restriction is presently in place) is at least 146.  75% of that temporarily low capacity would be 110 detainees. The Court has referenced the 75% figure, citing national ICE guidance.  As previously indicated, that number is of total capacity, not the detainee population at the outset of the pandemic.  It makes sense to tie any reduction to total capacity because some institutions, such as Bristol, were well below capacity (148 detainees with a capacity of 212) at the outset of the pandemic, while others had higher or lower percentages of capacity.

detention/index.html (*accessed* June 10, 2020).

### E.  A Special Master Is Unnecessary

The Court determined, correctly, that the conditions of the class members' confinement

are not properly litigated pursuant to a habeas corpus petition.[9]  A special master is not necessary

or appropriate at this time.  The essence of the petition and the complaint is that class members

are subject to a risk of infection that violates their constitutional rights.  They are not infected

and have not become infected over the last three months.  The conditions at BCHOC are not

causing medical problems.

### CONCLUSION

The track record at BCHOC speaks volumes.  There have been no confirmed positive

cases among the detainees.  While the reduction in detainee population certainly may have been

a factor in this, it is also possible that the virus was kept out of the detainee units entirely.  In any

event, some additional re-population is likely to be safe and further reduction is certainly not

warranted.  As stated in the attached declaration of Alysse Wurcel, M.D., infectious disease

---

[9] For an excellent discussion of this issue in a Bureau of Prisons case, *see Grinis, et al. v. Spaulding*, C.A. No. 20-10738-GAO, Order dated June 11, 2020 (dkt. # 60).

control is a matter of taking multiple steps to mitigate the risks.  There is no single solution and it

is impossible for a person to accurately determine an exact safe level for the detainees.

Respectfully submitted,

ANDREW E. LELLING,
United States Attorney

By:   */s/ Thomas E. Kanwit*
Thomas E. Kanwit
Michael Sady
Assistant U.S. Attorneys
U.S. Attorney's Office
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3100
thomas.kanwit@usdoj.gov
michael.sady@usdoj.gov

June 11, 2020


## CERTIFICATE OF SERVICE


     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


*/s/ Thomas E. Kanwit*
Thomas E. Kanwit

Dated:   June 11, 2020