DECLARATION OF ALYSSE WURCEL, M.D.

Pursuant to the authority of 28 U.S.C. § 1746, I, Alysse Wurcel, M.D. declare as follows:

1. I am a medical doctor with a specialty in the area of Infectious Diseases. I attended Tufts University and graduated with a B.A. degree in 2000. I graduated from the University of Pennsylvania's Medical School in 2008. I completed a residency in internal medicine at the Massachusetts General Hospital in 2011. In 2012, I did the first of two fellowships in Infectious Diseases at Columbia University Medical Center in New York City. I did a second fellowship in Infectious Diseases at Tufts Medical Center in 2015. I completed a Masters degree in Clinical and Translational Research at Tufts University's School of Graduate Biomedical Sciences in 2014. I am a board-certified infectious disease specialist with a strong track record of successful infectious diseases-related research in vulnerable populations including people with HIV, people who use drugs, and people who are incarcerated. I have published over 40 manuscripts. I am a member of the Massachusetts Medical Society, the Infectious Diseases Society of America, the HIV Medicine Association, and the Infectious Diseases Society of America Opioid Task Force, among others. Since 2014, I have held dual academic positions as an Assistant Professor in both the Tufts Medical Center Department of Geographic Medicine and Infectious Diseases, as well as the Department of Public Health and Community Medicine, at Tufts University School of Medicine in Boston. For the 2015-2016 academic year, I was honored as the top lecturer. I have received a number of other awards, grants and recognition. Much of my work concerns underserved and underprivileged communities. I am currently leading an investigation involving hepatitis C virus ("HCV") testing in jails. In addition to my inpatient and outpatient responsibilities at Tufts Medical Center, I work as a clinician treating HIV and HCV in six jails in Eastern Massachusetts. I am a consultant to the Massachusetts

Sheriffs' Association for COVID-19 prevention and mitigation. I am not being directly paid for my time in preparing this declaration and my opinion stated herein is not affected, in any manner of which I am consciously aware, by such employment.

2. I have been asked to address safety issues at the Bristol County House of Corrections through the lens of what, if any, is a safe level of detainees in light of the coronavirus pandemic. As the Court is likely aware, this is not a simple question susceptible of arithmetic determination.

3. COVID-19, the disease caused by SARS COV2, is a new disease and we are learning more every day. It appears to be transmitted primarily through droplets. This is typically in a sneeze or exhalation from someone infected with the virus. Since COVID-19 is spread via droplets containing the virus coming out of the mouth or nose of an infected person primarily, the nose, mouth and eyes are the most susceptible area of a person exposed to the virus. This is the focus of the CDC in its recommendations for detention and prison facilities, and it is why social distancing is recommended in the first place, and why masks are now recommended for those who cannot self-isolate.[1] While it is certainly true that the virus can also be transmitted by touching a surface that an infected person has touched, this is not addressed by social distancing

---

[1] As stated on the CDC website:

> "The virus is thought to spread mainly from person-to-person.
> -- Between people who are in close contact with one another (within about 6 feet).
> -- Through respiratory droplets produced when an infected person coughs, sneezes or talks.
> -- These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs."

CDC website at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (accessed June 9, 2020 at 12:19 p.m.).

so much as by proper hand washing, avoiding touching one's face, and disinfecting common areas.

4. There are several lines of defense for transmission of a droplet-spread virus from one person to another. The first is to keep people that are known or suspected of infection away from others. For a correctional facility, this means screening staff and any inmates or detainees prior to entry into the facility. A second step in this process is to quarantine anyone suspected of an infection if they are an inmate or detainee already within the facility.

5. Another means of defense against infection is to rigorously disinfect surfaces and areas within the facility. Hand washing has been identified by the CDC as a first line of defense against the spread of COVID-19, and I know from my training, experience, and expertise that this is a very important aspect of infection prevention and containment.

6. In addition to taking steps to keep the virus out of the facility and to kill the virus on surfaces, there are steps that can be taken to limit the likelihood of person-to-person transmission. These steps include requiring face masks to be worn, encouraging frequent hand washing (and avoiding touching one's face), and providing sufficient space so detainees and staff can maintain a distance of six feet or more.

7. Testing all people in jail, even asymptomatic people, can give you a sense if there is any COVID-19 in the jail. This is a snapshot in time, however, as the test can be done while the virus is still incubating. Jails that have the ability to test everyone, even asymptomatic people, are well positioned to identify and contain epidemics.

8. This spacing of individuals recommended by the CDC is widely referred to as "social distancing." Social distancing is challenging in jails. Social distancing is more possible in jails

that are under capacity.  CDC does not anticipate that social distancing will be possible at all times within a correctional facility.

      8. In the realm of infectious diseases, there are always trade-offs and practical considerations.  I view prevention and mitigation in the jails through a harm reduction lens.  Harm reduction is a framework for approaching drug use disorder. Someone may not be able to stop injecting heroin, but they can move from injecting to sniffing heroin.  In the jails, it would be impossible to completely effectively socially distance and give people who are incarcerated time out of their cell.   I have advised each of the jails on how to mitigate risk through masking, cleaning, and trying to encourage social distancing.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the 10 day of June, 2020

*[signature]*