UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————————————

|  |  |  |
|---|---|---|
| **MARIA ALEJANDRA CELIMEN SAVINO** | ) | |
| **and JULIO CESAR MEDEIROS NEVES,** | ) | |
| | ) | |
| **Petitioners-Plaintiffs,** | ) | |
| | ) | **20-cv-10617 WGY** |
| **v.** | ) | |
| | ) | |
| **THOMAS HODGSON, et al.,** | ) | |
| | ) | |
| **Respondents-Defendants.** | ) | |

—————————————————————————————

## SUPPLEMENTAL BRIEF ON REVOCATION OF BOND
## (LEAVE TO FILE GRANTED ON JUNE 8, 2020)

At the outset of this litigation, Defendants informed the Court that the immigration detainees at Bristol County House of Corrections ("BCHOC") were detained because they were subject to mandatory statutory detention or they had been deemed a significant danger to the community or of flight.  Although the detainees are held under civil law, a number of them have criminal histories that include violence, drug trafficking and the like.  Some have previously demonstrated an inability or unwillingness to comply with conditions imposed upon them.

Unfortunately, this has proven to be the case with a number of the released detainees. Ten of the forty-four detainees released by the Court have violated the conditions of their bail repeatedly.  All have continued to violate the Court's bail order even after their violations were brought to the attention of the Court and their counsel on May 22, 2020.

### A. Status Update

**1. Jose Alejandro Beltran-Araujo:**  On June 10, 2020, apparently not satisfied with simply violating the home confinement condition, **Jose Alejandro Beltran-Araujo** severed the strap of his OPS unit and absconded.  Supplemental Declaration of Assistant Field Office

Director Immaculata Guarana-Armstrong, attached hereto as Exhibit 1.  Two days before, he was arrested  by the Stamford Police Department and charged with violation of a protective order. *Id.* According to the police report, officers responded to 18 E. Walnut Street for a report of a female that was struck.  *Id.*  Upon investigation at the scene, the Officers noted that the alleged victim "kept concealing the left side of her face with her long hair [and] appeared nervous." *Id.*  The alleged victim would not admit to any physical abuse by Mr. Beltran-Araujo, but the officer asked her to pull her hair away from her face, and when she did, the officer "observed that her left eye was swollen and she had a visible dark red bruise around her eye like a black eye." She eventually told the officers that "she hit her eye against a door."  *Id.*  ERO has been unable to locate Beltran-Araujo, who was released by the police. *Id.*

Prior to these incidents, Beltran-Araujo repeatedly violated the Court's bail order by failing to remain quarantined for the  14-day period immediately following release and by failing to remain under house arrest thereafter.  Violations continued after April 26, 2020 with a total of more than 250 violations until he cut the bracelet on June 10, 2020. *Id.*

This is precisely the outcome Defendants were concerned about in opposing the release of Beltran-Araujo and other detainees with a history of violence.  While he has not been charged with assault and battery, it is hardly a stretch to conclude that, more likely than not, he hit his girlfriend after drinking at a party (which he admitted) where he should not have been in the first place (there was a valid restraining order in place requiring him to keep away from his girlfriend and the 18 E. Walnut Street address).  *Id.*

**2.  <u>Gabino Del Angel Moran</u>**:  Mr. Del Angel Moran was previously reported to the Court as a violator on May 22, 2020.  In the intervening period, **after counsel was on notice,** from May 23 to June 9, 2020, he violated 385 times.

**3.  Carlos Gutierrez-Deleon**: As previously stated, Deleon's ATD compliance report shows repeated violations of the quarantine and house arrest order between April 10, 2020 and May 8, 2020. An updated report shows violations continued between May 9, 2020 and May 22, 2020 with twenty-seven additional violations and as many as seven violations occurring on one day. **After counsel was on notice,** between May 23, 2020 and June 9, 2020, he violated the Court's order an additional thirty-eight times with as many as five violations occurring on one day.  He was caught by photograph going shopping and outside his home.

**4.  Cesar Vargas**:  Mr. Vargas repeatedly violated the Court's bail order by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Between April 11 and April 25, 2020, there were eight such violations during the quarantine period. Between April 26 to May 8, 2020, there were forty additional violations, with violations occurring each day. Additionally, violations continued between May 9, 2020 and May 22, 2020 with forty-five subsequent violations and as many as eight violations occurring on one day.  **After counsel was on notice,** between May 23, 2020 and June 3, 2020, he violated the Court's order an additional thirty-eight times with up to seven violations per day on three occasions.

**5.  Kavon  Mahadeo:**  This man also repeatedly  violated the Court's bail order  by failing to remain quarantined for the 14-day period immediately following release and  by failing to remain under house arrest thereafter. Between April 11 and April 25, 2020, there were one hundred and five (105) such violations  during the quarantine period. Between April 26 to May 8, 2020, there were between four and nineteen violations every day. Violations continued between May 9, 2020 and May 22, 2020 with one hundred twenty-nine (129) subsequent

violations and as many as fifteen violations occurring on one day. **After counsel was on notice,** between May 23, 2020 and June 9, 2020, he violated the Court's order an additional one hundred and eight times :with up to ten violations per day on three occasions.

      **6.** <u>**Desmond Joseph**</u>: Mr. Joseph has also repeatedly violated the Court's bail order, by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Such violations included twelve violations between April 11 and April 25, 2020 during the quarantine period, and daily violations of between six and twelve times each day from April 26 to May 8, 2020. Additionally, violations continued between May 9, 2020 and May 22, 2020 with seventy- one  additional violations and as many as ten violations occurring on one day. **After counsel was on notice,** between May 23, 2020 and June 9, 2020, he violated the Court's order an additional forty-nine times with up to eight violations on one day.

      **7.** <u>**Pamlar Ferreira**</u>: Ms. Ferreira has also repeatedly violated the Court's bail order by failing to remain quarantined  for the 14-day period immediately following release and by failing to remain under house arrest thereafter. There were twenty-two violations between April 11 and April 25, 2020 (during the quarantine period), and fifty violations from April 26 to May 22, 2020, with up to five violations  occurring on one day.  **After counsel was on notice,** between May 23, 2020 and June 3, 2020, she violated the Court's order an additional fifty-four times with more than five violations per day on six days.

      **8.** <u>**Lucas Valentim**</u>:  Mr. Valentim violated the Court's bail order by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Such violations included eleven violations on May 5 and May 6, 2020. Violations continued between May 9, 2020 and May 22, 2020 with thirty additional violations,

and up to seven violations occurring on one day. **After counsel was on notice,** between May 23, 2020 and June 3, 2020, he violated the Court's order twenty times with up to six violations on one day.

On June 8, 2020, he violated the Court's order an additional eight times. On this date, Mr. Valentim called BI to ask if he could leave his house to be tested for COVID-19. The BI specialist authorized his absence from his house for a medical visit. Beginning at 2:53 PM, GPS tracking points noted that he travelled to Norwood, MA, Burlington, MA (two different addresses), Attleboro, MA, and Pawtucket, RI (four different addresses not identified as his residence). None of the addresses he went to were medical facilities or pharmacies where medical testing is typically conducted.

9. **Ranferi Ramirez-Maldonado:**  This man violated the Court's bail order by failing to remain under house arrest after the quarantine period. Such violations include seven separate occasions between April 27, 2020 and May 6, 2020. Violations continued between May 8, 2020 and May 22, 2020 with twenty-four subsequent violations. **After counsel was on notice,** between May 23, 2020 and June 8, 2020, he violated the Court's order an additional twelve times.

10. **Marvin Arreaga:** Mr. Arreaga has also repeatedly violated the Court's bail order by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Such violations included twelve violations between April 11 and April 25, 2020 during the quarantine period, and forty-eight violations from April 26 to May 6, 2020. Violations continued between May 7, 2020 and May 22, 2020 with seventy additional violations, and up to nine violations on one day.  **After counsel was on notice,** between May 23, 2020 and June 8, 2020, he violated the Court's order an additional eighty-two

times with more than five violations per day on ten days.  These violations included working on a job away from his home, where he was caught on camera.[1]  *See* Exhibit 1 hereto.

### B.  These Detainees Violated the Quarantine Requirement

One of the arguments made by Plaintiffs in their Opposition to Defendant's Motion to Modify Preliminary Injunction, dkt. #196, is that the released class members somehow were not aware of the conditions of bail.  Plaintiffs argue that their violations really are not their fault because:

1. The government refused to provide counsel with the paperwork given to the detainees;

2. The detainees were not given complete or accurate paperwork; and

3. The detainees were given inconsistent instructions.

*Id.* at pp. 16-21.

The first point to make is that Plaintiffs have not claimed that the class members were given inconsistent information as regards the quarantine period.  Moreover, Defendants dispute Plaintiffs' contention that the released detainees were given incomplete or inconsistent documentation as to the conditions of their release.  *See* Exhibit 1 hereto, ¶¶ 8-10, and the attached representative sample of release paperwork.

Second, Plaintiffs' counsel was certainly not confused about the conditions of release.  The Court's order was clear.  The class is represented by at least nineteen attorneys and nine Yale Law School student interns.  Every weekday, they ask Defendants to make, on average, five to twelve class members available for telephone consultation each and every business day.

---

[1] ICE does have an electronic record of receiving a call from Mr. Arreaga at which time he asked if he could throw the trash away at his residence. However, ICE does not have any electronic record of receiving a call from him in which he asked if he could leave his house for work.

BCHOC must have arranged in excess of 400-500 calls between class counsel and class members.

### B. **Defendants Provided Complete and Accurate Release Paperwork**

As stated, Defendants dispute the claim that the release paperwork was incomplete or inaccurate. *See* Exhibit 1 at ¶¶ 8-10. The conditions of the Court's release order were set forth in the paperwork. *Id.* Some of the detainees gave their counsel incomplete copies, but that is not because they received incomplete copies.

Nor is there much to be made of the Plaintiffs' claim in their Opposition, filed on June 2, 2020, that Defendants refused to give counsel copies of the paperwork given to the released class members. Opposition, at n. 16. That is a misrepresentation. On April 24, 2020, undersigned counsel provided Plaintiffs' counsel (Oren Sellstrom and others) with the release paperwork.[2] *See* Exhibit B hereto. On April 29, 2020, a second email with the release paperwork was sent to Attorney Sellstrom. Thus, at the time the Opposition was filed, Plaintiffs' counsel had the release paperwork for 39 days.

It is true that defense counsel declined to undertake the job of asking ERO to copy the package given to every released detainee, get that paperwork to counsel for scanning and

_____

[2] According to the declaration of Oren Sellstrom, "We subsequently raised the issue at the April 24, 2020 hearing before the Court. Although the Court initially stated that it expected Defendant to produce release paperwork, Defendant's counsel took the position that class members should provide the paperwork to Plaintiffs' counsel themselves, and the Court ultimately did not order Defendant to produce it. Accordingly, Plaintiffs' counsel have attempted to obtain the release paperwork from class members themselves." Sellstrom Decl. at ¶¶ 6 & 7. What Attorney Sellstrom does not tell the Court in his declaration, made under oath, is that the release paperwork was provided to him by email **later that day**. The statement that the paperwork was never provided is untrue. Unfortunately, this is not the first time that Plaintiffs' counsel have misled the Court. On May 5, 2020, Attorney Sellstrom stated in a letter to the Court that the news that a detainee had tested positive was "buried in a footnote" in government counsel's prior letter to the Court. This was incorrect. The report was in the body of the letter. *See* May 5, 2020 letter to the Court by Assistant U.S. Attorney Kanwit.

forwarding to Plaintiffs' counsel.  Instead, defense counsel gave opposing counsel the package that ERO represented was being given to every released detainee.  That is certainly not a refusal.

While it may be true that the paperwork was not provided immediately upon the first request, Plaintiffs were well aware of the Court's release order and could have communicated its terms to their clients.  In fact, they claim they did:  "It has been the practice of Plaintiffs' legal team, since the Court first began releasing class members on bail, to reach out to class members as soon as possible following any order of release on bail.  Our purpose in doing so has been to inform the class members of their release, to explain and discuss the Court's conditions of bail…" Dkt. 196, Exhibit 1 at ¶ 2.  Simply put, the timing of when Plaintiffs' counsel received a copy of the release paperwork being provided to their clients is wholly irrelevant because (a) counsel was aware of the conditions imposed by the Court; and (b) the paperwork provided by ERO was consistent with the Court's order.  This is an attempt to divert responsibility.[3]

Plaintiffs' counsel has stated that they were aware of potential inconsistencies in the instructions given to released detainees at least as early as April 13, 2020:  "We have seen at least some paperwork that indicates this [providing the Court's order] has happened for some class members, but it is not clear to us that this has been ICE's consistent practice."  *Id.* at ¶ 4.  And, presumably, this is what led to the following statement:

> Plaintiffs' counsel for their part have reiterated the Court's
> conditions to released class members on multiple occasions,

---

[3] Moreover, in the period from April 10-24, defense counsel received over 500 emails related to this case.  Plaintiffs routinely asked for assistance with various things, such as setting up a direct telephone line at BCHOC, that required counsel's involvement.  Indeed, the request for a copy of the release paperwork was one of three items in the April 10 email and one of seven in the April 13 email, all the while counsel was briefing additional bond issues and a motion to stay further releases.  But, at bottom, it makes no difference because counsel knew all along what the release conditions were and, because those conditions were accurately reflected in the release paperwork given to the detainees, it would have made no difference if a copy was provided sooner.  Nor would it have impacted the detainees' willingness to violate the bail conditions.

> *beginning upon release* and continuing over the last week since
> receiving Defendant's Motion for Reconsideration. Whenever
> Plaintiffs' counsel become aware of release paperwork that is
> inconsistent or inaccurate, it is our practice to reiterate the Court's
> conditions to class members. Similarly, whenever Plaintiffs'
> counsel become aware of statements by ISAP that are inconsistent
> with the Court's orders, it is our practice to reiterate the Court's
> conditions to class members and reiterate the importance of
> following the Court's conditions no matter what ICE's agent tells
> them.

Decl. of Oren Sellstrom, ¶ 11.  Notably, counsel does not claim that their responsibility to inform

their clients of the conditions of their bail began upon hearing of allegedly inconsistent

instructions to their clients.  Their duty existed at the outset.[4]

The upshot of this is that Plaintiffs' counsel have known about the bail conditions since

the Court first ordered a release of a detainee, they had reason since at least April 13, 2020 to

believe that their clients required additional instruction on the conditions, and the released

detainees had the full bail conditions in writing from the time of their release.  And, yet, they did

not comply.  Not only did they not comply with the unmistakable condition of the 14-day

quarantine, they also did not comply with the house arrest provisions thereafter.

### C.  Erroneous Instructions Do Not Excuse the Violations

Plaintiffs have said that the released detainees got inconsistent and incorrect information

from ERO.  ICE has investigated this claim and believes it to be incorrect.  *See* Exhibit 1.  For

example, several of the detainees claim that a male ICE officer told them this or that, but they

were not processed by male officers.  *Id.*  Moreover, ICE contacted all of the ERO staff in the

---

[4] It is unlikely that the copies of release paperwork received by counsel are complete; one
of the examples is not a full set.  See Exhibit 1 hereto.  Another example, Exhibit C to the
Opposition, has the Court's conditions listed.

region and confirmed that no instructions contrary to the Court's order were given by ERO.  *Id.*, ¶ 48 and *passim*.

ICE's investigation has revealed that it's contractor, BI, likely gave incorrect information on a few occasions.  ICE, at least in this region, has not had a situation previously in which immigrants were released on a court order with non-standard conditions.  It did not foresee that BI might refer to standard conditions of release in this setting.  Of course, that will be corrected going forward.

But BI did not give contrary instructions regarding the 12-day quarantine, nor are Plaintiffs claiming they did.  And therefore, *at most*, this would account for some of the violations after the fourteen day quarantine and before May 23, 2020.  On May 22nd, Plaintiffs' counsel became aware that Defendants were claiming that their clients had violated the bail conditions.  And yet, every one of the ten class members listed above continued to violate the conditions of bail **after the date on which their counsel became aware of the problem.**  And, moreover, Plaintiffs' counsel have represented in writing that they were aware of some confusion as to their clients' understanding of the terms of their release as early as April 13, 2020. Sellstrom Decl. at ¶ 4.  Why then was it not made clear to the released class members at that point that they had to stay at home?  And almost two months later, in early June, the violations continued, notwithstanding that counsel had notice of actual violations since May 22, 2020 and some concerns regarding the instructions to their clients since early April.

In light of the continued violations, including one class member assaulting his girlfriend and cutting his bracelet, it is clear that Plaintiffs' claim that "[c]lass members have been diligent in trying to do what is required of them…,"  Sellstrom Decl. ¶ 10, is not true for the ten class members listed here, at least.

## CONCLUSION

This is not a situation in which an individual violated meaningless conditions of release. The quarantine and home confinement were essential aspects of the Court's willingness to release detainees in the midst of a pandemic.  It was essential for the safety of the community, as the detainees being released had not been tested for COVID-19.

Nor is this a situation where the detainees who violated their conditions did it once or twice.  We have hundreds of violations.  And, the violations cannot be excused by shifting blame to the government.  The detainees were given accurate written and oral instructions upon release. If they got confusing information later, it was incumbent upon them to check with their counsel. They did not do so.  And, most tellingly, they continued to violate the conditions for at least two weeks after counsel had notice of the violations and, presumably, contacted them to give them clear advice to stay at home.

Finally, one of the released class members has cut his bracelet after assaulting his girlfriend, who had a restraining order entered against him, and fled.  This ought to give the Court great pause before it considers releasing any other detainees.  And the Court must revoke bail for all ten of the detainees listed in this brief.  To do anything else would make a mockery of the Court's authority and jeopardize the community into which the detainees have been released.

Respectfully submitted,

ANDREW E. LELLING,
United States Attorney

By:   */s/ Thomas E. Kanwit*
Thomas E. Kanwit
Assistant U.S. Attorney
U.S. Attorney's Office
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200

Boston, MA  02210
(617) 748-3100
thomas.kanwit@usdoj.gov

June 12, 2020


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Thomas E. Kanwit*

Dated:   June 12, 2020