UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                        )
MARIA ALEJANDRA CELIMEN SAVINO,         )
JULIO CESAR MEDEIROS NEVES,             )
and all those similarly situated,       )
                                        )
         Plaintiffs-Petitioners,        )
                                        )    CIVIL ACTION
         v.                             )    NO. 20-10617-WGY
                                        )
STEVEN J. SOUZA, Superintendent of      )
Bristol County House of Correction      )
in his official capacity,               )
                                        )
         Defendant-Respondent.          )
                                        )
_____
```

YOUNG, D.J.                                              June 18, 2020

**MEMORANDUM**

**I.   INTRODUCTION**

     This memorandum sets the record straight.  First, it reiterates the Court's questions, raised in hearings held on June 3 and 15, as to which counsel for respondent ("the government") requested further clarification.  Second, the Court takes this opportunity briefly to explain why, at the June 3 hearing, the Court denied the government's motion for reconsideration of the preliminary injunction ("Mot. Recon."), ECF No. 185, and forthrightly to "address the [government's] argument that the preliminary injunction decision was incorrect," Obj. Recharacterization 1, ECF No. 200.

**II.   THE COURT'S TWO QUESTIONS**

At hearings held via videoconference on June 3 and 15, 2020, the Court asked the government whether it was complying with two procedures set by the Centers for Disease Control and Prevention ("CDC") and U.S. Immigration and Customs Enforcement ("ICE").  The government provided no clear answer at the first hearing and requested clarification at the second, which the Court now provides.  Both of these issues were flagged by the Court in its preliminary injunction opinion, issued on May 12, 2020.  See Savino v. Souza, __ F. Supp. 3d __, No. 20-10617-WGY, 2020 WL 2404923, at *6 (D. Mass. May 12, 2020).

First, has the government been complying, throughout this litigation, with the CDC's guidance that staff who are "close contacts" of individuals who have tested positive for COVID-19 must self-quarantine at home for 14 days?  This guidance, stated on page 12 of the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC's Interim Guidance") (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf, reads in relevant part: "**If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community):** self-

quarantine at home for 14 days and return to work if symptoms do not develop" (emphasis in original).[1]

Second, (a) has the government been complying with ICE's requirement that detention facility staff must "[n]otify both the ERO Field Office Director (or designee) and Field Medical Coordinator as soon as practicable, but in no case more than 12 hours after identifying any detainee who meets the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19," ICE, Enforcement and Removal Operations (ERO), COVID-19 Pandemic Response Requirements 6 (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf; and (b) has ICE been "review[ing] the case[es] to determine whether continued detention is appropriate," making "such custody determinations on a case-by-case basis, pursuant to the applicable legal standards, with due consideration of the public health considerations implicated," id. at 14?  At the June 15 hearing, the Court overstated ICE's commitment by suggesting that "hearings" were required; in fact, ICE has committed itself only to "review" the cases, with or without a

---

[1] A person is defined as a "close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on)." CDC's Interim Guidance 3.

[3]

hearing.  That being so, the Court inquires whether, throughout this litigation, this notification-and-review procedure has been carried out as ICE's policy requires.

The Court also underscores a question it asked during the June 15 hearing seeking to clarify the large discrepancy between the parties' lists of medically vulnerable detainees (under the CDC guidelines) currently held at Bristol County House of Correction (BCHOC): the government has identified only ten such people, see ECF No. 212, while the petitioners count as many as thirty-three, see ECF No. 222.  The CDC's guidelines do not appear to be so vague as to allow such a wide discrepancy.

### III. THE LIKELIHOOD OF FINDING DELIBERATE INDIFFERENCE

In issuing a preliminary injunction in this case, the Court ruled that the petitioners had shown a likelihood of success on the merits, which would entail proving that the government exhibited "deliberate indifference to a substantial risk of serious harm" to the detainees' health.  Savino, 2020 WL 2404923, at *7 (quoting Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011)).  The Court's reasoning rested on three pillars: (1) the government's refusal voluntarily to work toward reducing the population of the facility to a density in which social distancing would be possible; (2) the government's failure to test any asymptomatic detainees or staff, notwithstanding the known risk of asymptomatic infection; and

[4]

(3) the lack of adequate contact tracing, including the issue of "close contacts" discussed at the outset of this memorandum. See id. at *7-10.  The government's motion for reconsideration is principally an attack on each of these three pillars.

**A.   The Government's Blanket Opposition to Bail**

The government makes the surprising argument that the Court's description of the government's "wholesale blockade on bail," id. at *9, "is not a fair or accurate characterization." Mot. Recon. 16.  This is so, the government explains, because ICE's formal opposition to release on bail by the Court of all but six detainees was only its position "for the record"; in practice, however, "fully half of those releases were with Defendants' tacit approval."  Id.  How was that tacit approval manifested?  The government explains that, along with a general objection to all releases, it specifically highlighted a smaller "subset of detainees who should not be released."  Id. at 15. Thus, the government maintains, it partnered with the Court in a "collective process" of releasing detainees and deserves credit for many of the releases on bail.  Id. at 25.

This narrative is fanciful.  There was no "tacit approval" or "collective process" of releases.  Laboring hard and in good faith, counsel for the government helpfully singled out particular detainees as being especially unfit for bail in order to steer the Court away from those individuals.  Yet that does

[5]

not imply that the government agreed that others should be released, let alone worked toward that goal. It did not. At the end of the day the government's position was uncompromising. It was also off the wall. To see why, it is useful to look at the big picture and the small one.

First the big picture. Social distancing is a "cornerstone" of COVID-19 prevention. CDC's Interim Guidance 4. This was the major problem in BCHOC at the start of this litigation, since the detainees were indisputably sleeping and eating very close to one another. The government never argued that the full cohort of 148 BCHOC detainees could achieve effective social distancing.[2] Instead, it chose to pretend that social distancing was not critical, repeatedly asserting that the facility was safe because the virus could somehow be kept outside -- even after numerous staff and one detainee tested positive. See Savino, 2020 WL 2404923, at *9. The government's prevention strategy, as initially conceived and never disavowed, was essentially all Plan A and no Plan B. To borrow a driving

---

[2] In support of its motion to stay further releases, the government did argue that, as of April 14 when 92 detainees were held at BCHOC, "appropriate six foot social distancing is fully achievable." Defs.' Mem. Supp. Mot. Stay Further Releases 9, ECF No. 83. The government also contended that the safe population number "is not 100 and it's certainly not below 100." Tr. Hr'g (Apr. 9, 2020) 20:7-8, ECF No. 148. The Court denied the motion to stay, since it could not yet "determine[e] the merits of this case" by settling on a safe number. ECF No. 86.

analogy from the government,[3] it is like a NASCAR driver who spurns a seatbelt and helmet because she plans not to crash.

The government is still justifying its daredevil mindset, recently explaining that it "had no reason to think that the starting number [of detainees] was too high" and therefore it "did not embrace the concept of population density reduction." Defs.' Mem. Appropriate Level Detainee Population ("Population Mem.") 4-5 & n.4, ECF No. 214.  (How this admission can be squared with the government's supposed "tacit approval" of bail releases is anyone's guess.)  This is emphatically not a case in which the government "has been working toward exactly what the plaintiffs seek: a reduction in [the facility]'s population." Swain v. Junior, No. 20-11622, 2020 WL 3167628, at *10 (11th Cir. June 15, 2020) (emphasis in original).[4]

---

[3] The government likens the Court's conduct to "getting in the driver's seat, picking the destination and blaming the passengers for not driving the car."  Mot. Recon. 5.  The better comparison, however, would be to a driver getting on the highway northbound and faulting the passenger for remarking at every exit, "I would get off here and go south."

[4] The government oddly states that even had there only been 74 detainees at the start of the litigation "the Court would likely have assumed that the starting number was too high." Population Mem. 4.  That's a very strange thing to say.  The Court has made clear in two written opinions and numerous hearings that the main problem is crowding in conditions that do not allow for social distancing.  If there were only 74 detainees and they had adequate space, why would the Court have assumed that was unsafe?  Cf. Baez v. Moniz, No. 20-10753-LTS, 2020 WL 2527865, at *8 (D. Mass. May 18, 2020) (Sorokin, J.) (rejecting Eighth Amendment claim regarding COVID-19 prevention for 70 detainees in shared cells or dorms when defendant

Now the small picture.  Andrea James, a 54-year-old grandmother with diabetes and hypertension, arrived in ICE custody after serving twenty years in prison for cocaine distribution in 1998.  The government opposed bail because "ICE believes her to be a danger to the community."[5]  Georgios Nikiforides is a 49-year-old electrician who has been in the U.S. since he was two years old.  His criminal history consists of two convictions for assault, in 2002 and 2012, but he has since been awarded a full pardon.  He has chronic obstructive pulmonary disease, with a recent history of hospitalization for pneumonia, as well as hypertension.  ICE opposed his release because he "is a threat to public safety."[6]  Other examples are the 54-year-old grandfather of two U.S. citizens whose sole non-immigration offense is for shoplifting and the 57-year-old Walmart employee with hypertension whose only criminal history is immigration fraud.  As Judge Chhabria found in similar circumstances, "ICE's insistence on opposing these bail applications on a blanket basis has led it to take some positions that are downright irrational, not to mention

---

"offered diagrams and photographs demonstrating his efforts to ensure that all beds in such units have at least six feet of space between their heads").  As the government correctly observes, the Court has not yet made a determination regarding a safe population level at BCHOC.

[5] Defs.' Input Apr. 7 List, Ex. 1 at 1, ECF No. 50-1.

[6] Defs.' Input Apr. 8 List, Ex. 1 at 1, ECF No. 58-1.

inhumane." Zepeda Rivas v. Jennings, No. 20-cv-02731-VC, 2020 WL 3055449, at *2 (N.D. Cal. June 9, 2020).

**B.   Testing and Contact Tracing**

The other two pillars supporting the Court's ruling of a likelihood of deliberate indifference were the inadequate testing and contact tracing at BCHOC.

Regarding contact tracing, the government claims that "BCHOC was doing the same form of contact tracing done by most other Sheriffs' Offices," faults the Court for relying upon the "silence" of the record when it "never asked for evidence of the contact tracing," and adds: "Nor was contact tracing the standard of care for correctional facilities at the outbreak of the litigation." Mot. Recon. 24. These arguments are unpersuasive. Contact tracing absolutely was the standard of care for correctional facilities from the outset -- indeed, the CDC required self-quarantining for "close contacts" of COVID-19, as the Court observed in its prior opinion and has now reiterated in the first part of this memorandum. In any event, the Court properly looked beyond "the outbreak of the litigation" to the ongoing developments up to the date of the preliminary injunction. See Savino, 2020 WL 2404923, at *8 (citing Farmer v. Brennan, 511 U.S. 825, 846 (1994)). The silence of the record spoke volumes.

The government also chides the Court for relying on the lack of testing for asymptomatic individuals since "no one was recommending widespread testing for asymptomatic persons before the end of April." Mot. Recon. 18. The Court is aware and appreciates that COVID-19 tests were scarce through March and part of April, and that the expert recommendations have evolved during this litigation. For instance, the CDC now recommends, reflecting changes apparently made on June 13, "testing for asymptomatic individuals without known or suspected SARS-CoV-2 exposure for early identification in special settings," such as in "correctional and detention facilities."[7]

The preliminary injunction was issued on May 7. By then, strategic testing of <u>at least some</u> asymptomatic detainees and staff had become both necessary and feasible. In Massachusetts, "[o]n April 22, 2020, large-scale mobile testing became available to the [Department of Correction], and it began administering tests to any inmate or patient who voluntarily

---

[7] CDC, Overview of Testing for SARS-CoV-2 (revised June 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html (last accessed June 16, 2020). On May 11, at the White House's official televised COVID-19 briefing, Admiral Brett Giroir stated "[r]ight now, in America, anybody who needs a test can get a test," including for purposes of "contact tracing" and "asymptomatic surveillance" -- and he had earlier stated that this group "include[s] those who are in prisons." White House, Remarks by President Trump in a Press Briefing on COVID-19 Testing (May 11, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-covid-19-testing/.

agreed to be tested, facility by facility." Foster v. Commissioner of Corr., 484 Mass. 698, 2020 WL 2844516, at *7 (Mass. June 2, 2020); see id. at *16 (declining to find deliberate indifference in part because "increasingly throughout the month of May, the DOC has begun widespread testing of nonsymptomatic inmates, as well as offering testing to all correction officers upon request"). On April 23, the Federal Bureau of Prisons ("BOP") announced it had acquired rapid testing equipment which would be used, in part, to test "asymptomatic inmates" to "assist the slowing of transmission with isolating those individuals who test positive and quarantining contacts."[8] On April 27, the CDC, White House, and FDA released a "Testing Blueprint" recommending that "congregate living settings" should "actively" perform "sentinel monitoring," which "involves targeted, voluntary testing of asymptomatic individuals."[9]

By May 7, the government had been aware for several months that asymptomatic individuals can spread the virus. Clearly, some form of asymptomatic testing (not necessarily universal,

---

[8] BOP, Bureau of Prisons Expands COVID-19 Testing (Apr. 23, 2020), https://www.bop.gov/resources/news/pdfs/20200423_press_release_covid19_testing.pdf.

[9] White House, CDC & FDA, Testing Blueprint 3 & n.1 (Apr. 27, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/04/Testing-Blueprint.pdf.

but something) should have been on the government's radar and actively pursued. The record revealed no efforts or general strategy to test at least some asymptomatic detainees and staff.[10] On May 1, the superintendent affirmed that BCHOC "is not doing asymptomatic testing."[11]

## IV. CONCLUSION

The government emphasizes "that BCHOC has a virtually-perfect record of no confirmed positives among the detainee population" and that "[n]o one knows which steps, or what combination of measures, is responsible for the remarkable limit of COVID-19 among the ICE detainees." Population Mem. 3. That is true. Yet, just as "the increased rate of infection" does not itself prove deliberate indifference, Swain, 2020 WL 3167628, at *7, the absence of known infections does not disprove deliberate indifference.

We are not yet out of the woods.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[10] The exception is the group of twenty detainees who were tested on May 1 following the violent episode in Unit B, where one detainee tested positive (but then tested negative two days later). See Savino, 2020 WL 2404923, at *10.

[11] Decl. Oren Sellstrom Supp. Pls.' Mot. Prelim. Inj., Ex. D, Dep. Steven Souza 318:9-12, ECF No. 151-4; see also id. at 280:15-16 ("We do not do testing on staff. We direct them to their [primary care physician].").