### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

_____
                                            )
**MARIA ALEJANDRA CELIMEN SAVINO**   )
**and JULIO CESAR MEDEIROS NEVES,**    )
                                            )
**Petitioners-Plaintiffs,**                   )
                                            )     20-cv-10617 WGY
      **v.**                                    )
                                            )
**THOMAS HODGSON, et al.,**          )
                                            )
**Respondents-Defendants.**          )
_____)

### SECOND SUPPLEMENTAL BRIEF ON REVOCATION OF BOND

During the hearing on June 15, 2020, the Court ordered Defendants to provide it with the paperwork given to the released detainees by ICE and, if applicable, by its contractor, BI. Those papers are appended hereto. In addition, Defendants respond to the claims made regarding purportedly conflicting instructions given the released detainees regarding the terms of their release.

It is worth noting, however, that the obligation to inform released detainees of the terms of their bail fell upon Plaintiffs' counsel as well as on ICE. Counsel has acknowledged that. There is no real dispute that the released detainees were informed of the initial fourteen-day quarantine. Nor is there any dispute that since May 22, 2020, their counsel has been aware of their violations of the home confinement provision. Given the continued violations of the bail order after that date, it is apparent that counsel cannot, or will not, control their clients' behavior and the released detainees will not comply with the Court's conditions. Any debate as to what they were told, when and by whom, is essentially irrelevant as it *at most* goes to the period after

the fourteen day quarantine and May 22, 2020.  And, of course, even this carve out is notably generous given that Defendants' dispute regarding what the detainees were told.[1]

Of interest in this regard is the fact that only 25% of the detainees released by the Court have been so confused as to the terms of bail that they could not comply.  If the misinformation was routine, then one would expect more detainees to be violating the bail conditions.  The fact

---

[1] Plaintiffs have mischaracterized what Assistant Field Office Director Immaculata Guarna-Armstrong said.  She did **not** say that ICE officers gave inconsistent information, she said the *opposite*.  This is what she said:

> "For each alien ordered released by Judge Young, ICE provided such alien with an Order of Recognizance or an Order of Supervision setting forth the terms and conditions of such release, to include the Court ordered terms and conditions. The Orders of Recognizance and Supervision provided to the aliens ordered released by Judge Young included Judge Young's standard bail order that mandated compliance with all conditions deemed appropriate  and imposed  by ICE and also required that the  releasees be fully quarantined for 14 days from date leaving facility to the residence and  that during and after the 14-day quarantine,  releasees will remain under house arrest  and  I have also contacted the BI offices that provide assistance to ICE in monitoring the ATD program. shall not leave the residence for any reason save to attend immigration proceedings or attend to their own medical needs should those needs be so severe that they have to go to a doctor's' office or hospital (in which case they shall notify ICE as soon as practicable of their medical necessity). ICE ERO Boston officers explained the contents of the Order of Recognizance or Order of Supervision to the aliens ordered released by Judge Young prior to release. ICE also received signatures for such aliens on the Order of Recognizance or Order of Supervision to reflect understanding of the terms and conditions contained within such Orders."
>
> Based upon this contact, I have learned that BI contractors may have provided information contrary to the Court's order of home confinement if asked QY a number of the below releasees."

Declaration of Immaculata Guarna-Armstrong, Assistant Field Office Director, Ex. 1 to dkt. # , ¶¶  8-10, 49.  While AFOD Guarna-Armstrong found that ICE contractors, BI, *may* have given conflicting information, this is not ICE officers per se, and cannot override the clear written instructions given the detainees, the oral instructions upon release and, of necessity and presumption, the advice given by their attorneys.

that they are not reinforces Defendants' position: **all** released detainees were given written instructions regarding the Court's terms and conditions of bail.

### A. Status Update

**1. Jose Alejandro Beltran-Araujo:** On June 10, 2020, apparently not satisfied with simply violating the home confinement condition, **Jose Alejandro Beltran-Araujo** severed the strap of his OPS unit and absconded. Supplemental Declaration of Assistant Field Office Director Immaculata Guarana-Armstrong, attached hereto as Exhibit 1. Two days before, he was arrested by the Stamford Police Department and charged with violation of a protective order. *Id.* According to the police report, officers responded to 18 E. Walnut Street for a report of a female that was struck. *Id.* Upon investigation at the scene, the Officers noted that the alleged victim "kept concealing the left side of her face with her long hair [and] appeared nervous." *Id.* The alleged victim would not admit to any physical abuse by Mr. Beltran-Araujo, but the officer asked her to pull her hair away from her face, and when she did, the officer "observed that her left eye was swollen and she had a visible dark red bruise around her eye like a black eye." She eventually told the officers that "she hit her eye against a door." *Id.* ERO has been unable to locate Beltran-Araujo, who was released by the police. *Id.*

Prior to these incidents, Beltran-Araujo repeatedly violated the Court's bail order by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Violations continued after April 26, 2020 with a total of more than 250 violations until he cut the bracelet on June 10, 2020. *Id.*

This is precisely the outcome Defendants were concerned about in opposing the release of Beltran-Araujo and other detainees with a history of violence. While he has not been charged with assault and battery, it is hardly a stretch to conclude that, more likely than not, he hit his

girlfriend after drinking at a party (which he admitted) where he should not have been in the first place (there was a valid restraining order in place requiring him to keep away from his girlfriend and the 18 E. Walnut Street address). *Id.*

**Update:**  Beltran-Araujo has still not been located, nor has his GPS device.  His GPS device now has a dead battery and is not reporting, but, as indicated above, it had been cut off by Beltran-Araujo.

**2. Gabino Del Angel Moran**:  Mr. Del Angel Moran was previously reported to the Court as a violator on May 22, 2020.  In the intervening period, **after counsel was on notice,** from May 23 to June 14, 2020, he violated 451 times.

**Update:**  From June 10 to June 14, 2020, Mr. Del Angel Moran violated his home confinement 66 times. Thus, from the time that he should have known unequivocally that he was required to stay home, he violated the Court's order over 500 times.

It appears that a BI contractor, Michelle Oviedo, told him he cannot leave the states of NH, CT, RI, and MA on a call on April 14, 2020. She also states that she informed him on June 5, 2020 that he is on home confinement and he acknowledged that and said his lawyer had made him aware of the restrictions.  However, his violations continued after June 5, 2020 and he should have ceased violating shortly after May 22, 2020 when his counsel was aware of his violations and should have (and apparently did, but to little avail) re-notified him that no matter what anyone said he was to remain at home absent a medical appointment.

**3. Carlos Gutierrez-Deleon**: As previously stated, Deleon's ATD compliance report shows repeated violations of the quarantine and house arrest order between April 10, 2020 and May 8, 2020. An updated report shows violations continued between May 9, 2020 and May 22, 2020 with twenty-seven additional violations and as many as seven violations occurring on one

day. **After counsel was on notice,** between May 23, 2020 and June 14, 2020, he violated the Court's order an additional forty-one times with as many as five violations occurring on one day. He was caught by photograph going shopping and outside his home. (41 to 6/14)

As stated in the declaration of Immaculate Guarana-Armstrong, exhibit 1 to the Supplemental Brief on Revocation, dkt. # , ¶ 27, ICE disputes Mr. Gutierrez-Deleon's claim that an ICE officer advised that he could leave his home for food. There is no "Officer Souza" at the ICE ERO Burlington office. *Id.* ICE records do indicate that Mr. Gutierrez-Deleon did call on May 1, 2020 to inform that he was going to the hospital, and the ICE records indicate that the ICE officer informed him that he could go to the hospital. *Id.*

**Update:** On June 13 and 14, Mr. Gutierrez-Deleon violated his bail order three more times. *See* Ex. 1 hereto, ¶ 22.

**4. Cesar Vargas**: Mr. Vargas repeatedly violated the Court's bail order by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Between April 11 and April 25, 2020, there were eight such violations during the quarantine period. Between April 26 to May 8, 2020, there were forty additional violations, with violations occurring each day. Additionally, violations continued between May 9, 2020 and May 22, 2020 with forty-five subsequent violations and as many as eight violations occurring on one day. **After counsel was on notice,** between May 23, 2020 and June 3, 2020, he violated the Court's order an additional thirty-eight times with up to seven violations per day on three occasions. (46 to 6/14)

**Update**: Mr. Vargas has violated the home confinement dozens of times since June 12, 2020. He provided ICE/BI with a residential address in Revere but his GPS unit showed him all over Revere, Chelsea, Boston, Watertown, and Pawtucket, RI between June 14 and June 23,

2020. ERO tried to talk to him at the Pawtucket address but he did not answer yesterday. BI contacted him and he called back and said he was in Cambridge, MA at the time his GPS showed him in Pawtucket. *See* Supplemental Declaration of AFOD Guarna-Armstrong, attached hereto as Exhibit 1.

It does appear that a BI contractor, Samantha Solis, provided documentation to Mr. Vargas that indicated he could not leave the states of NH, CT, RI, and MA and that all clients under her supervision are advised of this restriction. See attached declaration of Samantha Solis. This should not have superseded the written release paperwork given to Mr. Vargas on his release and certainly does not excuse any violations after May 23, 2020 when he should have been made aware of the Court's order by his counsel.

**5. Kavon Mahadeo:** This man also repeatedly violated the Court's bail order by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Between April 11 and April 25, 2020, there were one hundred and five (105) such violations during the quarantine period. Between April 26 to May 8, 2020, there were between four and nineteen violations every day. Violations continued between May 9, 2020 and May 22, 2020 with one hundred twenty-nine (129) subsequent violations and as many as fifteen violations occurring on one day. **After counsel was on notice,** between May 23, 2020 and June 13, 2020, he violated the Court's order an additional one hundred and twenty-three times, with up to ten violations per day on three occasions.

**New information**: As a follow up to Mahadeo's claim, DO Moran stated the following:

> To the best of my knowledge I do not recall having a conversation with Beronica about this. More specifically, a search of my email, phone and text messages on 6/10/2020 revealed I did not call, text or send an email to Beronica. The only communications I had with Beronica on 6/10/2020 was her emailing me about violations of other participants on my docket, none of which I replied to.

6

>Additionally, none of the emails she sent to me on 6/10/2020 were pertaining to Kavon Mahadeo.

Previously, AFOD Guarna-Armstrong stated that ICE disagrees with Mahadeo's claim that "prior to his release a male ICE agent told us that we could leave the house after 14 days." Decl. at ¶¶ 32-33. AFOD Guarna-Armstrong also stated with the ICE ERO Officers that have been in contact with the releasees that such Officers, if ever asked about release conditions or home confinement, directed the releasees to comply with the Court's order of release. *Id.* She also noted that Mr. Mahadeo's release paperwork was signed by two female ICE officers, Supervisory Detention and Deportation Officer Yolanda Marfissi and Deportation Officer Jennifer Saravi . *Id.*

**6. Desmond Joseph**: Mr. Joseph has also repeatedly violated the Court's bail order, by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Such violations included twelve violations between April 11 and April 25, 2020 during the quarantine period, and daily violations of between six and twelve times each day from April 26 to May 8, 2020. Additionally, violations continued between May 9, 2020 and May 22, 2020 with seventy- one additional violations and as many as ten violations occurring on one day. **After counsel was on notice,** between May 23, 2020 and June 9, 2020, he violated the Court's order an additional forty-nine times with up to eight violations on one day.

**Update:** From June 12 to 14, 2020, Mr. Joseph violated the home confinement condition three more times.

**ICE's position regarding the claimed misinformation:** Mr. Joseph makes a claim like that of Kavon Mahadeo that an unnamed male ICE officer told him it was okay to leave the house after the 14-day quarantine period.  AFOD Guarna-Armstrong disputed this claim in her

7

declaration at ¶¶ 35 & 36.  Just as with all the released detainees, ICE officers referred Mr. Joseph to the terms and conditions of the Court's order incorporated expressly in the release papers.  Moreover, as with Mr. Mahadeo, Mr. Joseph was processed for release by two female ICE officers, not by a male.  Finally, Mr. Joseph's claim does not explain why he did not stay at home during the quarantine period, as to which he makes no allegation of misinformation, nor the period after counsel was put on notice that he was violating.  He violated fifty-two more times from May 23, 2020 to June 14, 2020.  In the attached declaration of ICE Deportation Officer Daniel J. Moran, he refutes the allegation from Kavon Mahadeo that DO Moran told "Veronica" at BI that Mahadeo could leave his residence. While it is true that Beronica Perez's declaration indicates that she spoke with Desmond Joseph and told him he could not leave the states of NH, CT, RI, and MA, that does not excuse his violation of the initial quarantine period nor the violations after May 23, 2020.   And given that he had paperwork that accurately stated the condition of home confinement, it is questionable whether Perez's statement excuses *any* of the violations.

    **7. <u>Pamlar Ferreira</u>**: Ms. Ferreira has also repeatedly violated the Court's bail order by failing to remain quarantined  for the 14-day period immediately following release and by failing to remain under house arrest thereafter. There were twenty-two violations between April 11 and April 25, 2020 (during the quarantine period), and fifty violations from April 26 to May 22, 2020, with up to five violations  occurring on one day.  **After counsel was on notice,** between May 23, 2020 and June 3, 2020, she violated the Court's order an additional fifty-four times with more than five violations per day on six days.

    **Update:**  Ms. Ferreira has not violated home confinement since June 3, 2020.

    **8. <u>Lucas Valentim</u>**:  Mr. Valentim violated the Court's bail order by failing to remain

quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Such violations included eleven violations on May 5 and May 6, 2020. Violations continued between May 9, 2020 and May 22, 2020 with thirty additional violations, and up to seven violations occurring on one day. **After counsel was on notice,** between May 23, 2020 and June 14, 2020, he violated the Court's order thirty-one times with up to six violations on one day.

On June 8, 2020, he violated the Court's order eight times. On this date, Mr. Valentim called BI to ask if he could leave his house to be tested for COVID-19. The BI specialist authorized his absence from his house for a medical visit. Beginning at 2:53 PM, GPS tracking points noted that he travelled to Norwood, MA, Burlington, MA (two different addresses), Attleboro, MA, and Pawtucket, RI (four different addresses not identified as his residence). None of the addresses he went to were medical facilities or pharmacies where medical testing is typically conducted.

**Update:**  After June 15, 2020, there have been no new violations.

9. **Ranferi Ramirez-Maldonado:**   This man violated the Court's bail order by failing to remain under house arrest after the quarantine period. Such violations include seven separate occasions between April 27, 2020 and May 6, 2020. Violations continued between May 8, 2020 and May 22, 2020 with twenty-four subsequent violations. **After counsel was on notice,** between May 23, 2020 and June 8, 2020, he violated the Court's order an additional twelve times.   (18 to 6/14)

**Update:**  From June 10 to 15, 2020, Mr. Ramirez-Maldonado violated the Court's order seven more times.  He thus disobeyed the Court's order at least nineteen times *after* he should have been unequivocally aware of the home confinement condition (although it is Defendants'

9

position that the condition was clearly stated in the paperwork and instructions given each released detainee at release).

    10.  **Marvin Arreaga**:  Mr. Arreaga has also repeatedly violated the Court's bail order by failing to remain quarantined for the 14-day period immediately following release and by failing to remain under house arrest thereafter. Such violations included twelve violations between April 11 and April 25, 2020 during the quarantine period, and forty-eight violations from April 26 to May 6, 2020. Violations continued between May 7, 2020 and May 22, 2020 with seventy additional violations, and up to nine violations on one day.  **After counsel was on notice,** between May 23, 2020 and June 8, 2020, he violated the Court's order an additional eighty-two times with more than five violations per day on ten days.  These violations included working on a job away from his home, where he was caught on camera.[2]  *See* Exhibit 1 hereto.  (93 to 6/14)

    **Update:**  Upon the Court revoking Mr. Arreaga's bail, ICE ERO arrested Mr. Arreaga on June 16, 2020. After his arrest, he was transferred to the Franklin County House of Correction in Greenfield, MA.  Upon his admission to Franklin County, he was tested for COVID-19 as such testing is occurring at that facility for new admissions. Mr. Arreaga was asymptomatic, but his COVID-19 test returned as positive on June 17, 2020. Mr. Arreaga remains detained at Franklin County.  ICE staff, and unknown civilian personnel, were exposed to COVID-19 by Arreaga's reckless violations of the Court's bail order.

---

[2] ICE does have an electronic record of receiving a call from Mr. Arreaga at which time he asked if he could throw the trash away at his residence. However, ICE does not have any electronic record of receiving a call from him in which he asked if he could leave his house for work.

### B. Defendants Provided Complete and Accurate Release Paperwork

Defendants dispute the claim that the release paperwork was incomplete or inaccurate. Copies of the paperwork provided to the detainees upon release is attached hereto. *See* Exhibits . The conditions of the Court's release order were set forth in the paperwork. *Id.* Some of the detainees gave their counsel incomplete copies, but that is not because they received incomplete copies.

Plaintiffs' counsel has stated that they were aware of potential inconsistencies in the instructions given to released detainees at least as early as April 13, 2020: "We have seen at least some paperwork that indicates this [providing the Court's order] has happened for some class members, but it is not clear to us that this has been ICE's consistent practice." *Id.* at ¶ 4. And, presumably, this is what led to the following statement:

> Plaintiffs' counsel for their part have reiterated the Court's conditions to released class members on multiple occasions, *beginning upon release* and continuing over the last week since receiving Defendant's Motion for Reconsideration. Whenever Plaintiffs' counsel become aware of release paperwork that is inconsistent or inaccurate, it is our practice to reiterate the Court's conditions to class members. Similarly, whenever Plaintiffs' counsel become aware of statements by ISAP that are inconsistent with the Court's orders, it is our practice to reiterate the Court's conditions to class members and reiterate the importance of following the Court's conditions no matter what ICE's agent tells them.

Decl. of Oren Sellstrom, ¶ 11. Notably, counsel does not claim that their responsibility to inform their clients of the conditions of their bail began upon hearing of allegedly inconsistent instructions to their clients. Their duty existed at the outset.

The upshot of this is that Plaintiffs' counsel have known about the bail conditions since the Court first ordered a release of a detainee, they had reason since at least April 13, 2020 to believe that their clients required additional instruction on the conditions, and the released

detainees had the full bail conditions in writing from the time of their release.  And, yet, they did not comply.  Not only did they not comply with the unmistakable condition of the 14-day quarantine, they also did not comply with the house arrest provisions thereafter.

### C. Erroneous Instructions Do Not Excuse the Violations

Plaintiffs have said that the released detainees got inconsistent and incorrect information from ERO.  ICE has investigated this claim and believes it to be incorrect insofar as it pertains to ERO.  *See* Exhibit 1.  For example, several of the detainees claim that a male ICE officer told them this or that, but they were not processed by male officers.  *Id.*  Moreover, ICE contacted all of the ERO staff in the region and confirmed that no instructions contrary to the Court's order were given by ERO.  *Id.*, ¶ 48 and *passim*.

ICE's investigation has revealed that it's contractor, BI, gave incorrect, or at least misleading, information on a few occasions.  ICE, at least in this region, has not had a situation previously in which immigrants were released on a court order with non-standard conditions.  It did not foresee that BI might refer to standard conditions of release in this setting.  Of course, that will be corrected going forward.  But even the incorrect information from BI was not a direct contradiction of the home confinement condition, it was simply inconsistent.  And it was incumbent upon the detainees to resolve that inconsistency by referring back to the paperwork and instructions they were given upon release and/or calling their counsel.

Further, BI did not give contrary instructions regarding the 12-day quarantine, nor are Plaintiffs claiming they did.  And therefore, *at most*, this would account for some of the violations after the fourteen day quarantine and before May 23, 2020.  On May 22nd, Plaintiffs' counsel became aware that Defendants were claiming that their clients had violated the bail conditions.  And yet, every one of the ten class members listed above continued to violate the

conditions of bail **after the date on which their counsel became aware of the problem.** And, moreover, Plaintiffs' counsel have represented in writing that they were aware of some confusion as to their clients' understanding of the terms of their release as early as April 13, 2020. Sellstrom Decl. at ¶ 4. And almost two months later, in early June, the violations continued, notwithstanding that counsel had notice of actual violations since May 22, 2020 and some concerns regarding the instructions to their clients since early April.

In light of the continued violations, including one class member assaulting his girlfriend and cutting his bracelet, it is clear that Plaintiffs' claim that "[c]lass members have been diligent in trying to do what is required of them…," Sellstrom Decl. ¶ 10, is not true for the ten class members listed here, at least.

### D. Other Matters

1. **Statement by Madelyn Sanchez:** Plaintiffs referenced alleged misstatement regarding the conditions of bail by BI Case Specialist Madelyn Sanchez. Unfortunately, Ms. Sanchez is out of the office on medical leave and it is unknown when she will return.

2. **ICE B restoration timeline:** There is not an exact date when ICE B will be returned to livable condition following on the destruction by the detainees formerly housed there. BCHOC estimates that it will be approximately one additional month before it may be used again.

## CONCLUSION

As stated previously, this is not a situation in which an individual violated meaningless conditions of release. The quarantine and home confinement were essential aspects of the Court's willingness to release detainees in the midst of a pandemic. It was essential for the safety of the community, as the detainees being released had not been tested for COVID-19.

Indeed, one of the released detainees who failed to comply with the home confinement is now positive for COVID-19.  He has exposed others, including his family and ICE officers, to the virus.

Nor is this a situation where the detainees who violated their conditions did it once or twice.  We have hundreds of violations.  And, the violations cannot be excused by shifting blame to the government.  The detainees were given accurate written and oral instructions upon release.  If they got confusing information later, it was incumbent upon them to check with their counsel.  They did not do so.  And, most tellingly, they continued to violate the conditions for at least two weeks after counsel had notice of the violations and, presumably, contacted them to give them clear advice to stay at home.

The Court should revoke bail for all ten of the detainees listed in this brief.  To do anything else would make a mockery of the Court's authority and jeopardize the community into which the detainees have been released.

Respectfully submitted,

ANDREW E. LELLING,
United States Attorney

By:   */s/ Thomas E. Kanwit*
      Thomas E. Kanwit
      Assistant U.S. Attorney
      U.S. Attorney's Office
      John J. Moakley U.S. Courthouse
      1 Courthouse Way, Suite 9200
      Boston, MA  02210
      (617) 748-3100
      thomas.kanwit@usdoj.gov

June 24, 2020

CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                                                                           */s/ Thomas E. Kanwit*

Dated:   June 24, 2020