## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

MARIA ALEJANDRA CELIMEN SAVINO,
*et al.*,

          Petitioners-Plaintiffs,

   v.

STEVEN SOUZA,

          Respondent-Defendant.

Case No. 1:20-cv-10617-WGY

### Second Supplemental Declaration of Kavon Mahadeo

I, Kavon Mahadeo, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge:

1.   My name is Kavon Mahadeo. I was previously held in immigration detention at Bristol County House of Correction, but was released on April 10, 2020 pursuant to Judge Young's order admitting me to bail.

2.   At the time of my release, I was fitted with an ankle monitor. ICE agents told me I must quarantine for 14 days but afterwards could leave my residence. Once I began having calls with ISAP, ISAP also told me I could leave my residence and even the state. All of this is detailed in my first declaration. Exhibits Under Seal Filed with ECF 202.

3.   On June 10, 2020, I had a scheduled check-in with ISAP over the phone. I spoke with a woman named Veronica, who insisted that I was allowed to leave the home. The specifics of that check-in are detailed in my first supplemental declaration. ECF 221 at 6.

4.   On June 16, 2020, I spoke with Alec Jessar, a law intern working on *Savino v. Souza*, about the hearing on June 15 regarding bail revocation and my compliance with release conditions. He informed me that the government has alleged that I have violated the terms of my release on bail hundreds of times since the date of my release.

5.   These allegations are simply wrong. There is no possible way that I violated bail conditions the hundreds of times that ICE alleges that I did.

6.   Specifically, I stayed on the premises of the hotel where I have been living from April 10 to April 29. I reported the address of the hotel, 63 Grand Street Waterbury, CT 06702, to the government at the time of my release. They have been aware that I have been living at

the hotel since I was released. I did not leave the hotel premises at any point during this period. Yet, the government has alleged that I violated my bail conditions 105 times during that period of time.

7.    I do not know how the government came to that conclusion. Perhaps, the government is alleging that I violated my bail by leaving my hotel *room*. It was my understanding that I was allowed to leave my *room* as long as I remained on the premises of the hotel. But, even if I went to the parking garage or lobby, there is no way that I did so 105 times, as ICE is claiming. I only went to the parking garage or to smoke 2-3 times per day, at most. The reason I went outside to smoke was that smoking in the hotel is not allowed. I also have reason to believe that ISAP's allegations are incorrect, because they actually admitted this to me in a phone call which I describe below in ¶ 12.

8.    I left the hotel premises after April 29 only when Madelyn, my case manager at ISAP, informed me that I was no longer on house arrest. I thought that ISAP was part of ICE and that ICE would know better than me what the conditions of release were, since I was in their custody.

9.    During the time when I believed, based on ISAP's instructions, that I could leave home, I left the room between three and six times per day, at most. It is not accurate that I left the hundreds of times as ICE is claiming. The idea that I left the hotel ten, eleven, twelve, thirteen, or fifteen times in a single day is wrong.

10.   After my lawyers informed me that ISAP's explicit instructions to me were wrong, and that I was still subject to house arrest, I stopped leaving the hotel premises. I even stopped going to the parking garage, to be extra careful. The reason I had been going to the parking garage was also to help my fiancée carry things up to the room. She is six months pregnant. But I stopped this after my lawyers told me that ISAP's instructions were wrong.

11.   I am aware that in its filing on June 24, the government is claiming that I violated bail 35 times between June 4 and June 9, and 15 times between June 12 and June 13. During that time, I remained on the hotel premises, always. That is what I understood house arrest to mean. All I did was go to the lobby and just outside the door to smoke. It is impossible that I could have violated the amount of times the government is alleging. The government admits that it received no violations between June 15 and June 18.

12.   On June 1, the hotel had a mandatory evacuation due to an emergency. I was in my room watching TV when the fire alarm went off. A recording told everyone to go downstairs and to use the stairs, not the elevator. When I got downstairs, hotel employees were ushering everyone to the street next to the hotel. We all waited there while the fire department and police arrived and searched the building. We waited for about two hours. Then the hotel employees told us we could go back inside. I went straight back to my room.

13.   On June 17 at 10:44 am, I received a call from ISAP. The woman asked me where I was. I told her I was in my room. She said she was not getting a clear signal of my location. She told me to go outside to reset my battery when it died. She told me that ISAP had been

picking up "drafts" due to different wi-fi signals coming from the buildings surrounding the hotel. She said that as a result of this, they had been receiving inaccurate data from my monitor. As an example, she told me that when I was in my room, ISAP might read my monitor as being down the street. She seemed to me to be implying that ISAP had been receiving inaccurate data ever since April 10.

14.     This is not the first time that something like this had happened. In mid-May, Madelyn told me that she was not sure where I was. I was at the hotel, and I told her this. She said that they were having problems with their system. She said that the monitor sends data to their system every couple of minutes, and she might have to refresh it. But she had not really cared about my location, because she had told me that I was allowed to leave the hotel anyway.

15.     A couple of weeks ago, I was in the lobby (when I thought I was allowed to be in the lobby, as long as I did not leave the premises), and Google Maps on my phone showed me as being down the street. This GPS problem was consistent with what ISAP was telling me about the problems with their system.

16.     I told the woman (on the June 17 call) that I was on house arrest, but she told me that it was fine for me to go outside to change the battery and smoke as long as I didn't leave the property. I believed that it would be worse *not* to listen to ISAP. I thought I would get in trouble for refusing to go outside when they told me to.

17.     The monitor was flashing at that moment, so I grabbed a battery, which I had been charging, from right next to my bed, went just outside the hotel doors, switched the battery, and went directly back to my room. I believe that the woman who called was either Madelyn or Rochelle Gaines, but I am not positive.

18.     The next day, June 18, at 9:44 a.m., I received a call from ISAP, from the number 860-296-0067. The woman told me that her name was Rochelle. She asked me to go outside and change the battery again. When I told her I was on house arrest, she said the same thing that the woman they day before had said. She also told me that it was okay for me to smoke on the property of the building. She said that she knew that I smoke. I walked outside and changed the battery, and then went directly back to my room.

19.     On June 23 at 3:17 pm**,** I called ISAP to check to see that the problems were fixed. I asked to be transferred to speak with Rochelle Gaines. Rochelle told me that the GPS problems seemed to have been fixed. As we were saying goodbye and hanging up, she told me, "Just make sure you smoke close to the building."

20.     I have not left the hotel's premises since May, when my lawyers informed me that I was still under house arrest regardless of what ISAP continues to tell me.

21.     On June 24, my monitor was beeping again, showing a low battery. I changed the battery inside of my room at 11:55 am. I did not leave.

22.     On June 24, as I finalized this declaration, I opened up Google Maps. I was in my room, but the map showed me as being across the street at Webster Bank. This makes me think

that GPS devices in the area, including my monitor and my phone, are not giving accurate readings.

23.     I am doing everything in my power to comply with the court's conditions and will continue to do so. It is confusing and frustrating that ISAP continues to tell me that it is okay to leave, and that they specifically ordered me to leave on two occasions. They are authority figures, and I worry that if I do not listen to them, I will get in trouble. I am also frustrated by all of the inaccuracy in location readings. I know my freedom is at stake here, and I do not want it to be taken away based on GPS errors. I know that it is in my interest to do exactly what the court says.

24.     I am aware that Defendant submitted a declaration from Beronica Perez, who told me that I was not on house arrest. Ms. Perez's declaration does not include anything about me.

25.     I am aware that Defendant submitted a declaration from Mr. Moran, my deportation officer. Mr. Moran indicates that he has never had contact with me. This is true, despite the fact that I have indicated numerous times to ISAP staff that I would like to speak with Mr. Moran. As I previously noted in my declarations, ISAP staff told me that they would speak for Mr. Moran.

26.     I am aware that Defendant provided a declaration from Mr. Hyde. Mr. Hyde's description of the day of release matches mine. He indicates that he sent me from one area to another, and that in the second area, I was fitted with the ankle monitor. It is in the second area, where Mr. Hyde was not present, that the ICE officer I reference in my first declaration told me I was not on house arrest after 14 days.

27.     I did interact with Mr. Hyde on the day of release. Defendant's brief filed on June 24 says that I was not processed by a male officer. Mr. Hyde's declaration is proof that that statement is not true.

28.     Defendant claims that I was processed by two female officers (Officer Marfissi and Officer Saravia). Yet, Mr. Hyde's declaration indicates that he signed the release paperwork *for* Officer Saravia. Further, Officer Marfissi never mentions me in her declaration.

29.     I never claimed that I was not processed by female officers. I was processed by both female and male officers.

30.     I mention these details to show the Court that the release day was confusing, with much going on. To me, all of these officers were authority figures. I did not know their names. But I do know that I was processed by two male officers, one of whom may have been Mr. Hyde but another of whom told me that I was not on house arrest following the 14-day quarantine. Defendant has contradicted himself and has not at all contradicted what I declare to be true to the best of my knowledge, that an ICE officer told me that I was not going to be on house arrest after 14 days.

31.     This declaration was read to me in English and I swear it is true. I have authorized Alec Jessar, a law intern working on *Savino v. Souza,* to sign it for me.

Date: June 25, 2020

/s/ Kavon Mahadeo
Kavon Mahadeo